IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LATHAM INTERNATIONAL, INC., *et al.*[1] | ) | Case No. 09-14490 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## DECLARATION OF MARK P. LAVEN IN SUPPORT OF FIRST DAY MOTIONS

I, Mark P. Laven, hereby declare that the following is true to the best of my

knowledge, information and belief:

1.      I am the President and Chief Executive Officer of Latham International,

Inc., Latham Manufacturing Corp. and Kafko (U.S.) Corp., and I am the Chief Executive Officer

of Viking Pools, LLC, and Coverstar, LLC (collectively, these entities are referred to as the

"Debtors" or the "Company"). I submit this declaration (the "Declaration") in support of the

Debtors' petitions and "first day" motions and applications, described further below

(collectively, the "First Day Motions"). Except as otherwise indicated, all statements in this

Declaration are based upon my personal knowledge my review of the Debtors' books and

records, relevant documents and other information prepared or collected by the Debtors'

employees or my opinion based on my experience with the Debtors' operations and financial

---

[1] The Debtors in these cases, along with the last four digits of each Debtors' federal tax identification numbers and their respective addresses, are: Latham International, Inc (9049), 787 Watervliet Shaker Road, Latham, NY 12110; Latham Manufacturing Corp. (9130), 787 Watervliet Shaker Road, Latham, NY 12110; Viking Pools, LLC (2924), 1473 Industrial Park Road, Jane Lew, WV 26378; Coverstar, LLC (1935), 1795 West 200 North, Lindon, UT 84046; and Kafko (U.S.) Corp. (0638), 787 Watervliet Shaker Road, Latham, NY 12110.

condition. In making my statements based on my review of the Debtors' books and records, relevant documents and other information prepared or collected by the Debtors' employees, I have relied upon these employees accurately recording, preparing or collecting any such documentation and other information. If I were called to testify as a witness in this matter, I could and would competently testify to each of the facts set forth herein based upon my personal knowledge, review of documents, or opinion. I am authorized to submit this Declaration on behalf of the Debtors.

2.      I joined the Debtors in 1975 as a sale representative and in 1982 I acquired Pacific Industries, Inc. and its related subsidiaries (collectively, "Old Latham") from my father, who founded Old Latham in 1956. Since then, I held several management positions at Old Latham before becoming President in 1987. I sold Old Latham to Cookson Group PLC in 1989 and left the company in 1992. In the years from 1992 to 2001, I was a self-employed investor and a management consultant. In December 2001, I assembled a group of investors and reacquired Old Latham from Cookson. We made two additional acquisitions before selling a majority interest in Old Latham in 2004 to Brockway Moran & Partners ("Brockway") and Splash Holdings, Inc. which is an indirect wholly owned sub of Pool Corporation ("Splash Holdings").

3.      Part I of this Declaration describes the business of the Debtors and the developments that led to their filing for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). Part II of this Declaration sets forth the relevant facts in support

of the First Day Motions filed concurrently herewith in support of their chapter 11 cases (the "Cases").[2]

## PART I

**A.  Overview of the Debtors and their Operations**

### Introduction

4.    Latham Manufacturing Corp. ("Latham") is the largest manufacturer of in-ground swimming pool components and pool accessories in North America.  Latham was founded in 1956 and is headquartered in Latham, New York.  Latham's diversified product line includes customized in-ground and ready-to-order above-ground vinyl pool liners, polymer and steel pool wall systems, steps and ladders, pool safety covers, spillover spas, one piece fiberglass pools, automatic pool covers, and a variety of other pool related accessories, sold under highly recognized brand names such as Pacific Pools™, the Elite Pool®, Sterling Pools®, Kafko®, Viking Pools®, CPC®, Coverstar®, Performance Pool®, Frontier®, Technican™, Trillium®, Premium Pool™, and Triac®.  Latham's products are primarily sold to the in-ground pool market both through a wide range of business-to-business distribution channels in the U.S., Canada and Europe as well as directly to pool builders and dealers.

### Business Operations

5.    Latham has seven main product lines:  (1) Vinyl Liners; (2) Pool Steps and Ladders; (3) Spillover Spas; (4) Polymer and Steel Wall Systems; (5) Automatic Pool Cover

---

[2] Capitalized terms not defined herein have the meanings ascribed to them in the First Day Motions.

Systems; (6) One-Piece Fiberglass Pools; and (7) Pool Safety Covers and Other Pool Accessories.

*Vinyl Liners* – The Company manufactures vinyl liners for in-ground, above-ground, and on-ground pools in a broad range of thicknesses, brands and patterns. These vinyl liners are available in virtually any size and shape, and the Company offers the largest selection of vinyl liner patterns in the industry. Due to various consumer tastes and the number of brands, Latham offers the widest selection of specific patterns. All of Latham's vinyl liners are well-known for their quality and durability.

Latham currently manufactures vinyl liners in seven (7) facilities throughout the United States and Canada. Above-ground vinyl liners are made in standard shapes and sizes. Due to the unique measurements of each custom vinyl-lined in-ground pool and the construction preferences of individual builders, all of Latham's in-ground liners are fabricated according to the specific customer's order dimensions. The Company typically manufactures above-ground liners in a made-to-stock manner during non-peak periods in order to maintain level employment for a core production staff and to enable it to dedicate 100% of its manufacturing capacity to made-to-order in-ground liners during peak season. Thus, inventory is built in the off-season to service builder orders during the peak pool season and throughout the year.

*Pool Steps and Ladders* – The Company offers the widest selection of pool steps in the industry, including thermoplastic, steel, and fiberglass construction. The Company produces three categories of pool steps: thermoplastic steps, fiberglass steps, and steel steps. Latham invented thermoplastic steps and patented the Totally Encapsulated System (TES)

feature which helped the Company to achieve the leading market share due to its strength and ease of construction. Each thermoplastic pool step is manufactured from a solid sheet of high density co-extruded plastic. This design results in a strong single-piece step that resists flexing, delaminating and splintering better than other step systems. The strength and flexibility of the thermoplastic polymer utilized also enables the steps to withstand the stress of frost and back-fill saturation better than other step materials. The steps feature a molded, raised, non-slip tread for safe and easy pool entry and exit. Supporting the one-piece step design is an integrated full-width polymer support structure. This matrix of thermoplastic struts is held in place by a concrete bond beam and includes modular bracing for optional deck support. The Company's *Pacific* and *Performance* brand thermoplastic steps are available in a diverse range of over 30 shapes, sizes, and in three colors to fit virtually any pool design. The Company's thermoplastic step products also feature single piece co-extruded thermoplastic construction and raised tread.

In addition to thermoplastic steps, the Company provides a diverse selection of fiberglass-reinforced acrylic and steel steps. The Company produces over 25 models of acrylic step designs, including drop-in, straight, curved, lagoon, roman and cantilever designs. The Company also offers over 80 designs of steel steps.

Latham manufactures two different above-ground pool ladder models, a "deck-to-pool" ladder and a stand-alone ladder model. The Company's ladders are injection molded using ultraviolet and chemical resistant thermoplastic resin. Latham's above-ground ladders are considered the highest quality ladders on the market due to their durable construction and numerous performance features. Both designs offer features not available on other ladder

models such as molded step treads, five steps instead of the standard four, and the ability to adjust to fit above-ground pool heights of 48 inches, 52 inches and 54 inches.

*Spillover Spas* – Latham manufactures a line of poolside spas for use in conjunction with vinyl-lined pools. Spillover spas share plumbing with the pool, typically utilizing water redirected from the heater or filtration system. Latham's spillover spas are engineered to operate in a number of different ways depending on the end user's preference, including as an isolated unit or with a flow-over feature allowing water to cascade into the pool. The Company's spillover spas are designed to complement both straight and curved walled swimming pools. The Company offers round, octagon, straight and radius models in 6 and 8-person capacities in a number of different colors. The Company's acrylic fiberglass line of spillover spas include 6-person octagonal and round models in a number of different colors.

*Polymer and Steel Wall Systems* – Latham manufactures a diverse range of pool wall panels in both steel and polymer construction. Steel pools comprise the substantial majority of the North American vinyl-lined pool industry, particularly in Canada, where over 90% of the installed vinyl-lined pool base have steel wall systems. Latham's steel wall systems are available in over 200 standard shapes as well as custom designs. Each steel panel is constructed of 14-gauge steel with a rust-resistant galvanized coating. All individual steel panels are kept straight by a matrix of riveted galvanized steel braces. All panels are held in place by a proprietary deck support system and framed steel support structure similar to the thermoplastic structures of its polymer panels. The Company's steel products are well-regarded for their quality and support design, and ease of installation and durability.

Latham's polymer wall panels, similar to steel, are formulated not to dent, decay or corrode and creates an extremely strong, durable panel and support structure. Latham introduced the first polymer wall panel in the industry and now has the leading market share in North America for all polymer pool components. Latham's polymer wall panels are available in many standard shapes and virtually limitless custom designs.

*Automatic Pool Cover Systems* – Debtor Coverstar LLC manufactures a range of motorized automatic pool covers for use in conjunction with new or existing pools. The automatic pool covers can be built into a new pool, and can also be fitted to virtually any pool size and shape under a recessed topguide or the addition of a bench at one end of the pool made from redwood, aluminum, or any durable material. The cover then slides on runners on top of or under the lip of the pool deck to cover the entire pool. The automatic pool covers are operated by a switch (which can be contained in a lockable box for safekeeping) to allow for a quick and easy removal of the pool cover. These automatic pool covers are produced to order.

*One-Piece Fiberglass Pools* — Debtor Viking Pools LLC manufactures a range of one-piece fiberglass pools in a variety of shapes and finish colors. These composite pools combine premium raw materials with a multi-stage manufacturing process, utilizing a ceramic core, sandwiched between two protective layers of specially designed resin and fiberglass. This process adds a greater stiffness to the pool shell and provides enhanced chemical resistance. The Debtors' one-piece, drop-in fiberglass pools are sold through a network of independent dealers throughout the United States and in Canada, and to a lesser extent for export. The one-piece fiberglass pools are sold under the "Viking," "CPC" and "Crystal Place" brand names.

*Pool Safety Covers and Other Pool Accessories* – Latham offers a number of additional pool-related accessories including 'safety covers' which are used to cover pools of all types during the winter season. In order to be designated as a 'safety cover,' the product needs to meet certain ASTM requirements. The Company produces these covers in both 'mesh' and 'solid' materials and sells them under a number of brand names. Safety covers are primarily manufactured between August and November, and the ability to produce covers in the pool building off-season helps the Company sustain level manufacturing operations throughout the year. In addition, the Company produces 'coping,' which joins the pool steel or polymer wall system to the concrete deck or patio. Coping is fabricated from either aluminum or plastic extruded material, and assembled by the builder at the time of pool construction.

6.      In conjunction with its comprehensive branding strategy, Latham utilizes a diverse group of distribution channels in order to maximize its reach to builders in North America. The Company's distribution channels include independent distributors and national buying groups, as well as its internal direct distribution capabilities. Latham's broad product offering, recognized brand names, strong customer service, reputation for quality and relative size of operations compared to smaller manufacturers provide attractive characteristics for customers who are able to purchase multiple products all through the Company as a single source of supply.

7.      The Company uses a network of wholesale distributors, buying groups, pool builders, dealers, retailers and repairs services companies (collectively, the "Retailers"), which sell the Debtors' products to end-user consumer pool owners.

## The Debtors' Corporate Structure and Management

8.      Attached hereto as **Exhibit A** is a detailed chart that sets forth the corporate structure and organization for each entity. Latham is a wholly-owned subsidiary of LII. Debtors Viking Pools LLC, Coverstar, LLC and Kafko (U.S.) Corp. are 100% owned by Latham.[3]

9.      The Company was founded in 1956. In December 2004, the parent company, which was then called Latham International, L.P., and certain of its subsidiaries, including Latham and Kafko (U.S.) Corp., were sold to Latham Acquisition, Corp, which was an acquisition company formed by Brockway Moran & Partners ("Brockway"), a private equity firm, and Splash Holdings. After the sale of the company to Brockway and Splash Holdings, Latham Acquisition Corp. underwent a name change on October 11, 2006, and became Latham International, Inc. ("Latham International").

10.      In September 2005, Latham Acquisition Corp. acquired all of the issued and outstanding equity interests of Debtor Viking Pools, Inc. (which was converted into a limited liability company and renamed Viking Pools, LLC). In June 2006, Latham Acquisition Corp. acquired all of the issued and outstanding stock of Coverstar, Inc. (which was subsequently converted into a limited liability company and renamed Coverstar, LLC).

---

[3] Non-debtor Latham Splash Canada Inc. is a wholly-owned non-debtor subsidiary of Latham, and owns certain preferred non-voting shares of Debtor Kafko (U.S.) Corp.

## B.    Equity, Financing, and Significant Indebtedness

11.    Brockway, through certain of its investment companies, and Splash Holdings each own approximately 35% of the outstanding equity interests in LII. Apollo Investment Corporation owns approximately 4% of the equity interests of LII. The remaining equity interests in LII are owned by officers, employees and former employees of the Debtors.

12.    As summarized below, the Debtors currently owe a total of $197,529,346 in senior indebtedness and unsecured subordinated indebtedness.

13.    Latham is the borrower on the Debtors' secured term loan and revolving borrowing arrangement having entered into a certain credit agreement dated December 30, 2004 (the "Prepetition Credit Agreement") with certain lenders and Wachovia Bank, National Association as administrative agent (the "Prepetition Agent").[4] The other Debtors are guarantors of the obligations of Latham Manufacturing under the Prepetition Credit Agreement as of the Petition Date. The outstanding amount of the term loan is approximately $147.9 million as of the Petition Date (the "Prepetition Financing Claims"). There are no outstanding revolving debt obligations under the Prepetition Credit Agreement as of the Petition Date. The Prepetition Financing Claims are secured by substantially all of the Debtors' assets. The Debtors' remaining indebtedness described below is unsecured.

---

[4] The Debtors' non-debtor Canadian affiliate, Latham Splash Canada Inc., is also a borrower under the Prepetition Credit Agreement, but its obligations are limited to revolving debt obligations under the Canadian facility encompassed within the Prepetition Credit Agreement. There are no outstanding obligations under the Canadian facility as of the Petition Date.

14. In addition to being the borrower under the Prepetition Credit Agreement, Latham Manufacturing is the issuer of certain senior subordinated notes due 2012 (the "Subordinated Debt") originally in favor of Apollo Investment Corporation. The other Debtors are guarantors of the Subordinated Debt. The outstanding amount of the Subordinated Debt is approximately $41,800,000 million as of the Petition Date, and is subordinated to the Prepetition Financing Claims.

15. LII is the ultimate parent of the Debtors and their non-debtor affiliates. LII is the obligor under a promissory note dated December 30, 2004 in favor of Latham International, L.P. (the "Seller Note"), which was executed as part of a prepetition asset acquisition by the Debtors. The outstanding amount of the Seller Note is approximately $7.8 million as of the Petition Date and is also subordinated to the Prepetition Financing Claims.

16. As of November 30, 2009, on an unaudited consolidated basis, the Debtors reported total assets of approximately $66,994,161, including approximately $5,783,601 in accounts receivable and $16,838,340 in inventory, and $239,438,055 in liabilities, which included $2,261,529 in accounts payable and $197,529,346 of long term debt, as discussed more fully below. For the 2009 fiscal year through November, the Company, on an unaudited consolidated basis, reported net sales and losses of $90,190,350 and ($181,414,993) respectively.

## C.    Circumstances Leading to the Commencement of the Chapter 11 Cases

17. Significant declines in market demand for the industry's products over the past three years have resulted in lower sales and significant unused manufacturing capacity in the Debtors' product lines. The downturn in the economy has negatively impacted sales industry-

wide. The Debtors estimate that industry sales for 2009 will be down approximately 45% from 2008 and 70 to 75% from 2005. As a result of declining sales, there is significant excess industry capacity in the market. Historical sales have been best correlated with consumer sentiment and the availability of credit for customers to purchase the Debtors' products. The housing boom earlier in the decade, and corresponding home equity cash outs and rising prices for the Debtors' products, provided robust sales for the Debtors' products and the market in general. However, commencing in 2007 and continuing today, the housing bust and deteriorating economic climate resulted in declining industry sales. The continued downward spiral of consumer sentiment due to the state of the economy has contributed to the declining sales experienced industry-wide. In addition, traditional lenders who provide financing to consumers, such as GE and KeyBank, have ceased lending for pool purchases.

18.     In response to these economic challenges, the Company aggressively worked to mitigate the economic impact caused by the above circumstances. During the period from 2007 to 2009, the Company made significant headcount reductions over each of the Company's divisions. Along with reducing headcount, management has actively worked to decrease the Company's legacy manufacturing footprint, reducing manufacturing facilities from 32 to 15. Additionally, a significant SKU reduction initiative was implemented in order to simplify manufacturing operations and reduce inventory, and the Company is taking advantage of these changes in 2009. This program has been a key component of management's ability to successfully reduce inventory levels and subsequently drive profitability and cash flow.

19.     While these efforts have, in part, helped the Company weather the current economic decline, the Company still requires additional cash to purchase inventory in the near-term in order to operate their business. Because of the seasonal nature of the industry, the Company must spend approximately $25,000,000 during the first half of 2010 to satisfy the Company's peak seasonal working capital needs, as well as to reduce their existing debt load, in order to continue their operations. As a result of these events, the Company is compelled to attempt to effect the financial restructuring described below though the Plan in order to emerge with sufficient liquidity to continue operations.

**D.     The Prepetition Marketing Efforts to Restructure the Company**

20.     In early July 2009, Latham's board of directors (the "Board") engaged Moelis & Company ("Moelis") as its exclusive financial advisor to the Company to assist it in evaluating the Company's restructuring alternatives.

21.     In July, 2009, Moelis performed preliminary business diligence with the Company at its headquarters in Latham, New York. This process included analyzing and discussing industry dynamics and trends, the Company's products and targeted markets, the Company's operations and cost-cutting initiatives, historical financials and profitability metrics, cash flow and profitability projections, and included site visits to certain of the Company's facilities.

22.     In August 2009, Moelis provided the Company with potential alternatives in connection with the Company's restructuring efforts and also with the Company's lenders to update them on the current state of, and outlook for, the Company.

23.     Following these presentations, in late August 2009, the Company and

Moelis also met with Capstone Advisory Group, LLC ("Capstone"), a financial advisory firm

retained by certain of the Prepetition Lenders (the "Steering Group") to explain the potential

restructuring alternatives that were presented to the Steering Group, and assisted in facilitating

Capstone's diligence efforts with respect to a potential restructuring of the Company.  In

September, 2009, Moelis delivered a detailed presentation to the Company and the Board laying

out the potential restructuring alternatives to be considered.

24.     Starting in September 2009 and continuing though December 2009, the

Company and Moelis conducted negotiations on a plan term sheet with the Steering Group

pursuant to which the Lender Parties would acquire substantially all of the Debtors' assets

pursuant to debt-for equity exchange under a plan of reorganization.  Negotiations commenced in

September 2009 between the Steering Group and the Debtors on the Debtors' proposed capital

structure post reorganization.  In mid-December 2009 the parties agreed to terms providing for

the Debtors' recapitalization pursuant to the terms of the Plan.

25.     Concurrent with the Plan negotiations described above, in early October

2009, Moelis began a formal process seeking to raise an asset-based revolving credit facility (the

"ABL Facility") for the Company to provide the necessary exit financing in connection with the

Plan.  The proposed ABL Facility would be used to fund the Company's working capital needs

post-confirmation.  In conjunction with the Company, Moelis developed a "marketing teaser"

and lender presentation.  The Company and Moelis also set up an electronic data room for

lenders to review upon signing a confidentiality agreement.  Moelis contacted approximately 30

lenders soliciting interest in providing the ABL Facility. Of the lenders contacted, a number of

lenders submitted preliminary term sheets and conducted further diligence on the Company.

Through November and December of 2009, the Company and Moelis facilitated diligence with

these banks. Concurrently, the Company and Moelis worked with third-party appraisers and

field examiners to develop inventory, accounts receivable, property and equipment and field

analyses for the potential lenders to review. These lenders continue to conduct diligence on the

Company in an effort to offer committed exit financing prior to anticipated emergence from

chapter 11.

E.      **The Debtors' Chapter 11 Goals**[5]

26.     As I discuss above, the goals of the restructuring are to recapitalize the

Company's balance sheet to provide a manageable capital structure for the Company and to

provide adequate liquidity to support the Company's working capital needs.

27.     I believe that prolonged chapter 11 cases would severely damage the

Company's ongoing business operations and threaten their viability as a going concern,

especially if the Company is unable to announce the confirmation of the Plan prior to the start of

the Northeast Spa and Pool Association show, for the reasons that I discuss below. In addition, I

believe that the Debtors will run out of cash in early February, 2010 if they do not emerge from

Chapter 11 before then.

---

[5] Unless otherwise noted, capitalized terms used in this section have the meanings ascribed to them in the prepackaged *Joint Plan of Reorganization of Latham International, Inc., et al., Under Chapter 11 of the Bankruptcy Code* (the Plan").

## Summary of the Plan

28.     The Plan provides for the establishment of three new companies: New Holdco, New Midco and New Opco.  On or prior to the effective date of the Plan (the "Effective Date"), an agent for the Lender Parties will form New Holdco, New Midco and New Opco.  New Holdco will issue 100% of the stock in New Holdco (the " New Equity") and issue the New Note, and contribute the New Equity and New Note (defined below) to New Midco in exchange for 100% of the stock of New Midco.  New Midco will contribute the New Equity and New Note to New Opco in exchange for 100% of the stock of New Opco.  On the Effective Date, New Opco shall acquire all of the assets of Debtors Latham International, Inc., Latham Manufacturing Corp., and Kafko (U.S.) Corp., including the equity interests in Viking Pools, LLC and Coverstar, LLC but specifically excluding the stock of Latham International, Inc., Latham Manufacturing Corp. and Kafko (U.S.) Corp., in exchange for the New Equity and New Note  On the Effective Date, the Debtors shall distribute the New Equity and New Note to the Lender Parties in exchange for, and in satisfaction of, the indebtedness owed under the Prepetition Credit Agreement.

29.     The Plan also provides for the availability of $25,000,000 in the form of proceeds from the ABL Facility to meet the Debtors' working capital needs.  The Plan also provides for the issuance of a new note in the amount of $20,000,000 in favor of the Lender Parties (the "New Note").  Interest on the New Note shall be payable quarterly either:(a) in cash at a rate of LIBOR plus 400 basis points with a 3% LIBOR floor; or in New Holdco's discretion, (b) at the rate of 10% per annum, in any combination selected by New Holdco of 6% or more in

PIK and 4% or less in cash. The New Note shall have a maturity date of five years following the Effective Date, and shall be secured by substantially all of New Holdco's assets. The New Note will be junior in priority to the ABL Facility. All consideration necessary for New Opco to make Cash payments or distributions on behalf of the Debtors as contemplated by the Plan shall be obtained from the ABL Facility and other Cash from New Opco, including Cash from New Opco's business operations.

30.     Pursuant to the Plan, I am informed and believe that all allowed administrative claims and priority tax claims shall be paid in accordance with the requirements of the Bankruptcy Code. I am further informed and believe that all allowed non-tax priority claims, allowed other secured claims (i.e. any secured claims other than the Prepetition Financing Claims, although the Debtors are not currently aware of any such other secured claims) and allowed general unsecured claims will also be paid in accordance with the requirements of the Bankruptcy Code. On the Effective Date, the Subordinated Note Claims and the Seller Note Claims will be cancelled and the Subordinated Note Purchase Agreement and the Seller Subordinated Purchase Agreement will be of no further force or effect. On the Effective Date, the Existing Equity Interests in Latham International, Inc.; Latham Manufacturing Corp.; and Kafko (U.S.) Corp. will also be cancelled. None of the Holders of the Subordinated Note Claims, the Seller Note Claims, or the Existing Equity Interests will receive any distributions under this Plan on account of their respective claims or interests.

**Solicitation of the Plan**

31.     On or about December 18, 2009, the Debtors caused a copy of the Plan, the Disclosure Statement and the appropriate ballots to be delivered to Holders of Prepetition Financing Claims (classified as Holders of Class 3 Prepetition Financing Claims), the only impaired class of creditors entitled to vote on the Plan. The Debtors established December 21, 2009 at 5:00 p.m. (prevailing Eastern Time), as the deadline for the receipt of votes to accept or reject the Plan.

32.     I am informed and believe that the Plan was overwhelmingly accepted by the Holders of Class 3 (Prepetition Financing Claims), which I am informed is the only class entitled to vote on the Plan. I am informed and believe 100% of all Class 3 Creditors who voted on the Plan, cast votes to accept the Plan.[6] The prepackaged nature of the Plan will allow the Debtors to exit chapter 11 quickly while the Plan provisions and its proposed implementation will allow the Debtors to meet their working capital needs and substantially de-leverage their balance sheet substantially.

**The Need for Expedited Confirmation of the Plan**

33.     Each year, the Company attends several regional or national trade shows. The purpose of these shows is to provide an opportunity for pool builders to meet with suppliers, manufacturers and distributors, in order for these parties to make decisions and commitments for

---

[6] I am informed and believe that, of the 48 members of Class 3 entitled to vote, 43 members voted to accept the Plan, which acceptances I am informed and believe constitutes $130,344,834.05 of the total $147,934,146.63 dollar amount of Class 3. I am further informed and believe that Five members of Class 3 did not vote and zero members of Class 3 voted to reject the Plan.

the following season. Some shows are typically better attended, and therefore more important, than others. I believe that the Northeast Spa and Pool Association show (the "Trade Show"), which is held the last week in January each year in Atlantic City, N.J., is the most important of all shows. The show opens on Tuesday January 26, 2010. The Company has attended and exhibited at the Trade Show for over 35 years, and the Company anticipates that all of its competitors will be exhibiting at this year's Trade Show as well. Given the Trade Show's large turnout of 10,000 people or more in attendance and the Trade Show's late-timing during the industry off-season, this is one of the last decision points for builders and distributors to meet with their suppliers in advance of the upcoming peak selling season, which takes place from March to June.

34. I believe that it is critical for the Plan to be confirmed no later than January 25, 2010 – the day before the start of the Trade Show – so that the Company can assure its customers that the Company has resolved its financial restructuring as provided under the Plan, and that the Company will be able to meet customer needs going forward. Pool builders, who are the Company's key customers, are entrepreneurs, and operate small businesses. I believe that many of these pool builders would be vulnerable to being poached by the Company's competitors if the Company cannot inform its customers at the Trade Show that the Plan had been confirmed and, as a result, that the Company will shortly exit the chapter 11 process. I believe that if the Company is unable to make these representations to customers and to allay any concerns about the Company's ability to fulfill and process customer orders, then the Company's 2010 sales forecast would be at risk.

35.     Concurrently with the First Day Motions, I understand that the Debtors

filed the *Debtors' Motion for Entry of Order (A) Scheduling an Objection Deadline and*

*Combined Hearing on Their Disclosure Statement and Plan Confirmation, (B) Approving Form*

*and Notice of Confirmation Hearing, (C) Establishing Procedures for Objections to Their Plan*

*and Disclosure Statement, (D) Approving Solicitation Procedures and (E) Granting Related*

*Relief* pursuant to which they request, among other things, that the Bankruptcy Court schedule a

hearing to consider confirmation of the Plan and approve the Disclosure Statement sent to the

Lender Parties prior to January 25, 2010.  For the reasons explained above, I believe that it is

critical to the successful reorganization of the Debtors that the Bankruptcy Court consider

confirmation of the Plan before the occurrence of the Trade Show.

## PART II

## First Day Motions and Applications

36.     In order to enable the Debtors to minimize the adverse effects of the

commencement of the chapter 11 cases on their liquidation and sales efforts, the Debtors have

requested various types of relief in the First Day Motions filed concurrently with this

Declaration.  A summary of the relief sought in each First Day Motion is set forth below.

37.     I have reviewed each of these First Day Motions (including the exhibits

and schedules thereto).  The facts stated therein are true and correct to the best of my knowledge,

information and belief, and I believe that the type of relief sought in each of the First Day

Motions:  (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption

to their current business operations; and (b) is essential to maximizing the value of the Debtors' assets for the benefit of their estates and creditors.

## A.    Motion and Orders for Admission Pro Hac Vice

38.    The Debtors have chosen the law firm of Pachulski Stang Ziehl & Jones LLP to represent them as general bankruptcy counsel during the course of their chapter 11 Cases. By this motion, the Debtors seek to have David Bertenthal, Esquire. Maxim B. Litvak, Esquire, and Joshua M. Fried, Esquire (collectively, the "Admittees") admitted *pro hac vice* before the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") to represent the Debtors, as proposed attorneys, pursuant to Local Rule 83.5(c) of the United States District Court for the District of Delaware. I believe that the *pro hac vice* admissions of the Admittees to file pleadings and appear and be heard in the chapter 11 Cases will be in the best interests of the Debtors and their estates.

## B.    Application of the Debtors Pursuant to Section 327(a) of the Bankruptcy Code, Rule 2014 of the Federal Rules of Bankruptcy Procedure and Local Rule 2014-1 for Authorization to Employ and Retain Pachulski Stang Ziehl & Jones LLP as Counsel for the Debtors and Debtors in Possession *Nunc Pro Tunc* to the Petition Date

39.    The Debtors seek to employ and retain the firm of Pachulski Stang Ziehl & Jones LLP ("PSZJ") as their bankruptcy counsel with regard to the filing and prosecution of their chapter 11 cases. The Debtors request the entry of an order pursuant to section 327(a) of the Bankruptcy Code authorizing them to employ and retain PSZJ, *nunc pro tunc* to the Petition Date, as their attorneys under a general retainer to perform the legal services that will be

necessary during the chapter 11 Cases. I believe the retention of PSZJ is in the best interests of the Debtors' estates and creditors.

**C.**    **Debtors' Motion For Order Directing Joint Administration Of Related Chapter 11 Cases For Procedural Purposes Only**

40.     The Debtors in these cases are affiliated entities. I am informed by counsel that the joint administration of the chapter 11 cases will permit the Clerk of the Court to utilize a single general docket for these cases and combine notices to creditors of the Debtors' respective estates and other parties in interest, which will result in significant savings to the estates. Accordingly, I believe that the relief requested in the joint administration motion is in the best interests of the Debtors' estates.

**D.**    **Application of Debtors for Order Under § 28 U.S.C. § 156(c) Authorizing and Approving the Retention of and Appointing Epiq Bankruptcy Solutions, LLC as Noticing and Balloting Agent**

41.     The Debtors seek entry of an order authorizing and approving the retention of and appointing Epiq Bankruptcy Solutions, LLC ("Epiq"), *nunc pro tunc* to the Petition Date, as noticing and balloting agent (the "Noticing Agent") for the Debtors and, as applicable, the Clerk to, among other things: (i) serve as the Court's notice agent to mail certain notices to the estates' creditors and parties-in-interest, (ii) provide computerized balloting database services, and (iii) provide expertise, consultation and assistance with ballot processing and with other administrative information related to the Debtors' bankruptcy cases. With the large number of creditors that the Debtors have identified, the Debtors believe it is in the best interests of their estates and their creditors to appoint Epiq as agent for the Clerk.

42. I understand that Epiq is one of the country's leading chapter 11 administrators with experience in noticing, claims processing, assisting with claims reconciliation and distribution. I believe Epiq is well qualified to provide the Debtors with experienced noticing, claims and balloting services in connection with theses cases, and has substantial experience in the matters upon which it is to be engaged.

43. Accordingly, I believe it is in the best interest of the Debtors' estates to seek the entry of an order retaining and appointing Epiq as the agent for the Clerk and as custodian of official court records and to perform such other services as may be required by the Debtors. Additionally, the Debtors seek authorization to compensate Epiq for services rendered and to reimburse Epiq for expenses incurred without further order of this Court upon the Debtors' receipt of reasonably detailed statements of fees and expenses.

**E.**     **Debtors' Motion For An Order Establishing Procedures For Interim Compensation Pursuant To Section 331 Of The Bankruptcy Code**

44. The Debtors request approval of certain procedures for compensating and reimbursing court-approved professionals on a monthly basis, which I am informed are comparable to the procedures established in other similar-sized chapter 11 cases in this district.

45. With the first day motions, the Debtors seek approval to employ PSZJ as their bankruptcy counsel. Thereafter, the Debtors intend to seek authority to retain certain other professionals in the Cases as the need arises. In addition, I am informed that an official committee of unsecured creditors (the "Committee") may be appointed, and that the Committee also may seek to retain various professionals (the "Committee Professionals").

46. I am informed that entry of an interim compensation order will streamline the professional compensation process and enable the Court and all other parties to more effectively monitor the professional fees incurred in the Cases. Further, it will avoid forcing professionals to finance the Cases while awaiting final approval of their fees and expenses. I believe that such relief is in the best interests of the Debtors' estates.

**F.** **Debtors' Motion Pursuant To Bankruptcy Code Sections 105(a), 363, And 507(a) For An Order Authorizing The Debtors To (I) Pay And/Or Honor Prepetition Wages, Salaries, Employee Benefits, And Other Compensation; (II) Remit Withholding Obligations; (III) Maintain Employee Compensation And Benefits Programs And Pay Related Administrative Obligations; And (IV) Have Applicable Banks And Other Financial Institutions Receive, Process, Honor, And Pay Certain Checks Presented For Payment And Honor Certain Fund Transfer Requests**

47. As of the Petition Date, the Debtors collectively employ 551 full and part-time U.S. employees in hourly, salaried, supervisory, management, sales, and administrative positions to perform the functions necessary to effectively and efficiently operate the Debtors' business (the "Employees") through Debtors Latham Manufacturing Corp. ("Latham"), Kafko [U.S.] Corp. ("Kafko"), Coverstar LLC ("Coverstar") and Viking Pools LLC ("Viking"). The Debtors employ both salaried and hourly Employees. 380 Employees are paid hourly and 168 Employees are salaried. 548 Employees are employed full-time and 3 Employees work part time.

48. By this Motion, the Debtors seek to minimize the personal hardship to the Employees if their prepetition obligations are not paid as a result of the filing of these Chapter 11 Cases, to maintain Employee morale during this critical time and to minimize the disruption to the Debtors' business operations, all for the benefit of the Debtors' creditors and their estates, by

requesting, in their sole discretion, the authority (a) to pay and/or honor, inter alia, certain prepetition claims of Employees for wages, commissions and salaries (the "Wages"), employee benefits and other compensation or reimbursements (the "Benefits"), remit withholding obligations, and to pay all costs incident to the foregoing (collectively, the "Wages and Benefits"), and (b) to continue to pay and/or honor such Wages and Benefits as they become due postpetition in the ordinary course of the Debtors' business.

49. The Debtors' aggregate monthly payroll for November, 2009, including wages, salaries, bonuses and commissions, was approximately $1,628,802.00, a small portion of which was paid to temporary employment agencies for the services of one temporary employee and one independent contractor as further described below. The Employees are paid either weekly or bi-weekly in arrears through direct deposit or checks issued after the close of the associated pay periods. The Debtors anticipate that their go-forward post-petition monthly payroll will be approximately $1,700,000.00, which figure includes wages and taxes paid by the Debtors on behalf of the Employees (including withholding taxes paid by Employees), and withholdings for various Employee benefits.

50. On the respective Next Employee Pay Dates, approximately $650,000 in Wages will be due on account of the pay periods summarized above, a portion of which will be on account of the Wages earned by Employees in the prepetition period. By this motion, the Debtors seek authority to pay up to $650,000 on account of pre-petition Wages to Employees for the payroll due on the Next Employee Pay Dates.

51.     The Debtors use a payroll service company, Automated Data Processing ("ADP") to process their payroll.  Based on historic averages, I estimate that the Debtors may owe ADP an estimated $8,500 in unpaid fees with respect to ADP's processing of the Debtors' payroll and related administration for December, 2009 (the "Administration Fees").  The Debtors request authority to pay ADP the Administration Fees up to $10,000 that may be owing as of the Petition Date and to pay ADP postpetition in the ordinary course of the Debtors' business with respect to the same.

52.     In the ordinary course of its business, the Debtors routinely withhold from Wages certain amounts that the Debtors are required to transmit to third parties for purposes such as Social Security and Medicare, federal and state or local income taxes, contributions to the Debtors' benefit plans described more fully below, 401(k) contributions, garnishment, child support or similar obligations pursuant to court order or law (collectively, the "Withholding Obligations").  As of the Petition Date, I believe that there are no Withholding Obligation amounts left to be remitted to any third parties.  In an abundance of caution, the Debtors seek authority to remit Withholding Obligations of up to $50,000 on account of the pre-petition periods.

53.     The Debtors customarily reimburse Employees who incur business expenses in the ordinary course of performing their duties on behalf of the Debtors.  Such expenses typically include, but are not limited to, business-related travel expenses, including air travel, auto travel and car rental, lodging, meal charges, business lunches, telephone charges, and miscellaneous other allowed travel expenses (the "General Reimbursement Obligations").  The

Debtors seek authority to pay any prepetition General Reimbursement Obligations up to a total amount of $75,000, and to continue to honor General Reimbursement Obligations incurred postpetition in the ordinary course of the Debtors' business.

54.     The Debtors provide their Employees with an option to participate in a medical insurance plan through a number of insurance providers (the "Medical Plans"). The Debtors each use a unique provider for its Medical Plan. Medical Plan premiums are paid in full by the Debtors to the insurance providers for their Employees on the first day of each month. In total for November 2009, the Debtors paid $232,500 on account of their Medical Plans to their Medical Plan Insurance Providers and PGP, which amount includes Employee contributions, COBRA premium payments and all HRA reimbursements. As of the Petition Date, I do not believe the Debtors have any outstanding pre-petition amounts owing to any Medical Plan Insurance Providers on account of their Medical Plans. In an abundance of caution, however, the Debtors seek authority to pay up to one month's invoices to their Medical Plan Insurance Providers not to exceed $250,000 on account of pre-petition periods in the event that amounts may be owing on their Medical Plan for which the Debtors are not yet aware. The Debtors further seek authority to continue to offer their Medical Plans postpetition in the ordinary case of business and in their discretion.

55.     Certain of the Debtors also provide their eligible Employees with fully insured dental insurance through various carriers (the "Dental Plans"). Dental Plan premiums are paid in full by the Debtors to the dental insurance providers in advance on the first day of each month. As of the Petition Date, I believe the Debtors do not have any outstanding pre-

petition amounts owing to the Dental Plan Insurance Providers on account of their Dental Plan. In an abundance of caution, the Debtors seek authority to pay up to one month's invoice to Dental Plan Insurance Providers not to exceed $20,000.00 on account of pre-petition periods in the event that amounts may be owing on their Dental Plan for which the Debtors are not yet aware.

56.     The Debtors also provide their eligible Latham, Kafko and Coverstar Employees with vision insurance through Empire Blue View (the "Vision Plan"). Participating Latham, Kafko and Coverstar Employees pay the full monthly cost of the Vision Plan premiums for themselves and their dependents. The Debtors Pay Empire Blue View the full amount of any premiums due for their Employees in advance each month and then recoup the premiums through deductions from the Employees' Wages. In November 2009, the Debtors paid $1,200 on account of their Vision Plan premiums to Empire Blue View, which include COBRA payments. The Debtors seek authority to continue to offer the Vision Plan postpetition in the ordinary course of business in their discretion and to remit any pre-petition amounts owing on account of the Vision Plan in an aggregate amount not to exceed $1,500 in an abundance of caution.

57.     Latham, Kafko and Coverstar also offer their Employees access to flexible spending accounts ("FSA") to set aside pre-tax dollars to pay for eligible medical and dependent care costs. The FSA is administered for the Debtors by PGP. The Debtors seek authority to honor the FSA Contributions in connection with satisfaction of the Wages, to pay all current and

future administrative fees to PGP related to the FSA program, and to continue to provide the FSA program postpetition in the ordinary course of the Debtors' business.

58.     The Debtors provide their Employees with life insurance, short-term and long-term disability insurance, and accidental death and dismemberment insurance. The Debtors seek authority to continue to offer their Employees life insurance, short-term and long-term disability insurance, and accidental death and dismemberment insurance postpetition in the ordinary course of business in their discretion and to pay all amounts that may be due and owing for such programs due to prepetition obligations. As of the Petition Date, I believe that there are no amounts owing on account of the pre-petition period for these programs. However, in an abundance of caution, the Debtors seek authority to pay up to $23,000.00 for all of these programs on account of any pre-petition amounts that may be owing for which we are not yet aware.

59.     Each of the Debtors provide their Employees with differing forms of regular paid time off ("PTO") consisting of holidays, vacation, personal, and/or sick leave time. In addition, Employees are eligible for other PTO, including, among other things, for bereavement leave, jury duty, or military service. The Debtors request authority in their discretion to honor, but not to pay, existing PTO earned by their Employees and continue to honor similar PTO policies regarding vacation time, sick time, personal time, and holidays on a post-petition basis and in the ordinary course of the Debtors' business.

60.     The Debtors offer their eligible Employees a 401(k) retirement plan (the "401(k) Plan") administered by Fidelity Management Trust Company ("Fidelity"). An

Employee is eligible for the 401(k) Plan on the first day of the month following one year after the Employee's hire date. While the Debtors historically had a matching program, the Debtors terminated matching contributions prepetition. The Debtors incur approximately $8,500 per year in administrative costs to administer the 401(k) Plan (the "401(k) Fees"). The Debtors request authority, in their discretion, to continue their existing 401(k) Plan and pay any 401(k) Fees in the ordinary course of the Debtors' business, including any 401(k) Fees for the pre-petition period in an amount up to $10,000.

61.     Under the laws of various states, the Debtors are required to maintain workers' compensation insurance to provide their Employees with coverage for claims arising from or related to their employment with the Debtors. The Debtors currently maintain an annual workers' compensation policy (the "Workers' Compensation Insurance Policy") with Travelers Insurance Company ("Travelers") pursuant to which Travelers provides workers' compensation insurance coverage up to the statutory limits and up to $1,000,000 per occurrence for employer liability. I believe that the continuance of their Workers' Compensation Policy is appropriate in the ordinary course of business, but out of an abundance of caution, seek authority to maintain their workers' compensation and other liability insurance in accordance with applicable law postpetition and to pay all premium installments as they come due in the ordinary course of business for next year's coverage.

62.     The Debtors maintain a qualified defined benefit pension plan under the Internal Revenue Code (the "IRC") and the Employee Retirement Income Security Act of 1974 ("ERISA") for approximately 52 retired Employees of DLM Plastics, Inc., a firm acquired by

Latham Manufacturing Corp. (the plan was subsequently renamed the "Latham Retirement Plan"). The Latham Retirement Plan has been closed to any new participants since 2002 from any of the Debtors, and the Debtors do not make any regular contributions to the plan. The Latham Retirement Plan is administered by the Principal Financial Group ("Principal"). Principal collects monthly and quarterly administrative fees totaling approximately $17,000 per year directly from the Debtors. The Debtors also make annual premium payments to the Pension Benefit Guaranty Corporation of approximately $2,300 for the Latham Retirement Plan. The Debtors seek the authority, but not direction, to continue to make administrative payments to Principal and premium payments to the Pension Benefit Guaranty Corporation on account of the Latham Retirement Plan in the ordinary course.

63.    In the ordinary course of business, the Debtors maintain a program through which their eligible Employees are provided a monthly stipend in lieu of a company-leased vehicle for use to pay for an automobile and automobile-related expenses (collectively, the "Automobile Expenses"). Approximately 30 Employees receive stipends averaging $700 per month per participating Employee. As of the Petition Date, the Debtors believe that there are approximately $22,000 in prepetition obligations owed for Automobile Expenses for Employees. The Debtors seek the authority, but not direction, to pay prepetition Automobile Expenses up to a maximum of $25,000 and to continue to pay Automobile Expenses for their Employees in the ordinary course.

64.    Many Employees live from paycheck to paycheck and rely exclusively on receiving their full compensation or reimbursement of their expenses in order to continue to pay

their daily living expenses. I believe that these Employees may be exposed to significant financial and healthcare related problems if the Debtors are not permitted to pay and/or honor the Wages and Benefits, and the expenses associated therewith, in the ordinary course of the Debtors' business. Moreover, I believe that if the Debtors are unable to honor accrued Employee Wages and the Benefits described above, including honoring PTO, Employee morale and loyalty will be jeopardized at a time when Employee support is critical. The Debtors believe that any uncertainty with regard to continuation of Wages and Benefits will cause significant anxiety at precisely the time the Debtors needs their Employees to perform their jobs at peak efficiency.

65.     The Employees have an intimate knowledge of the operation of the Debtors' business and are critical components to the success of these Chapter 11 Cases. I believe that deterioration in the morale and welfare of the Employees at this critical time undoubtedly would adversely impact the Debtors and their ability to maximize the value of their assets. I believe that satisfaction of the Wages and Benefits is necessary to maintain the Employees' morale during the case and to insure continued, efficient operation in order to maximize value for all creditors.

**G.      Motion Of The Debtors For Entry Of An Order (I) Authorizing, But Not Requiring, The Debtors To Remit And Pay Certain Prepetition Sales And Use And Similar Taxes And Regulatory Fees In The Ordinary Course Of Business, And (II) Authorizing Banks And Financial Institutions To Honor And Process Checks And Transfers Related Thereto**

66.     In the ordinary course of business, the Debtors (i) pay taxes, including, but not limited to, sales, use and franchise taxes and other taxes necessary to operate their businesses (collectively, the "Taxes") and certain regulatory fees for licenses, permits, and other similar

assessments (the "Fees"), and (ii) collect such Taxes and Fees from their customers for payment on behalf of the Debtors and, in some instances, their customers. In both cases, the proceeds collected by the Debtors are remitted to various governmental bodies (the "Taxing Authorities") in accordance with the requirements of such Taxing Authorities.

67.     By this Motion, the Debtors request entry of an order (i) authorizing, but not directing, them to pay prepetition Taxes required to conduct the Debtors' businesses to the respective taxing or other appropriate Taxing Authorities in an amount up to $100,000, in the ordinary course of the Debtors' business, in addition to prepetition Taxes that may later come due as a result of certain audits; (ii) authorizing the Debtors to pay certain Fees due on account of licenses, permits, and other similar assessments in an amount up to $15,000; and (iii) authorizing financial institutions to receive, process, honor, and pay all checks issued and electronic payment requests made relating to the foregoing.

68.     The Debtors pay the Taxes and Fees monthly, quarterly, or annually to the respective Taxing Authorities, in each case as required by applicable laws and regulations. I estimate that the total amount of prepetition Taxes owing to the various Taxing Authorities do not exceed $100,000, in addition to prepetition Taxes that may later come due as a result of certain audits. I estimate that the Debtors do not owe any prepetition Fees to the various Taxing Authorities.

69.     I believe that any such amounts that are actually due, but have not yet been paid to the Taxing Authorities because of the commencement of these chapter 11 cases, represent a small fraction of the Debtors' total assets. If the Debtors do not pay such amounts in

a timely manner, I am advised by my counsel that the Taxing Authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, and pursue other remedies that will harm the estates. I am also informed that some, if not all, of the Taxing Authorities may initiate an audit of the Debtors if the Taxes and Fees are not paid immediately. I believe that such audits will unnecessarily divert the Debtors' attention away from the reorganization process. I understand that certain of these outstanding tax liabilities are for trust fund taxes that the Debtors have collected and hold in trust for the applicable Taxing Authorities. I am informed by my counsel that such funds do not constitute property of the estate and could not otherwise be used by the estates.

70.     I believe that payment of these Taxes and Fees is critical to the Debtors' continued, uninterrupted operations. Non-payment may cause the Taxing Authorities and regulatory agencies to take precipitous actions, including but not limited to, conducting audits, filing liens, seeking to impose liability against the Debtors and their directors and officers, and, if applicable, seeking to lift the automatic stay, all of which would disrupt the Debtors' day-to-day operations and could potentially impose significant costs on the Debtors' estates. I believe that payment of the Taxes and Fees will avoid these unnecessary and potentially costly governmental actions.

**H.     Debtors' Motion For An Order Authorizing, But Not Directing, Debtors To Pay Prepetition Claims Of Shippers And Warehousemen And Granting Related Relief**

71.     By this Motion, the Debtors seek entry of an order authorizing, but not directing, the Debtors, in their business judgment, to pay prepetition obligations owed to

common carriers for ground transportation, air freight, ocean freight, and similar charges and freight forwarding charges (which freight forwarding charges may include in the amount payable to the freight forwarder for charges for customs duties and dock facilities) incurred by the Debtors, including those that give rise (or legitimately may give rise) to any statutory or common-law possessory liens on account of unpaid charges owing from the Debtors to such shippers (collectively, "Shipping Obligations"), as further described in this Motion. The Debtors also seek authority to pay, in the exercise of their business judgment, warehousing and port facility charges (the "Warehousing Obligations") to any third party warehousemen as further described in this Motion. The Debtors propose to pay such claims, when, in the Debtors' sole discretion, the Shippers' and Warehousemen's exercise of contractual or statutory self-help remedies would harm or disrupt the Debtors' businesses. The Debtors request the authority, but not the direction, to pay up to $100,000 on account of such claims.

72.     The Debtors seek to prevent the breakdown of their manufacturing supply network by requesting authority to pay certain prepetition claims relating to the Shippers and Warehousemen (directly or through the Logistics Coordinators, which payments shall include the Logistics Coordinators' fee) that the Debtors determine are necessary or appropriate to (a) obtain release of critical or valuable supplies and products that may be subject to liens, (b) maintain a reliable, efficient and smooth distribution system, and (c) induce critical Shippers and Warehousemen to continue to carry merchandise and make timely delivery. Notably, the Debtors only seek authority, not direction, to make such payments.

73.     I believe that the total proposed amount to be paid to the Shippers, Warehousemen and Logistics Coordinators is minimal compared to the importance of and necessity for the Shippers, Warehousemen and Logistics Coordinators and the losses the Debtors may suffer if their operations are disrupted. Moreover, in most cases, I do not believe that there are viable timely alternatives to the Shippers, Warehousemen and Logistics Coordinators that would not result in, at a minimum, a temporary shut down of their supply or distribution networks.

74.     I believe that failure to pay these Shipping Obligations will result in certain Shippers and Logistics Coordinators discontinuing shipments of supplies and finished products, thereby adversely affecting Debtors' distribution system and operations. I also believe that certain Shippers or Logistics Coordinators may withhold essential merchandise in their possession pending payment. Payment of some or all of these charges will prevent the disruption to the Debtors' businesses that will result from such actions. Moreover, I am informed by my counsel that some of these Shippers may contend that they are entitled to possessory liens in any goods and/or publications they hold as of the Petition Date, pursuant to state or other applicable law, and will refuse to deliver or release such goods and/or publications until their claims have been satisfied and their liens redeemed.

75.     I believe that the value of the goods in the possession of the Shippers or Logistics Coordinators, together with the potential injury to the Debtors from disruption of their businesses if the goods and/or publications are not released, far exceeds the amount of unpaid Shipping Obligations that the Debtors seek to pay by this Motion. I therefore believe that it is

necessary and important to their continued business operations and to their successful

reorganization that they be able to pay these Shipping Obligations.

76.    Moreover, if the Debtors are not able to make payments sought herein to

those Shippers or Logistics Coordinators whose services the Debtors utilized prepetition, I

believe it is likely that many of such Shippers or Logistics Coordinators will cease to do business

with the Debtors, forcing the Debtors to obtain substitute carriers or coordinators of their

finished products with little or no warning.  Such an arrangement would almost certainly obligate

the Debtors to pay premium charges to the replacement carriers in order to obtain timely delivery

of their supplies and finished products and would, in any event, severely disrupt the Debtors'

operations.

I.    **Motion Of The Debtors For Entry Of An Order Authorizing The Debtors To Maintain And Administer Customer Programs And Honor Prepetition Obligations Related Thereto**

77.    By this Motion, the Debtors request that the Court enter an order

authorizing the Debtors, in their sole discretion, to: (a) honor certain prepetition obligations

under the Debtors' customer related programs (the "Customer Programs"); (b) continue to

administer their Customer Programs in a manner consistent with past practices and in the

ordinary course of business; and (c) continue, renew, replace, implement new and/or terminate

their Customer Programs, in the ordinary course of business, without further application to the

Court.  I estimate that the total amount of prepetition obligations owed under the Customer

Programs (collectively, the "Customer Program Obligations") do not exceed $2.7 million.  I

believe that honoring such obligations is critical to the Debtors' business and customer

relationships and the total amount owing is small compared to the damage which would be suffered by the Debtors as a result of failing to honor the Customer Program Obligations and maintain the Customer Programs in the ordinary course.

78.     In connection with its manufacturing and distribution of swimming pool components and pool accessories, I believe it is critical that the Debtors maintain positive customer relationships and their reputation for reliability.  Achieving these goals will be particularly important while operating in chapter 11.  Indeed, I believe that the ability to maintain their Customer Programs and to honor their Customer Program Obligations in the ordinary course of business is necessary to retain their customer base and reputation for reliability, thereby not only preserving, but likely enhancing the going-concern value of the Debtors and their estates.

79.     Prior to the Petition Date, each of the Debtors' divisions honored warranty coverage with respect to their diversified product line (the "Warranties").  While the specific terms of the Warranties vary by product, the Debtors generally warrant that if one of the Debtors' products fails due to a manufacturing defect within the warranty period commencing on the date of purchase, the Debtors repair or replace such product.  I believe that the ability to continue to provide the Warranties is vital to the Debtors' ongoing relationship with their Customers and to maintaining the going-concern value of the Debtors' businesses.  I believe that the preservation of Customer loyalty generated by the Warranties far outweighs the costs of such programs.  In contrast, I believe that any failure to maintain the Warranties, and to honor the prepetition Customer Obligations accrued thereunder, will cause Customers to lose confidence in

the Debtors and their products, resulting in significant deterioration in sales. Accordingly, the Debtors seek authorization, but not direction, to continue to honor Customer Obligations under the Warranties in the ordinary course of business, including obligations arising prior to the Petition Date.

80.     The Debtors offers rebate programs to its Customers who sell their products (each, an "Incentive") designed to keep their products competitive in the eyes of the Customers that market them. Depending on the product purchased and the specifics of the arrangement with the particular Customer, these Incentives accrue continuously by the Debtors and are paid to the Customer in either cash or credit. I believe that the continuation of the Incentive programs is essential to retain the support of the Debtors' Customers and to preserve the going-concern value of the Debtors' estates. I further believe that any failure to honor these Incentives could seriously jeopardize the loyalty and goodwill of the Debtors' network of Customers. Accordingly, to keep Customers selling and distributing the Debtors' products, it is imperative that the Debtors honor the Incentives due to them.

**J.      Motion of the Debtors for Entry of an Order Authorizing the Debtors to (A) Continue Insurance Coverage Entered Into Prepetition, (B) Enter Into New Insurance Policies, (C) Maintain Postpetition Financing of Insurance Premiums, and (D) Enter Into New Postpetition Financing Agreements**

81.     In the ordinary course of business, the Debtors maintain numerous insurance policies for its U.S. and Canadian operations providing coverage for, among other things: property, casualty (including general liability, automotive liability, export liability, travel accident, umbrella coverage, excess liability and workers' compensation), crime liability,

international liability, and fiduciary liability (collectively, the "Insurance Policies"). The

Debtors' maintenance of insurance policies providing coverage for their Canadian operations

benefits the estates because it enables its non-debtor Canadian subsidiaries to continue

operations.

82.     The Debtors pay all insurance obligations through their Insurance Policies.

The Debtors pay the premiums for certain of their coverage in full when due, and for certain of

the Insurance Policies the Debtors finance payment over the course of the coverage year.

83.     By this motion, the Debtors seek an order authorizing them in their

business judgment to continue the Insurance Policies on an uninterrupted basis in accordance

with the same practices and procedures as in effect immediately prior to the Petition Date, and to

pay all premiums, claims, deductibles, excess payments, retrospective adjustments, settlement

costs , insurance broker fees, and all other obligations arising under or in connection with the

Insurance Policies (collectively, the "Insurance Obligations") including, in their sole discretion

and business judgment, those Insurance Obligations that were due and payable or related to the

period prior to the commencement of these chapter 11 cases.  In addition, the Debtors request

authority to continue, in the ordinary course of business, their insurance premium financing

arrangements and, to the extent necessary, to pay prepetition insurance premium financing

obligations owed by the Debtors on account of such arrangements.

84.     I believe that maintaining the Debtors' insurance coverage under the

Insurance Policies is a crucial ordinary-course-of-business transaction.  Authority to pay any

prepetition amounts that may be due and owing under the Insurance Policies – to the extent the

Debtors determine that such payment is necessary to avoid cancellation, default, alteration, assignment, attachment, lapse, or any form of impairment of the coverage, benefits or proceeds provided under the Insurance Policies – is necessary to the Debtors' continued operation. I am informed by my counsel that continuation of such coverage is required under the law and I believe it is imperative to the protection and preservation of the Debtors' most valuable assets.

**K.** **Motion of the Debtors for an Order Under Section 366 of the Bankruptcy Code (A) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Service, (B) Deeming Utilities Adequately Assured of Future Performance, and (C) Establishing <u>Procedures for Determining Adequate Assurance of Payment</u>**

85.     In the normal course of business, the Debtors have relationships with various utility companies and other providers (each a "Utility Provider" and, collectively, the "Utility Providers") for the provision of telephone, gas, electricity and related services (the "Utility Services"). The Debtors estimate that their average monthly postpetition payments to the Utility Providers will aggregate approximately $177,000.

86.     Because uninterrupted Utility Services are critical to the Debtors' ongoing operations, the Debtors seek the entry of an order:  (a) prohibiting the Utility Providers from altering, refusing or discontinuing services; (b) deeming Utility Providers adequately assured of future performance; and (c) establishing procedures for determining adequate assurance of future payment.

87.     In order to provide adequate assurance of payment for future services to the Utility Providers, the Debtors propose to make a deposit (a "Utility Deposit") equal to 50% of the Debtors' estimated cost of their monthly utility consumption to each Utility which the

Debtors intend to continue to utilize during the course of these cases. The Debtors estimate that the Utility Deposits, in the aggregate, will total approximately $88,500. The Debtors propose to make Utility Deposits to each of the Utility Providers within ten days after the entry of an interim order, pending further order of the Court, for the purpose of providing each Utility Provider with adequate assurance of payment of its postpetition services to the Debtors.

88.     In addition, the Debtors seek to establish reasonable procedures by which a Utility Provider may request additional adequate assurance of future payment, in the event that such Utility Provider believes that its Utility Deposit does not provide it with satisfactory adequate assurance.

89.     It is my belief that the Debtors cannot continue to operate without continued Utility Services. If any of the Utility Providers alter, refuse or discontinue service, even for a brief period, the Debtors' business operations would be severely disrupted. In contrast, the Utility Providers will not be prejudiced by the continuation of their services and will be paid all postpetition utility charges. It is therefore critical that Utility Services continue uninterrupted. I believe that such relief is in the best interests of the Debtors' estates.

**L.     Motion of Debtors for Order Under 11 U.S.C. §§ 105, 363 and 503(B) Authorizing, but Not Directing, Debtors to Pay Unimpaired Claims in the Ordinary Course of Business**

90.     The Debtors have filed these chapter 11 cases to swiftly implement a balance sheet restructuring and to effectuate a sale through a pre-packaged Plan. The overall purpose of the Plan is to provide the Debtors with a capital structure geared appropriately to their operational needs. The Debtors' immediate ability to maintain operational continuity and the

continued support of their customers and vendors during the chapter 11 cases is critical. I

believe that any disruption to the Debtors' ordinary course of business, including the Debtors'

payment cycle, could significantly impede the Debtors' restructuring. Hence, in order to reflect

the substantial value of the Debtors' businesses and preserve such value for creditors, the Plan

provides that the Debtors' general unsecured trade claims will be paid in full (the "Unimpaired

Claims).

91.     I estimate the Unimpaired Claims to total no more than $2.25 million. I

believe that this is a small figure relative to the Debtors' obligations to their principal secured

lenders who are owed at least $147.9 million. Moreover, a substantial portion of the Unimpaired

Claims are owed to a small group of approximately 15 vendors who are absolutely critical to the

Debtors' operations and are simply irreplaceable (together, the "Critical Vendors"). As of the

Petition Date, the Debtors estimate that the Critical Vendors have claims against the Debtors on

account of critical materials supplied prepetition that aggregate approximately $750,000 (the

"Critical Vendor Claims"). Although I believe that all Unimpaired Claims should be paid

consistent with the Plan, at a minimum, the Critical Vendor Claims must be paid in order to

avoid a potentially catastrophic disruption to the Debtors' business operations.

92.     I believe that the business relationship that the Debtors have developed

with their vendors has enabled the Debtors to negotiate competitive rates and terms and a level of

certainty that goods and services will be delivered in accordance with the Debtors' production

schedules and quality standards. If the Debtors' supply cycle is interrupted or if the Debtors are

forced to find alternative sources for goods or services (assuming such sources are even

available), I believe that the likely result will be a severe disruption of the Debtors' operations and the Debtors' ability to meet applicable delivery deadlines. Under these circumstances and consistent with the Plan, I believe that payment of the Unimpaired Claims in the ordinary course of business is necessary and in the best interests of creditors.

**M.      Motion Of Debtors For Order Under 11 U.S.C. §§ 105, 363, 503(b), 1107 And 1108 Authorizing (I) Maintenance Of Existing Bank Accounts, (II) Continued Use Of Existing Business Forms, (III) Continued Use Of Existing Cash Management System, (IV) Continued Performance Of Intercompany Transactions And Providing Administrative Priority Status To Postpetition Intercompany Claims, And (V) <u>Waiver Of Section 345(B) Deposit And Investment Requirements</u>**

93.      By this Motion, the Debtors seek authorization (1) to maintain their existing bank accounts and to pay any prepetition routine banking fees imposed by the financial institutions where the Debtors' bank accounts are maintained, (2) to continue to use their existing check stock and business forms until exhausted, (3) to continue to use their existing cash management system, (4) to continue performance of intercompany transactions and to provide administrative priority to postpetition intercompany claims, and (5) for a limited waiver of the deposit and investment guidelines imposed under section 345(b) of the Bankruptcy Code.

94.      The Debtors' cash management system (the "Cash Management System") is a network of bank accounts that facilitates the timely and efficient collection, management, and disbursement of funds used in the Debtors' business. Because of the nature of the Debtors' operations and the disruption that would result if the Debtors were forced to close their existing accounts, it is critical that the Cash Management System remain in place. Four of the five Debtors maintain bank accounts that comprise the Cash Management System. Debtors Latham

Manufacturing Corp. ("Latham Manufacturing"), Viking Pools, LLC ("Viking"), Coverstar, LLC

("Coverstar"), and Kafko [U.S.] Corp. ("Kafko") maintain bank accounts. Debtor Latham

International, Inc. ("Latham International") does not maintain bank accounts.

95. _Deposit, Disbursement and Concentration Accounts._ Each Debtor that

participates in the Cash Management System collects revenue and makes disbursements as part

of its ongoing operations. Given the relative size of the Debtors' business, the Cash

Management System is particularly efficient and streamlined. Each of the Debtors (except

Latham International) has one primary deposit account and one primary disbursement account at

Wachovia Bank for a total of eight accounts. Each of these accounts is a zero balance account

(together, the "ZBA Accounts"), which in the case of the deposit accounts is swept daily into a

single main concentration account at Wachovia Bank held in the name of Latham Manufacturing

(the "Concentration Account"), and in the case of the disbursement accounts, draws funds

automatically as needed out of the Concentration Account. Most of the Debtors' ordinary course

operational expenses, including payroll obligations, are funded through the disbursement ZBA

Account of the particular Debtor that is responsible for such obligations. As addressed further

below, the Debtors also use monies in the Concentration Account to fund the activities of three

foreign employees through a non-debtor foreign subsidiary called Pacific Pools Europe.

96. _Investment Account._ Amounts in the Concentration Account that exceed

approximately $200,000 are typically deposited into an investment account (the "Investment

Account") at Wells Fargo Bank and invested in an Evergreen Investments money market fund in

order to maximize the interest accruing on such funds when they are not necessary for

operations. These funds are drawn from the Investment Account into the Concentration Account on an as-needed basis to cover the Debtors' operational expenses. The Evergreen Investments money market fund invests in a diversified portfolio of money market instruments (high quality, short-term debt obligations), which include notes, bonds, debentures, commercial paper, interests in bank loans to companies, certificates of deposit, bankers' acceptances and repurchase agreements.

97. <u>Local Accounts</u>. In addition to the ZBA Accounts and the Concentration Account, there are approximately ten local accounts at various banking institutions (the "Local Accounts") that are used for deposits and disbursements in locations that either do not have Wachovia branches or were established for particular business purposes. Each of the Local Accounts is swept on a recurring basis to the applicable primary Wachovia deposit account automatically or once balances exceed $5,000.

98. Approximately $200,000 to $800,000 flows through the Cash Management System on an average daily basis. Most of the funds accumulated by the Debtors reside in the Concentration Account or in the Investment Account mentioned above. As of the Petition Date, the Debtors have approximately $6.7 million in cash or cash equivalents, which primarily resides in the Concentration Account or the Investment Account.

99. The Debtors seek a waiver of the United States Trustee's requirement that the Bank Accounts be closed and new postpetition bank accounts be opened at depositories authorized by the United States Trustee. If strictly enforced in this case, I believe that the United

States Trustee's requirement would cause a severe disruption in the Debtors' activities and would impair the Debtors' ability to operate under chapter 11.

100.     Maintenance of the Bank Accounts will greatly facilitate the Debtors' operations in chapter 11.  As noted above, all revenues and income realized by the Debtors ultimately flows into the Concentration Account through an interlinked and highly streamlined Cash Management System.  Similarly, disbursements are primarily generated out of the Concentration Account and are effectuated through the Cash Management System.  If the Bank Accounts were closed, the Debtors would have to open new accounts and then attempt to arrange alternative electronic and manual payment procedures for payments into and out of the Debtors' accounts, which would completely disrupt the flow of postpetition receipts and disbursements.  In addition, closing the Bank Accounts would require the Debtors to cancel and reinstitute wire transfer instructions which would be difficult to modify under exigent circumstances.  I believe that these disruptions would severely impact and could irreparably harm the Debtors' ability to operate their business at this critical juncture.

101.     I believe that the Debtors' Cash Management System constitutes an essential business practice and was created and implemented by the management of the Debtors in the exercise of their business judgment.  The widespread use of this particular Cash Management System, moreover, is attributable to the numerous benefits it provides, including the ability to (a) process and timely pay expenses; (b) allow a mechanism for deposits from revenues; (c) ensure cash availability; (d) control and monitor corporate funds; and (e) reduce administrative expenses by facilitating the movement of funds and the development of timely

and accurate balance and presentment information. I believe preserving a "business as usual" atmosphere and avoiding the unnecessary distractions that would inevitably be associated with a substantial disruption of the Cash Management System will facilitate and enhance the Debtors' efforts to continue to operate postpetition.

102. Prior to the Petition Date, certain of the Debtors, amongst themselves and with two foreign non-debtor subsidiaries, engaged in intercompany financial transactions in the ordinary course of business (collectively, the "Intercompany Transactions"), and as part of the Debtors' consolidated Cash Management System. At any given time, there may be balances due and owing from one Debtor to another Debtor or non-debtor affiliate. These balances represent extensions of intercompany credit made in the ordinary course of business and are an essential component of the Cash Management System. The Debtors maintain records of these transfers of cash and can ascertain, trace and account for these Intercompany Transactions. The Debtors, moreover, will continue to maintain such records, including records of all current intercompany accounts receivable and payable.

103. To ensure each individual Debtor will not, at the expense of its creditors, fund the operations of another entity, the Debtors request that all intercompany claims against a Debtor by another Debtor or non-debtor subsidiary arising after the Petition Date as a result of ordinary course intercompany transactions through the Cash Management System (collectively, "Intercompany Claims"), be accorded administrative priority expense status; provided, for the avoidance of doubt, that such Intercompany Claims shall at all times be junior and subordinate to the Adequate Protection Superpriority Claims granted pursuant to any approved cash collateral

order to the Agent and the Secured Lenders (as each such term is defined in any approved cash collateral order). If Intercompany Claims are accorded administrative priority expense status, each entity utilizing funds flowing through the Cash Management System should continue to bear ultimate repayment responsibility for such ordinary course transactions.

104.    The Debtors also seek an interim waiver of the Bankruptcy Code requirement to limit the amounts held in their Bank Accounts. Under the Cash Management System, most of the Debtors' available funds are held in the Investment Account and invested in an Evergreen Investments money market fund and periodically transferred into the Concentration Account. The Debtors' believe that their Bank Accounts are (a) covered by FDIC insurance and contain amounts which are within the limits of such insurance and/or (b) with financial institutions which have standing agreements with the office of the United States Trustee. To the extent needed for a particular Bank Account, the Debtors will work with the various financial institutions to put acceptable collateralization agreements in place or otherwise satisfy the requirements of the Bankruptcy Code.

**N.      Motion Of Debtors For Interim And Final Orders Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, And 507: (A) Authorizing Use Of Cash Collateral; (B) Granting Adequate Protection; And (C) Scheduling A Final Hearing**

105.    By this Motion, the Debtors seek authorization to use cash collateral in which the Agent and the Secured Lenders assert an interest (the "Cash Collateral"), in accordance with the Budget and the terms of the Interim Order and the Final Order, to fund the Debtors' operations pending confirmation and effectiveness of a pre-packaged plan of reorganization by February 1, 2010. The use of Cash Collateral will provide the Debtors with

the necessary funds to operate their business, pay their employees and other expenses including professional fees and expenses, and maximize the value of their estates for the benefit of creditors.

106. The Debtors have approximately $6.7 million of cash and cash equivalents as of the Petition Date. Through January 30, 2010, the Debtors propose to use approximately $10.9 million of cash. During this period, the Debtors expect to generate approximately $6.6 million in cash receipts (of which approximately $3.4 million represents a payment from the Debtors' Canadian subsidiary on account of an existing intercompany note).

107. The Debtors seek authorization to use Cash Collateral and to grant certain liens and superpriority claims in favor of the Agent and the Secured Lenders, as adequate protection of their interests in the Prepetition Collateral, solely to the extent of any diminution in value of the Prepetition Collateral. As noted above, the Agent and the Steering Group consents to the use of cash requested herein, subject to entry of the Interim Order and the Final Order.

108. The Debtors request that the Court conduct an interim hearing (the "Interim Hearing"), pursuant to Local Bankruptcy Rule 4001-2(b), to consider the entry of the Interim Order, and schedule the Final Hearing to consider entry of a Final Order at or prior to the hearing to consider confirmation of the plan.

109. The Agent and the Steering Group consent to the Debtors' use of Cash Collateral on the terms of the Interim Order, the Final Order and the Budget. Such consent is conditioned upon the grant of certain liens and superpriority claims in favor of the Agent and the Secured Lenders as adequate protection of such parties' interests in the Prepetition Collateral,

solely to the extent of any diminution in value of the Prepetition Collateral. Specifically and subject to the Carve-Out, the Debtors' propose to grant the Agent and the Secured Lenders postpetition liens in, and superpriority claims against, all of the assets of the Debtors' estates (excluding only Avoidance Actions or the proceeds thereof).

110. The Debtors have proposed a pre-packaged plan of reorganization that contemplates confirmation and effectiveness by February 1, 2010. In the interim, the Debtors require access to Cash Collateral to fund operations. As noted above, the Debtors have approximately $6.7 million of cash and cash equivalents as of the Petition Date. Through January 30, 2010, the Debtors propose to use approximately $10.9 million of cash. During this period, the Debtors expect to generate approximately $6.6 million in cash receipts (of which approximately $3.4 million represents a payment from the Debtors' Canadian subsidiary on account of an existing intercompany note). Although the Debtors' business is seasonal in nature, the Debtors are generating positive EBITDA (earnings before interest, taxes, depreciation and amortization) and are expecting to generate approximately $7 million in positive EBITDA on an annual basis during each of the calendar years 2009 and 2010.

111. Without the use of Cash Collateral, I believe that the Debtors will be unable to operate their business and will have no means to effectuate a reorganization. Because the Debtors would be forced to immediately shutter their operations without access to cash, the going concern value of the Debtors' assets would be lost and creditors would be severely prejudiced. The Debtors' use of Cash Collateral therefore will allow the Debtors to maximize recoveries for all creditors.

112.     Based upon the foregoing and given the Agent's and the Steering Group's consent to use of cash on the terms set forth in the Interim Order, the Final Order and the Budget, this Court should authorize the Debtors' use of Cash Collateral and the grant of adequate protection contemplated by the Interim Order, as adequate protection for and to the extent of any diminution in the value after the Petition Date of the Agent's or the Secured Lenders' interests in the Prepetition Collateral.

113.     The Debtors must have immediate access to Cash Collateral in order to pay their ongoing operational expenses and to maximize the value of their estates. Funds are urgently needed to meet all of the Debtors' cash needs and to administer these cases in an orderly manner. In the absence of immediate postpetition financing, the Debtors' ability to preserve the value of their business and assets will be immediately and irreparably jeopardized, resulting in significant harm to the Debtors' estates. I believe that interim relief, pending the Final Hearing, is necessary, appropriate and fully warranted, and is essential to avoid immediate and irreparable harm to the Debtors, their estates, and their creditors.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  December 22, 2009

By:     Mark P. Laven
Title:    President and Chief Executive Officer
            Latham International, Inc., et al.