# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LATHAM INTERNATIONAL, INC., *et al.*[1] | ) | Case No. 09-14490 (____) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## DEBTORS' MOTION PURSUANT TO BANKRUPTCY CODE SECTIONS 105(a), 363, AND 507(a) FOR AN ORDER AUTHORIZING THE DEBTORS TO (I) PAY AND/OR HONOR PREPETITION WAGES, SALARIES, EMPLOYEE BENEFITS, AND OTHER COMPENSATION; (II) REMIT WITHHOLDING OBLIGATIONS; (III) MAINTAIN EMPLOYEE COMPENSATION AND BENEFITS PROGRAMS AND PAY RELATED ADMINISTRATIVE OBLIGATIONS; AND (IV) HAVE APPLICABLE BANKS AND OTHER FINANCIAL INSTITUTIONS RECEIVE, PROCESS, HONOR, AND PAY CERTAIN CHECKS PRESENTED FOR PAYMENT AND HONOR CERTAIN FUND TRANSFER REQUESTS

The above-captioned debtors and debtors in possession (the "Debtors") in the

instant chapter 11 cases (the "Chapter 11 Cases"), hereby move this Court (the "Motion") for the

entry of an order (the "Order"), pursuant to sections 105(a), 363, and 507(a) of title 11 of the

United States Code (as amended, the "Bankruptcy Code") and rules 6003 and 6004 of the

Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), authorizing the

Debtors to (i) pay and/or honor prepetition wages, salaries, employee benefits, and other

employee compensation or reimbursements; (ii) remit withholding obligations; (iii) maintain

employee compensation and benefits programs and pay related administrative obligations; and

---

[1] The Debtors in these cases, along with the last four digits of each Debtors' federal tax identification numbers and their respective addresses, are: Latham International, Inc (9049), 787 Watervliet Shaker Road, Latham, NY 12110; Latham Manufacturing Corp. (9130), 787 Watervliet Shaker Road, Latham, NY 12110; Viking Pools, LLC (2924), 1473 Industrial Park Road, Jane Lew, WV 26378; Coverstar, LLC (1935), 1795 West 200 North, Lindon, UT 84046; and Kafko (U.S.) Corp. (0638), 787 Watervliet Shaker Road, Latham, NY 12110.

(iv) have applicable banks and other financial institutions receive, process, honor, and pay certain checks presented for payment and honor certain fund transfer requests. In further support of this request, the Debtors state as follows:

## Jurisdiction and Venue

1.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).

2.     The statutory bases for the relief requested herein are sections 105(a), 363(b), 507(a) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004.

## General Background

3.     On the date hereof (the "Petition Date"), the Debtors commenced these cases by filing voluntary petitions with this Court for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been and no committees have been appointed or designated.

4.     The Debtors are the largest manufacturer of inground swimming pool components and pool accessories in North America. The Debtors' diversified product lines include customized in-ground and ready-to-order above-ground vinyl pool liners, polymer and steel pool wall systems, steps and ladders, pool safety covers, spillover spas, one piece fiberglass pools, automatic pool covers, and a variety of other pool related accessories, sold under highly

recognized brand names. The Debtors' products are primarily sold to the in-ground pool market both through a wide range of business-to-business distribution channels in the U.S., Canada and Europe, as well as directly to pool builders and dealers.

5.     The factual background relating to the Debtors' commencement of these chapter 11 cases is set forth in detail in the *Declaration of Mark P. Laven in Support of First Day Motions* (the "Laven Declaration") filed contemporaneously with this Motion and incorporated herein by reference.

## Relief Requested

6.     As of the Petition Date, the Debtors collectively employ 551 full and part-time U.S. employees in hourly, salaried, supervisory, management, sales, and administrative positions to perform the functions necessary to effectively and efficiently operate the Debtors' business (the "Employees") through Debtors Latham Manufacturing Corp. ("Latham"), Kafko [U.S.] Corp. ("Kafko"), Coverstar LLC ("Coverstar") and Viking Pools LLC ("Viking"). The Debtors employ both salaried and hourly Employees. 380 Employees are paid hourly and 168 Employees are salaried. 548 Employees are employed full-time and 3 Employees work part time.[2] The Employees of Latham who are engaged in administrative occupations are primarily located at the Debtors' headquarters in Latham, New York. Certain additional Latham Employees and Employees of Kafko, Coverstar and Viking are located at the Debtors' manufacturing plants and distribution centers located throughout the United States. Each of the

---

[2]  Of the 551 total Employees employed by the Debtors, 355 are employed by Latham, 33 are employed by Kafko, 53 are employed by Coverstar and 110 are employed by Viking. Debtor Latham International, Inc. has no Employees.

Debtors offers their Employees a wage payment schedule and benefit package that, in many respects, is unique to the individual Debtor. None of the Debtors' Employees or Temporary Employees are associated with a national union.

7.     By this Motion, the Debtors seek to minimize the personal hardship to the Employees if their prepetition obligations are not paid as a result of the filing of these Chapter 11 Cases, to maintain Employee morale during this critical time and to minimize the disruption to the Debtors' business operations, all for the benefit of the Debtors' creditors and their estates, by requesting, in their sole discretion, the authority (a) to pay and/or honor, *inter alia*, certain prepetition claims of Employees for wages, commissions and salaries (the "Wages"), employee benefits and other compensation or reimbursements (the "Benefits"), remit withholding obligations, and to pay all costs incident to the foregoing (collectively, the "Wages and Benefits"), and (b) to continue to pay and/or honor such Wages and Benefits as they become due postpetition in the ordinary course of the Debtors' business. The Wages and Benefits for which this relief is sought are set forth in detail below. Where individual Debtors offer Wages and Benefits unique to their Employees, the substantive differences are summarized below.

8.     The Debtors have been paying and/or honoring the Wages and Benefits in the ordinary course of business up to the Petition Date. The Debtors represent that they have (or will have) sufficient funds available postpetition to pay or honor promptly all Wages and Benefits, to the extent described herein, on an ongoing basis and in the ordinary course of business. Consequently, there is no reason for the Employee's Wages and Benefits to be

disrupted, which disruption would directly harm the Employees and the Debtors' efforts in these Chapter 11 Cases.

## The Debtors' Wages and Benefits Programs

### A. Wages, Salaries, Commissions and Associated Withholding

9.     The Debtors' aggregate monthly payroll for November, 2009, including wages, salaries, bonuses and commissions, was approximately $1,628,802.00, a small portion of which was paid to temporary employment agencies for the services of one temporary employee and one independent contractor as further described below.  The Employees are paid either weekly or bi-weekly in arrears through direct deposit or checks issued after the close of the associated pay periods.  Each of the Debtors pay their Employees according to a different schedule summarized below:

**Table 1: Summary of Debtors' Compensation Schedules**

| Debtor | Hourly Employees | Salaried Employees |
|---|---|---|
| Latham | Weekly | Bi-weekly |
| Kafko | Weekly | Weekly |
| Coverstar | Bi-weekly | Bi-weekly |
| Viking | Weekly | Weekly |

The Debtors anticipate that their go-forward post-petition monthly payroll will be approximately $1,700,000.00, which figure includes wages and taxes paid by the Debtors on behalf of the Employees (including withholding taxes paid by Employees), and withholdings for various Employee benefits, which are described more fully below.

10. Given the differing pay schedules used by the different Debtors, the last date on which the Debtors' Employees were paid prior to the Petition Date (the "Last Employee Pay Date") is also different for each of the Debtors and is summarized below:

**Table 2: Summary of Last Employee Pay Date with Associated Pay Periods[3]**

| Debtor | Last Hourly Employee Pay Date | Associated Pay Period for Last Hourly Employee Pay Date | Last Salaried Employee Pay Date | Associated Pay Period for Last Salaried Employee Pay Date |
|---|---|---|---|---|
| **Latham** | December 21 | December 13 to December 25 | December 21 | December 13 to December 25 |
| **Kafko** | December 21 | December 13 to December 25 | December 21 | December 13 to December 25 |
| **Coverstar** | December 4 | November 15 to November 28 | December 4 | November 15 to November 28 |
| **Viking** | December 18 | December 11 to December 25 | December 18 | December 11 to December 25 |

While the majority of the Employees are on direct deposit, many, primarily hourly employees are paid by check. Accordingly, as part of the relief requested hereunder, the Debtors seek authority to honor checks that may not have cleared by the Petition Date to Employees on account of pre-petition Wages, and if necessary, to authorize the Debtors' payroll agent to reissue those checks to Employees.

11. The next scheduled payroll for Employees after the Petition Date (the "Next Employee Pay Date") is summarized in the table below:

---

[3] The Last Employees Pay Dates listed herein have been adjusted to reflect a planned shutdown of operations at several of the Debtors' manufacturing facilities during the Christmas and New Years holiday season. The Debtors routinely run multiple pay periods prior to the scheduled shutdown to relieve the administrative burden of distributing payroll with reduced staff levels during the shutdown. Thus, the actual pay periods for just prior to the filing may not match the typical pay periods for the Debtors listed in Table 1.

**Table 3: Summary of Next Employee Pay Date with Associated Pay Periods**

| Debtor | Next Hourly Employee Pay Date | Associated Pay Period for Next Hourly Employee Pay Date | Next Salaried Employee Pay Date | Associated Pay Period for Next Salaried Employee Pay Date |
|---|---|---|---|---|
| Latham | January 7, 2010 | December 26, 2009 to January 2, 2010 | January 7, 2010 | December 26, 2009 to January 9, 2010 |
| Kafko | January 7, 2010 | December 26, 2009 to January 2, 2010 | January 7, 2010 | December 26, 2009 to January 2, 2010 |
| Coverstar | December 31 2009 | November 29 to December 12, 2009 | December 31, 2009 | November 29 to December 12, 2009 |
| Viking | January 7, 2010 | December 26, 2009 to January 2, 2010 | January 7, 2010 | December 26, 2009 to January 2, 2010 |

On the respective Next Employee Pay Dates, approximately $650,000 in Wages will be due on account of the pay periods summarized above, a portion of which will be on account of the Wages earned by Employees in the prepetition period. By this motion, the Debtors seek authority to pay up to $650,000 on account of pre-petition Wages to Employees for the payroll due on the Next Employee Pay Dates. No payments to any Employee on account of prepetition Wages will exceed the $10,950 cap of Bankruptcy Code section 507(a)(4).

12.     The Debtors use a payroll service company, Automated Data Processing ("ADP") to process their payroll. The Debtors transmit the payroll data for processing to ADP three days prior to the applicable payroll date. ADP debits the Debtors' payroll account two days prior to the payroll date in an amount necessary to cover the Wages, including Withholding Obligations (as defined below). In order to meet the payroll due on the Next Employee Pay Dates, the Debtors would need to transmit the payroll data to ADP by the Monday preceding the Next Scheduled Pay Date for each Debtor and provide funds to cover the payroll by the

Wednesday preceding the Next Scheduled Pay Date for each Debtor. The Debtors pay approximately $8,500 per month to ADP on account of payroll processing services. As of the Petition Date, the Debtors have not received their December 2009 invoice for ADP. Based on historic averages, the Debtors estimate that they may owe ADP an estimated $8,500 in unpaid fees with respect to ADP's processing of the Debtors' payroll and related administration for December, 2009 (the "Administration Fees"). The Debtors request authority to pay ADP the Administration Fees up to $10,000 that may be owing as of the Petition Date and to pay ADP postpetition in the ordinary course of the Debtors' business with respect to the same.

13.     In the ordinary course of its business, the Debtors routinely withhold from Wages certain amounts that the Debtors are required to transmit to third parties for purposes such as Social Security and Medicare, federal and state or local income taxes, contributions to the Debtors' benefit plans described more fully below, 401(k) contributions, garnishment, child support or similar obligations pursuant to court order or law (collectively, the "Withholding Obligations"). On average, the Debtors' Withholding Obligations for the pay periods in November 2009 were approximately $36,000 per pay period. The Debtors anticipate that their Withholding Obligations for the periods covered by the Next Employee Pay Dates will be approximately the same as their historical averages. In connection with the relief requested herein, the Debtors request authority for themselves or their agents, on behalf of the Debtors, to remit tax withholdings to the appropriate taxing agencies and to satisfy the other Withholding Obligations in connection with the payment of the Wages and Benefits. As of the Petition Date, the Debtors believe that there are no Withholding Obligation amounts left to be remitted to any

third parties. In an abundance of caution, the Debtors seek authority to remit Withholding Obligations of up to $50,000 on account of the pre-petition periods.

14.     In addition to their Employees, the Debtors also utilize the services of one independent contractor (the "Independent Contractor") and one temporary employee, who is hired through temporary employment agencies, to perform essential services in the Debtors' manufacturing facilities (the "Temporary Employees"). The Independent Contractor is the Debtors' acting Chief Financial Officer and fills a vital need for the Debtors in maintaining the books and records of the Debtors during these Chapter 11 Cases. The Temporary Employee assists the Chief Financial Officer in Latham's accounting department, and also will be critical to handling the management of these Chapter 11 Cases. The Debtors seek to pay the Temporary Employee and Independent Contractor that provide services to the Debtors in accordance with the agreements with the Independent Contactor and the temporary employment agency that arranges for the services of the Temporary Employee. All limits regarding the amounts of Unpaid Wages proposed to pay herein include the Debtors' proposed payments to Temporary Employees and Independent Contractors for their prepetition services.

**B.     Business Expense Reimbursements**

15.     The Debtors customarily reimburse Employees who incur business expenses in the ordinary course of performing their duties on behalf of the Debtors. Such expenses typically include, but are not limited to, business-related travel expenses, including air travel, auto travel and car rental, lodging, meal charges, business lunches, telephone charges, and miscellaneous other allowed travel expenses (the "General Reimbursement Obligations"). Such

General Reimbursement Obligations also include nominal amounts billed by Employees to corporate charge cards for the purchase of supplies, inventory, and equipment on behalf of the Debtors and in support of the Debtors' businesses.

16.     It is difficult for the Debtors to determine the exact amounts of General Reimbursement Obligations that are due and owing for any particular time period since the expenses incurred by Employees on behalf of the Debtors throughout the year vary on a monthly basis and because there may be some delay between when an Employee incurs an expense and submits the corresponding expense report for processing. Based on historical experience, the average monthly amount of General Reimbursement Obligations for all Employees is approximately $51,500.

17.     The Debtors seek authority to pay any prepetition General Reimbursement Obligations up to a total amount of $75,000, and to continue to honor General Reimbursement Obligations incurred postpetition in the ordinary course of the Debtors' business.

## C.     **Health Benefits**

18.     The Debtors provide several health benefit plans to their Employees, including medical and vision insurance, health care reimbursement accounts and dental insurance (collectively, the "Health Plans"), as described in more detail below. Employees are eligible to participate in the Health Plans commencing on the first day of the month following ninety days of employment by the Debtors.

19.     The administrators of the Health Plans invoice the Debtors in advance for the full amount of premiums owing as of the first of each month for that month's coverage

period both on account of the Debtors' Employees. As of the Petition Date, the Debtors have paid their December 2009 invoices to the Health Plans. Accordingly, as of the Petition Date, the Debtors do not believe they owe any premiums related to the Health Plans.

20.     As described in greater detail below, for most of the Health Plans, Employees make contributions and the Debtors deduct the Employees' portion of the premiums owing under the Health Plans from the Employees' Wages every pay period. The Debtors then provide the administrator of the Health Plan with the full payment of premiums that includes both the Debtors' and Employee's contribution.

21.     As required by law, the Debtors also offer certain of the Health Plans to their former employees who have elected COBRA coverage. In the case of the former employees who have elected COBRA coverage, the Debtors do not pay any premiums on behalf of the Employees. Instead, such former employees pay the full amount of the premiums due to a third party COBRA administrator, Rose & Kiernan, who manages the COBRA accounts for former Employees of Latham, Kafko and Coverstar.[4] Although the Debtors advance the premium amounts for these former employees when the Debtors pay their monthly invoices to the Health Plans, these advanced COBRA premium amounts are reimbursed to the Debtors by Rose & Kiernan, who collects the premium amounts owing directly from the former employees and remits them to the Debtors. Prior to the Petition Date, Rose & Kiernan had provided the Debtors with all COBRA premiums collected from former employees for December 2009, deducted an administration fee and sent the amount of the remaining COBRA premiums to the

---

[4] Viking does not use a third party administrator for COBRA payments, and instead collects premium payments directly from its former Employees

Debtors. The Debtors incorporated the COBRA premiums with the amounts previously paid to the administrator of the Health Plans. Accordingly, as of the Petition Date, the Debtors do not believe they owe any COBRA premiums related to the Health Plans.

a.     **Medical Plans**

22.     The Debtors provide their Employees with an option to participate in a medical insurance plan through a number of insurance providers (the "Medical Plans"). The Debtors each use a unique provider for its Medical Plan. Medical Plan premiums are paid in full by the Debtors to the insurance providers for their Employees on the first day of each month. Pursuant to established contribution requirements, the Debtors and their Employees share the obligation to pay such premiums for the Employee and any eligible dependents. Each pay period, the Debtors deduct from the Employees' Wages, the Employees' portion of the Medical Plan contribution, which amount depends upon the plan they select (together, the "Medical Plan Contributions") and the number of dependents included in the coverage. The Debtors recoup from these Employee contributions the amounts for monthly premium contributions that were paid at the beginning of the month. On average for all Debtors, the Employees contribute approximately 30% of the premium cost for the Medical Plan. The Debtors then contribute the remaining 70% of the monthly premiums and pay to their insurance company the full amount due for all Employee premiums on the first day of each month.

23.     Because the insurance provider and the Debtors' contribution for monthly premiums and plan terms are different for each of the Debtors, the Medical Plans are described separately below for each Debtor.

24.    Latham, Kafko and Coverstar.  Latham, Kafko and Coverstar Employees are insured through Blue Shield of Northeastern New York ("BSNENY") for the Medical Plan applicable to those Debtors.  Latham, Kafko and Coverstar each pay approximately 70% of the monthly cost of the Medical Plan premiums for Employees and dependents.  Single employees pay $77.21 monthly in premiums for the Medical Plan with an annual deductible of $1000. Employees and eligible dependents under family coverage pay $208.26 monthly in premiums for the Medical Plan with an annual aggregate deductible of $2,000.  In November 2009, Latham, Kafko and Coverstar collectively paid $177,000.00 on account of the Medical Plan premiums to BSNENY, which amount includes both the Employee and company contributions.

25.    In addition to the insurance provided to Latham, Kafko and Coverstar Employees through BSNENY, six Kafko Employees in California are provided insurance through Kaiser Permanente ("Kaiser").  Premiums are rated and costed by individual based on their age and geographic locations, by zip code, according to standard practice in California for this plan and this carrier.  In November 2009, Kafko paid $2,700 on account of the Medical Plan premiums to Kaiser, which amount includes both the Employee and company contributions.

26.    Latham, Kafko and Coverstar Employees are also provided a health reimbursement account ("HRA") to offset the payment of a portion of the deductible required under the Health Plan.  Pursuant to the HRA, the Employee is provided a rebate check equal to half of the total amount of the deductible when the Employee pays the full amount of the deductible.  The rebate checks are issued from the administrator of the HRA, Preferred Group Plans, Inc. ("PGP"), when PGP receives information from BSNENY that an individual employee

or family has met its respective $1,000 or $2,000 deductible. PGP then invoices the Debtors

monthly for the payments sent to any Employee or family that met its deductible in the previous

month. On December 4, 2009, the Debtors paid PGP $7,100.00 for all November 2009 HRA

payments made to Employees.

       27.    <u>Viking</u>. Viking Employees are insured through Mountain State Blue

Cross Blue Shield ("Mountain State BCBS" and together with BSNENY, the "Medical Plan

Insurance Providers") for the Viking Medical Plan. Viking pays approximately 80% of the

monthly cost of the Medical Plan premiums for Employees and approximately 70% of the

monthly cost of the Medical Plan premiums for dependents. Single employees pay $50.77

monthly in premiums for the Viking Medical Plan. Employees and eligible dependents under

family coverage pay between $93.23 and $213.30 monthly in premiums for the Viking Medical

Plan. In November 2009, Viking paid $45,800.00 on account of its Medical Plan premiums to

Mountain State BCBS, which amount includes both the Employee and company contribution. [5]

       28.    In total for November 2009, the Debtors paid $232,500 on account of their

Medical Plans to their Medical Plan Insurance Providers and PGP, which amount includes

Employee contributions, COBRA premium payments and all HRA reimbursements. As of the

Petition Date, the Debtors do not believe they have any outstanding pre-petition amounts owing

to any Medical Plan Insurance Providers on account of their Medical Plans. In an abundance of

caution, however, the Debtors seek authority to pay up to one month's invoices to their Medical

Plan Insurance Providers not to exceed $250,000 on account of pre-petition periods in the event

---

[5] Viking Employees are not provided any HRA plan.

that amounts may be owing on their Medical Plan for which the Debtors are not yet aware. The Debtors further seek authority to continue to offer their Medical Plans postpetition in the ordinary case of business and in their discretion.

### b. **Dental Plans**

29. Certain of the Debtors also provide their eligible Employees with fully insured dental insurance through various carriers (the "Dental Plans"). Dental Plan premiums are paid in full by the Debtors to the dental insurance providers in advance on the first day of each month. Each pay period, the Debtors deduct from the Employees' Wages, the Employees' portion of the Dental Plan contribution, which amount depends upon the number of dependents included in the coverage. The Debtors recoup from these Employee contributions the amounts for monthly premium contributions that were paid to the insurers at the beginning of the month. As with the Medical Plans, the insurance provider, contribution amount for monthly premiums and plan terms are different for each of the Debtors' Dental Plans.

30. Latham and Kafko. Latham and Kafko Employees are insured through Delta Dental ("Delta") for the Dental Plan. Latham and Kafko pay approximately 70% of the monthly cost of the Dental Plan premiums for Employees and dependents. Single employees pay $6.89 monthly in premiums for the Dental Plan. Employees and eligible dependents pay $20.50 monthly in premiums for the family Dental Plan. In November 2009, Latham and Kafko paid $12,800 on account of their Dental Plan premiums to Delta, which amount includes COBRA payments and both the Employee and company contribution.

31.     Coverstar.  Coverstar Employees are insured through Dental Select
("Select") for the Dental Plan.  Coverstar Employees pay the full monthly cost of the Dental Plan
premiums for themselves and their dependents through deductions from their Wages, and
Coverstar passes these amounts along to Select for the Dental Plan premiums.  Single employees
pay $9.07 monthly in premiums for the Dental Plan.  Employees and eligible dependents pay
$19.84-$31.88 monthly in premiums for the family Dental Plan.  In November 2009, Coverstar
paid $1,200 on account of their Dental Plan premiums to Select, which amount includes COBRA
payments.

32.     Viking.  Viking Employees are insured through the Metropolitan Life
Insurance Company ("MetLife" and together with Delta and Select, the "Dental Plan Insurance
Providers") for the Dental Plan.  Viking Employees pay the full monthly cost of the Dental Plan
premiums for themselves and their dependents through deductions from their Wages, and Viking
passes these amounts along to Select for the Dental Plan premiums.  Single employees pay
$28.52 monthly in premiums for the Dental Plan.  Employees and eligible dependents pay
$60.87 - $95.93 monthly in premiums for the family Dental Plan.  In November 2009, Viking
paid $4,200 on account of their Dental Plan premiums to MetLife, which amount includes
COBRA payments.

33.     As of the Petition Date, the Debtors do not have any outstanding pre-
petition amounts owing to the Dental Plan Insurance Providers on account of their Dental Plan.
In an abundance of caution, the Debtors seek authority to pay up to one month's invoice to
Dental Plan Insurance Providers not to exceed $20,000.00 on account of pre-petition periods in

the event that amounts may be owing on their Dental Plan for which the Debtors are not yet

aware.

### c. **Vision**

34.     The Debtors also provide their eligible Latham, Kafko and Coverstar

Employees with vision insurance through Empire Blue View (the "Vision Plan").  Participating

Latham, Kafko and Coverstar Employees pay the full monthly cost of the Vision Plan premiums

for themselves and their dependents.  The Debtors Pay Empire Blue View the full amount of any

premiums due for their Employees in advance each month and then recoup the premiums

through deductions from the Employees' Wages.  In November 2009, the Debtors paid $1,200

on account of their Vision Plan premiums to Empire Blue View, which include COBRA

payments.  The Debtors seek authority to continue to offer the Vision Plan postpetition in the

ordinary course of business in their discretion and to remit any pre-petition amounts owing on

account of the Vision Plan in an aggregate amount not to exceed $1,500 in an abundance of

caution.

### d. **Flexible Spending Accounts**

35.     Latham, Kafko and Coverstar also offer their Employees access to flexible

spending accounts ("FSA") to set aside pre-tax dollars to pay for eligible medical and dependent

care costs.[6]  An Employee's FSA deduction is taken out of his or her paycheck each pay period

and put in an account to be used for eligible expenses throughout the year.  As of the Petition

Date, there are accrued FSA contribution amounts that will be subject to remittance on account

---

[6]  Viking Employees are not eligible to participate in any FSA.

of the period after the Debtors' last payroll but before the Petition Date, which amounts are included in the Wages described above.

36.     Like the HRA, the FSA is administered for the Debtors by PGP. PGP receives claims for benefits and disburses payments on such claims, and the Debtors pay PGP a monthly fee based upon the number of participants and certain associated expenses. The Debtors estimate that they pay on average to PGP $12,700 per month for FSA contribution amounts withheld from Employee Wages. The Debtors seek authority to pay PGP up to $12,700 on account of pre-petition periods for which currently unknown amounts may be owing. The Debtors also pay PGP approximately $675.00 per month in administrative fees for managing the Flexible Spending Account program.

37.     The Debtors seek authority to honor the FSA Contributions in connection with satisfaction of the Wages, to pay all current and future administrative fees to PGP related to the FSA program, and to continue to provide the FSA program postpetition in the ordinary course of the Debtors' business.

**D.     Life, AD&D and Disability Insurance**

38.     The Debtors provide their Employees with life insurance, short-term and long-term disability insurance, and accidental death and dismemberment insurance, all as described below.[7] The Debtors seek authority to continue to offer their Employees life insurance, short-term and long-term disability insurance, and accidental death and

---

[7] Viking Employees are not provided with short-term disability insurance.

dismemberment insurance postpetition in the ordinary course of business in their discretion and to pay all amounts that may be due and owing for such programs due to prepetition obligations. The Debtors' premium contributions to the life insurance, short-term and long-term disability insurance, and accidental death and dismemberment insurance are paid on average within 20 days of invoice and total, in the aggregate, approximately $20,000 per month. As of the Petition Date, there are no amounts owing on account of the pre-petition period for these programs. However, in an abundance of caution, the Debtors seek authority to pay up to $23,000.00 for all of these programs on account of any pre-petition amounts that may be owing for which they are not yet aware.

39.     Disability Insurance. The Debtors provide all active, full-time Employees with short and long-term disability coverage (the "Disability Insurance"), except for Viking Employees who receive no short-term disability coverage. Short-term disability for Latham, Kafko and Coverstar Employees is provided by Aetna, Inc. ("Aetna") and administered by The Business Council of New York State, Inc. Insurance Fund (the "NYS Business Council"). Short-term disability insurance provides employees with 50% of base wages up to a maximum of $170 per week for up to 26 weeks. An Employee is eligible for short-term disability coverage after 6 months of full time service and after a waiting period of 7 days or after all sick time has been exhausted. The Debtors pay 100% of the premium cost less $.60 per week per employee of the short term disability coverage, which amounts to approximately $4,400 per month.

40. Long-term disability coverage is provided by is provided by (a) Aetna for Latham and Kafko Employees (b) MetLife for Viking Employees.[8] The long-term disability coverage offered by the Debtors covers 60% of an Employee's monthly base pay up to a maximum of $1,500 per month. An Employee is eligible for long-term disability coverage after 6 months of full time service and after a waiting period of 180 days with a covered disability. The Debtors pay 100% of the premium cost of the long term disability coverage, which amounts to approximately $4,700 per month. Employees can voluntarily purchase additional LTD coverage at their own cost which paid through regular payroll deductions. Under these supplemental LTD programs, the Debtors deduct from the Employees' Wages the applicable premiums and remit the premium amount to the applicable third party insurance carriers. Such amounts are included in the Withholding Obligations discussed above and the Debtors seek authority to remit any unremitted amounts as described herein. The Debtors also seek authority to continue to offer the supplemental LTD programs postpetition in their ordinary course of business.

41. <u>Life/AD&D Insurance</u>. The Debtors provide life insurance and accidental death and dismemberment insurance ("Life/AD&D Insurance") for Latham and Kafko employees through The Business Council of New York. The coverage provided by the Life/AD&D Insurance is equal to the Employee's annual earnings up to a maximum of $200,000. The Debtors pay 100% of such premium and the cost to the Debtors to provide such coverage is $17,000 per month.

---

[8] Coverstar Employees are not provided long-term disability coverage.

42.     The Debtors also provide their Employees with an option to elect (at their cost) voluntary life insurance and accidental death and dismemberment insurance, which provide coverage above what the Debtors offer as well as coverage for the Employee's spouse and dependent children if they elect the voluntary life insurance plan for themselves ("Voluntary Programs"). Under these Voluntary Programs, the Debtors deduct from the Employees' Wages the applicable premiums and remit the premium amount to the applicable third party insurance carriers. Such amounts are included in the Withholding Obligations discussed above and the Debtors seek authority to remit any unremitted amounts as described herein. The Debtors also seek authority to continue to offer the Voluntary Programs postpetition in their ordinary course of business.

43.     The Debtors provide a life and accidental death and dismemberment policy for their employees at Coverstar, at a value of $20,000 per employee through The Hartford. The Debtors pay 100% of the premium and the cost to the Debtors to provide such coverage is $450 per month. Employees are eligible to purchase additional coverage at their cost in increments of $10,000 up to the lesser of three times annual earnings or $500,000.

44.     The Debtor's provide a life and accidental death and dismemberment policy for their employees at Viking in an amount equal to the Employee's annual earnings up to a maximum of $50,000 through MetLife. The Debtors pay 100% of such premium and the cost to the Debtors to provide such coverage is $2,100 per month

## E.    Holidays, Vacation, and Leave

45.    Each of the Debtors provide their Employees with differing forms of regular paid time off ("PTO") consisting of holidays, vacation, personal, and/or sick leave time. In addition, Employees are eligible for other PTO, including, among other things, for bereavement leave, jury duty, or military service. Each of the Debtors provide for different PTO benefits as summarized below:

46.    Latham and Kafko. Full time Employees of Latham and Kafko with 30 days of service are entitled to nine paid holidays. Full-time Employees of these Debtors are entitled to two weeks of vacation (80 hours) after one year of service, three weeks of vacation (120 hours) at the start of their fifth year of service, four weeks of vacation (160 hours) at the start of their tenth year of service and five weeks of vacation (200 hours) at the start of their twentieth year of service. Latham and Kafko Employees are entitled to carry-over up to one week's vacation from year to year, and are entitled to be paid the full equivalent amount of their accrued vacation upon termination. After one year's employment, Latham and Kafko Employees are also entitled to one bonus day off that must be used in the current calendar year. Employees of Latham and Kafko are also entitled to sick and personal leave time and a number of paid and unpaid days off for jury duty, military service and other reasons under policies that are specific to each of the Latham and Kafko facilities and other family leave policies in accordance applicable state and federal laws.

47.    Coverstar. All full-time hourly Employees of Coverstar are entitled to seven paid holidays and various unpaid days off for jury duty, military service and other family

51407-001\DOCS_DE:154985.9

leave policies in accordance applicable state and federal laws. In addition to the above, Coverstar salaried employees are entitled to additional PTO for vacation, sick leave and personal leave. Full-time salaried Employees of Coverstar accrue PTO on a rolling basis each pay period. In a given full-time work year, Employees with at least one full year of service accrue 8 days of PTO per year, Employees with two to nine years of service accrue 13 days of PTO per year, and Employees with ten years or more of service accrue 18 days of PTO per year. Coverstar salaried Employees must take PTO in full-day increments, and can not carry unused PTO over into the next year. Coverstar Employees are entitled to be paid the full amount of their PTO upon termination or permanent lay-off.

48. <u>Viking</u>. Vacation, sick leave and personal time off for all Viking Employees is accrued every pay period starting as of the Employee's respective hire date and is based upon length of service. Employees accrue approximately 1.5 hours of PTO per week during their first five years of service, 2.3 hours of PTO in years six through eight and 3.08 hours of PTO per week after eight years of service. Unused PTO may be carried over from year to year up to a maximum of 240 hours of PTO, and Employees are entitled to be paid the full amount of their PTO upon termination or permanent lay-off.

49. The Debtors request authority in their discretion to honor, but not to pay, existing PTO earned by their Employees and continue to honor similar PTO policies regarding vacation time, sick time, personal time, and holidays on a post-petition basis and in the ordinary course of the Debtors' business.

**F.     401(k) Plan**

50.     The Debtors offer their eligible Employees a 401(k) retirement plan (the
"401(k) Plan") administered by Fidelity Management Trust Company ("Fidelity"). An
Employee is eligible for the 401(k) Plan on the first day of the month following one year after
the Employee's hire date. While the Debtors historically had a matching program, the Debtors
terminated matching contributions prepetition. Employee contributions to the 401(k) Plan are
withheld from paychecks and sent to Fidelity monthly prior to the tenth day of the following
month. The Debtors believe that there are no accrued 401(k) Plan contributions for November
2009 that remain unremitted. As of the Petition Date, the Debtors have withheld from certain
Employees contributions to the 401(k) Plan for December 2009 pay periods. The Debtors seek
authority to remit these Employee contributions to the 401(k) Plan to Fidelity in the same
manner as all other Withholding Obligations described above.

51.     The Debtors incur approximately $8,500 per year in administrative costs
to administer the 401(k) Plan (the "401(k) Fees"). The Debtors pay 401(k) Fees to Fidelity
quarterly in arrears. The Debtors' next payment to Fidelity for the last quarter of 2009 will be
due in January 2010, for which the Debtors have not yet received an invoice. The Debtors
estimate that the amount will be approximately $8,500, but seek authority to pay up to $10,000
out of an abundance of caution. Accordingly, the Debtors request authority, in their discretion,
to continue their existing 401(k) Plan and pay any 401(k) Fees in the ordinary course of the
Debtors' business, including any 401(k) Fees for the pre-petition period in an amount up to
$10,000.

## G.   **Workers' Compensation Insurance**

52.    Under the laws of various states, the Debtors are required to maintain workers' compensation insurance to provide their Employees with coverage for claims arising from or related to their employment with the Debtors. The Debtors currently maintain an annual workers' compensation policy (the "Workers' Compensation Insurance Policy") with Travelers Insurance Company ("Travelers") pursuant to which Travelers provides workers' compensation insurance coverage up to the statutory limits and up to $1,000,000 per occurrence for employer liability.

53.    The current term of the Workers' Compensation Insurance Policy runs through December 30, 2009, and costs $55,711 for the Debtors' California operations and $343,915 for operations in all other states ,on an annual basis, subject to final audit. The Debtors have paid all premium amounts for their current term of Workers' Compensation to Travelers.

54.    Certain benefits under the Workers' Compensation Insurance Policy may have been incurred prepetition but have yet to be fully paid, and certain other claims may have been filed prepetition but have yet to be resolved. For the claims administration process to operate in an efficient manner and to ensure that the Debtors comply with state law requirements, the Debtors must continue to assess, determine and adjudicate claims. Accordingly, the Debtors seek authority to (a) continue to maintain the Workers' Compensation Insurance Policy in the ordinary course of business and (b) pay certain prepetition amounts related thereto, including, without limitation, workers' compensation claims, deductibles, premiums and fees owed as such amounts become due in the ordinary course of the Debtors' business. The Debtors submit that

the continuance of their Workers' Compensation Policy is appropriate in the ordinary course of business, but out of an abundance of caution, seek authority to maintain their workers' compensation and other liability insurance in accordance with applicable law postpetition and to pay all premium installments as they come due in the ordinary course of business for next year's coverage.

## H.    Retirement Programs

55.    The Debtors maintain a qualified defined benefit pension plan under the Internal Revenue Code (the "IRC") and the Employee Retirement Income Security Act of 1974 ("ERISA") for approximately 52 retired Employees of DLM Plastics, Inc., a firm acquired by Latham Manufacturing Corp. (the plan was subsequently renamed the "Latham Retirement Plan"). The Latham Retirement Plan has been closed to any new participants since 2002 from any of the Debtors, and the Debtors do not make any regular contributions to the plan. The Latham Retirement Plan is administered by the Principal Financial Group ("Principal"). Principal collects monthly and quarterly administrative fees totaling approximately $17,000 per year directly from the Debtors. The Debtors also make annual premium payments to the Pension Benefit Guaranty Corporation of approximately $2,300 for the Latham Retirement Plan. The Debtors seek the authority, but not direction, to continue to make administrative payments to Principal and premium payments to the Pension Benefit Guaranty Corporation on account of the Latham Retirement Plan in the ordinary course.[9]

---

[9] By requesting authority to continue to administer the Latham Retirement Plan, the Debtors are not assuming or affirming any contracts, agreements, programs, or applicability of any law related to the Latham Retirement Plan and the Debtors reserve all of their rights with regard to the Latham Retirement Plan.

## I.    **Other Miscellaneous Programs**

56.    The Debtors offer the following programs under which their Employees may participate at their option, each of which the Debtors seek to continue after the Petition Date:

57.    Automobile Expenses.  In the ordinary course of business, the Debtors maintain a program through which their eligible Employees are provided a monthly stipend in lieu of a company-leased vehicle for use to pay for an automobile and automobile-related expenses (collectively, the "Automobile Expenses").  Approximately 30 Employees receive stipends averaging $700 per month per participating Employee.  As of the Petition Date, the Debtors believe that there are approximately $22,000 in prepetition obligations owed for Automobile Expenses for Employees.  The Debtors seek the authority, but not direction, to pay prepetition Automobile Expenses up to a maximum of $25,000 and to continue to pay Automobile Expenses for their Employees in the ordinary course.

## **Relief Requested**[10]

58.    Pursuant to sections 105(a), and 363(b)(1) and (c)(1) of the Bankruptcy Code and the "necessity of payment" doctrine, the Debtors seek authority to pay or honor, in their sole discretion:

(a)    the unpaid Wages, including any associated payroll processing obligations;

---

[10] Nothing in this Motion is intended to or shall convert any prepetition claim into an administrative claim.

(b)     any prepetition obligations owed to Independent Contractors for services rendered prior to the Petition Date pursuant to the agreements with such Independent Contractors;

(c)     any Withholding Obligations attributable to the period prior to the Petition Date and to remit the same to applicable authorities or other appropriate third-parties;

(d)     the General Reimbursement Obligations;

(e)     all prepetition obligations under the Medical Plan, Dental Plan and Vision Plan;

(f)     all prepetition obligations under the Workers' Compensation Insurance Policy;

(g)     honor vacation time and PTO earned prepetition by Employees;

(h)     the Automobile Expenses; and

(i)     any other prepetition claims or obligations described in this Motion for which such authority is specifically requested herein

(with each of the foregoing referred to collectively as the "Prepetition Employee Obligations.").

59.     The Debtors also seek authority to continue, in their sole discretion, on a postpetition basis:

(a)     the Medical Plan, the Dental Plan and the Vision Plan;

(b)     the Disability Insurance, Life/AD&D Insurance and Voluntary Life Insurance Programs;

(c)     the Workers' Compensation Insurance Policy;

(d)     vacation and time-off policies pursuant to the terms of the Debtors'
        applicable policies and this Motion;

(e)     their existing 401(k) Plan including payment of any 401(k) fees in
        the ordinary course of the Debtors' business; and

(f)     any other benefit program described in this Motion for which
        authority is specifically requested herein

(with each of the foregoing referred to collectively as the "Employee Programs.").

60.     The Debtors represent that (i) they will not distribute any amounts over
$10,950 directly to any individual employee on account of unpaid Wages, and (ii) they will not
pay any amounts in excess of the estimated outstanding amounts for each category of prepetition
claim identified herein without further order from this Court.

61.     To enable the Debtors to accomplish the foregoing, the Debtors request
that the Court authorize and direct the Debtors' banks and other financial institutions to receive,
process, honor, and pay all checks presented for payment and electronic payment requests
relating to the foregoing.

62.     Notwithstanding the authority requested in this Motion, the Debtors, in the
ordinary course of business sometimes modify, change and discontinue employee programs and
implement new employee programs and will continue to do so during these Chapter 11 Cases,
and will provide notice thereof as required by applicable rules and law.

**Basis for Relief**

63.     Statutory support for the requested relief exists pursuant to
sections 105(a), 363(b)(1) and (c)(1), and 507(a) of the Bankruptcy Code and the "necessity of

payment" doctrine (discussed *infra*). Bankruptcy Code section 363(b)(1) authorizes a debtor in possession to use property of the estate other than in the ordinary course of business after notice and a hearing. Bankruptcy Code section 363(c) authorizes a debtor in possession to enter into transactions in the ordinary course of business without notice and a hearing. Bankruptcy Code section 105(a) further provides, in pertinent part, that this Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of the Bankruptcy Code.

64.     The relief requested in this Motion is supported by the well-established "necessity of payment" doctrine.[11] The "necessity of payment" doctrine, which has been embraced by the Third Circuit, "teaches no more than, if payment of a claim which arose prior to reorganization is essential to the continued operation of the [business] during reorganization, payment may be authorized even if it is made out of corpus." *In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3rd Cir. 1981). *See also In re Sharon Steel Corp.*, 159 B.R. 730, 737 (Bankr. W.D. Pa. 1993) (embracing "necessity of payment" doctrine and citing *Lehigh & New England Ry. Co.* with approval). Similarly, the court in *In re Ionosphere Clubs, Inc.*, 98 B.R. 174 (Bankr. S.D.N.Y. 1989), stated that the "necessity of payment" doctrine "recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay prepetition claims where such payment is essential to the continued operation of the debtor." *Id.* at 176. In that case, the court permitted Eastern Air Lines, Inc., to pay its current employees' prepetition wages, salaries, medical benefits, and business expense claims. Judge Lifland relied on his

---

[11]  The doctrine was first articulated by the Supreme Court in railroad reorganization cases, *see Miltenberger v. Logansport Ry.*, 106 U.S. 286 (1882), and it has been held to be equally applicable to non-railroad debtor cases. *See, e.g., Dudley v. Mealey*, 147 F.2d 268, 271 (2d Cir. 1945) (hotel); *In re Gulf Air, Inc.*, 112 B.R. 152, 153 (Bankr. W.D. La. 1989) (airline).

equitable powers under Bankruptcy Code section 105(a) and, in particular, the "necessity of payment" doctrine to authorize such payments, recognizing that the debtor had to make the payments in order to retain its current employees and maintain positive employee moral--two factors that he deemed critical to the rehabilitation of an operating debtor. *Id.* at 176-77 (*citing* H.R. Rep. No. 595 95th Cong. 1st Sess. 16 (1977)). Other courts also have found that the "necessity of payment" doctrine applies to the payment of prepetition employee compensation and benefits. *See In re Chateaugay Corp.*, 80 B.R. 279, 281 (Bankr. S.D.N.Y. 1987) (under the "necessity of payment" doctrine, bankruptcy court should defer to the debtor's business judgment in permitting payment of certain workers' compensation claims).

65.     This Court similarly has approved the payment of prepetition claims of employees for wages, salaries, expenses, and benefits on the grounds that the payment of such claims was necessary to effectuate a successful reorganization or liquidation. *See, e.g., In re DHP Holdings II Corp.,* Case No. 08-183422 (Bankr. D. Del. Jan. 5, 2009); *In re EZ Lube, LLC.*, Case No. 08-13256 (CSS) (Bankr. D. Del. Dec. 10, 2008); *In re NetEffect, Inc.*, Case No. 08-12008 (KJC) (Bankr. D. Del. Aug. 28, 2008); *In re Western Nonwovens Inc.*, Case No. 08-11435 (PJW) (Bankr. D. Del. July 15, 2008); *In re Global Motorsport Group, Inc.*, Case No. 08-10192 (KJC) (Bankr. D. Del. Feb. 1, 2008)*; In re Answer Financial Inc.*, Case No. 08-10140 (MFW) (Bankr. D. Del. Jan. 23, 2008); *In re Aegis Mortgage Corporation*, Case No. 07-11119 (BLS) (Bankr. D. Del. Aug. 15, 2007); *In re Mortgage Lenders Network USA, Inc.*, Case No. 07-10146 (Bankr. D. Del. Feb. 7, 2007) (PJW); *In re Global Home Products LLC, et al.*, Case No. 06-10340 (Bankr. D. Del. Apr. 11, 2006)(KG); *In re Proxim Corp.*, Case No. 05-11639

(PJW) (Bankr. D. Del. June 15, 2005); *In re Maxide Acquisition, Inc.*, Case No. 05-10429

(MFW) (Bankr. D. Del. Feb. 15, 2005); *In re Redback Networks, Inc.*, Case No. 03-13359

(MFW) (Bankr. D. Del. Nov. 5, 2003).

66.     The "necessity of payment" doctrine authorizes the Debtors to pay the

amounts it seeks authority to pay pursuant to this Motion because the Debtors' Employees are

critical assets necessary both to the Debtors' operations and the successful prosecution of these

Chapter 11 Cases.

67.     Pursuant to sections 507(a)(4) of the Bankruptcy Code, claims of

Employees of the Debtors for "wages, salaries, or commissions, including vacation, severance,

and sick leave pay" earned within 180 days before the Commencement Date are afforded priority

unsecured status to the extent of $10,950 per Employee.  The Debtors believe that all of the

Employee Wages relating to the period prior to the Petition Date constitute priority claims under

sections 507(a)(4) of the Bankruptcy Code.  As priority claims, the Wages must be paid in full

before any general unsecured obligations of the Debtors may be satisfied.  Accordingly, the relief

requested may affect only the timing of the payment of these priority obligations, and will not

prejudice the rights of general unsecured creditors or other parties in interest.

68.     Pursuant to the relief requested herein, the Debtors request authority only

to pay up to the $10,950 statutory cap under Bankruptcy Code section 507(a)(4) to each

Employee on account of all unpaid Wages collectively owing to such Employee.[12]

---

[12]  In the event any unpaid amounts owing to any Employee on account of unpaid Wages exceed the $10,950
statutory cap, the Debtors reserve the right to petition the Court for authority to pay such amounts.

69.     Many Employees live from paycheck to paycheck and rely exclusively on receiving their full compensation or reimbursement of their expenses in order to continue to pay their daily living expenses. These Employees may be exposed to significant financial and healthcare related problems if the Debtors are not permitted to pay and/or honor the Wages and Benefits, and the expenses associated therewith, in the ordinary course of the Debtors' business. Moreover, the Debtors believe that if they are unable to honor accrued Employee Wages and the Benefits described above, including honoring PTO, Employee morale and loyalty will be jeopardized at a time when Employee support is critical. The Debtors believe that any uncertainty with regard to continuation of Wages and Benefits will cause significant anxiety at precisely the time the Debtors needs their Employees to perform their jobs at peak efficiency.

70.     Additionally, the Debtors submit that the Withholding Obligations (including any 401(k) contributions held by the Debtors) do not constitute property of the Debtors' estate and principally represent employee earnings that governments (in the case of taxes), Employees (in the case of voluntary Withholding Obligations), and judicial authorities (in the case of involuntary Withholding Obligations), have designated for deduction from Employee paychecks. The failure to transfer these withheld funds could result in hardship to certain Employees. The Debtors expect inquiries from garnishers regarding the Debtors' failure to submit, among other things, child support and alimony payments, which are not the Debtors' property but, rather, have been withheld from Employee paychecks. Moreover, if the Debtors cannot remit these amounts, the Debtors' Employees may face legal action due to the Debtors' failure to submit these payments.

71.     Finally, the Debtors submit that with respect to the wage-related taxes that constitute "trust fund" taxes, the payment of such taxes will not prejudice other creditors of the Debtors' estate given that the relevant taxing authorities would have a priority claim under section 507(a)(8) of the Bankruptcy Code in respect of such obligations.  Moreover, the monies payable for trust fund taxes, as well as the other funds that are held in trust for the benefit of third parties, such as withheld funds with respect to the 401(k) Plan, are not property of the Debtors' estate. *See, e.g., Begier v. IRS*, 496 U.S. 53 (1990) (withholding taxes are property held by a debtor in trust for another and, as such, are not property of the debtor's estates).

72.     The Employees have an intimate knowledge of the operation of the Debtors' business and are critical components to the success of these Chapter 11 Cases. Deterioration in the morale and welfare of the Employees at this critical time undoubtedly would adversely impact the Debtors and their ability to maximize the value of their assets.  Satisfaction of the Wages and Benefits, as described herein, is necessary to maintain the Employees' morale during the case and to insure continued, efficient operation in order to maximize value for all creditors.

73.     Finally, Pursuant to Rule 6003(b) of the Federal Rules of Bankruptcy Procedure, which became effective December 1, 2007, "a motion to pay all or part of a claim that arose before the filing of the petition" shall not be granted by the Court within 20 days of the Petition Date "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm . . . ." Fed. R. Bankr. P. 6003(b).  For the reasons described more fully above and as supported by the Laven Declaration, the Debtors submit that the requirements of Rule 6003 have

been met and that the relief requested in this Motion is necessary to avoid immediate and irreparable harm.

## No Assumption or Assignment of Employee Benefits

74.     To the extent any Employee Benefits or related agreement is deemed an executory contract within the meaning of section 365 of the Bankruptcy Code, the Debtors do not, at this time, seek to assume any such contract. Accordingly, if the Court authorizes the payments described above, such payments should not be deemed to constitute a postpetition assumption or adoption of the programs, policies, or agreements as executory contracts pursuant to section 365 of the Bankruptcy Code. Moreover, authorization to pay all amounts on account of Employee Wages and Benefits shall not affect the Debtors' right to contest the amount or validity of these obligations.

**Request for Authority for Banks and Other Financial Institutions
to Honor Checks Issued to Pay Wages and Benefits, to Honor All
Fund Transfer Requests Relating to the Foregoing, and to Pay All
Processing Fees Associated with Payment of Employee Wages and Benefits**

75.     The Debtors request that all applicable banks and other financial institutions be authorized to receive, process, honor, and pay all checks presented for payment and to honor all fund transfer requests made by the Debtors to Employees, whether such checks were presented or fund transfer requests were submitted prior to, on, or after the Petition Date. The Debtors represent that they have (or will have) sufficient postpetition funding to pay promptly all Employee Wages and Benefits, to the extent described herein, on an ongoing basis and in the ordinary course of business. Nothing contained in this Motion, however, shall constitute a request for authority to assume any agreements, policies, or procedures relating to

Employee Wages and Benefits. Further, the Debtors seek to retain the discretion to decide which Employee Wages and Benefits it will pay and honor, and nothing in this Motion shall be deemed an admission by the Debtor that any Employee Wages and Benefits will in fact be paid or honored.

76.     Finally, the Debtors request authority to pay all of the processing fees associated with payment of the Employee Wages and Benefits including, but not limited to, any fees owed to any third party administrators of Employee Benefits as described in the Motion.

## No Previous Request

77.     No prior motion for relief requested herein has been made to this or any other court.

## Notice

78.     Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (i) the Office of the United States Trustee and (ii) the Debtors' prepetition secured lenders. As the Motion is seeking "first day" relief, within two business days after the hearing on the Motion, the Debtors will serve copies of the Motion and any order entered respecting the Motion as required by Del. Bankr. LR 9013-1(m). The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Debtors respectfully request that the Court enter an order approving the relief set forth above and granting such other relief as is just and proper.

Dated: December 22, 2009

PACHULSKI STANG ZIEHL & JONES LLP

Laura Davis Jones (Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Joshua M. Fried (CA Bar No. 181541)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
E-mail:     ljones@pszjlaw.com
            dbertenthal@pszjlaw.com
            jfried@pszjlaw.com
            tcairns@pszjlaw.com

[Proposed] Counsel to Debtors and
Debtors in Possession