IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LATHAM INTERNATIONAL, INC., *et al.*[1] | ) | Case No. 09-14490 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTORS TO (A) CONTINUE INSURANCE COVERAGE ENTERED INTO PREPETITION, (B) ENTER INTO NEW INSURANCE POLICIES, (C) MAINTAIN POSTPETITION FINANCING OF INSURANCE PREMIUMS, AND (D) ENTER INTO NEW POSTPETITION FINANCING AGREEMENTS**

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), hereby move this Court (the "Motion") for entry of an order authorizing the Debtors to: (a) continue insurance coverage entered into prepetition and continue to pay all prepetition premiums, taxes, charges, and other obligations, including brokers' fees, owed under or with respect to existing insurance policies; (b) enter into new insurance policies through renewal of the current insurance policies or the purchase of new policies; (c) maintain premium financing agreements for insurance coverage entered into prepetition; and (d) enter into new postpetition premium financing agreements. In support of this Motion, the Debtors respectfully state as follows:

---

[1] The Debtors in these cases, along with the last four digits of each Debtors' federal tax identification numbers and their respective addresses, are: Latham International, Inc (9049), 787 Watervliet Shaker Road, Latham, NY 12110; Latham Manufacturing Corp. (9130), 787 Watervliet Shaker Road, Latham, NY 12110; Viking Pools, LLC (2924), 1473 Industrial Park Road, Jane Lew, WV 26378; Coverstar, LLC (1935), 1795 West 200 North, Lindon, UT 84046; and Kafko (U.S.) Corp. (0638), 787 Watervliet Shaker Road, Latham, NY 12110.

1

## Jurisdiction and Venue

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2. Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory predicates for the relief requested herein are §§ 105(a), 361, 362, 363(b), 364(c), 503, 1107 and 1108 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## Background

4. On the date hereof (the "Petition Date"), the Debtors commenced these cases by filing voluntary petitions for relief under chapter 11 the Bankruptcy Code.

5. The Debtors have continued in possession of their property and have continued to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6. No request has been made for the appointment of a trustee or an examiner in these cases, and no official committee has yet been appointed by the Office of the United States Trustee.

7. The Debtors are the largest manufacturer of inground swimming pool components and pool accessories in North America. The Debtors' diversified product lines include customized in-ground and ready-to-order above-ground vinyl pool liners, polymer and steel pool wall systems, steps and ladders, pool safety covers, spillover spas, one piece fiberglass

pools, automatic pool covers, and a variety of other pool related accessories, sold under highly recognized brand names. The Debtors' products are primarily sold to the in-ground pool market both through a wide range of business-to-business distribution channels in the U.S., Canada and Europe, as well as directly to pool builders and dealers.

8. The factual background regarding the Debtors, including their current and historical business operations and the events precipitating their chapter 11 filings, are set forth in detail in the *Declaration of Mark P. Laven in Support of First Day Motions* (the "Laven Declaration") filed concurrently herewith and fully incorporated herein by reference.[2]

## Summary of the Debtors' Insurance Coverage

9. In the ordinary course of business, the Debtors maintain numerous insurance policies for its U.S. and Canadian operations providing coverage for, among other things: property, casualty (including general liability, automotive liability, export liability, travel accident, umbrella coverage, excess liability and workers' compensation), crime liability, international liability, and fiduciary liability (collectively, the "Insurance Policies"). The Debtors' maintenance of insurance policies providing coverage for their Canadian operations benefits the estates because it enables its non-debtor Canadian subsidiaries to continue operations. A detailed list of the Debtors' current Insurance Policies is attached hereto as **Exhibit A**. A summary of the Debtors' existing Insurance Policies follows:

---

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Laven Declaration.

51407-001\DOCS_DE:155925.2

A.      **Workers' Compensation Program**

10.     Under applicable law, the Debtors are required to maintain workers' compensation policies and programs to provide their employees with workers' compensation coverage for claims arising from or related to their employment with the Debtors (the "Workers' Compensation Program"). The current Workers' Compensation Program insures losses arising during the period December 30, 2008 through December 30, 2009. The Workers' Compensation Program includes statutory limits of $1 million per accident, a policy limit of $1 million per disease, a per employee limit of a $1 million, and a deductible of $0. The annual premium payable for such coverage is approximately $416,844.

B.      **Directors and Officers Liability Insurance**

11.     As is common with large businesses of this kind, the Debtors maintain insurance coverage for all of their directors and officers that covers, among other things, defense costs, settlements, court awards and pre- and post judgment interest arising from claims brought by third parties alleging an insured is liable for an error, misstatement, misleading statement, improper act, omission, neglect or breach of duty (the "D & O Program"). The aggregate limit of liability for these policies is $5 million, and the per occurrence deductible, where applicable, is $75,000. The aggregate annual premium is $33,627. The current policy carried an original expiration date of December 19, 2009. However, on December 18, 2009, the Debtors paid a $8,390 premium to extend the D & O Program through March 19, 2010, and purchased a 6-year tail policy for $58,847.

## C. General Liability, Excess Liability, Automobile, and Property Insurance Policies

12. The Debtors maintain general liability insurance that insures premises liability, products/completed operations liability, personal injury, advertizing liability, and umbrella excess liability for its U.S. and Canadian operations. The coverage provided by its general liability insurance includes a $1 million per occurrence limit, and a $2 million aggregate limit. The per occurrence self insured retention under the general liability policy is $250,000. In addition, the Debtors maintain three layers of excess liability coverage provided by three different carriers. The aggregate limit of liability under these policies is $15 million. The aggregate annual premium for the general and excess liability coverage is $663,359, and the current policies expire on December 30, 2009.

13. The Debtors maintain automobile insurance that insures automobile liability, medical payments, uninsured and underinsured motorists and physical damage to hired vehicles. The Debtors maintain separate policies for their U.S. and Canadian operations. The total amount of coverage provided by each policy is $1 million. The total aggregate annual deposit premium paid by Debtors for automobile insurance coverage is $95,897 and the current policies expire on December 30, 2009.

14. The Debtors maintain property insurance that insures the Debtors' property for perils such as, but not limited to, fire, flood and earthquake. The Debtors maintain separate policies for their U.S. and Canadian operations. The total amount of coverage provided by its property insurance $100 million. The aggregate annual premiums for property insurance is approximately $279,374 and the current policies expire on December 30, 2009.

### D. Miscellaneous Policies

15. The Debtors maintain several other insurance policies that ocean cargo liability, international liability, workplace violence, and travel accident liability ("Miscellaneous Policies"). The aggregate annual premium for the Miscellaneous Policies coverage is approximately $22,155.

### Payment of Insurance Obligations

16. The Debtors pay all insurance obligations through their Insurance Policies. The Debtors pay the premiums for certain of their coverage in full when due, and for certain of the Insurance Policies the Debtors finance payment over the course of the coverage year.

### A. Insurance Brokers

17. AON Risk Services Central, Inc. ("AON"), Krauter & Company ("Krauter"), and Rose & Kiernan, Inc. ("Rose" and, together with AON and Krauter, the "Insurance Brokers") serve as the Debtors' insurance agents/brokers. AON manages the Debtors' relationships with various third-party insurance carriers (the "Insurance Carriers") under the following policies: general liability, umbrella liability, property, export liability, travel accident, and international liability. Krauter manages the Debtors' relationships with various Insurance Carriers under the following policies: fiduciary liability, crime liability, workplace violence, and employer liability. Rose manages the Debtors' relationships with various Insurance Carriers under the following policies: workers' compensation, employee benefits, and automotive liability.

18.    Among other things, the Insurance Brokers represent the Debtors in various ongoing negotiations with the Debtors' Insurance Carriers. Under the current service agreement with AON, the Debtors' pay AON an annual service fee of $92,500. The agreement with AON expires on December 31, 2009. As of the Petition Date, the Debtors have paid all service fees due and owing to the Insurance Brokers under current service agreements, so no amounts remain to be paid under those agreements after the Petition Date. The Debtors believe that it is in the best interests of their creditors and estates to continue their business relationships with the Insurance Brokers. Accordingly, the Debtors seek the Court's authorization to continue postpetition their prepetition practice of paying brokerage fees to the Insurance Brokers.

B.    **Insurance Premium Financing**

19.    The Insurance Policies maintained by the Debtors will all expire under their annual terms, beginning with policies due to expire on December 31, 2009 (all insurance policies, except fiduciary liability and workplace violence liability). The Debtors' premiums for the Insurance Policies total approximately $1.6 million on an annual basis. As part of their existing financing arrangements, the Debtors have financed the insurance premiums for certain of the Insurance Policies (collectively, the "Financed Policies"). The Debtors' business determination to finance the payment of premiums in connection with the Financed Policies is based on the fact that it is not always economically advantageous for the Debtors to pay the premiums on the Insurance Policies at inception. Accordingly, in the ordinary course of the Debtors' business, the Debtors may choose to finance the premiums on some of their policies pursuant to premium financing agreements with third-party lenders (the "PFAs").

20.     As of the Petition Date, the Debtors maintain one PFA with AFCO Credit Corporation, an insurance premium finance company ("AFCO").[3] The PFA finances the payment of premiums for umbrella excess liability, cargo liability, general liability, and international liability coverage (a copy of which is attached as **Exhibit B**). The total premiums under the PFA equal $669,218.65.

21.     Pursuant to the PFA, the Debtors paid $134,630 to AFCO as an initial down payment, and, after the assessment of a $10,142.38 finance charge, financed a total of $544,731.03. The current PFA requires nine monthly payments to AFCO, each in the total amount of $60,525.67, with the final installment paid on or about September 30, 2009. The Debtors have paid all obligations due prepetition under the PFA, and no additional installments are due.

22.     Pursuant to the PFA, AFCO has (i) a security interest in any and all unearned premiums with respect to the Financed Policies and (ii) a power of attorney from the Debtors to cancel the Financed Policies in the event that the Debtors default on their obligations to make payments under the PFA.

## Requested Relief

23.     The Debtors do not believe that they need Court approval to maintain the Insurance Policies or to amend, extend or renew them in the ordinary course of business. Moreover, with respect to outstanding amounts that come due after the Petition Date, the Debtors

---

[3] AFCO Credit Corp. acquired the Debtors' PFA from AON Premium Finance, LLC.

respectfully do not believe that they need Court approval as these obligations arguably constitute the postpetition use of the Debtors' property in the ordinary course of their business.

24. However, in an abundance of caution and pursuant to Bankruptcy Code sections 105(a), 361, 362, 363(b), and 364 and Bankruptcy Rule 6003 and 6004(a), the Debtors hereby seek an order authorizing them in their business judgment to continue the Insurance Policies on an uninterrupted basis in accordance with the same practices and procedures as in effect immediately prior to the Petition Date, and to pay all premiums, claims, deductibles, excess payments, retrospective adjustments, settlement costs, insurance broker fees, and all other obligations arising under or in connection with the Insurance Policies (collectively, the "Insurance Obligations") including, in their sole discretion and business judgment, those Insurance Obligations that were due and payable or related to the period prior to the commencement of these chapter 11 cases. The Debtors also seek an order authorizing the banks at which they maintain accounts (the "Banks") to honor, process, and pay, to the extent funds are available in their accounts, any checks or wire transfer requests issued by the Debtors with respect to their Insurance Obligations.

25. In addition, pursuant to Bankruptcy Code sections 105, 361, 362, 363 and 364, the Debtors request authority to continue, in the ordinary course of business, their insurance premium financing arrangements and, to the extent necessary, to pay prepetition insurance premium financing obligations owed by the Debtors on account of such arrangements. Pursuant to their business judgment, the Debtors determined that it was advantageous to finance the premiums for certain of their Insurance Policies rather than making a single, up-front, lump sum

payment to the insurers. The monthly payment arrangements set forth in the current financing agreements minimize the cash strain placed upon the Debtors' businesses by its insurance costs.

**Basis for Relief**

**A.      The Debtors Are Authorized to Pay the Insurance Obligations**

26.     The Court may authorize the Debtors to pay prepetition premiums to maintain insurance coverage under section 363(b) of the Bankruptcy Code. In particular, section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and an hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." Thus, under this section, a court may authorize a debtor to pay certain prepetition claims. *See Ionosphere Clubs*, 98 B.R. at 175 (affirming lower court order authorizing payment of prepetition wages pursuant to section 363(b) of the Bankruptcy Code); *In re Cooper-Standard Holdings Inc.*, Case No. 09-12743 (Bankr. D. Del. August 5, 2009); *In re J.L. French*, Case No. 09-12445 (Bankr. D. Del. July 14, 2009); *In re UAL Corp.*, Case No. 02-48191 (ERW) (Bankr. N.D. Ill. Dec. 9, 2002) (authorizing payment of prepetition claims under section 363 of the Bankruptcy Code as an out-of-the-ordinary-course transaction); *In re Jillian's Entm't Holdings, Inc.*, Case No. 04-33192 (DTS) (Bankr. W.D. Ky. June 22, 2004).

27.     Maintaining the Debtors' insurance coverage under the Insurance Policies is a crucial ordinary-course-of-business transaction. Authority to pay any prepetition amounts that may be due and owing under the Insurance Policies – to the extent the Debtors determine that such payment is necessary to avoid cancellation, default, alteration, assignment, attachment, lapse, or any form of impairment of the coverage, benefits or proceeds provided under the

10

Insurance Policies – is necessary to the Debtors' continued operation. Continuation of such coverage is required under the law and is imperative to the protection and preservation of the Debtors' most valuable assets. *See* 28 U.S.C. § 959(b) (chapter 11 debtor obligated under federal law to operate chapter 11 business according to the laws of the states where business and properties are located).

28. In addition, the Debtors may need to renew or replace certain of their Insurance Policies in the upcoming months. The nonpayment of any premiums, deductibles, or related fees under one of the Insurance Policies could result in one or more of the Insurance Carriers increasing future insurance premiums, declining to renew their insurance policies or refusing to enter into new insurance agreements with the Debtors in the future. If the Insurance Policies lapse without renewal, the Debtors may be exposed to substantial liability for employees' worker's compensation claims, first party property claims, and third party liability claims to the detriment of all parties in interest.

29. The Insurance Policies are vital to the Debtors' ongoing operations. Pursuant to the terms of contracts that the Debtors or their non-debtor affiliates are parties to, as well as the guidelines established by the Office of the United States Trustee, the Debtors are obligated to remain current with respect to the bulk of their primary Insurance Policies. Additionally, the funding of the Workers' Compensation Program is a requirement under applicable law for the Debtors' ability to employ personnel for its businesses and operations. The retention of qualified and dedicated senior management is also linked to the continued effectiveness of the D&O Program. Therefore, the continuation of the Insurance Policies and the

payment of all prepetition and postpetition Insurance Obligations arising under the Insurance Policies is essential to the Debtors' businesses and to preserve value for all parties in interest.

**B.      Section 105(a) of the Bankruptcy Code Justifies Payment of All Insurance Obligations**

30.     In addition to the foregoing, the relief requested herein is also supported by Section 105(a) of the Bankruptcy Code, which empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). A bankruptcy court may use its equitable powers under section 105 of the Bankruptcy Code to permit a debtor-in-possession to pay prepetition claims when payment is necessary to effectuate a debtors' bankruptcy goals and essential to the continued operation of the business. *See Miltenberger v. Logansport, C. & S.W.R. Co.*, 106 U.S. 286 (1882); *In re Lehigh & New Eng. Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981); *In re Just for Feet, Inc.*, 242 B.R. 821, 825 (D. Del. 1999) (under necessity of payment doctrine prepetition claims may be paid if essential to the continued operation of the business during reorganization); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 192 (Bankr. D. Del. 1994) (recognizing that necessity of payment doctrine authorizes payment of prepetition claims when "such payment is essential to the continued operation of the business").

31.     Courts in this District have granted the relief requested herein in other chapter 11 cases. *See e.g., In re Cooper-Standard Holdings Inc.*, Case No. 09-12743 (Bankr. D. Del. August 5, 2009); *In re J.L. French*, Case No. 09-12445 (Bankr. D. Del. Jul. 14, 2009); *In re Flying J Inc.*, No. 08-13384 (MFW) (Bankr. D. Del. Feb. 18, 2009) [Docket No. 509]; *In re Linens Holding Co.*, No. 08-10832 (CSS) (Bankr. D. Del. May 2, 2008) [Docket No. 58]; *In re*

12

*Hoop Holdings, LLC*, No. 08-10544 (BLS) (Bankr. D. Del. March 28, 2008) [Docket No. 50]; *In re Sharper Image Corp.*, No. 08-10322 (KG) (Bankr. D. Del. Feb. 20, 2008) [Docket No. 48]; *In re FLYi, Inc.*, No. 05-20011 (MFW) (Bankr. D. Del. Dec. 21, 2005) [Docket No. 234]; *In re Freedom Rings, LLC*, No. 05-14268 (CSS) (Bankr. D. Del. Oct. 18, 2005) [Docket No. 29]; *In re Foamex Int'l Inc.*, No. 05-12685 (PJW) (Bankr. D. Del. Sept. 20, 2005) [Docket No. 41]; *In re Key3Media Group, Inc.*, No. 03-10323 (JWV) (Bankr. D. Del. Feb. 4, 2003) [Docket No. 38].

32. Other courts have also permitted debtors-in-possession to pay prepetition obligations in connection with insurance and workers' compensation programs in furtherance of a successful reorganization. *See In re Loral Space & Commc'ns Ltd.*, Case No. 03-41710 (RDD) (Bankr. S.D.N.Y. July 15, 2003); *Pension Benefit Guar. Corp. v. Sharon Steel Corp. (In re Sharon Steel Corp.)*, 159 B.R. 730, 736 (Bankr. W.D. Pa. 1993); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989) (authorizing the payment of prepetition employee wages and benefits); *In re Gulf Air, Inc.*, 112 B.R. 152 (Bankr. W.D. La. 1989) (authorizing debtor-in-possession to pay prepetition employee wages and benefits, and health, life, and workers' compensation insurance premiums); *Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.)*, 80 B.R. 279 (Bankr. S.D.N.Y. 1987) (affirming order authorizing debtor to pay certain prepetition wages, salaries, employee reimbursement expenses, and benefits, including payments on workers' compensation claims).

C. **Payment of Premium Financing Obligations is Necessary to Comply with United States Trustee Requirements.**

33. The Debtors believe that the ordinary course maintenance of their PFAs, including payment of all monthly obligations under the PFAs is necessary and essential to the

13

Debtors' operation of their businesses while they pursue the reorganization process, especially where, the Debtors' failure to pay their monthly premium obligations to AFCO could have disastrous consequences for the Debtors. Because the Debtors are required to maintain insurance coverage during their chapter 11 cases, the cancellation of these policies would be particularly disastrous. *See* 3 United States Trustee Manual 113-3.2.3 (Oct. 1998) (requiring maintenance of appropriate insurance coverage).

### D. Payment of the Premium Financing Obligations is Warranted under Bankruptcy Code Sections 361, 362, and 363.

34. Security interests created by PFAs generally are recognized as secured claims in bankruptcy to the extent of the amount of unearned premiums financed pursuant to such agreements. *See In re St. James Inc.*, 402 B.R. 209, 213 (Bankr. E.D. Mich. 2009); *TIFCO, Inc. v. U.S. Repeating Arms Co. (In re U.S. Repeating Arms Co.)*, 67 B.R. 990, 994-95 (Bankr. D. Conn. 1986); *Drabkin v. A.I. Credit Corp. (In re Auto-Train Corp.)*, 9 B.R. 159, 164-66 (Bankr. D.D.C. 1981). As a secured creditor, AFCO would be entitled to seek relief from the automatic stay, either to cancel the Debtors' insurance policies in accordance with the terms of their respective PFA, or to seek adequate protection of their investment. *See Universal Motor Express*, 72 B.R. 208, 211 (Bankr. W.D.N.C. 1987) (recognizing that a default under the financing arrangement and the resulting decline in value of the unearned premiums justified relief from the automatic stay).

35. As duly perfected secured creditors, insurance premium financiers are entitled to adequate protection of the value of their security, pursuant to Bankruptcy Code section 361, to protect them against the diminution in the value of their collateral. Adequate

14

protection may take many forms, including relief from the automatic stay and authority to apply unearned premiums to the outstanding debt.

36. The Debtors' failure to provide such adequate protection - for example by failing to pay the ongoing installments due under the Financing Agreement - may constitute cause under Bankruptcy Code section 362(d) for AFCO to obtain relief from the automatic stay and terminate the underlying policies.

37. Even if the Debtors were successful in preventing AFCO from lifting the automatic stay to pursue their remedies, such litigation likely would be contested and thus very costly to the estates. If AFCO succeeded in obtaining such relief from the Court, the Debtors would then be required to obtain replacement insurance on an expedited basis. If the Debtors were required to obtain replacement insurance and to pay a lump-sum premium for such insurance policy in advance, this payment likely would be greater than what the Debtors currently pay. Even if the lender were not permitted to terminate the Financed Policies, any interruption of payment would have a severe, adverse effect on the Debtors' ability to finance premiums for future policies. Additionally, it would be unnecessarily disruptive to switch insurance policies and distract the Debtors at this critical time. Retaining the current Insurance Policies throughout these chapter 11 cases provides continuity for both claims administration and costs.

38. In view of the importance of maintaining insurance coverage with respect to their business activities and preserving the Debtors' liquidity by financing the insurance premiums, the Debtors believe it is in the best interests of their estates to authorize the Debtors to

15

honor their obligations under the PFAs, to renew them and enter into new PFAs as necessary. The Debtors will need to continue their insurance coverage throughout these chapter 11 cases. By spreading out the cost of the Insurance Policies over the applicable coverage period, PFAs often provide liquidity advantages as compared to the payment of up-front lump-sum payments for insurance coverage.

39. The Debtors believe that the renewal or negotiation of PFAs falls squarely within the ordinary course of their business that the Debtors would not need the Court's prior approval to maintain or enter into new premium financing agreements. However, out of an abundance of caution, the Debtors seek the Court's authority to renew the PFA and enter into new PFAs, in their discretion, without further Court approval.

E. **Banks Should Be Authorized to Honor Prepetition Checks and Wire Transfer Requests**

40. To the extent that a check issued or a funds transfer requested prior to the Petition Date for payment of Insurance Obligations has not cleared the particular bank as of the Petition Date, the Debtors seek entry of an order (a) authorizing the banks where such checking accounts are kept to honor such checks and/or funds transfer requests and (b) authorizing the Debtors to issue replacement checks, submit replacement funds transfer requests or provide other means of payment to the appropriate Insurance Carriers or Insurance Brokers to the extent necessary to pay all outstanding Insurance Obligations described in the Motion.

41. The Debtors represent that each of these checks or transfers is or will be drawn on the Debtors' general disbursement accounts and can be readily identified as relating directly to payments under the Insurance Policies. Accordingly, the Debtors believe that

prepetition checks and transfers other than those relating to the Insurance Policies will not be honored inadvertently.

42. The relief requested herein is not prejudicial to any party in interest and, in fact, only benefits the Debtors' estate and their creditors. For this reason, and the supporting authority found in sections 105(a) and 363(b) of the Bankruptcy Code, the Debtors respectfully request entry of an order: (a) authorizing the Debtors to (i) continue the Insurance Policies on an uninterrupted basis in accordance with the same practices and procedures as were in effect before the Petition Date, and authorizing it to pay all premiums, deductibles, insurance broker fees, and all other Insurance Obligations relating to the periods before and after the Petition Date, and (ii) continue their insurance premium financing arrangements with AFCO; and (b) authorizing the Banks to honor, process, and pay, to the extent funds are available in their accounts, any checks or wire transfer requests issued by the Debtors with respect to their Insurance Obligations and premium financing obligations.

43. To the extent any Insurance Policies or related agreement is deemed an executory contract within the meaning of section 365 of the Bankruptcy Code, the Debtors do not, at this time, seek to assume such contract. Accordingly, if the Court authorizes the payments described above, any such payment should not be deemed to constitute a postpetition assumption or adoption of the programs, policies, or agreements as executory contracts pursuant to section 365 of the Bankruptcy Code. Nothing in the Motion should be construed as impairing the Debtors' right to contest the amount or priority of any Insurance Obligations that may be

17

51407-001\DOCS_DE:155925.2

owed to the Insurance Carriers, and the Debtors expressly reserves all of its rights with respect thereto.

### Satisfaction of Bankruptcy Rule 6003 and Waiver of Bankruptcy Rule 6004

44. Pursuant to Rule 6003(b) *of* the Federal Rules of Bankruptcy Procedure, "a motion to pay all or part of a claim that arose before the filing of the petition" shall not be granted by the Court within 20 days of the Petition Date "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm . . . ." Fed. R. Bankr. P. 6003(b). Because the benefits provided by the Insurance Polices are vital for the Debtors' businesses, and for the reasons set forth in the Laven Declaration, the Debtors submit that the requirements of Rule 6003 have been met and that the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates.

45. To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the ten-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h), to the extent these rules are applicable.

### Debtors' Reservation of Rights

46. Nothing contained herein is intended or should be construed as an admission of the validity of any claim against the Debtors, a waiver of the Debtors' rights to dispute any claim, or an approval or assumption of any agreement, contract, or lease under section 365 of the Bankruptcy Code. The Debtors expressly reserve their rights to contest any invoice with respect to insurance premium under applicable non-bankruptcy law. Likewise, if

18

this Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission of the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

## Notice

47.  Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (i) the Office of the United States Trustee and (ii) the Debtors' prepetition secured lenders. As the Motion is seeking "first day" relief, within two business days after the hearing on the Motion, the Debtors will serve copies of the Motion and any order entered respecting the Motion as required by Del. Bankr. LR 9013-1(m). The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

48.  No prior application for the relief requested herein has been made to this or any other court.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that the Court enter an order, granting the relief requested herein and granting such other and further relief as the Court deem appropriate.

Dated: December 22, 2009

PACHULSKI STANG ZIEHL & JONES LLP

/s/ Laura Davis Jones
Laura Davis Jones (Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Joshua M. Fried (CA Bar No. 181541)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
E-mail: ljones@pszjlaw.com
dbertenthal@pszjlaw.com
jfried@pszjlaw.com
tcairns@pszjlaw.com

[Proposed] Counsel to Debtors and
Debtors in Possession

51407-001\DOCS_DE:155925.2