Latham International, Inc. ("**LII**") and its debtor affiliates[1] (collectively, with LII, the "**Debtors**" or the "**Company**") are sending you this document and the accompanying materials (the "**Disclosure Statement**") because you are a creditor entitled to vote to approve the *Prepackaged Joint Plan of Reorganization of Latham International, Inc., et al., Under Chapter 11 of the Bankruptcy Code*, dated December 18, 2009, as the same may be amended from time to time (the "**Plan**"). The Company is commencing this solicitation of your vote to approve the Plan (the "**Solicitation**") before the Company files voluntary cases under chapter 11 of the United States Bankruptcy Code, as amended (the "**Bankruptcy Code**").

---

## DISCLOSURE STATEMENT FOR SOLICITATION OF ACCEPTANCES OF PREPACKAGED JOINT CHAPTER 11 PLAN OF REORGANIZATION

---

### DATED DECEMBER 18, 2009

The Company has not commenced reorganization cases under chapter 11 of the Bankruptcy Code as of the date of this Disclosure Statement. If, however, the Company receives properly completed ballots indicating acceptances of the Plan, to meet the voting requirements prescribed by section 1126 of the Bankruptcy Code, it intends to file (but hereby expressly reserves the right not to file) with a United States Bankruptcy Court voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "**Cases**"), and to seek, as promptly thereafter as practicable, confirmation of the Plan. Because the Cases have not yet been commenced, this Disclosure Statement has not been approved by the Bankruptcy Court as containing "adequate information" within the meaning of section 1125(a) of the Bankruptcy Code. If the Company files the Cases, it will seek in an order of the Bankruptcy Court (a) approving this Disclosure Statement as having contained "adequate information," (b) approving the Solicitation as having been in compliance with section 1126(b) of the Bankruptcy Code, and (c) confirming the Plan. The Bankruptcy Court may order additional disclosures.

### SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS

Neither this Disclosure Statement nor the Plan has been filed with or reviewed by the Bankruptcy Court, and the securities to be issued on or after the Effective Date (as defined below) will not have been the subject of a registration statement filed with the United States Securities and Exchange Commission (the "SEC") under the United States Securities Act of 1933, as amended (the "Securities Act"), or any securities regulatory authority of any state under any state securities law ("Blue Sky Law"). The Company is relying on section 4(2) of the Securities Act and similar Blue Sky Law provisions, as well as, to the extent applicable, the exemption from the Securities Act and equivalent state law registration requirements provided by section 1145(a)(1) of the Bankruptcy Code, to exempt from registration under the Securities Act and Blue Sky Law

---

[1] The Debtors in these cases, along with the last four digits of each Debtors' federal tax identification numbers and their respective addresses, are: Latham International, Inc (9049), 787 Watervliet Shaker Road, Latham, NY 12110; Latham Manufacturing Corp. (9130), 787 Watervliet Shaker Road, Latham, NY 12110; Viking Pools, LLC (2924), 1473 Industrial Park Road, Jane Lew, WV 26378; Coverstar, LLC (1935), 1795 West 200 North, Lindon, UT 84046; and Kafko (U.S.) Corp. (0638), 787 Watervliet Shaker Road, Latham, NY 12110.

the offer and sale of new securities in connection with the Solicitation and the Plan.

Each holder of a Class 3 Prepetition Financing Claim (defined in section II of the Plan) or authorized signatory for the beneficial owner of a Prepetition Financing Claim will be requested to certify on its Ballot whether such holder or beneficial owner is an Accredited Investor, as that term is defined by Rule 501 of Regulation D of the Securities Act. However, the failure to return the certification will not affect such holder's or such beneficial owner's right to receive a distribution under the Plan.

The Plan has not been approved or disapproved by the SEC or any state securities commission and neither the SEC nor any state securities commission has passed upon the accuracy or adequacy of the information contained herein. Any representation to the contrary is a criminal offense. Neither the Solicitation nor this Disclosure Statement constitutes an offer to sell or the solicitation of an offer to buy securities in any state or jurisdiction in which such offer or solicitation is not authorized.

This Disclosure Statement and the information set forth herein is confidential. This Disclosure Statement contains material non-public information concerning the Company, its subsidiaries, and their respective securities. Each recipient hereby acknowledges that (a) it is aware that the federal securities laws of the United States prohibit any person who has material non-public information about a company, which is obtained from the company or its representatives, from purchasing or selling securities of such company or from communicating the information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such securities and (b) is familiar with the United States Securities Exchange Act of 1934, as amended (the "Securities Exchange Act"), and the rules and regulations promulgated thereunder, and agrees that it will not use or communicate to any person under circumstances where it is reasonably likely that such person is likely to use or cause any person to use, any confidential information in contravention of the Securities Exchange Act or any of its rules and regulations, including Rule 10b-5.

The Company cannot assure you that the Disclosure Statement, including any exhibits to the Disclosure Statement that is ultimately approved by the Bankruptcy Court in the Cases will not contain different, additional, or material terms that do not appear in this Disclosure Statement. Therefore, the Company urges each Holder of a Claim entitled to vote on the Plan (a) to read and consider carefully this entire Disclosure Statement (including the Plan and the matters described under Article XVII of this Disclosure Statement, entitled "Plan Related Risk Factors" and (b) to consult with its own advisors with respect to reviewing this Disclosure Statement, the Plan, and each of the proposed transactions contemplated thereby prior to deciding whether to accept or reject the Plan. You should not rely on this Disclosure Statement for any purpose other than to determine whether to vote to accept or reject the Plan.

---

The deadline to accept or reject the Plan is 5:00 p.m. (Eastern time) on December 21, 2009, unless extended by the Company, in its discretion.

---

If the Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, all Holders of Claims against, and Holders of Interests in, the Debtors will be bound by the terms of the Plan and the transactions contemplated thereby.

**PACHULSKI STANG ZIEHL & JONES LLP**
Laura Davis Jones (Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Joshua M. Fried (CA Bar No. 181541)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705
(Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

Counsel to Latham International, Inc., et al.

**TABLE OF CONTENTS**

                                                                                                          **Page Number**

ARTICLE I. INTRODUCTION AND OVERVIEW ............................................................................. 1

   A.    INTRODUCTION ............................................................................................................ 1
   B.    DISCLAIMERS .............................................................................................................. 1
   C.    PURPOSE AND EFFECT OF THE PLAN FOR VOTING AND FOR DISTRIBUTION PURPOSES .................... 2
   D.    AN OVERVIEW OF THE CHAPTER 11 PROCESS ................................................................. 3
   E.    PLAN OVERVIEW .......................................................................................................... 3
   F.    WHO MAY VOTE ON THE PLAN ..................................................................................... 4
   G.    SUMMARY OF SOLICITATION PACKAGE AND VOTING INSTRUCTIONS ...................................... 4
   H.    CONFIRMATION OF THE PLAN ........................................................................................ 6
        1.    *Generally* ............................................................................................................ 6
        2.    *The Confirmation Hearing* ................................................................................... 6
   I.    CONFIRMING AND CONSUMMATING THE PLAN ................................................................. 6
   J.    RULES OF INTERPRETATION ........................................................................................... 6

ARTICLE II. HISTORY, ORGANIZATION AND ACTIVITIES OF THE COMPANY ................. 7

   A.    BUSINESS OPERATIONS ................................................................................................. 7
   B.    CORPORATE STRUCTURE AND MANAGEMENT ................................................................... 9
   C.    EQUITY, FINANCING, AND SIGNIFICANT INDEBTEDNESS .................................................... 10
   D.    EVENTS LEADING UP TO THE PROPOSED FINANCIAL RESTRUCTURING .................................. 11
   E.    EFFORTS TO RESTRUCTURE/ MARKETING OF NEW REVOLVING LOAN ................................... 11
   F.    SUMMARY OF PROPOSED RESTRUCTURING ...................................................................... 12
   G.    ANTICIPATED EVENTS OF THE CHAPTER 11 CASES ......................................................... 13
        1.    *Voluntary Petitions* ............................................................................................. 13
        2.    *Expected Timetable of the Chapter 11 Cases* ........................................................ 13
        3.    *First Day Relief* .................................................................................................. 13

ARTICLE III. DESCRIPTION OF THE PLAN ............................................................................... 14

   A.    TREATMENT OF UNCLASSIFIED CLAIMS ......................................................................... 14
        1.    *Administrative Claims* ......................................................................................... 14
        2.    *Priority Tax Claims* ............................................................................................ 15
        3.    *Claims for Professional Fees* ............................................................................... 15
   B.    TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS ...................................................... 15
        1.    *Class 1 – Priority Non-Tax Claims.* ...................................................................... 15
        2.    *Class 2 – Other Secured Claims.* .......................................................................... 16
        3.    *Class 3 – Prepetition Financing Claims.* ............................................................... 16
        4.    *Class 4 – Subordinated Note Claims.* .................................................................... 16
        5.    *Class 5 – Seller Note Claims.* .............................................................................. 17
        6.    *Class 6 – General Unsecured Claims.* ................................................................... 17
        7.    *Class 7 – Existing Equity Interests* ....................................................................... 17
        8.    *Class 8 – Reorganized Debtor Intercompany Claims* .............................................. 17
        9.    *Class 9 – Intercompany Claims.* ........................................................................... 18
   C.    FULL SATISFACTION, DISCHARGE AND RELEASE .............................................................. 18

ARTICLE IV. ACCEPTANCE OR REJECTION OF THE PLAN .................................................... 18

   A.    ONLY ONE VOTING CLASS .......................................................................................... 18
   B.    ACCEPTANCE BY IMPAIRED CLASSES ............................................................................ 18
   C.    PRESUMED ACCEPTANCE/REJECTION OF PLAN ............................................................... 18
   D.    NONCONSENSUAL CONFIRMATION ................................................................................ 18

ARTICLE V. MEANS FOR IMPLEMENTATION OF THE PLAN .................................................. 19

   A.    SOURCES OF CASH FOR PLAN DISTRIBUTIONS ............................................................... 19

i

B. ISSUANCE OF NEW EQUITY ................................................................................................ 19
C. SECURITIES EXEMPTION ................................................................................................... 19
D. POWERS OF NEW HOLDCO, NEW MIDCO AND NEW OPCO ............................................. 20
E. CANCELLATION OF SECURITIES AND AGREEMENTS .......................................................... 20
F. EXIT FACILITY .................................................................................................................... 20
G. NEW NOTE ........................................................................................................................ 20
H. NEW CERTIFICATES OF INCORPORATION AND NEW BY-LAWS .......................................... 21
I. DIRECTORS AND OFFICERS OF NEW HOLDCO, NEW MIDCO AND NEW OPCO ................. 21
J. EQUITY GRANT, AND ISSUANCE OF LAVEN WARRANTS AND MANAGEMENT WARRANTS ...... 21
K. PURCHASE OF ASSETS BY NEW OPCO ............................................................................. 22
L. CORPORATE TRANSACTIONS ............................................................................................ 22
M. CORPORATE ACTION ........................................................................................................ 22
N. EFFECTUATING DOCUMENTS; FURTHER TRANSACTIONS .................................................. 22
O. EXEMPTION FROM CERTAIN TAXES AND FEES ................................................................. 23
P. EMPLOYEE AND RETIREE BENEFITS .................................................................................. 23
Q. PRESERVATION OF RIGHTS OF ACTION ............................................................................ 23
R. SUBSTANTIVE CONSOLIDATION ....................................................................................... 24
S. REORGANIZED DEBTOR INTERCOMPANY CLAIMS ............................................................ 24
T. UNITED STATES TRUSTEE FEES ........................................................................................ 24
U. SUBORDINATION ............................................................................................................... 24

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ....................................................... 24

A. DATES OF DISTRIBUTIONS ................................................................................................ 24
B. DISBURSING AGENT ......................................................................................................... 25
C. CASH DISTRIBUTIONS ....................................................................................................... 25
D. ROUNDING OF PAYMENTS ................................................................................................ 25
E. DISTRIBUTIONS ON ACCOUNT OF CLAIMS ALLOWED AFTER THE EFFECTIVE DATE ......... 25
    1. General Distribution Procedures. ............................................................................... 25
    2. Address for Delivery of Distributions. ......................................................................... 26
    3. Undeliverable Distributions and Unclaimed Property. .............................................. 26
    4. Withholding Taxes. ..................................................................................................... 26
    5. Setoffs. ........................................................................................................................ 26

ARTICLE VII. PROCEDURES FOR RESOLVING DISPUTED CLAIMS ...................................... 26

A. NO FILING OF PROOFS OF CLAIM .................................................................................... 26
B. DISPUTED CLAIMS ............................................................................................................ 27
C. PROCEDURES REGARDING DISPUTED CLAIMS. ................................................................ 27
D. ALLOWANCE OF CLAIMS .................................................................................................. 27

ARTICLE VIII. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES 28

A. ASSUMPTION AND REJECTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES .......... 28
B. OBJECTIONS TO ASSUMPTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES .......... 28
    1. Objection Procedure Generally. .................................................................................. 28
    2. Objection Based on Grounds Other Than "Cure" Amount. ....................................... 28
    3. Objection Based on "Cure" Amount. .......................................................................... 28
C. PAYMENT RELATED TO ASSUMPTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ...... 29
D. REJECTION DAMAGE CLAIMS FOR REJECTED CONTRACTS ............................................. 29

ARTICLE IX. CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN .................... 29

A. CONDITIONS TO CONFIRMATION OF THE PLAN ............................................................... 29
B. CONDITIONS TO EFFECTIVE DATE .................................................................................... 29
C. EFFECT OF FAILURE OF CONDITIONS TO CONFIRMATION ............................................... 29
D. EFFECTIVE DATE .............................................................................................................. 30

ARTICLE X. EFFECTS OF CONFIRMATION ............................................................................. 30

ii

**ARTICLE XI. INJUNCTION** ............................................................................................................**30**

    A.    GENERALLY ........................................................................................................................30

    B.    INJUNCTION RELATED TO RIGHTS OF ACTION AND TERMINATED CLAIMS, ADMINISTRATIVE EXPENSES OR

    INTERESTS ................................................................................................................................30

    C.    EXCULPATION ....................................................................................................................31

    D.    DEBTOR RELEASE ...............................................................................................................31

    E.    THIRD PARTY RELEASE.........................................................................................................31

    F.    SUBSEQUENT DISCOVERY OF FACTS DOES NOT AFFECT ENFORCEABILITY OF RELEASES ...................31

**ARTICLE XII. RETENTION OF JURISDICTION** ................................................................**32**

**ARTICLE XIII. MISCELLANEOUS** ........................................................................................**33**

    A.    REVOCATION OF PLAN OF REORGANIZATION ...........................................................................33

    B.    SEVERABILITY OF PLAN PROVISIONS .....................................................................................34

    C.    GOVERNING LAW...............................................................................................................34

    D.    EXHIBITS ..........................................................................................................................34

    E.    NOTICES...........................................................................................................................34

    F.    RESERVATION OF RIGHTS ....................................................................................................34

    G.    DEFECTS, OMISSIONS AND AMENDMENTS ...............................................................................35

    H.    FILING OF ADDITIONAL DOCUMENTS .....................................................................................35

    I.    SUCCESSORS AND ASSIGNS .................................................................................................35

    J.    SETOFFS AND RECOUPMENTS ..............................................................................................35

    K.    TAX EXEMPTION ...............................................................................................................35

    L.    SECURITIES EXEMPTION .....................................................................................................35

    M.    PLAN INTEREST RATE .........................................................................................................36

    N.    IMPLEMENTATION ..............................................................................................................36

    O.    CERTAIN ACTIONS ............................................................................................................36

    P.    WAIVER OF TEN (10) DAY STAY..........................................................................................36

    Q.    SUBSTANTIAL CONSUMMATION ...........................................................................................36

**ARTICLE XIV. SOLICITATION AND VOTING PROCEDURES** ...................................**36**

    A.    THE SOLICITATION PACKAGE ..............................................................................................37

    B.    VOTING DEADLINE ............................................................................................................37

    C.    VOTING INSTRUCTIONS ......................................................................................................37

    D.    VOTING TABULATION .........................................................................................................38

**ARTICLE XV. VALUATION ANALYSIS AND FINANCIAL PROJECTIONS** ............**39**

    A.    VALUATION .....................................................................................................................39

        1.    *Valuation Methodology.* ...............................................................................................*41*

**ARTICLE XVI. CONFIRMATION PROCEDURES** .............................................................**43**

    A.    THE CONFIRMATION HEARING.............................................................................................43

    B.    STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN...................................................43

        1.    *Best Interests of Creditors Test/Liquidation Analysis* ....................................................*44*

        2.    *Feasibility*....................................................................................................................*45*

        3.    *Acceptance by Impaired Classes* ...................................................................................*45*

        4.    *Confirmation Without Acceptance by All Impaired Classes.*............................................*46*

    C.    IDENTITY OF PERSONS TO CONTACT FOR MORE INFORMATION ...................................................47

    D.    DISCLAIMER ....................................................................................................................47

**ARTICLE XVII. PLAN RELATED RISK FACTORS**...........................................................**48**

    A.    GENERAL .........................................................................................................................48

    B.    CERTAIN BANKRUPTCY LAW CONSIDERATIONS.......................................................................48

        1.    *Parties in Interest May Object to Company's Classification of Claims and Interests*............*48*

    2.     *Failure to Satisfy Vote Requirement*................................................................................48
    3.     *The Company May Not Be Able to Obtain Confirmation or Consummation of the Plan*........48
    4.     *The Company May Object to the Amount or Classification of a Claim*................................49
    5.     *Risk of Non-Occurrence of the Effective Date*.................................................................49
    6.     *Substantive Consolidation Risks*....................................................................................49
    7.     *Contingencies Not to Affect Votes of Impaired Classes to Accept the Plan*.......................49
C.     FINANCIAL INFORMATION; DISCLAIMER.......................................................................49
D.     CERTAIN TAX MATTERS..............................................................................................49
E.     RISK THAT THE INFORMATION IN THIS DISCLOSURE STATEMENT MAY BE INACCURATE...49
F.     LIQUIDATION UNDER CHAPTER 7................................................................................50
G.     SECURITIES RISK........................................................................................................50

**ARTICLE XVIII. SECURITIES LAW MATTERS.............................................................50**

A.     PLAN SECURITIES.......................................................................................................50
B.     ISSUANCE AND RESALE OF PLAN SECURITIES UNDER THE PLAN.....................................51
    1.     *Exemption from Registration*........................................................................................51
    2.     *Resales of Plan Securities; Definition of Underwriter*....................................................51

**ARTICLE XIX. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES ....................52**

A.     CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES TO THE DEBTORS.........53
    1.     *Transfer of Business Assets*..........................................................................................53
    2.     *Reduction of NOLs*......................................................................................................54
    3.     *Limitation on NOL Carryforwards And Other Tax Attributes*...........................................54
B.     CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES TO THE HOLDERS OF
CLASS 1, CLASS 3, AND CLASS 6 CLAIMS............................................................................54
C.     ACCRUED INTEREST...................................................................................................55
D.     MARKET DISCOUNT....................................................................................................55

**ARTICLE XX. ALTERNATIVES TO CONFIRMATION OF THE PLAN .......................55**

**ARTICLE XXI. RECOMMENDATION ...............................................................................56**

iv

## EXHIBITS

EXHIBIT A    Prepackaged Joint Plan of Reorganization

EXHIBIT B    Financial Projections

EXHIBIT C    Liquidation Analysis

# ARTICLE I.

## INTRODUCTION AND OVERVIEW

### A.    Introduction

The Company is sending you this Disclosure Statement because the Company is asking you to vote to approve the Plan. A copy of the Plan is attached hereto as **Exhibit A**. This Disclosure Statement describes certain aspects of the Plan, including the treatment of the Holders of the Claims and Interests, and also describes certain aspects of the Company's operations, financial projections, and other related matters.

The Plan that the Company describes in this Disclosure Statement provides for the reorganization of the Company's capital structure and satisfaction of all Claims against, and Interests in, the Debtors. Specifically, the Plan provides for (i) a purchase and sale of the Company's assets by the Debtors to New Opco, (ii) Holders of the Prepetition Financing Claims directly or indirectly owning 100% of the equity of New Latham Group (which includes New Opco), subject to dilution by the Equity Grant and certain management warrant grants, (iii) the issuance of an ABL Facility in the amount of $25,000,000 to cover post confirmation operating expenses, and (iv) the New Note in the amount of $20,000,000. The Company believes such a restructuring will significantly strengthen its financial position and enhance its ability to sustain current operations as a viable going concern, as reorganized.

The Company is providing the information in this Disclosure Statement solely for purposes of soliciting the votes of Holders of Class 3 Prepetition Financing Claims entitled to vote to accept or reject the Plan or object to Confirmation. Nothing in this Disclosure Statement may be used by any Entity for any other purpose.

All exhibits to this Disclosure Statement are incorporated into and made a part of this Disclosure Statement as if set forth in full herein.

The Plan constitutes a motion seeking entry of an order substantively consolidating the Cases for voting and for distribution purposes to the extent set forth in the Plan. Upon the Effective Date, for Plan distribution purposes, the assets and liabilities of the Debtors will be treated as pooled and all claims will be satisfied by the Debtors or New Opco, on behalf of the Debtors.

**Your vote on the Plan is important.** Absent acceptance of the Plan, there likely will be protracted delays or a Chapter 7 liquidation. These alternatives may provide for a lesser distribution to holders of Allowed Claims than the Plan does. **Accordingly, the Company recommends that you accept the Plan by completing and returning the enclosed ballot(s) no later than December 21, 2009, at 5:00 p.m. Eastern time.**

**This Disclosure Statement summarizes certain provisions of the Plan, certain other documents, and certain financial information. The Company believes that these summaries are fair and accurate in all material respects; however, you should read the Plan in its entirety. In the event of any inconsistency or discrepancy between a description contained in this Disclosure Statement and the terms and provisions of the Plan or the other documents or financial information to be incorporated herein by reference, the Plan, or such other documents, as applicable, shall govern for all purposes.**

### B.    Disclaimers

THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE DEBTORS' PROPOSED PLAN. PLEASE READ THIS DOCUMENT WITH CARE. THE PURPOSE OF THE DISCLOSURE STATEMENT IS TO PROVIDE "ADEQUATE INFORMATION" OF A KIND, AND IN SUFFICIENT DETAIL, AS FAR AS IS REASONABLY PRACTICABLE IN LIGHT OF THE NATURE AND HISTORY OF THE DEBTORS AND THE CONDITION OF THE DEBTORS' BOOKS AND RECORDS, THAT WOULD ENABLE A HYPOTHETICAL REASONABLE INVESTOR TYPICAL OF HOLDERS OF CLAIMS

1

OR INTERESTS OF THE RELEVANT CLASS TO MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN.

FOR THE CONVENIENCE OF CREDITORS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT THE PLAN ITSELF QUALIFIES ANY SUMMARY. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.

NO REPRESENTATIONS CONCERNING THE DEBTORS' FINANCIAL CONDITION OR ANY ASPECT OF THE PLAN ARE AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE OR REJECTION THAT ARE OTHER THAN AS CONTAINED IN OR INCLUDED WITH THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION.

THE FINANCIAL INFORMATION CONTAINED HEREIN, UNLESS OTHERWISE INDICATED, IS UNAUDITED. MOREOVER, BECAUSE OF THE DEBTORS' FINANCIAL DIFFICULTIES, AS WELL AS THE COMPLEXITY OF THE DEBTORS' FINANCIAL MATTERS, THE BOOKS AND RECORDS OF THE DEBTORS, UPON WHICH THIS DISCLOSURE STATEMENT IN PART IS BASED, MAY BE INCOMPLETE OR INACCURATE. HOWEVER, REASONABLE EFFORT HAS BEEN MADE TO ENSURE THAT ALL SUCH INFORMATION IS FAIRLY PRESENTED.

PACHULSKI STANG ZIEHL & JONES LLP ("PSZ&J") IS GENERAL INSOLVENCY COUNSEL TO THE DEBTORS. PSZ&J HAS RELIED UPON INFORMATION PROVIDED BY THE DEBTORS IN CONNECTION WITH PREPARATION OF THIS DISCLOSURE STATEMENT. ALTHOUGH PSZ&J HAS PERFORMED CERTAIN LIMITED DUE DILIGENCE IN CONNECTION WITH THE PREPARATION OF THIS DISCLOSURE STATEMENT, COUNSEL HAS NOT INDEPENDENTLY VERIFIED ALL OF THE INFORMATION CONTAINED HEREIN.

THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS LEGAL, BUSINESS OR TAX ADVICE. EACH CREDITOR OR INTEREST HOLDER SHOULD CONSULT HIS OR HER OWN LEGAL COUNSEL AND ACCOUNTANT AS TO LEGAL, TAX AND OTHER MATTERS CONCERNING HIS OR HER CLAIM.

## C.     Purpose and Effect of the Plan for Voting and for Distribution Purposes

The primary purpose of the Plan is to effectuate the restructuring and substantial de-leveraging of the Company's capital structure in order to bring it into alignment with the Company's present and future operating prospects and to provide the Company with greater liquidity. The Plan will allow the Company to continue its businesses in the ordinary course and provides for full payment of Allowed General Unsecured Claims. Presently, based on the current outlook, the funds expected to be generated by the Company's operation or other sources will not be sufficient to meet the Company's current debt service requirements and satisfy its current debt obligations unless the restructuring is consummated. The Company believes that the restructuring will reduce uncertainty with respect to its future and better position it to develop and maintain new customers.

In connection with developing the Plan, the Company reviewed its current business operations and compared its prospects as an ongoing business enterprise with the estimated recoveries of Claims and Interests in various liquidation scenarios. As a result, the Company concluded that the recovery for Holders of Allowed Claims and Interests would be maximized by continuing to operate as a going concern. The Company believes that its businesses and assets have significant value that would not be realized in a liquidation, either in whole or in substantial part. Consistent with the liquidation analysis described herein, the value of the Company's assets would be considerably greater if the Company operates as a going concern instead of liquidating. Moreover, the Company believes that any alternative to Confirmation of the Plan, such as an out-of-court restructuring, liquidation, or attempts by another part in interest to file a plan of reorganization, would result in significant delays, litigation, and additional costs, and ultimately would lower the recoveries for Holders of Allowed Claims and Interests.

2

Accordingly, the Company strongly recommends that you vote to accept the Plan if you are entitled to vote.

## D.    An Overview of the Chapter 11 Process

Chapter 11 is the principal business reorganization Chapter of the Bankruptcy Code. Pursuant to Chapter 11, a debtor may remain in possession of its assets and business and attempt to reorganize its business for the benefit of such debtor, its creditors and other parties in interest.

The commencement of a reorganization case creates an estate comprising all the legal and equitable interests of a debtor in property as of the date the bankruptcy petition is filed. Sections 1107 and 1108 of the Bankruptcy Code provide that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession," unless the bankruptcy court orders the appointment of a trustee. The filing of a reorganization case also triggers the automatic stay provisions of section 362 of the Bankruptcy Code which provide, among other things, for an automatic stay of all attempts to collect prepetition claims from a debtor or otherwise interfere with its property or business. Except as otherwise ordered by the bankruptcy court, the automatic stay generally remains in full force and effect until the effective date of a plan of reorganization, following confirmation of such plan of reorganization.

The Bankruptcy Code provides that upon commencement of a Chapter 11 bankruptcy case, the Office of the United States Trustee may appoint a committee of unsecured creditors and may, in its discretion, appoint additional committees of creditors or of equity interest holders if necessary to assure adequate representation.

Upon the commencement of a Chapter 11 bankruptcy case, all creditors and equity interest holders have standing to be heard on any issue in the Chapter 11 proceedings pursuant to section 1109(b) of the Bankruptcy Code.

The formulation and confirmation of a plan of reorganization is the principal objective of a Chapter 11 case. The plan of reorganization sets forth the means of satisfying the claims against and equity interests in the debtor.

A "prepackaged" plan of reorganization is one in which a debtor seeks approval of a plan of reorganization from affected creditors before filing for bankruptcy. Because solicitation of acceptances takes place before the bankruptcy filing, the amount of time required for the bankruptcy case is often less than in more conventional bankruptcy cases. Greater certainty of results and reduced costs are other benefits generally associated with prepackaged bankruptcy cases.

## E.    Plan Overview

The Plan provides for the classification and treatment of Claims against and Interests in the Debtors. For classification and treatment of Claims and Interests, the Plan designates Classes of Claims and Classes of Interests. These Classes and Plan treatments take into account the differing nature and priority under the Bankruptcy Code of the various Claims and Interests.

The following chart[2] briefly summarizes the classification and treatment of Claims and Interests under the Plan. Amounts listed below are estimated.

| Class | Type of Claim or Interest | Impairment | Entitled to Vote | Estimated Recovery Under Plan |
|-------|---------------------------|------------|------------------|-------------------------------|

---

[2] This chart is only a summary of the classification and treatment of Claims and Interests under the Plan. References should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Claims and Interests.

3

| Class | Type of Claim or Interest | Impairment | Entitled to Vote | Estimated Recovery Under Plan |
|---|---|---|---|---|
| Unclassified | Administrative Claims | N/A | No | 100% |
| Unclassified | Priority Tax Claims | N/A | No | 100% |
| 1 | Priority Non-Tax Claims | No | No | 100% |
| 2 | Other Secured Claims | No | No | 100% |
| 3 | Prepetition Financing Claims | Yes | Yes | 24% to 34% |
| 4 | Subordinated Note Claims | Yes | No | 0% |
| 5 | Seller Note Claims | Yes | No | 0% |
| 6 | General Unsecured Claims | Yes | No | 100% |
| 7 | Existing Equity Interests | No | No | 0% |
| 8 | Reorganized Debtor Intercompany Claims | No | No | 100% |
| 9 | Intercompany Claims | Yes | No | 0% |

## F. Who May Vote on the Plan

Each Holder of an Allowed Claim in Class 3 is entitled to vote either to accept or to reject the Plan. Only those votes cast by Holders of Allowed Claims shall be counted in determining whether acceptances have been received sufficient in number and amount to obtain Confirmation. An Impaired Class of Claims shall have accepted the Plan if: (a) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (b) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan. Classes 1, 2, 6 and 8 are deemed to accept the Plan by operation of law and are not entitled to vote on the Plan. The Holders Claims in Classes 4 and 5 and Holders of Interests in Class 7 shall not receive any distributions under the Plan and are therefore deemed to reject the Plan and are not entitled to vote. Because Classes 4, 5, 7 and 9 are deemed to reject the Plan by operation of law, the Debtors will request the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code. Without limiting the foregoing, in the event that any Class of Claims entitled to vote on the Plan fails to accept the Plan as required by section 1129(a) of the Bankruptcy Code, the Plan may be amended and, in any event, the Debtors reserve the right to seek confirmation of the Plan over such rejection pursuant to section 1129(b) of the Bankruptcy Code.

Instructions for voting on the Plan are set forth below in Article XIV entitled "Solicitation and Voting Procedures."

## G. Summary of Solicitation Package and Voting Instructions

The following materials constitute the solicitation package (the "Solicitation Package"):

- the appropriate Ballot and applicable Voting Instructions;

- a pre-addressed, postage pre-paid return envelope; and

4

- this Disclosure Statement with all exhibits, including the Plan.

The only voting class, Class 3, is entitled to vote to accept or reject the Plan and shall be served by email or with paper copies of this Disclosure Statement with all exhibits, including the Plan. Any party who desires additional paper copies of these documents may request copies by writing to Epiq Bankruptcy Solutions, LLC, 757 Third Avenue, 3rd Floor, New York, NY 10017, Telephone: (646) 282-2500 ("Epiq" or the "Voting Agent"). All parties entitled to vote to accept or reject the Plan shall receive by email, or a paper copy of, each appropriate Ballot.

The Company, has engaged Epiq as the Voting Agent to assist in the balloting and tabulation process. Epiq will, among other things, answer questions, provide additional copies of all Solicitation Package materials, and generally oversee the solicitation process.

Only the Holders of Class 3 Prepetition Financing Claims are entitled to vote to accept or reject the Plan. To be counted, Ballots cast by Holders must be received by Epiq by 5:00 p.m. (prevailing Eastern Time) on **December 21, 2009**, the Voting Deadline. Voting instructions are attached to each Ballot.

Unless the Company, in its discretion decides otherwise, any Ballot received after the Voting Deadline shall not be counted. Epiq will process and tabulate Ballots for Class 3, the only Class entitled to vote to accept or reject the Plan and will File a voting report (the "Voting Report") as soon as practicable on or after the Petition Date.

For answers to any questions regarding solicitation procedures, parties may contact Epiq directly, at 646-282-2500, with any questions related to the solicitation procedures applicable to their Claims and Interests.

The Plan Supplement will be Filed by the Debtors no later than five (5) days before the date fixed by the Bankruptcy Court for filing objections to confirmation of the Plan (the "Plan Supplement Filing Date"). When Filed, the Plan Supplement will be available in both electronic and hard copy form, although the Company will not serve paper or CD-ROM copies. Details about how to access the Plan Supplement will be provided in the notice sent to all parties in interest at the commencement of the Chapter 11 Cases.

**Any Ballot that is properly executed by the Holder of a Claim, but fails to clearly indicate an acceptance or rejection, or that indicates both an acceptance and a rejection of the Plan, shall not be counted.**

**Each Holder of a Class 3 Prepetition Financing Claim must vote all of its Prepetition Financing Claims either to accept or reject the Plan and may not split its votes. By signing and returning a Ballot, each Holder of a Prepetition Financing Claim in Class 3 will certify to the Bankruptcy Court and the Company that no other Ballots with respect to such Prepetition Financing Claim have been cast or, if any other Ballots have been cast with respect to such Class of Prepetition Financing Claims, such other Ballots are revoked.**

**All Ballots are accompanied by Voting Instructions. It is important to follow the specific instructions provided with each Ballot.**

**The Company is relying on section 4(2) of the Securities Act and similar Blue Sky Law provisions, as well as, to the extent applicable, the exemption from the Securities Act and equivalent state law registration requirements provided by section 1145(a)(1) of the Bankruptcy Code, to exempt from registration under the Securities Act and Blue Sky Law the offer and sale of new securities in connection with the Solicitation and the Plan.**

5

## H.    Confirmation of the Plan

### 1.    Generally

"Confirmation" is the technical term for the Bankruptcy Court's approval of a plan of reorganization or liquidation. The timing, standards and factors considered by the Bankruptcy Court in deciding whether to confirm a plan of reorganization are discussed in Article XV below.

### 2.    The Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.

Following commencement of the Cases, the Company intends to promptly schedule a Confirmation Hearing and will provide notice of the Confirmation Hearing to all necessary parties. The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing of any adjournment thereof.

## I.    Confirming and Consummating the Plan

It is a condition to Confirmation of the Plan that the Bankruptcy Court shall have entered the Confirmation Order in form and substance acceptable to the Debtors. Certain other conditions contained in the Plan must be satisfied or waived pursuant to the provisions of Article XV of the Plan.

Following Confirmation, the Plan will be consummated on the Effective Date, the day that is the first Business Day following the Confirmation Date on which: (1) no stay of the Confirmation Order is in effect; and (2) all conditions specified in Article XV of the Plan have been satisfied or waived pursuant to Article XV of the Plan.

For further information, see Article XV of the Plan, entitled "Conditions to Confirmation and Effectiveness."

## J.    Rules of Interpretation

The following rules for interpretation and construction shall apply to this Disclosure Statement: (1) capitalized terms used in the Disclosure Statement and not otherwise defined shall have the meaning ascribed to such terms in Article II of the Plan; (2) unless otherwise specified, any reference in this Disclosure Statement to a contract, instrument, release, indenture, or other agreement or document being in a particular form or substantially on such terms and conditions; (3) unless otherwise specified, any reference in this Disclosure Statement to an existing document, schedule, or exhibit, whether or not filed, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (4) any reference to an entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references in this Disclosure Statement to Articles are references to Articles of this Disclosure Statement; (6) unless otherwise specified, all references in this Disclosure Statement to exhibits are references to exhibits in this Disclosure Statement; (7) unless otherwise set forth in this Disclosure Statement, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (8) any term used in capitalized form in this Disclosure Statement that is not otherwise defined in this Disclosure Statement or the Plan but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

51407-001\DOCS_LA:211361.8

## ARTICLE II.

## HISTORY, ORGANIZATION AND ACTIVITIES OF THE COMPANY

**A.**     **Business Operations**

Latham Manufacturing Corp. ("Latham") is the largest manufacturer of in-ground swimming pool components and pool accessories in North America. Latham was founded in 1956 and is headquartered in Latham, New York. Latham's diversified product line includes customized in-ground and ready-to-order above-ground vinyl pool liners, polymer and steel pool wall systems, steps and ladders, pool safety covers, spillover spas, one piece fiberglass pools, automatic pool covers, and a variety of other pool related accessories, sold under highly recognized brand names such as Pacific Pools™, the Elite Pool®, Sterling Pools®, Kafko®, Viking Pools®, CPC®, Coverstar®, Performance Pool®, Frontier®, Technican™, Trillium®, Premium Pool™, and Triac®. Latham's products are primarily sold to the in-ground pool market both through a wide range of business-to-business distribution channels in the U.S., Canada and Europe as well as directly to pool builders and dealers.

Latham has seven main product lines: (1) Vinyl Liners; (2) Pool Steps and Ladders; (3) Spillover Spas; (4) Polymer and Steel Wall Systems; (5) Automatic Pool Cover Systems; (6) One-Piece Fiberglass Pools; and (7) Pool Safety Covers and Other Pool Accessories.

*Vinyl Liners* – The Company manufactures vinyl liners for in-ground, above-ground, and on-ground pools in a broad range of thicknesses, brands and patterns. These vinyl liners are available in virtually any size and shape, and the Company offers the largest selection of vinyl liner patterns in the industry. Due to various consumer tastes and the number of brands, Latham offers the widest selection of specific patterns. All of Latham's vinyl liners are well-known for their quality and durability.

Latham currently manufactures vinyl liners in seven (7) facilities throughout the United States and Canada. Above-ground vinyl liners are made in standard shapes and sizes. Due to the unique measurements of each custom vinyl-lined in-ground pool and the construction preferences of individual builders, all of Latham's in-ground liners are fabricated according to the specific customer's order dimensions. The Company typically manufactures above-ground liners in a made-to-stock manner during non-peak periods in order to maintain level employment for a core production staff and to enable it to dedicate 100% of its manufacturing capacity to made-to-order in-ground liners during peak season. Thus, inventory is built in the off-season to service builder orders during the peak pool season and throughout the year.

*Pool Steps and Ladders* – The Company offers the widest selection of pool steps in the industry, including thermoplastic, steel, and fiberglass construction. The Company produces three categories of pool steps: thermoplastic steps, fiberglass steps, and steel steps. Latham invented thermoplastic steps and patented the Totally Encapsulated System (TES) feature which helped the Company to achieve the leading market share due to its strength and ease of construction. Each thermoplastic pool step is manufactured from a solid sheet of high density co-extruded plastic. This design results in a strong single-piece step that resists flexing, delaminating and splintering better than other step systems. The strength and flexibility of the thermoplastic polymer utilized also enables the steps to withstand the stress of frost and back-fill saturation better than other step materials. The steps feature a molded, raised, non-slip tread for safe and easy pool entry and exit. Supporting the one-piece step design is an integrated full-width polymer support structure. This matrix of thermoplastic struts is held in place by a concrete bond beam and includes modular bracing for optional deck support. The Company's *Pacific* and *Performance* brand thermoplastic steps are available in a diverse range of over 30 shapes, sizes, and in three colors to fit virtually any pool design. The Company's thermoplastic step products also feature single piece co-extruded thermoplastic construction and raised tread.

In addition to thermoplastic steps, the Company provides a diverse selection of fiberglass-reinforced acrylic and steel steps. The Company produces over 25 models of acrylic step designs, including drop-in, straight, curved, lagoon, roman and cantilever designs. The Company also offers over 80 designs of steel steps.

7

Latham manufactures two different above-ground pool ladder models, a "deck-to-pool" ladder and a stand-alone ladder model. The Company's ladders are injection molded using ultraviolet and chemical resistant thermoplastic resin. Latham's above-ground ladders are considered the highest quality ladders on the market due to their durable construction and numerous performance features. Both designs offer features not available on other ladder models such as molded step treads, five steps instead of the standard four, and the ability to adjust to fit above-ground pool heights of 48 inches, 52 inches and 54 inches.

*Spillover Spas* – Latham manufactures a line of poolside spas for use in conjunction with vinyl-lined pools. Spillover spas share plumbing with the pool, typically utilizing water redirected from the heater or filtration system. Latham's spillover spas are engineered to operate in a number of different ways depending on the end user's preference, including as an isolated unit or with a flow-over feature allowing water to cascade into the pool. The Company's spillover spas are designed to complement both straight and curved walled swimming pools. The Company offers round, octagon, straight and radius models in 6 and 8-person capacities in a number of different colors. The Company's acrylic fiberglass line of spillover spas include 6-person octagonal and round models in a number of different colors.

*Polymer and Steel Wall Systems* – Latham manufactures a diverse range of pool wall panels in both steel and polymer construction. Steel pools comprise the substantial majority of the North American vinyl-lined pool industry, particularly in Canada, where over 90% of the installed vinyl-lined pool base have steel wall systems. Latham's steel wall systems are available in over 200 standard shapes as well as custom designs. Each steel panel is constructed of 14-gauge steel with a rust-resistant galvanized coating. All individual steel panels are kept straight by a matrix of riveted galvanized steel braces. All panels are held in place by a proprietary deck support system and framed steel support structure similar to the thermoplastic structures of its polymer panels. The Company's steel products are well-regarded for their quality and support design, and ease of installation and durability.

Latham's polymer wall panels, similar to steel, are formulated not to dent, decay or corrode and creates an extremely strong, durable panel and support structure. Latham introduced the first polymer wall panel in the industry and now has the leading market share in North America for all polymer pool components. Latham's polymer wall panels are available in many standard shapes and virtually limitless custom designs.

*Automatic Pool Cover Systems* – Debtor Coverstar LLC manufactures a range of motorized automatic pool covers for use in conjunction with new or existing pools. The automatic pool covers can be built into a new pool, and can also be fitted to virtually any pool size and shape under a recessed topguide or the addition of a bench at one end of the pool made from redwood, aluminum, or any durable material. The cover then slides on runners on top of or under the lip of the pool deck to cover the entire pool. The automatic pool covers are operated by a switch (which can be contained in a lockable box for safekeeping) to allow for a quick and easy removal of the pool cover. These automatic pool covers are produced to order.

*One-Piece Fiberglass Pools* — Debtor Viking Pools LLC manufactures a range of one-piece fiberglass pools in a variety of shapes and finish colors. These composite pools combine premium raw materials with a multi-stage manufacturing process, utilizing a ceramic core, sandwiched between two protective layers of specially designed resin and fiberglass. This process adds a greater stiffness to the pool shell and provides enhanced chemical resistance. The Debtors' one-piece, drop-in fiberglass pools are sold through a network of independent dealers throughout the United States and in Canada, and to a lesser extent for export. The one-piece fiberglass pools are sold under the "Viking," "CPC" and "Crystal Place" brand names.

*Pool Safety Covers and Other Pool Accessories* – Latham offers a number of additional pool-related accessories including 'safety covers' which are used to cover pools of all types during the winter season. In order to be designated as a 'safety cover,' the product needs to meet certain ASTM requirements. The Company produces these covers in both 'mesh' and 'solid' materials and sells them under a number of brand names. Safety covers are primarily manufactured between August and November, and the ability to produce covers in the pool building off-season helps the Company sustain level manufacturing operations throughout the year. In addition, the Company produces 'coping,' which

8

joins the pool steel or polymer wall system to the concrete deck or patio. Coping is fabricated from either aluminum or plastic extruded material, and assembled by the builder at the time of pool construction.

In conjunction with its comprehensive branding strategy, Latham utilizes a diverse group of distribution channels in order to maximize its reach to builders in North America. The Company's distribution channels include independent distributors and national buying groups, as well as its internal direct distribution capabilities. Latham's broad product offering, recognized brand names, strong customer service, reputation for quality and relative size of operations compared to smaller manufacturers provide attractive characteristics for customers who are able to purchase multiple products all through the Company as a single source of supply.

The Company uses a network of wholesale distributors, buying groups, pool builders, dealers, retailers and repairs services companies (collectively, the "Retailers"), which sell the Debtors' products to end-user consumer pool owners.

## B. Corporate Structure and Management

Latham is a wholly-owned subsidiary of LII. Debtors Viking Pools LLC, Coverstar, LLC and Kafko (U.S.) Corp. are 100% owned by Latham.[3]

The Company was founded in 1956. In December 2004, the parent company, which was then called Latham International, L.P., and certain of its subsidiaries, including Latham and Kafko (U.S.) Corp., were sold to Latham Acquisition, Corp, which was an acquisition company formed by Brockway Moran & Partners ("Brockway"), a private equity firm, and Poolcorp, a public company. After the sale of the company to Brockway and Poolcorp, Latham Acquisition Corp. underwent a name change on October 11, 2006, and became Latham International, Inc. ("Latham International").

In September 2005, Latham Acquisition Corp. acquired all of the issued and outstanding equity interests of Debtor Viking Pools, Inc. (which was converted into a limited liability company and renamed Viking Pools, LLC). In June 2006, Latham Acquisition Corp. acquired all of the issued and outstanding stock of Coverstar, Inc. (which was subsequently converted into a limited liability company and renamed Coverstar, LLC).

---

[3] Non-debtor Latham Splash Canada Inc. is a wholly-owned non-debtor subsidiary of Latham, and owns certain preferred non-voting shares of Debtor Kafko (U.S.) Corp.

9

Figure 1 – Current Corporate Structure

**Latham International, Inc.**
As of December 2008

LII    20-1939049

LMC    20-1939130

Latham Splash Canada

Pacific Pools Europe

Kafko[1]
98-0150638

Viking
91-2002924

Coverstar
As of June 2006
20-5691935

[1] Latham Splash Canada, Inc. owns Special Class A fixed value, non-voting shares of Kafko (U.S.) Corp. Latham Manufacturing Corp. owns 100% of the voting common stock.

## C.    Equity, Financing, and Significant Indebtedness

Brockway, through certain of its investment companies, and Poolcorp each own approximately 35% of the outstanding equity interests in LII. Apollo Investment Corporation owns approximately 4% of the equity interests of LII. The remaining equity interests in LII are owned by officers, employees and former employees of the Debtors.

As summarized below, the Debtors currently owe $197,529,346 in senior and junior secured debt and outstanding unsecured subordinated notes.

Latham is the borrower on the Debtors' secured term loan and revolving borrowing arrangement having entered into a certain credit agreement dated December 30, 2004 (the "First Lien Credit Agreement") with certain lenders and Wachovia Bank, National Association as administrative agent.[4] The other Debtors are guarantors of the obligations of Latham Manufacturing under the First Lien Credit Agreement as of the Petition Date. The outstanding amount of the term loan is approximately $147.9 million as of the Petition Date (the "First Lien Debt"). There are no outstanding revolving debt obligations under the First Lien Credit Agreement as of the Petition Date. The First Lien Debt is secured by the Debtors' assets. The remaining indebtedness described below is unsecured.

In addition to being the borrower under the First Lien Credit Agreement, Latham Manufacturing is the issuer of certain senior subordinated notes due 2012 (the "Subordinated Debt") in favor of Apollo Investment Corporation. The other Debtors are guarantors of the Subordinated Debt. The outstanding amount of the Subordinated Debt is approximately $41.8 million as of the Petition Date.

LII is the ultimate parent of the Debtors and their non-debtor affiliates. LII is the obligor under a promissory note dated December 30, 2004 in favor of Latham International, L.P. (the "Seller Note"),

---

[4] The Debtors' non-debtor Canadian affiliate, Latham Splash Canada Inc., is also a borrower under the First Lien Credit Agreement, but its obligations are limited to revolving debt obligations under the Canadian facility encompassed within the First Lien Credit Agreement. There are no outstanding obligations under the Canadian facility as of the Petition Date.

10

which was executed as part of a prepetition asset acquisition by the Debtors. The outstanding amount of the Seller Note is approximately $7.8 million as of the Petition Date.

As of November 30, 2009, on an unaudited consolidated basis, the Debtors reported total assets of approximately $66,994,161, including approximately $5,783,601 in accounts receivable and $16,838,340 in inventory, and $239,438,055 in liabilities, which included $2,261,529 in accounts payable and $197,529,346 of long term debt, as discussed more fully below. For the 2009 fiscal year through November, the Company, on an unaudited consolidated basis, reported net sales and losses of $90,190,350 and ($181,414,993) respectively.

## D.    Events Leading Up To the Proposed Financial Restructuring

Significant declines in market demand for the industry's products over the past three years have resulted in lower sales and significant unused manufacturing capacity in the Debtors' product lines. The downturn in the economy has negatively impacted sales industry-wide. The Debtors estimate that industry sales for 2009 will be down approximately 45% from 2008 and 70 to 75% from 2005. As a result of declining sales, there is significant excess industry capacity in the market. Historical sales have been best correlated with consumer sentiment and the availability of credit for customers to purchase the Debtors' products. The housing boom earlier in the decade, and corresponding home equity cash outs and rising prices for the Debtors' products, provided robust sales for the Debtors' products and the market in general. However, commencing in 2007 and continuing today, the housing bust and deteriorating economic climate resulted in declining industry sales. The continued downward spiral of consumer sentiment due to the state of the economy has contributed to the declining sales experienced industry-wide. In addition, traditional lenders who provide financing to consumers, such as GE and KeyBank, have ceased lending for pool purchases.

In response to these economic challenges, the Company aggressively worked to mitigate the economic impact caused by the above circumstances. During the period from 2007 to 2009, the Company made significant headcount reductions over each of the Company's divisions. Along with reducing headcount, management has actively worked to decrease the Company's legacy manufacturing footprint, reducing manufacturing facilities from 32 to 15. Additionally, a significant SKU reduction initiative was implemented in order to simplify manufacturing operations and reduce inventory, and the Company is taking advantage of these changes in 2009. This program has been a key component of management's ability to successfully reduce inventory levels and subsequently drive profitability and cash flow.

While these efforts have, in part, helped the Company weather the current economic decline, the Company still requires additional cash to purchase inventory in the near-term in order to operate their business. Because of the seasonal nature of the industry, the Company must spend approximately $25,000,000 during the first half of 2010 to satisfy the Company's peak seasonal working capital needs, as well as to reduce their existing debt load, in order to continue their operations. As a result of these events, the Company is compelled to attempt to effect the financial restructuring described below though the Plan in order to emerge with sufficient liquidity to continue operations.

## E.    Efforts to Restructure/ Marketing of New Revolving Loan

In early July 2009, Latham's board of directors (the "Board") engaged Moelis & Company ("Moelis") as its exclusive financial advisor to the Company to assist it in evaluating the Company's restructuring alternatives.

In July, 2009, Moelis performed preliminary business diligence with the Company at its headquarters in Latham, New York. This process included analyzing and discussing industry dynamics and trends, the Company's products and targeted markets, the Company's operations and cost-cutting initiatives, historical financials and profitability metrics, cash flow and profitability projections, and included site visits to certain of the Company's facilities.

In August 2009, Moelis provided the Company with potential alternatives in connection with the Company's restructuring efforts and also with the Company's lenders to update them on the current state of, and outlook for, the Company.

11

Following these presentations, in late August 2009, the Company and Moelis also met with Capstone Advisory Group, LLC ("Capstone"), a financial advisory firm retained by the lenders who hold the First Lien Debt (the "Lender Parties"), to explain the potential restructuring alternatives that were presented to the Lender Parties, and assisted in facilitating Capstone's diligence efforts with respect to a potential restructuring of the Company. In September, 2009, Moelis delivered a detailed presentation to the Company and the Board laying out the potential restructuring alternatives to be considered.

Starting in September 2009 and continuing though December 2009, the Company and Moelis conducted negotiations on a plan term sheet with the Lender Parties, pursuant to which, the Lender Parties would acquire substantially all of the Debtors' assets pursuant to debt-for equity exchange under a plan of reorganization. Negotiations commenced in September 2009 between the Lender Parties and the Debtors on the Debtors' proposed capital structure post reorganization. In mid-December 2009 the parties agreed to terms providing for the Debtors' recapitalization pursuant to the terms of the Plan.

Concurrent with the Plan negotiations described above, in early October 2009, Moelis began a formal process seeking to raise an asset-based revolving credit facility (the "ABL Facility") for the Company to provide the necessary exit financing in connection with the Plan. The proposed ABL Facility would be used to fund the Company's working capital needs post-confirmation. In conjunction with the Company, Moelis developed a "marketing teaser" and lender presentation. The Company and Moelis also set up an electronic data room for lenders to review upon signing a confidentiality agreement. Moelis contacted approximately 30 lenders soliciting interest in providing the ABL Facility. Of the lenders contacted, a number of lenders submitted preliminary term sheets and conducted further diligence on the Company. Through November and December of 2009, the Company and Moelis facilitated diligence with these banks. Concurrently, the Company and Moelis worked with third-party appraisers and field examiners to develop inventory, accounts receivable, property and equipment and field analyses for the potential ABL Lenders to review. The ABL Lenders continue to conduct diligence on the Company in an effort to offer committed exit financing prior to anticipated emergence from chapter 11.

## F.    Summary of Proposed Restructuring

The Debtors have determined that prolonged chapter 11 cases would severely damage their ongoing business operations and threaten their viability as a going concern. The prepackaged nature of the Plan will allow the Debtors to exit chapter 11 quickly while the Plan provisions and its proposed implementation allow the Debtors to meet their working capital needs and substantially de-leverage their balance sheet substantially.

The Plan provides for the availability of $25,000,000 in the form of proceeds from the ABL Facility to meet the Debtors' working capital needs. The Plan also provides for the issuance of the New Note in the amount of $20,000,000 in favor of the Lender Parties pursuant to the terms of the Term Sheet annexed as Exhibit D to the Disclosure Statement, as such term sheet may be amended pursuant to the Plan Supplement. All consideration necessary for New Opco to make Cash payments or distributions on behalf of the Debtors as contemplated by the Plan shall be obtained from the ABL Facility and other Cash from New Opco, including Cash from New Opco's business operations.

The Plan provides for the establishment of three new companies: New Holdco, New Midco and New Opco. On or prior to the Effective Date, an agent for the Lender Parties will form New Holdco, New Midco and New Opco. New Holdco will issue 100% of the stock in New Holdco (the " New Equity") and issue the New Note, and contribute the New Equity and New Note to New Midco in exchange for 100% of the stock of New Midco. New Midco will contribute the New Equity and New Note to New Opco in exchange for 100% of the stock of New Opco. On the Effective Date, New Opco shall acquire all of the assets of Latham International, Inc., Latham Manufacturing Corp., and Kafko (U.S.) Corp., including the equity interests in Viking Pools, LLC and Coverstar, LLC but specifically excluding the stock of Latham International, Inc., Latham Manufacturing Corp. and Kafko (U.S.) Corp. , in exchange for the New Equity and New Note On the Effective Date, the Debtors shall distribute the New Equity and New Note to the Lender Parties in exchange for, and in satisfaction of, the indebtedness owed under the Prepetition Credit Agreement.

12

Pursuant to the Plan, all Allowed Administrative Claims and Priority Tax Claims shall be paid in accordance with the requirements of the Bankruptcy Code. Allowed Non-Tax Priority Claims, Allowed Other Secured Claims and Allowed General Unsecured Claims and are not Impaired under the Plan. On the Effective Date, the Subordinated Note Claims and the Seller Note Claims shall be deemed cancelled and extinguished and the Subordinated Note Purchase Agreement and the Seller Subordinated Purchase Agreement shall each be deemed of no further force and effect. On the Effective Date, the Existing Equity Interests in Latham International, Inc.; Latham Manufacturing Corp.; and Kafco (U.S.) Corp. shall be cancelled. None of the Holders of the Subordinated Note Claims, the Seller Note Claims, or the Existing Equity Interests will receive any distributions under this Plan on account of such claims or interests.

## G.     Anticipated Events of the Chapter 11 Cases

### 1.     Voluntary Petitions

Latham Manufacturing Corp., Latham International, Inc., Viking Pools LLC, Coverstar, LLC and Kafko (U.S.) Corp. will file chapter 11 bankruptcy petitions on the Petition Date commencing the Cases.

### 2.     Expected Timetable of the Chapter 11 Cases

The Company expects the Cases to proceed quickly. The Company cannot assure you, however, that the Bankruptcy Court will enter various orders on the timetable anticipated by the Company. On the Petition Date, the Company will promptly request the Bankruptcy Court to set a hearing date to approve this Disclosure Statement and schedule a hearing to confirm the Plan. If the Plan is confirmed, the Effective Date of the Plan is projected to be shortly after the date the Bankruptcy Court enters the Confirmation Order and all of the condition to the occurrence of the Effective Date are either satisfied or waived. The Company will attempt as soon as practicable to emerge from protection under chapter 11.

### 3.     First Day Relief

In order to facilitate the Cases and minimize disruption to the Company's operations, the Company intends to present certain motions to the Bankruptcy Court on the Petition Date seeking certain relief, including but not limited to, the relief summarized below. The relief sought will facilitate the administration of the Cases, including the authority to pay Unimpaired Claims and prepetition General Unsecured Claims as they arise in the ordinary course of business.

The Company will not seek to pay the total aggregate amount of Unimpaired Claims and General Unsecured Claims outstanding on the Petition Date; rather, the Company will seek authority only to pay such amounts as they become due in their ordinary course of business. Such relief is typical in chapter 11 cases; however, there is no guarantee that the Bankruptcy Court will grant any or all of the requested relief. The pleadings filed by the Debtors on the Petition Date may include, but are not necessarily limited to, the following:

(a)     Approval of Solicitation Procedures and Scheduling of Combined Disclosure Statement Approval and Confirmation Hearing

To expedite the Cases, the Company intends to seek an immediate order setting a date for a combined hearing to (i) approve the Solicitation, and (ii) approve the adequacy of the Disclosure Statement and confirm the Plan. The Company will seek the earliest possible date permitted by the applicable rules and the Bankruptcy Court's calendar for such hearings.

(b)     Use of Cash Collateral

The Company will require the use of the cash collateral of their secured lenders in order to operate efficiently as the Company reorganizes. Accordingly, the Company will seek an order of the Bankruptcy Court authorizing the Company to use cash collateral on an interim and final basis pursuant to agreed terms negotiated with the Lender Parties.

13

(c)      Employees

The Company will seek authority to pay employee compensation and, additionally, the Company intends to continue all prepetition benefit programs, including, among others, the medical, dental and 401(k) plans to the extent applicable. This relief will allow the Company to maintain employee morale and prevent costly distractions and retention issues.

(d)      Use of Existing Cash Management System

The Company will seek authority to maintain its prepetition cash management systems after commencement of the Cases, including intercompany transfers and use of bank accounts. This facilitates the efficient operation of the Company by not requiring it to shut down its existing accounts and needlessly create a identical system for each Debtor for the limited duration of the Cases.

(e)      Utilities

The Company will move the Court on the Petition Date to enter orders approving procedures for, among other things, determining adequate assurance for utility providers, prohibiting utility providers from altering, refusing, or discontinuing services and determining that the Company is not required to provide any additional adequate assurance pending entry of a Final Order. The Company believes that uninterrupted utility services are essential to the Company's ongoing operations and, therefore, to the success of the Company's reorganization.

(f)      Applications to Employ Professionals

The Company will also apply for orders authorizing the Company to employ Pachulski Stang Ziehl & Jones LLP as the Company's bankruptcy counsel and Moelis & Company as the Company's financial advisors.

## ARTICLE III.

## DESCRIPTION OF THE PLAN

THE FOLLOWING SUMMARY OF CLASSIFICATIONS OF CLAIMS AND INTERESTS AND THE DISTRIBUTIONS UNDER THE PLAN IS SUBJECT, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE, TO THE PLAN.

## A.      Treatment of Unclassified Claims

Certain types of Claims are not placed into voting Classes; instead they are unclassified. They are not considered Impaired and they do not vote on the Plan because they are automatically entitled to the specific treatment provided for them in the Bankruptcy Code. As such, the Debtors have not placed the following Claims in a Class:

### 1.      Administrative Claims

Each Administrative Claim shall, unless the holder of such Claim shall have agreed to different treatment of such Claim, be paid in full in Cash by New Opco, on behalf of the Debtors, on the latest of: (a) the Effective Date, or as soon thereafter as practicable; (b) such date as may be fixed by the Bankruptcy Court, or as soon thereafter as practicable; (c) the tenth Business Day after such Claim is Allowed, or as soon thereafter as practicable; and (d) such date as the holder of such Claim and New Opco may agree.

All requests for payment of Administrative Claims must be filed no later than twenty (20) days after the Effective Date, or the holders thereof shall be forever barred from asserting such Administrative

14

Claims against the Debtors and the New Latham Group or from sharing in any distribution under the Plan. Holders of Administrative Claims based on liabilities incurred in the ordinary course of the Debtors' business following the Petition Dates shall not be required to comply with the Administrative Claim Bar Date, provided that, (i) such holders have otherwise submitted an invoice, billing statement or other evidence of indebtedness to the Debtors in the ordinary course of business, and (ii) such Claims are not past due according to their terms.

### 2. Priority Tax Claims

Each Allowed Priority Tax Claim shall, unless the holder of such Claim shall have agreed to different treatment of such Claim, (i) be paid in full in Cash, without interest, by New Opco, on behalf of the Debtors, on the latest of: (a) the Effective Date, or as soon thereafter as practicable; (b) such date as may be fixed by the Bankruptcy Court, or as soon thereafter as practicable; (c) the tenth Business Day after such Claim is Allowed, or as soon thereafter as practicable; and (d) such date as the holder of such Claim and New Opco may agree, or (ii) receive deferred cash payments to the extent permitted by Section 1129(a)(9) of the Bankruptcy Code with interest on the unpaid portion of such Claim at the statutory rate under applicable nonbankruptcy law or at a rate to be agreed upon by the Debtors or New Opco and the appropriate governmental unit or, if they are unable to agree, to be determined by the Bankruptcy Court; *provided, however*, that New Opco, on behalf of the Debtors, may prepay any or all such Claims at any time, without premium or penalty. For the purpose of option (ii), the payment of each Allowed Priority Tax Claim shall be made in equal quarterly installments with the first installment due on the latest of: (i) the first Business Day following the end of the first full calendar quarter following the Effective Date, (ii) the first Business Day following the end of the first full calendar quarter following the date an order allowing such claim becomes a Final Order, and (iii) such other time or times as may be agreed with the holder of such claim. Each installment shall include simple interest on the unpaid balance of the Allowed Priority Tax Claim, without penalty of any kind, at the non-default rate of interest prescribed, agreed or determined under option (ii).

### 3. Claims for Professional Fees

Each Professional seeking an award by the Bankruptcy Court of Professional Fees: (a) must file its final application for allowance of compensation for services rendered and reimbursement of expenses incurred through the Effective Date on or before sixty (60) days from the Effective Date; and (b) if the Bankruptcy Court grants such an award, each such Person will be paid in full in Cash in such amounts as are allowed by the Bankruptcy Court as soon thereafter as practicable. All final applications for allowance and disbursement of Professional Fees must be in compliance with all of the terms and provisions of any applicable order of the Bankruptcy Court, including the Confirmation Order. The fees and expenses of Professionals incurred on and after the Effective Date shall be paid by New Opco, on behalf of the Debtors.

### B. Treatment of Classified Claims and Interests

The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, Confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. A Claim or Interest is in a particular Class only to the extent that such Claim or Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

### 1. Class 1 – Priority Non-Tax Claims.

    (a)    Class 1 consists of all Priority Non-Tax Claims.

    (b)    Treatment: Except to the extent that a Holder of a Priority Non-Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Priority Non-Tax Claim, on or as soon as

practicable after the Effective Date or when such obligation becomes due in the ordinary course of business in accordance with applicable law or the terms of any agreement that governs such Priority Non-Tax Claim, whichever is later, each holder of such Priority Non-Tax Claim shall be paid in full in Cash by the Debtors or New Opco, or otherwise receive such treatment as to render such holder Unimpaired.

(c)     Voting: Class 1 is an Unimpaired Class and Holders of Class 1 Priority Non-Tax Claims are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

2.     **Class 2 – Other Secured Claims.**

(a)     Class 2 consists of all Other Secured Claims.

(b)     Treatment:  Except to the extent that a Holder of an Allowed Other Secured Claim and the Debtors agree to less favorable treatment for such Holder, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Secured Claim, each Allowed Other Secured Claim shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(c)     Voting: Class 2 is Unimpaired, and Holders of Class 2 Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 2 Other Secured Claims are not entitled to vote to accept or reject the Plan.

3.     **Class 3 – Prepetition Financing Claims.**

(a)     Class 3 consists of the Prepetition Financing Claims.

(b)     Treatment:  On the Effective Date, in full and final satisfaction, settlement, release, and discharge and in exchange for all Prepetition Financing Claims, all Prepetition Financing Claims shall be indefeasibly satisfied through the distribution by the
Debtors to each Holder of Prepetition Financing Claim of (i) its pro rata share of the New Note; and (ii) its pro rata share of 100% of the New Equity in New Holdco, subject to dilution on account of the Equity Grant, the Laven Warrants, and the Management Warrants, in accordance with the terms of the Plan.

(c)     Voting: Class 3 is an Impaired Class and Holders of Class 3 Prepetition Financing Claims are entitled to vote to accept or reject the Plan.

4.     **Class 4 – Subordinated Note Claims.**

(a)     Class 4 consists of all Seller Note Claims.

(b)     Treatment:  On the Effective Date, the Subordinated Note Claims shall be deemed cancelled and extinguished and the Subordinated Note Purchase Agreement and of no further force or effect.  Holders of Subordinated Note Claims in Class 4 will not receive any distributions on account of such claims.

(c)     Voting: Class 4 is an Impaired Class and Holders of Subordinated Note Claims are conclusively deemed to have voted to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code.

16

5.     **Class 5 – Seller Note Claims.**

   (a)     Class 5 consists of all Seller Note Claims.

   (b)     Treatment:  On the Effective Date, the Seller Note Claims shall be deemed cancelled and extinguished and the Seller Subordinated Purchase Agreement shall be of further no force or effect.  Holders of Seller Note Claims in Class 5 will not receive any distributions on account of such claims.

   (c)     Voting: Class 5 is an Impaired Class and Holders of Seller Note Claims are conclusively deemed to have voted to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code.

6.     **Class 6 – General Unsecured Claims.**

   (a)     Class 6 consists of all General Unsecured Claims.

   (b)     Treatment:  Except to the extent that a Holder of a General Unsecured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each General Unsecured Claim, on or as soon as practicable after the Effective Date or when such obligation becomes due in the ordinary course of business in accordance with applicable law or the terms of any agreement that governs such General Unsecured Claim, whichever is later, each holder of such General Unsecured Claim shall be paid in full in Cash, or otherwise receive such treatment as to render such holder Unimpaired.

   (c)     Voting: Class 6 is an Unimpaired Class and Holders of Class 6 General Unsecured Claims are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

7.     **Class 7 – Existing Equity Interests**

   (a)     Class 7 consists of all Existing Equity Interests.

   (b)     Treatment:  On the Effective Date, Existing Equity Interests in Latham International, Inc.; Latham Manufacturing Corp.; and Kafko (U.S.) Corp. shall be cancelled and the Holders of such Existing Equity Interests in Latham International, Inc.; Latham Manufacturing Corp.; and Kafko (U.S.) Corp. shall receive no property or distribution under the Plan on account of such interests.

   (c)     Voting: Class 7 is an Impaired Class and Holders of Existing Equity Interests in Latham International, Inc.; Latham Manufacturing Corp.; and Kafko (U.S.) Corp. are conclusively deemed to have voted to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code.

8.     **Class 8 – Reorganized Debtor Intercompany Claims.**

   (a)     Class 8 consists of all Reorganized Debtor Intercompany Claims.

   (b)     Treatment:  Except to the extent otherwise agreed by the Reorganized Debtors in their sole discretion, all Reorganized Debtor Intercompany claims shall remain unimpaired.

   (c)     Voting: Class 8 is an Unimpaired Class and Holders of Reorganized Debtor Intercompany Claims are conclusively deemed to have voted to accept the Plan.

17

9. **Class 9 – Intercompany Claims.**

   (a) <u>Class 9 consists of all Intercompany Claims.</u>

   (b) <u>Treatment:</u> On the Effective Date, Intercompany Claims shall be cancelled and the Holders of Intercompany Claims shall receive no property or distributions under the Plan on account of such Intercompany Claims.

   (c) <u>Voting:</u> Class 9 is an Impaired Class and Holders of Intercompany Claims are deemed to have voted to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code.

## C.    <u>Full Satisfaction, Discharge and Release</u>

The payments, distributions, grant of entitlements and other treatment, including cancellation and/or extinguishment without consideration or distribution, afforded to Holders of Allowed Claims and Interests under Article V of the Plan shall be in full and complete satisfaction, discharge and release of and in exchange for such Allowed Claims or Interests.

## ARTICLE IV.

## ACCEPTANCE OR REJECTION OF THE PLAN

## A.    <u>Only One Voting Class</u>

Only Holders of an Allowed Claims in Class 3 are entitled to vote either to accept or to reject the Plan. Only those votes cast by Holders of Allowed Claims shall be counted in determining whether acceptances have been received sufficient in number and amount to obtain Confirmation.

## B.    <u>Acceptance by Impaired Classes</u>

An Impaired Class of Claims shall have accepted the Plan if: (a) the Holders (other than any Holder designated under Section 1126(e) of the Bankruptcy Code) of at least two-thirds in dollar amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (b) the Holders (other than any Holder designated under Section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.

## C.    <u>Presumed Acceptance/Rejection of Plan</u>

Holders of claims in Classes 1, 2, 6 and 8 are Unimpaired under the Plan and are not entitled to vote. The Holders of Claims in Classes 4, 5 and 9 and Interests in Class 7 shall not receive any distributions under the Plan and are therefore deemed to reject the Plan and are not entitled to vote.

## D.    <u>Nonconsensual Confirmation</u>

Because Classes 4, 5 and 9 are deemed to reject the Plan by operation of law, the Company intends to request the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code. Without limiting the foregoing, in the event that any Class of Claims entitled to vote on the Plan fails to accept the Plan as required by section 1129(a) of the Bankruptcy Code, the Plan may be amended and, in any event, the Company reserves the right to seek confirmation of the Plan over such rejection pursuant to section 1129(b) of the Bankruptcy Code.

51407-001\DOCS_LA:211361.8

# ARTICLE V.

## MEANS FOR IMPLEMENTATION OF THE PLAN

### A.    Sources of Cash for Plan Distributions

All consideration necessary for New Opco to make Cash payments or distributions on behalf of the Debtors pursuant to the Plan shall be obtained from the ABL Facility and other Cash from New Opco, including Cash from New Opco's business operations.

### B.    Issuance of New Equity

The Holders of Allowed Prepetition Financing Claims shall acquire the New Equity in accordance with the terms of this Plan without further act or action under applicable law, regulation, rule or order.

Except as otherwise provided by the Plan, the issuance of the New Equity, and the subsequent issuance of New Holdco shares designated for the Equity Grant, and the Laven Warrants, and Management Warrants to be issued by New Holdco, are authorized in accordance with the Plan, without any further action by Holders of Claims or Interests, but subject to approval New Holdco Board.

On or prior to the Effective Date, the Prepetition Agent, or such other agent for the Prepetition Lenders will form New Holdco, New Midco and New Opco. New Holdco will issue the New Equity and New Note to New Midco in exchange for 100% of the stock of New Midco. New Midco will contribute the New Equity and New Note to New Opco in exchange for 100% of the stock of New Opco. On the Effective Date, New Opco shall use the New Equity and New Note to purchase all of the assets of Latham International, Inc., Latham Manufacturing Corp. and Kafko (U.S.) Corp. (including the Intercompany Existing Equity Interests in Coverstar, LLC and Viking Pool, LLC, but excluding the Intercompany Existing Equity Interests in Latham Manufacturing Corp. and Kafko (U.S.)). On the Effective Date, the Debtors shall distribute the New Equity and New Note to the Holders of Allowed Prepetition Financing Claims.

All of the shares of New Equity issued pursuant to the Plan shall be duly authorized, validly issued and fully paid and non-assessable. Each distribution and issuance referred to in this Plan shall be governed by the terms and conditions set forth herein applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

Effective as of the Effective Date, the Existing Equity Interests in Latham International, Inc., Latham Manufacturing Corp. and Kafko (U.S.) Corp. shall be cancelled. The Existing Equity Interests in Latham International, Inc.; Latham Manufacturing Corp.; and Kafko (U.S.) Corp. will not receive any distributions under this Plan.

### C.    Securities Exemption

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of any New Equity contemplated by the Plan and all agreements incorporated herein shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration before the offering, issuance, distribution or sale of securities. In addition, under section 1145 of the Bankruptcy Code, any New Equity issued in accordance with the Plan and any and all agreements incorporated therein will be freely tradable by the recipients thereof, subject to (1) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act; (2) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments; (3) the restrictions on the transferability of such securities and instruments; and (4) applicable regulatory approval.

19

**D.** **Powers of New Holdco, New Midco and New Opco**

On the Effective Date, New Holdco, New Midco and New Opco shall be authorized to undertake and implement the transactions described herein, including the execution of such other and further documents, as are necessary or appropriate to implement the Plan. To the extent necessary for business, regulatory, tax, or other corporate purposes and provided that it does not alter the obligations to Creditors or other parties-in-interest under this Plan or otherwise adversely impact any rights granted to any party under this Plan, New Holdco, New Midco and New Opco may create or dissolve one or more subsidiaries, or may modify the form and terms of corporate governance as necessary or appropriate. The Debtors or New Opco on behalf of the Debtors, will be the entities under the Plan that are exclusively responsible for paying all Allowed Claims pursuant to the Plan.

New Opco will acquire the assets of Latham International, Inc., Latham Manufacturing Corp., Viking Pools, LLC, Coverstar, LLC, and Kafko (U.S.) Corp. pursuant to the terms of the Plan and a purchase and sale agreement entered into among New Opco and the Debtors. Thereafter, New Opco will operate these assets as a going concern. For purposes of the Plan, New Opco is not intended as, and is not in fact, a substitute for or a successor to the Debtors in any way whatsoever. All actions taken by New Opco relating to the Debtors, or on behalf of the Debtors, solely relate to, and are a requirement and prerequisite of, the purchase and sale transaction between Debtors, as seller, and New Opco, as purchaser.

**E.** **Cancellation of Securities and Agreements**

On the Effective Date, except as otherwise specifically provided for in the Plan, (A) the obligations of the Debtors under (1) the Prepetition Credit Agreement, (2) the Subordinated Note Purchase Agreement, (3) the Seller Subordinated Note Purchase Agreement, and (4) any other note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such notes, or other instruments or documents evidencing indebtedness or obligations of the Debtors that are specifically reinstated pursuant to the Plan), shall be cancelled and neither the Debtors nor the New Latham Group shall have any continuing obligations thereunder; and (B) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligations of the Debtors (other than those obligations that are specifically reinstated pursuant to the Plan) shall be released and discharged; *provided, however,* notwithstanding Confirmation or the occurrence of the Effective Date, any agreement that governs the rights of the Holder of a Claim shall continue in effect solely for purposes of allowing Holders to receive distributions under the Plan as provided herein.

**F.** **Exit Facility**

On the Effective Date, New Opco shall enter into the ABL Facility. All obligations under the ABL Facility shall be secured by the assets of the New Latham Group and each member of the New Latham Group (whether then or thereafter created) shall guaranty the timely payment of all obligations under the ABL Facility. The terms of the ABL Facility shall be subject to the terms, provisions and conditions of documentation acceptable to the Debtors, Prepetition Agent, the Steering Group and the ABL Lenders. Subject to any limitations under either the ABL Facility, New Opco shall be authorized to (i) enter into the ABL Facility, (ii) grant any liens, and security interests and incur or guaranty the indebtedness provided by the ABL Facility, respectively, and (iii) issue, execute, deliver and perform all documents, instruments and agreements necessary or appropriate to implement and effectuate all obligations under the ABL Facility, and to take all other actions necessary or appropriate to implement and effectuate the borrowings under the ABL Facility.

**G.** **New Note**

On or before the Effective Date, New Holdco shall issue the New Note. All obligations under the New Note shall be secured by the assets New Holdco. Subject to any limitations under the New Note, New Holdco shall be authorized to (i) issue the New Note, (ii) grant any liens, and security interests with

20

respect to the New Note, and (iii) issue, execute, deliver and perform all documents, instruments and agreements necessary or appropriate to implement and effectuate all obligations under the New Note, and to take all other actions necessary or appropriate to implement and effectuate the borrowings under the New Note.

## H. New Certificates of Incorporation and New By-Laws

On or before the Effective Date, New Holdco, New Midco and New Opco will file their certificates of incorporation with the applicable Secretary of State and/or other applicable authorities in accordance with the corporate laws of the state of incorporation. New Holdco, New Midco and New Opco may amend and restate their respective new certificates of incorporation and new by-laws and other constituent documents as permitted by the laws of the state of incorporation and their new certificates of incorporation and new by-laws.

## I. Directors and Officers of New Holdco, New Midco and New Opco

Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, as of the Effective Date, the New Holdco Board shall consist of seven (7) directors, consisting of five members selected by the Prepetition Agent and the Steering Group, Mark Laven, the Chief Executive Officer of Latham, and one member to be agreed upon by the Prepetition Agent and the Steering Group and Mark Laven. The members of the New Holdco Board, to the extent known, shall be identified in the Plan Supplement. The Plan Supplement shall designate the five directors to be selected by the Prepetition Agent and the Steering Group.

Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, as of the Effective Date, the New Midco Board shall consist of two (2) directors, consisting of one member selected by the Prepetition Agent and the Steering Group and one member selected by Mark Laven. The members of the New Midco Board, to the extent known, shall be identified in the Plan Supplement.

Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, as of the Effective Date, the New Opco Board shall consist of two (2) directors, consisting of one member selected by the Prepetition Agent and the Steering Group and one member selected by Mark Laven. The members of the New Opco Board, to the extent known, shall be identified in the Plan Supplement.

## J. Equity Grant, and Issuance of Laven Warrants and Management Warrants

As soon as practicable after the Effective Date, the New Holdco Board will adopt and implement the terms of the Equity Grant and the issuance of the Laven Warrants, and the Management Warrants and subject, in all respects, to the following terms and conditions set forth below unless otherwise agreed by New Holdco and the applicable Entities:

> (i) The Equity Grant shall vest ratably over a period of four years commencing on the Effective Date; and

> (ii) The Laven Warrants shall be awarded by the Board of Directors of New Holdco to Mark Laven and shall vest ratably over a period of four years commencing on the date such warrants are issued.

> (iii) The Management Warrants shall be awarded by the Board of Directors of New Holdco to management recipients as determined by such Board of Directors in their sole discretion and shall vest ratably over a period of four years commencing on date such warrants are issued

Issuances made under the Laven Warrants, Management Warrants and Equity Grants will dilute the interests of the common stockholders of New Holdco. In connection with the issuance of the Laven

Warrants, Management Warrants and Equity Grants to employees of the Debtors, if any, New Holdco may take whatever actions are necessary to comply with applicable federal, state, local and international tax withholding obligations, including withholding from distributions a portion of the New Holdco stock and/or warrants and selling such securities to satisfy tax withholding obligations including, without limitation, income, social security, and Medicare taxes.

### K.     Purchase of Assets by New Opco

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated therein, on the Effective Date, (i) all property in the Estates of Latham International, Inc., Latham Manufacturing Corp. and Kafko (U.S.) Corp. (including Existing Equity Interests in Coverstar, LLC and Viking Pools, LLC) all Causes of Action, and any property acquired by any of Latham International, Inc., Latham Manufacturing Corp. and Kafko (U.S.) Corp. pursuant to the Plan shall be purchased by New Opco, free and clear of all Liens, Claims, charges, or other encumbrances (except for the Liens, if any, granted to secure the ABL Facility); and (ii) all property in the Estates of Coverstar, LLC and Viking Pools, LLC, all Causes of Action, and any property acquired by any of Coverstar, LLC and Viking Pools, LLC pursuant to the Plan shall respectively vest in the Reorganized Debtors, free and clear of all Liens, Claims, charges, or other encumbrances (except for the Liens, if any, granted to secure the ABL Facility). On and after the Effective Date, except as otherwise provided in the Plan, New Opco and the Reorganized Debtors may operate their business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### L.     Corporate Transactions

On the Effective Date or as soon as reasonably practicable thereafter, the New Latham Group shall take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including: (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and deliver of appropriate instruments of transfer, assignment, assumption or delegation or any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion or dissolution pursuant to applicable state law; and (4) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

### M.     Corporate Action

Each of the matters provided for by this Plan involving the corporate structure of the New Latham Group or corporate or related actions to be taken by or required of the New Latham Group shall, as of the Effective Date, be deemed to have occurred and be effective as provided in this Plan (except to the extent otherwise indicated), and shall be authorized, approved, and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by Holders of Claims or Interests, directors of the Debtors, or any other Entity.

### N.     Effectuating Documents; Further Transactions

On and after the Effective Date, the New Latham Group and the officers and members of the New Latham Group are authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of and on behalf of the New Latham Group, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

22

## O. Exemption from Certain Taxes and Fees

Pursuant to section 1146(a) of the Bankruptcy Code, any transfer from a Debtor to New Opco or to any Entity, or from any member of the New Latham Group to a Debtor or another member of the New Latham Group pursuant to, in contemplation of, or in connection with the Plan or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors; (2) the creation, modification, consolidation, or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recoding of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles, or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

## P. Employee and Retiree Benefits

Except as required under this Plan, on and after the Effective Date, New Opco and the Reorganized Debtors (1) may honor, in the ordinary course of business, any contracts, agreements, policies, programs, and plans, in each case to the extent disclosed in the Disclosure Statement or the Debtors' pleadings filed on the Petition Date, for, among other things, compensation, health care benefits, disability benefits, deferred compensation benefits, travel benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation insurance, and accidental death and dismemberment insurance for the directors, officers, and employees of any of the Debtors who served in such capacity at any time; and (2) will honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising prior to the Petition Date in accordance with the terms of the Plan; *provided, however,* that New Opco's or the Reorganized Debtors' performance of any employment agreement will not entitle any person to any benefit or alleged entitlement under any policy, program, or plan that has expired or been terminated before the Effective Date, or restore, reinstate, or revive any such benefit or alleged entitlement under any such policy, program or plan. Nothing in the plan shall limit, diminish, or otherwise alter New Opco's defenses, claims, Causes of Action, or other rights with respect to any such contracts, agreements, policies, programs, and plans. Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, on and after the Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

## Q. Preservation of Rights of Action

In accordance with section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly released (including, for the avoidance of doubt, Avoidance Actions and the releases by the Debtors provided in this Plan), New Opco and the Reorganized Debtors shall acquire and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date and New Opco's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. New Opco and the Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of New Opco. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or New Opco, as applicable, will not pursue any and all available Causes of Action against them. Except with respect to Causes of Action as to which the Debtors or New Opco have released any Person or Entity on or before the Effective Date (including pursuant to the releases by the Debtors pursuant to this Plan or otherwise), the Debtors or New Opco, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, New Opco and the Reorganized Debtors

23

expressly reserve all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or consummation of the Plan.

**R.      Substantive Consolidation**

On the Effective Date, the Cases, the Debtors and the Estates shall be deemed to be substantively consolidated for voting and distribution purposes only under this Plan. For Plan distribution purposes, the assets and liabilities of the Debtors shall be treated as pooled and all Claims shall be satisfied by the Debtors or New Opco, on behalf of the Debtors. Any Claims against one or more of the Debtors based upon a guaranty, indemnity, co-signature, surety or otherwise, of Claims against another Debtor shall be treated as a single Claim against the consolidated estate of the Debtors and shall be entitled to distributions under this Plan by the Debtors or New Opco only with respect to such single Claim.

**S.      Reorganized Debtor Intercompany Claims**

On the Effective Date, and the Reorganized Debtors shall, at their sole discretion reinstate or compromise, as the cases may be, the Reorganized Debtor Intercompany Claims.

**T.      United States Trustee Fees**

All outstanding amounts due under 28 U.S.C. § 1930 that have not been paid shall be paid by the Debtors on or before the Effective Date. Thereafter, New Opco shall pay any statutory fees due pursuant to 28 U.S.C. § 1930(a)(6) and such fees shall be paid until entry of a final decree or an order converting or dismissing the Cases.

**U.      Subordination**

Pursuant to section 510(a) of the Bankruptcy Code, nothing herein shall be deemed to limit the enforceability of any subordination agreement or intercreditor agreement, including, without limitation, the Subordinated Note Purchase Agreement, and the Seller Subordinated Note Purchase Agreement, that is otherwise enforceable under applicable nonbankruptcy law. Accordingly, distributions hereunder will be made subject to any enforceable subordination or intercreditor agreement known to the Debtors. Creditors that are parties to any such enforceable subordination or intercreditor agreements shall notify the Debtors of their existence in advance of the Effective Date and shall provide the Debtors with copies of such agreements, or identify such agreements if they are already in the Debtors' possession. Failure to do so shall be deemed a waiver of such rights. The Prepetition Lenders are deemed to have notified the Debtors of their subordinated agreements and intercreditor agreements with the Subordinated Note Purchase Agreement and Seller Subordinated Note.

## ARTICLE VI.

## PROVISIONS GOVERNING DISTRIBUTIONS

**A.      Dates of Distributions**

Except as otherwise provided in the plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class and in the manner provided therein. In the event that any payment or act under the Plan is required to be made or performed on a date that is not on a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions provided in the Plan. Except as otherwise provided herein, Holders of Claims