shall not be entitled to interest, dividends or accruals on the distributions provided for herein, regardless of whether distributions are delivered on or at any time after the Effective Date.

Upon the Effective Date, all Debts of the Debtors shall be deemed fixed and adjusted pursuant to the Plan and the Debtors and New Opco shall have no liability on account of any Claims or Interests except as set forth in the Plan and in the Confirmation Order. All payments and all distributions made by the Debtors or New Opco under the Plan shall be in full and final satisfaction, settlement and release of all Claims.

## B.     Disbursing Agent

Except as provided herein, all distributions under the Plan shall be made by the Debtors or New Opco as Disbursing Agent or such other Entity designated by the Debtors or New Opco as a Disbursing Agent on the Effective Date. New Opco or such other Entity designated by the Debtors or New Opco, shall not be required to give any bond or surety or other security for the performance of its duties as Disbursing Agent unless otherwise ordered by the Bankruptcy Court.

The Disbursing Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

## C.     Cash Distributions

Distributions of Cash may be made either by check drawn on a domestic bank or wire transfer from a domestic bank, at the option of New Opco, on behalf of the Debtors, except that Cash payments made to foreign Creditors may be made in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

## D.     Rounding of Payments

Whenever payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole cent. To the extent Cash remains undistributed as a result of the rounding of such fraction to the nearest whole cent, such Cash shall be treated as "Unclaimed Property" under the Plan.

## E.     Distributions on Account of Claims Allowed After the Effective Date

Except as otherwise agreed by the Holder of a particular Claim, or as provided in the Plan, all distributions shall be made upon the Distribution Date. Distributions to any Holder of an Allowed Claim shall be allocated first to the principal amount of any such Allowed Claim, as determined for federal income tax purposes, and then, to the extent the consideration exceeds such amount, to the remainder of such Claim comprising interest, if any (but solely to the extent that interest is an allowable portion of such Allowed Claim). Whenever any payment of a fraction of a cent would otherwise be called for, the actual distribution shall reflect a rounding of such fraction down to the nearest cent.

### 1.     General Distribution Procedures.

The Debtors, New Opco or any other duly appointed agent shall make all distributions of Cash or other property required under the Plan, unless the Plan specifically provides otherwise. All cash and other property held by New Opco for distribution under the Plan shall be held by it in trust for the exclusive benefit of the Holders of Allowed Claims, shall not be commingled with the general assets of New Opco and shall not be subject to any claim by any Person except as provided under the Plan.

25

## 2. Address for Delivery of Distributions.

Distributions to Holders of Allowed Claims shall be made (1) at the address set forth on any proofs of claim filed by such Holders (to the extent such proofs of claim are filed in the Cases) or (2) at the addresses set forth in any written notices of address change delivered to the Debtors.

## 3. Undeliverable Distributions and Unclaimed Property.

If the distribution to the Holder of any Allowed Claim is returned to New Opco as undeliverable, no further distribution shall be made to such Holder, and New Opco shall have no obligation to make any further distribution to the Holder, unless and until New Opco is notified in writing of such Holder's then current address.

Any Entity which fails to claim any cash within 1 year from the date upon which a distribution is first made to such entity shall forfeit all rights to any distribution under the Plan. Entities which fail to claim cash shall forfeit their rights thereto and shall have no claim whatsoever against the Debtors or New Opco or against any Holder of an Allowed Claim to whom distributions are made by New Opco.

## 4. Withholding Taxes.

Pursuant to section 346(f) of the Bankruptcy Code, the Debtors or New Opco shall be entitled to deduct any federal, state or local withholding taxes from any Cash payments made with respect to Allowed Claims, as appropriate. From and as of the Effective Date, the Debtors or New Opco shall comply with all reporting obligations imposed on it by any Governmental Unit in accordance with applicable law with respect to such withholding taxes. As a condition to making any distribution under the Plan, the Debtors or New Opco may require that the Holder of an Allowed Claim provide such Holder's taxpayer identification number and such other information and certification as may be deemed necessary for the Debtors or New Opco to comply with applicable tax reporting and withholding laws.

## 5. Setoffs.

New Opco, on behalf of the Reorganized Debtors, may, to the extent permitted under applicable law, setoff against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim, the claims, rights and causes of action of any nature (other than claims arising under chapter 5 of the Bankruptcy Code) that the Debtors may hold against the Holder of such Allowed Claim that are not otherwise waived, released or compromised in accordance with the Plan; *provided, however*, that neither such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors of any such claims, rights and causes of action that the Debtors possess against such Holder.

## ARTICLE VII.

## PROCEDURES FOR RESOLVING DISPUTED CLAIMS

## A. No Filing of Proofs of Claim

Except as otherwise provided under the Plan, Holders of Claims shall not be required to file a proof of claim and no parties should file a proof of claim. New Opco, on behalf of the Debtors, intends to make distributions under the Plan in accordance with the books and records of the Debtors. Unless disputed by the Holder of a Claim, the amount set forth in the applicable Debtors' books and records shall constitute the Allowed amount of such Holder's Claim. If the Holder of a Claim disagrees with the Debtor's books and records with respect to the Allowed Amount of such Holder's Claim, such Holder must advise New Opco in writing, in which event the Claim will become a Disputed Claim. The Debtors intend to attempt to resolve any such disputes consensually or through judicial means outside the Bankruptcy Court. Nevertheless, New Opco, on behalf of the Debtors, may, in its discretion, file with the Bankruptcy Court an objection to the allowance of such Claim or any other appropriate motion or adversary proceeding with respect thereto. All such objections shall be litigated to Final Order, provided

26

however, that New Opco, on behalf of the Debtors, may compromise, settle, withdraw or resolve any objections to Claims without further order of the Bankruptcy Court.

## B.    Disputed Claims

All objections to Claims shall be filed and served not later than ninety (90) days following the Effective Date; *provided, however,* such date may be extended by the Bankruptcy Court beyond such ninety (90) days upon motion (the "Extension Motion") filed by New Opco prior to the expiration of the above-noted 90 day deadline. Unless otherwise provided in the Confirmation Order, New Opco, on behalf of the Debtors, is authorized to settle, or withdraw any objections to, any Disputed Claim following the Effective Date without further notice to Creditors or authorization of the Bankruptcy Court, in which event such Claim shall be deemed to be an Allowed Claim in the amount compromised for purposes of the Plan. Under no circumstances will any distributions be made on account of Disallowed Claims.

## C.    Procedures Regarding Disputed Claims

No payment or other distribution or treatment shall be made on account of a Disputed Claim, even if a portion of the Claim is not disputed, unless and until such Disputed Claim becomes an Allowed Claim and the amount of such Allowed Claim is determined by a Final Order or by stipulation between the Debtors and the Holder of the Claim. No distribution or other payment or treatment shall be made on account of a Disallowed Claim at any time.

On the Distribution Date, New Opco shall establish the Disputed Claims Reserve and New Opco shall deposit into the Disputed Claims Reserve the amount of Cash or other consideration to be provided under the Plan to the Holder of a Disputed Claim as if such Holder's Disputed Claim were an Allowed Claim in an amount to be determined by New Opco, in the reasonable exercise of New Opco's business judgment.

The Debtors (prior to the Effective Date) or New Opco (after the Effective Date) may, at any time, and from time to time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim, or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to such objection. Any Final Order of the Bankruptcy Court that estimates a Disputed Claim pursuant to the Plan irrevocably shall constitute and be a conclusive and final determination of the maximum allowable amount of Claim, should it become an Allowed Claim. Accordingly, the Holder of a Disputed Claim that is estimated by the Bankruptcy Court pursuant to the Plan will not be entitled to any subsequent reconsideration or upward adjustment of the maximum allowable amount of such Claim as a result of any subsequent adjudication or actual determination of the allowed amount of such Disputed Claim or otherwise, and the Holder of such Claim shall not have recourse to the Debtors or New Opco in the event the allowed amount of the Claim of such Holder is at any time later determined to exceed the estimated maximum allowable amount. As soon as practicable after entry of an order estimating a Disputed Claim under section 502(c) of the Bankruptcy Code, New Opco, on behalf of the Debtors, shall deposit into the Disputed Claims Reserve the amount of cash or other consideration to be provided under the Plan to the Holder of the Disputed Claim as if the Disputed Claim were an Allowed Claim in its maximum allowable amount.

## D.    Allowance of Claims

Following the date on which a Disputed Claim becomes an Allowed Claim after the Distribution Date, New Opco, on behalf of the Debtors, shall pay directly to the Holder of such Allowed Claim the amount provided for under the Plan, as applicable. Conversely, following the date a Disputed Claim becomes a Disallowed Claim, New Opco shall no longer be required to reserve the amount on reserve in the Disputed Claims Reserve with respect to such Disputed Claim (or otherwise cancel such interests) unless, after such transfer, the amounts remaining in the Disputed Claim Reserve would be insufficient to satisfy the obligations established under the Plan.

27

# ARTICLE VIII.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**A.**     **Assumption and Rejection of Executory Contracts and Unexpired Leases**

Except for any executory contracts or unexpired leases: (i) that are listed as Rejected Contracts on the Plan Supplement; (ii) that previously were assumed or rejected by an order of the Bankruptcy Court, pursuant to sections 365 and 1123 of the Bankruptcy Code; or (iii) as to which a motion for approval of the assumption or rejection of such contracts or leases has been Filed and served prior to Confirmation; each executory contract and unexpired lease entered into by the Debtors prior to the Petition Date that has not previously expired or terminated pursuant to its own terms shall be deemed assumed by the applicable Debtor and assigned to New Opco or the Reorganized Debtors pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. The Confirmation Order shall constitute an Order of the Bankruptcy Court approving both (i) the assumption and assignment of the Assigned Contracts by the applicable Debtor to New Opco or the Reorganized Debtors and (ii) the rejection of the Rejected Contracts, pursuant to sections 365 and 1123 of the Bankruptcy Code, as of the Effective Date. On the Effective Date, New Opco shall pay any Allowed Cure Claims associated with any Assigned Contracts owned by the Debtors (i.e., claims of non-Debtor contract parties against the Debtors for monetary damages for breaches of such Assigned Contracts).

**B.**     **Objections to Assumption of Executory Contracts and Unexpired Leases**

**1.**     **Objection Procedure Generally.**

Any party objecting to any Debtor's proposed assumption and assignment of an executory contract or unexpired lease based on a lack of adequate assurance of future performance or on any other ground including the adequacy of the "cure" amount set forth on the Cure Payment Schedule shall file and serve a written objection to the assumption of such contract or lease on or before the deadline to object to Confirmation. Failure to timely file an objection shall constitute consent to the assumption and assignment of the applicable Assigned Contract, including an acknowledgment that the proposed assumption provides adequate assurance of future performance and that the applicable "cure" amount set forth on the Cure Payment Schedule is proper and sufficient for purposes of section 365 of the Bankruptcy Code.

**2.**     **Objection Based on Grounds Other Than "Cure" Amount.**

If any party timely and properly files an objection to assumption based on any ground other than the adequacy of the applicable "cure" amount set forth on the Cure Payment Schedule and the Bankruptcy Court ultimately determines that any Debtor cannot assume the executory contract or lease or that New Opco or the Reorganized Debtors cannot provide adequate assurance of future performance as proposed, then the unexpired lease or executory contract shall automatically thereupon be deemed to have been excluded from the Cure Payment Schedule and shall be rejected.

**3.**     **Objection Based on "Cure" Amount.**

If any party timely and properly files an objection to assumption based on the adequacy of the applicable "cure" amount set forth the Cure Payment Schedule and such objection is not resolved between the Debtors and the objecting party, the Bankruptcy Court shall resolve such dispute at the Confirmation Hearing or another hearing date to be determined by the Bankruptcy Court. The resolution of such dispute shall not affect the assumption and assignment of the executory contract or lease that is the subject of such dispute but rather shall affect only the "cure" amount New Opco, on behalf of the applicable Debtor(s), must pay in order to assume such contract or lease and assign it to New Opco. Notwithstanding the immediately preceding sentence, if the Debtors and New Opco in their discretion determine that the amount asserted to be the necessary "cure" amount would, if ordered by the Bankruptcy Court, make the assumption and assignment of the executory contract or lease imprudent, then the Debtors may elect to (1) reject the executory contract or lease, or (2) request an expedited hearing on the resolution of the "cure" dispute, exclude assumption or rejection of the contract or lease

28

from the scope of the Confirmation Order, and retain the right to reject the executory contract or lease pending the outcome of such dispute.

## C.  Payment Related to Assumption of Executory Contracts and Unexpired Leases

If not the subject of dispute as of the Confirmation Date, any monetary defaults under each executory contract and unexpired lease to be assumed under the Plan shall be satisfied by New Opco pursuant to section 365(b) of the Bankruptcy Code: (i) by payment of (1) the applicable "cure" amount set forth in the schedule of Assigned Contracts, (2) such other amount as ordered by the Bankruptcy Court, or (3) such other amount as agreed upon by New Opco, on behalf of the Debtors, in Cash within thirty (30) days following the Effective Date; or (ii) on such other terms as agreed to by the parties to such executory contract or unexpired lease. In the event of a dispute regarding the appropriate "cure" amount, payment of the amount otherwise payable hereunder shall be made following entry of a Final Order or agreement by New Opco.

## D.  Rejection Damage Claims for Rejected Contracts

If the rejection of an executory contract or unexpired lease pursuant to the Plan or otherwise gives rise to a Claim by the other party or parties to such contract or lease, such Claim shall be forever barred and shall not be enforceable against the Debtors or their Estates unless a proof of Claim is Filed and served on the Debtors and their counsel within thirty days after the earlier of (a) Confirmation or (b) service of a notice that the executory contract or unexpired lease has been rejected. All such Claims for which proofs of Claim are required to be Filed, if Allowed, will be, and will be treated as, Class 6 General Unsecured Claims, subject to the provisions of the Plan.

## ARTICLE IX.

## CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN

### A.  Conditions to Confirmation of the Plan

It shall be a condition to Confirmation of the Plan that all of the terms and conditions of the Plan are approved or jointly waived by the Debtors and the Lender Parties.

### B.  Conditions to Effective Date

The Plan will not be consummated and the Effective Date will not occur unless and until (A) the Confirmation Order is in a form acceptable to both the Debtors and to the Agent and Steering Group and is entered by the Bankruptcy Court; (B) the Plan and Plan Supplement, including any amendments, modifications, or supplements thereto shall be acceptable to: (a) the Debtors; and (b) the Required Plan Modification Agents; (C) the ABL Facility, the New Note, and such other corporate documents required to implement the Plan shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof; (D) all actions, documents, certificates, and agreements necessary to implement the Plan shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws have been fully executed and delivered; and (E) the Confirmation Order shall either be a Final Order or, if an appeal has been Filed, no stay has been obtained. The foregoing conditions may be jointly waived by the Debtors, the Agent and Steering Group (such waiver shall not require any notice, Bankruptcy Court order, or any further action).

### C.  Effect of Failure of Conditions to Confirmation

Each of the conditions to the Effective Date must be satisfied or duly waived, as provided above, within thirty days after the Confirmation Date. If the Confirmation Order is vacated for failure to satisfy a condition to the Effective Date, the Plan shall be deemed null and void in all respects.

29

**D.     Effective Date**

Provided the above-referenced conditions to the occurrence of the Effective Date are satisfied, the Plan shall become effective on the Effective Date.

## ARTICLE X.

## EFFECTS OF CONFIRMATION

Confirmation will bind the Debtors; all Holders of Claims and Existing Equity Interests and other parties in interest to the provisions of the Plan whether or not the claim or interest of such Holder is Impaired under the Plan and whether or not the Holder of such Claim or Interest has accepted the Plan. All Claims and debts shall be as fixed and adjusted pursuant to the Plan. With respect to any taxes of the kind specified in Bankruptcy Code section 1146(c), the Plan shall also bind any taxing authority, recorder of deeds or similar official for any county, state, or governmental unit or parish in which any instrument related to under the Plan or related to any transaction contemplated under the Plan is to be recorded.

As otherwise provided in the Plan or the Confirmation Order, the rights afforded under the Plan and the treatment of Claims under the Plan are in exchange for and in complete satisfaction, discharge, and release of, all Claims against the Reorganized Debtors. Except to the extent provided under the Plan, confirmation of the Plan shall discharge each of the Reorganized Debtors from all Claims or other debts that arose at any time before the Effective Date and all debts of the kind specified in section 502(g), 502(h) or 502 (i) of the Bankruptcy Code. As of the Effective Date, all entities that have held, currently hold or may hold a Claim or other debt or liability that is discharged or any other right that is terminated under the Bankruptcy Code or the Plan are permanently enjoined from commencing or continuing any action, the employment of process, or other action, to collect, recover or offset any such Claim as a liability of the Reorganized Debtors to the full extent permitted by section 524 of the Bankruptcy Code.

## ARTICLE XI.

## INJUNCTION

**A.     Generally**

Unless otherwise provided in the Plan or the Confirmation Order, all injunctions and stays provided for in the Cases pursuant to sections 105 and 362 of the Bankruptcy Code or otherwise in effect on the Confirmation Date shall remain in full force and effect until the Effective Date. From and after the Effective Date, all Persons are permanently enjoined from, and restrained against, commencing or continuing in any court any suit, action, or other proceeding, or otherwise asserting any Claim or interest, (a) seeking to hold (i) the Debtors or the New Latham Group or (ii) the property of the Debtors or the New Latham Group, liable for any Claim, obligation, right, interest, debt, or liability that has been satisfied, discharged or released pursuant the Plan.

**B.     Injunction Related to Rights of Action and Terminated
Claims, Administrative Expenses or Interests**

Except as provided in the Plan or in the Confirmation Order, as of the Confirmation Date, all Entities that have held, currently hold or may hold a Claim, Administrative Expense, Interest, or other debt or liability that is stayed, Impaired, or terminated pursuant to the terms of the Plan are permanently enjoined from taking any of the following actions either (x) against the Debtors, the Agent or the New Latham Group, or their property on account of all or such portion of any such Claims, Administrative Expenses, Interests, debts, or liabilities that are stayed, Impaired, or terminated or (y) against any Person with respect to any right of action or any objection to a Claim, Administrative Expense, or Interest, which right of action or objection, under the Plan, is waived,

released, assigned or exclusively retained by any of the Debtors: (a) commencing or continuing, in any manner or in any place, any action or other proceeding; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree or order, (c) creating, perfecting, or enforcing any lien or encumbrance; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability, or obligation due; and (e) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan. To avoid any doubt, except as otherwise expressly noted in the Plan, nothing in the Plan or herein shall be construed or is intended to affect, enjoin, modify, release, or waive any claims, rights, and actions that a third party may have against a person other than the Debtors, the Agent or the New Latham Group, provided that such claims, rights, and actions are wholly separate and exist independently from any claims, rights, and actions of the Estates.

C.    **Exculpation**

As of and subject to the occurrence of the Effective Date, each of the Debtors, the Agent, the Lender Parties, Holders of Existing Equity Interests, and their respective representatives, officers, directors, principals, partners, members, employees agents, financial advisors, attorneys, accountants, investment bankers, consultants, and other Professionals, acting in their capacity as such, shall neither have nor incur any liability to any Person or Entity for any act taken or omitted to be taken, in connection with, or related to, the formulation, preparation, dissemination, implementation, administration, Confirmation or consummation of the Plan or any contract, instrument, waiver, release or other agreement or document created or entered into, in connection with the Plan, or any other act taken or omitted to be taken in connection with the Cases; *provided, however*, that the foregoing provisions of this subsection shall have no effect on the liability of any Person or Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct.

D.    **Debtor Release**

Each Debtor, for itself and its respective successors, assigns, and transferees shall be deemed to have released any and all claims and causes of action against the Debtors, the Agent, the Lender Parties, Holders of Existing Equity Interests, and their respective representatives, officers, directors, principals, partners, members, employees agents, financial advisors, attorneys, accountants, investment bankers, consultants, and other Professionals, acting in their capacity as such, arising prior to the Effective Date.

E.    **Third Party Release**

Each Creditor that (i) is deemed to have voted to accept the Plan; or (ii) does not elect to opt-out of this release by checking the appropriate box on the ballot provided to such Creditor in connection with solicitation of such Creditor's vote to accept to reject the Plan, for itself and its respective successors, assigns, transferees, those officers and directors, acting in such capacities as of the Petition Date, agents, members, financial advisors, attorneys, employees, partners, affiliates, representatives, in each case in their capacity as such, shall, by virtue of its vote, be deemed to have released any and all claims and causes of action against the Debtors, Agent, Lender Parties, Holders of Existing Equity Interests and the Debtors, and their respective representatives, officers, directors, principals, partners, members, employees agents, financial advisors, attorneys, accountants, investment bankers, consultants, and other Professionals, acting in their capacity as such, arising prior to the Effective Date.

F.    **Subsequent Discovery of Facts Does Not Affect Enforceability of Releases**

Each releasing party under the Plan shall be deemed to have granted the releases set forth herein, notwithstanding that it may hereafter discover facts in addition to, or different from, those which it now knows or believes to be true, and without regard to the subsequent discovery or existence of such different or additional facts, and such party expressly waives any and all rights that it may have under any statute or common law principle, including section 1542 of the California Civil Code, which would limit the effect of such releases to those Claims or causes of

31

**action actually known or suspected to exist at the time of Confirmation. Section 1542 of the California Civil Code generally provides as follows: "A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."**

### ARTICLE XII.

### RETENTION OF JURISDICTION

From and after the Confirmation Date, the Bankruptcy Court shall retain such jurisdiction as is legally permissible, including, but not limited to, for the following purposes:

i.  to establish the priority or secured or unsecured status of, allow, disallow, determine, liquidate, classify, or estimate any Claim, Administrative Expense or Interest (including, without limitation and by example only, determination of Tax issues or liabilities in accordance with section 505 of the Bankruptcy Code), resolve any objections to the allowance or priority of Claims, Administrative Expense or Interests, or resolve any dispute as to the treatment necessary to reinstate a Claim, Administrative Expense or Interest pursuant to the Plan;

ii.  to grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

iii.  to resolve any matters related to the rejection of any executory contract or unexpired lease to which any of the Debtors is a party or with respect to which any of the Debtors may be liable, and to hear, determine, and, if necessary, liquidate any Claims or Administrative Expenses arising therefrom;

iv.  to ensure that distributions to Holders of Allowed Claims, Administrative Expenses, or Interests are made pursuant to the provisions of the Plan, and to effectuate performance of the provisions of the Plan;

v.  to decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters and grant or deny any applications involving the Debtors that may be pending before the Effective Date or that may be commenced thereafter as provided in the Plan;

vi.  to enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan, the Disclosure Statement, or the Confirmation Order, except as otherwise provided in the Confirmation Order or in the Plan, including, without limitation, any stay orders as may be appropriate in the event that the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

vii.  to resolve any cases, controversies, suits, or disputes that may arise in connection with the consummation, interpretation, or enforcement of the Plan or the Confirmation Order;

viii.  subject to the restrictions on modifications provided in any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan, to modify the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code or modify the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan, the Disclosure Statement, or the Confirmation Order; or remedy any defect or

32

omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, the Disclosure Statement, or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan, to the extent authorized by the Bankruptcy Code;

ix. to issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of the Plan or the Confirmation Order;

x. to consider and act on any dispute regarding and the compromise and settlement of any Claim against the Debtors;

xi. to enter such orders as may be necessary or appropriate in connection with the recovery of the assets of the Debtors wherever located;

xii. to hear and determine any motions or contested matters involving Tax Claims or Taxes either arising prior (or for periods including times prior) to the Effective Date or relating to the administration of the Cases, including, without limitation (i) matters involving federal, state and local Taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code, (ii) matters concerning Tax refunds due for any period including times prior to the Effective Date, and (iii) any matters arising prior to the Effective Date affecting Tax attributes of the Debtors;

xiii. to determine such other matters as may be provided for in the Confirmation Order or as may from time to time be authorized under the provisions of the Bankruptcy Code or any other applicable law;

xiv. to enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings issued or entered in connection with the Cases or the Plan;

xv. to remand to state court any claim, cause of action, or proceeding involving the Debtors that was removed to federal court in whole or in part in reliance upon 28 U.S.C. § 1334;

xvi. to determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan, the Disclosure Statement, or the Confirmation Order, except as otherwise provided in the Plan;

xvii. to determine any other matter not inconsistent with the Bankruptcy Code;

xviii. to enter an order or final decree concluding the Cases; and

xix. to close the Cases when administration of the Cases has been completed.

**ARTICLE XIII.**

**MISCELLANEOUS**

A. **Revocation of Plan of Reorganization**

The Debtors reserve the right to revoke and withdraw the Plan at any time on or before the Confirmation Date. If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then the Plan shall be deemed null and void and, in such event, nothing contained in the Plan shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any

33

other entity or to prejudice in any manner the rights of the Debtors or any entity in any further proceedings involving the Debtors.

**B.     Severability of Plan Provisions**

If, prior to Confirmation, any nonmaterial term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, Impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order will constitute a judicial determination that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**C.     Governing Law**

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order the Bankruptcy Court, and extent on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

**D.     Exhibits**

All exhibits attached to the Plan, the Plan Supplement, or the Disclosure Statement are incorporated into the Plan. The final version of all exhibits to the Plan, the Plan Supplement, and the Disclosure Statement will be substantially in the forms attached hereto or thereto. The Debtors reserve the right to make nonsubstantive changes and corrections to such exhibits in advance of the Confirmation Hearing. If any exhibits are changed or corrected, the replacement exhibits will be filed with the Bankruptcy Court prior to the commencement of the Confirmation Hearing.

**E.     Notices**

All notices required or permitted to be made in accordance with the Plan shall be in writing and shall be delivered personally or by nationally recognized overnight or next-day courier service, first class mail or via facsimile with electronic confirmation of receipt as follows:

(By Mail or Facsimile)

Pachulski Stang Ziehl & Jones LLP           Latham International, Inc.
919 North Market Street, 17th Floor         Attn: Mark Laven
Wilmington, DE  19801                       787 Watervliet Shaker Road
Attn:   Laura Davis Jones, Esq.             Latham, NY  12110
        David M. Bertenthal, Esq.
        Joshua M. Fried, Esq.

**F.     Reservation of Rights**

Neither the filing of the Plan nor any statement or provision contained in the Plan or in the Disclosure Statement, nor the taking by any party-in-interest of any action with respect to the Plan, shall: (a) be or be deemed to be an admission against interest, and (b) until the Effective Date, be or be deemed to be a waiver of any rights any party in interest may have (i) against any other party in interest, or (ii) in any of the assets of any other party in interest, and, until the Effective Date, all such rights are specifically reserved. In the event that the Plan is not confirmed or fails to become effective, neither the Plan nor the Disclosure Statement nor any statement contained in the Plan or in the Disclosure Statement may be used

34

or relied upon in any manner in any suit, action, proceeding or controversy within or without these Cases involving the Debtors, except with respect to Confirmation of the Plan.

### G. Defects, Omissions and Amendments

The Debtors may, with the approval of the Bankruptcy Court and without notice to all Holders of Claims or Interests, insofar as it does not materially and adversely affect Holders of Claims or Interests, correct any defect, omission or inconsistency in the Plan in such manner and to such extent as may be necessary or desirable to expedite the execution of the Plan. The Plan may be altered or amended before or after Confirmation as provided in section 1127 of the Bankruptcy Code if, in the opinion of the Bankruptcy Court, the modification does not materially and adversely affect the interests of Holders of Claims, so long as the Plan, as modified, complies with sections 1122 and 1123 of the Bankruptcy Code and the Plan Proponents have complied with section 1125 of the Bankruptcy Code. The Plan may be altered or amended before or after the Confirmation Date but, prior to substantial consummation, in a manner which, in the opinion of the Bankruptcy Court, materially and adversely affects Holders of Claims, so long as the Plan, as modified, complies with Bankruptcy Code sections 1122 and 1123, the Debtors have complied with Bankruptcy Code section 1125 and, after notice and a hearing, the Bankruptcy Court confirms such Plan, as modified, under Bankruptcy Code section 1129.

### H. Filing of Additional Documents

The Debtors shall file with the Bankruptcy Court such agreements, instruments, pleadings, orders, papers or other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

### I. Successors and Assigns

The rights, benefits and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors and/or assigns of such entity.

### J. Setoffs and Recoupments

The Debtors may, but shall not be required to, set off against or recoup from the payments to be made pursuant to the Plan in respect of a Claim, any claim of any nature whatsoever that the Debtors or the Estates, as applicable, may have against the Holder of such Claim, but neither the failure to do so or the allowance of any Claim hereunder shall constitute a waiver or release of any such claim by the Debtors or the Estates, against such Holder.

### K. Tax Exemption

Pursuant to section 1146 of the Bankruptcy Code, the issuance, transfer or exchange of any security under the Plan, or the execution, delivery or recording of an instrument of transfer pursuant to, in implementation of or as contemplated by the Plan, including, without limitation, any transfers to or by the Debtors of the Debtors' property in implementation of or as contemplated by the Plan (including, without limitation, any subsequent transfer of property by the reorganized Debtors) shall not be taxed under any state or local law imposing a stamp tax, transfer tax or similar tax or fee. Consistent with the foregoing, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument, without requiring the payment of any documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

### L. Securities Exemption

Any rights issued under, pursuant to or in effecting the Plan, and the offering and issuance thereof by any party shall be exempt from section 5 of the Securities Act of 1933, if applicable, and from any state or federal securities laws requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in, a security, and shall otherwise enjoy all

exemptions available for distributions of securities under a plan of reorganization in accordance with all applicable law, including without limitation, section 1145 of the Bankruptcy Code.

**M.**     **Plan Interest Rate**

If and to the extent it is determined by the Bankruptcy Court that interest is required to be paid on an Allowed Claim other than as set forth in the Plan, the interest rate to be used shall be the Plan Interest Rate as determined by the Bankruptcy Court for such Claim.

**N.**     **Implementation**

Upon Confirmation, the Debtors shall be authorized to take all steps and execute all documents necessary to effectuate the provisions contained in the Plan.

**O.**     **Certain Actions**

By reason of entry of the Confirmation Order, prior to, on or after the Effective Date (as appropriate), all matters provided for under the Plan that would otherwise require approval of directors or stockholders of the Debtors under the Plan, including, without limitation, (i) the distribution of Cash pursuant to the Plan, (ii) the adoption, execution, delivery, and implementation of all contracts, leases, instruments, releases, and other agreements or documents related to the Plan, and (iii) the adoption, execution, and implementation of other matters provided for under the Plan involving the Company or organizational structure of the Debtors, shall be deemed to have occurred and shall be in effect prior to, on or after the Effective Date (as appropriate), pursuant to the applicable general corporation, limited liability, or partnership law of the state in which the applicable Debtor is chartered, organized or incorporated, without any requirement of further action by the directors and stockholders of the Debtors.

Effective upon the Effective Date, each of the Debtors' formation documents shall each be deemed amended to prohibit the issuance by the Debtors of nonvoting securities to the extent required under section 1123(a)(6) of the Bankruptcy Code.

On or as soon as practicable following the Effective Date, the Debtors or the reorganized Debtors, as applicable, shall be authorized to cancel, annul and extinguish all Interests.

**P.**     **Waiver of Ten (10) Day Stay**

The Debtors request as part of the Confirmation Order a waiver from the Bankruptcy Court of the ten (10) day stay of Bankruptcy Rule 3020(e) and, to the extent applicable, a waiver of the ten (10) day stay of Bankruptcy Rule 6004(g).

**Q.**     **Substantial Consummation**

On the Effective Date, the Plan shall be deemed substantially consummated under Bankruptcy Code sections 1101 and 1127(b).

## ARTICLE XIV.

## SOLICITATION AND VOTING PROCEDURES

The following summarizes briefly the procedures to accept or reject the Plan. Holders of Claims entitled vote on the Plan are encouraged to review the relevant provisions of the Bankruptcy Code and/or to consult their own attorneys.

## A. The Solicitation Package

The following materials constitute the solicitation package (the "Solicitation Package"):

- the appropriate ballot(s) (each, a "Ballot") and applicable voting instructions (with a pre-addressed, postage pre-paid return envelope); and

- the Disclosure Statement with all exhibits; including the Plan and any other supplements or amendments to these documents.

Holders of Class 3 Prepetition Financing Claims, entitled to vote to accept or reject the Plan, shall be served paper copies of the Disclosure Statement with all exhibits, including the Plan. Any party who desires additional paper copies of these documents may request copies from Epiq by contracting to Epiq Bankruptcy Solutions LLC, 757 Third Avenue, 3rd Floor, New York, NY 10017, or calling 646-282-2500.

## B. Voting Deadline

The period during which Ballots with respect to the Plan will be accepted by the Company will terminate at 5:00 p.m. (Eastern time) on December 21, 2009 (the "Voting Deadline"), unless the Company, in its sole discretion, extends the date until which the Ballots will be accepted. Except to the extent the Company so determines or as permitted by the Bankruptcy Court, Ballots that are received after the Voting Deadline will not be counted or otherwise used by the Company in connection with the Company's request for Confirmation of the Plan (or any permitted modification thereof).

The Company reserves the absolute right, at any time or from time to time, to extend the period of time (on a daily or hourly basis, if necessary) during which Ballots will be accepted for any reason, including determining whether or not the requisite number of acceptances have been received, by making a public announcement of such extension no later than the first Business Day next succeeding the previously announced Voting Deadline. The Company will give notice of any such extension in a manner deemed reasonable to the Company in its discretion. There can be no assurance that the Company will exercise its right to extend the Voting Deadline.

## C. Voting Instructions

Only the Holders of Allowed Class 3 Claims are entitled to vote to accept or reject the Plan, and they may do so by completing the appropriate Ballots and returning them in the envelope provided. The failure of a Holder to deliver a duly executed Ballot will be deemed to constitute an abstention by such Holder with respect to voting on the Plan, and such abstention will not be counted as votes for or against the Plan. Voting instructions are attached to each Ballot.

**The deadline by which Epiq must receive your Ballot is 5:00 p.m. (Eastern time), on December 21, 2009.**

The Company is providing the Solicitation Package to Holders of Prepetition Financing Claims whose names appear as of the Voting Record Date.

Any Ballot that is properly executed by the Holder of a Claim, but which does not clearly indicate an acceptance or rejection of the Plan or which indicates both an acceptance and a rejection of the Plan, shall not be counted.

All Ballots are accompanied by return envelopes. It is important to follow the specific instructions provided on each Ballot.

By signing and returning a Ballot, you will be certifying to the Bankruptcy Court and the Company that, among other things:

37

- the Holder has received and reviewed a copy of the Disclosure Statement and Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

- the Holder has voted all of its Claims within Class 3 either to accept or reject the Plan and cast the same vote with respect to all Claims in Class 3;

- no other Ballot with respect to the same Claim has been cast, or, if any other Ballots have been cast with respect to such Claim, then any such Ballots are thereby revoked.

## D.    Voting Tabulation

The Ballot does not constitute, and shall not be deemed to be, a proof of claim or an assertion or admission of a Claim or Interest. Only Holder of Class 3 Claims as of the Voting Record Date (as defined below) shall be entitled to vote with regard to such Claims.

The following Ballots will not be counted in determining the acceptance or rejection of the Plan: (1) any Ballot that is illegible, contains insufficient information to permit identification of the Holder, or is not on the form provided; (2) any Ballot cast by a party that does not hold a Claim in the Class that is entitled to vote on the Plan; (3) any Ballot received after the Voting Deadline, except as described below; (4) any unsigned Ballot; (5) any Ballot that is not marked to accept or reject the Plan, or marked both to accept and reject the Plan; (6) any Ballot cast by a party that holds a Claim in a Class that is entitled to vote, but did not hold the Claim on December 15, 2009 (the "Voting Record Date"); and/or (7) any Ballot submitted by a party not entitled to cast a vote with respect to the Plan for any reason.

Unless the Company decides otherwise, Ballots received after the Voting Deadline may not be counted. The method of delivery of the Ballots to be sent to Epiq is at the election and risk of each Holder of a Class 3 Claim. Except as otherwise provided in the Solicitation Procedures, a Ballot will be deemed delivered when Epiq actually receives the executed Ballot, including delivery by facsimile and email. No Ballot should be sent to the Company, or the Company's financial or legal advisors. The Company expressly reserves the right to amend from time to time the terms of the Plan (subject to compliance with the requirements of section 1127 of the Bankruptcy Code and the terms of the Plan regarding modifications). The Bankruptcy Code may require the Company to disseminate additional solicitation materials if the Company makes material changes to the terms of the Plan or if the Company waives a material condition to Confirmation. In that event, solicitation will be extended to the extent directed by the Bankruptcy Court.

If multiple Ballots are received from the same Holder with respect to the same Claim prior to the Voting Deadline, the last Ballot timely received will be deemed to reflect that voter's intent and will supersede and revoke any prior Ballot. Holders must vote all of their Claims either to accept or reject the Plan and may not split their vote. Accordingly, a Ballot that partially rejects and partially accepts the Plan will not be counted. Further, to the extent there are multiple Claims within the Voting Class, the Company may, in its discretion, and to the extent possible, aggregate the Class 3 Claims of any particular Holder within the Class for the purpose of counting votes.

In the event a designation of lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Bankruptcy Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected.

The Company will file with the Bankruptcy Court, prior to the commencement of the Confirmation Hearing, a report prepared by Epiq reflecting the tabulation of Ballots for the Class entitled to vote on the Plan (the "Voting Report"). The Voting Report shall, among other things, delineate every Ballot that does not conform to the applicable voting instructions or that contains any form of irregularity (each, an "Irregular Ballot") including, but not limited to, those Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures or lacking necessary information, or damaged. The Voting Report also shall indicate the Company's intentions with regard to such Ballots that do not

conform to the applicable voting instructions or that contains any form of irregularity. Neither the Company nor any other person or entity will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report, nor will any of them incur an liability for failure to provide such notification.

## ARTICLE XV.

## VALUATION ANALYSIS AND FINANCIAL PROJECTIONS

### A.     Valuation

THE VALUATIONS SET FORTH HEREIN REPRESENT ESTIMATED REORGANIZATION VALUES AND DO NOT NECESSARILY REFLECT VALUES THAT COULD BE ATTAINABLE IN THE PUBLIC OR PRIVATE MARKETS. THE EQUITY VALUE ASCRIBED IN THE ANALYSIS DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET VALUE. SUCH TRADING VALUE, IF ANY, MAY BE MATERIALLY DIFFERENT FROM THE REORGANIZATION VALUE RANGES ASSOCIATED WITH THE VALUATION ANALYSIS.

Moelis has advised the Debtors with respect to the reorganization value of New Opco, Reorganized Viking and Reorganized Coverstar, in the aggregate, on a going concern basis. Solely for purposes of the Plan, the estimated range of reorganization value of New Opco, Reorganized Viking and Reorganized Coverstar, in the aggregate, is assumed to be $36 million to $50 million (with a midpoint value of $43 million) as of an assumed Effective Date of February 1, 2010. Moelis' estimate of a range of enterprise values does not constitute an opinion as to fairness from a financial point of view of the consideration to be received under the Plan or of the terms and provisions of the Plan.

THE ESTIMATED RANGE OF THE REORGANIZATION VALUE, AS OF AN ASSUMED EFFECTIVE DATE OF FEBRUARY 1, 2010, REFLECTS WORK PERFORMED BY MOELIS ON THE BASIS OF INFORMATION IN RESPECT OF THE BUSINESS AND ASSETS OF THE DEBTORS AVAILABLE TO MOELIS AS OF DECEMBER 15, 2009. IT SHOULD BE UNDERSTOOD THAT, ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT MOELIS' CONCLUSIONS, MOELIS DOES NOT HAVE ANY OBLIGATION TO UPDATE, REVISE, OR REAFFIRM ITS ESTIMATE.

Based upon the estimated range of the reorganization value of New Opco, Reorganized Viking and Reorganized Coverstar, in the aggregate, of between $36 million and $50 million and assumed debt of $20 million as of the Effective Date, assuming an Effective Date of February 1, 2010, Moelis has estimated the range of new common stock for New Opco, Reorganized Viking and Reorganized Coverstar, in the aggregate, between approximately $16 million and $30 million, with a mid-point value of $23 million (based on $20 million of new debt).

The foregoing estimate of the reorganization value of New Opco, Reorganized Viking and Reorganized Coverstar, in the aggregate, is based on a number of assumptions, including a successful reorganization of the Debtors' business and finances in a timely manner, the implementation of the business plan of New Opco, Reorganized Viking and Reorganized Coverstar, in the aggregate, the achievement of the forecasts reflected in the Financial Projections, access to an ABL Revolver, the continuing leadership of the existing management team, market conditions as of December 15, 2009 continuing through the assumed Effective Date of February 1, 2010, and the Plan becoming effective in accordance with the estimates and other assumptions discussed herein.

With respect to the Financial Projections prepared by the management of the Debtors and included in **Exhibit B** to this Disclosure Statement, Moelis assumed that such Financial Projections have been reasonably prepared in good faith and on a basis reflecting the best currently available estimates and judgments of the Debtors as to the future operating and financial performance of New Opco, Reorganized Viking and Reorganized Coverstar, in the aggregate. Moelis' estimate of a range of reorganization values assumes that the Debtors' Financial Projections will be achieved by New Opco, Reorganized Viking and Reorganized Coverstar, in the aggregate, in all material respects, including revenue growth and

39

improvements in operating margins, earnings and cash flow. As a result, to the extent that the estimate of enterprise values is dependent upon New Opco, Reorganized Viking and Reorganized Coverstar, in the aggregate, performing at the levels set forth in the Financial Projections, such analysis must be considered speculative. If the business performs at levels below those set forth in the Financial Projections, such performance may have a material impact on the Financial Projections and on the estimated range of values derived therefrom.

IN ESTIMATING THE RANGE OF THE REORGANIZATION VALUE AND EQUITY VALUE OF NEW OPCO, REORGANIZED VIKING AND REORGANIZED COVERSTAR, IN THE AGGREGATE, MOELIS:

- REVIEWED CERTAIN HISTORICAL FINANCIAL INFORMATION OF THE DEBTORS FOR RECENT YEARS AND INTERIM PERIODS;

- REVIEWED CERTAIN INTERNAL FINANCIAL AND OPERATING DATA OF THE DEBTORS, INCLUDING THE FINANCIAL PROJECTIONS, WHICH WERE PREPARED AND PROVIDED TO MOELIS BY THE DEBTORS' MANAGEMENT AND WHICH RELATE TO THE DEBTORS' BUSINESS AND THEIR PROSPECTS;

- MET WITH CERTAIN MEMBERS OF SENIOR MANAGEMENT OF THE DEBTORS TO DISCUSS THE DEBTORS' OPERATIONS AND FUTURE PROSPECTS;

- REVIEWED PUBLICLY AVAILABLE FINANCIAL DATA AND CONSIDERED THE MARKET VALUE OF PUBLIC COMPANIES IN THE BUILDING PRODUCTS SECTOR;

- CONSIDERED RELEVANT PRECEDENT TRANSACTIONS IN THE BUILDING PRODUCTS SECTOR;

- CONSIDERED CERTAIN ECONOMIC AND INDUSTRY INFORMATION RELEVANT TO THE OPERATING BUSINESS; AND

- CONDUCTED SUCH OTHER STUDIES, ANALYSIS, INQUIRIES AND INVESTIGATIONS AS IT DEEMED APPROPRIATE.

ALTHOUGH MOELIS CONDUCTED A REVIEW AND ANALYSIS OF THE DEBTORS' BUSINESSES, OPERATING ASSETS, LIABILITIES AND BUSINESS PLANS OF NEW OPCO, REORGANIZED VIKING AND REORGANIZED COVERSTAR, IN THE AGGREGATE, IT ASSUMED AND RELIED ON THE ACCURACY AND COMPLETENESS OF ALL FINANCIAL AND OTHER INFORMATION FURNISHED TO IT BY THE DEBTORS, AS WELL AS PUBLICLY AVAILABLE INFORMATION. IN ADDITION, MOELIS DID NOT INDEPENDENTLY VERIFY MANAGEMENT'S FINANCIAL PROJECTIONS IN CONNECTION WITH SUCH ESTIMATES OF THE REORGANIZATION VALUE AND EQUITY VALUE, AND NO INDEPENDENT VALUATIONS OR APPRAISALS OF THE DEBTORS WERE SOUGHT OR OBTAINED IN CONNECTION HEREWITH.

ESTIMATES OF THE REORGANIZATION VALUE AND EQUITY VALUE DO NOT PURPORT TO BE APPRAISALS OR NECESSARILY REFLECT THE VALUES THAT MAY BE REALIZED IF ASSETS ARE SOLD AS A GOING CONCERN, IN LIQUIDATION, OR OTHERWISE.

IN THE CASE OF NEW OPCO, REORGANIZED VIKING AND REORGANIZED COVERSTAR, IN THE AGGREGATE, THE ESTIMATES OF THE REORGANIZATION VALUE PREPARED BY MOELIS REPRESENT THE HYPOTHETICAL REORGANIZATION VALUE OF NEW OPCO, REORGANIZED VIKING AND REORGANIZED COVERSTAR, IN THE AGGREGATE. SUCH ESTIMATES WERE DEVELOPED SOLELY FOR PURPOSES OF THE FORMULATION AND NEGOTIATION OF THE PLAN AND THE ANALYSIS OF IMPLIED

RELATIVE RECOVERIES TO CREDITORS THEREUNDER. SUCH ESTIMATES REFLECT COMPUTATIONS OF THE RANGE OF THE ESTIMATED REORGANIZATION ENTERPRISE VALUE OF NEW OPCO, REORGANIZED VIKING AND REORGANIZED COVERSTAR, IN THE AGGREGATE, THROUGH THE APPLICATION OF VARIOUS VALUATION TECHNIQUES AND DO NOT PURPORT TO REFLECT OR CONSTITUTE APPRAISALS, LIQUIDATION VALUES, OR ESTIMATES OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN, WHICH MAY BE SIGNIFICANTLY DIFFERENT THAN THE AMOUNTS SET FORTH HEREIN.

THE VALUE OF AN OPERATING BUSINESS IS SUBJECT TO NUMEROUS UNCERTAINTIES AND CONTINGENCIES WHICH ARE DIFFICULT TO PREDICT AND WILL FLUCTUATE WITH CHANGES IN FACTORS AFFECTING THE FINANCIAL CONDITION AND PROSPECTS OF SUCH A BUSINESS. AS A RESULT, THE ESTIMATE OF THE RANGE OF THE REORGANIZATION ENTERPRISE VALUE OF NEW OPCO, REORGANIZED VIKING AND REORGANIZED COVERSTAR, IN THE AGGREGATE, SET FORTH HEREIN IS NOT NECESSARILY INDICATIVE OF ACTUAL OUTCOMES, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE SET FORTH HEREIN. SUCH ESTIMATES ARE INHERENTLY SUBJECT TO UNCERTAINTIES AND ACTUAL OUTCOMES AND RESULTS MAY DIFFER MATERIALLY FROM THOSE SET FORTH HEREIN. IN ADDITION, THE VALUATION OF NEWLY ISSUED SECURITIES IS SUBJECT TO ADDITIONAL UNCERTAINTIES AND CONTINGENCIES, ALL OF WHICH ARE DIFFICULT TO PREDICT.

## 1. Valuation Methodology.

Moelis performed a variety of analyses and considered a variety of factors in preparing the valuation of New Opco, Reorganized Viking and Reorganized Coverstar, in the aggregate. Several generally accepted valuation techniques for estimating the enterprise value of New Opco, Reorganized Viking and Reorganized Coverstar, in the aggregate, were used. Moelis primarily relied on three methodologies: discounted cash flow analysis, comparable public company analysis and precedent transactions analysis. Moelis weighed each of these analyses based on their relative merits and made judgments as to the significance of each analysis in determining the indicated enterprise value range of New Opco, Reorganized Viking and Reorganized Coverstar, in the aggregate. Moelis' valuation must be considered as a whole, and selecting just one methodology or portions of the analyses, without considering the analyses as a whole, could create a misleading or incomplete conclusion as to the enterprise value of New Opco, Reorganized Viking and Reorganized Coverstar, in the aggregate.

In preparing its valuation estimate, Moelis performed a variety of analyses and considered a variety of factors, some of which are described herein. The following summary does not purport to be a complete description of the analyses and factors undertaken to support Moelis' conclusions. The preparation of a valuation is a complex process involving various determinations as to the most appropriate analyses and factors to consider, as well as the application of those analyses and factors under the particular circumstances. As a result, the process involved in preparing a valuation is not readily summarized.

**(a) Discounted Cash Flow Approach.** The discounted cash flow ("**DCF**") valuation methodology relates to the value of an asset or business to the present value of expected future cash flows to be generated by that asset or business. The DCF methodology is a "forward looking" approach that discounts the expected future cash flows by a theoretical or observed discount rate determined by calculating the average cost of debt and equity for publicly traded companies that are similar to the Debtors. The expected future cash flows have two components: the present value of the projected unlevered after-tax free cash flows for a determined period and the present value of the terminal value of cash flows (representing firm value beyond the time horizon of the Financial Projections). Moelis' discounted cash flow valuation is based on the business plan projections and operating results of New Opco, Reorganized Viking and Reorganized Coverstar, in the aggregate. Moelis discounted the projected cash flows using the estimated weighted average cost of capital of New Opco, Reorganized Viking and Reorganized Coverstar, in the aggregate, and calculated a terminal value of New Opco, Reorganized Viking and Reorganized Coverstar, in the aggregate.

41

Management believes that during the seven-year period from 2015-2021, New Opco, Reorganized Viking and Reorganized Coverstar, in the aggregate will return to normalized levels of demand and profitability. Specifically, management believes that from 2014 to 2021, net revenue will grow at an annual rate of approximately 7% per year and EBITDA margin will improve by approximately 100 basis points per year.

This approach relies on the company's ability to project future cash flows with some degree of accuracy. Because the Financial Projections reflect significant assumptions made by the Debtors' management concerning anticipated results, the assumptions and judgments used in the Financial Projections may or may not prove correct and, therefore, no assurance can be provided that projected results are attainable or will be realized. Moelis cannot and does not make any representations or warranties as to the accuracy or completeness of the Financial Projections of New Opco, Reorganized Viking and Reorganized Coverstar, in the aggregate.

**(b) Comparable Public Company Analysis.** A comparable public company analysis estimates value based on a comparison of the target company's financial statistics with the financial statistics of public companies that are similar to the target company. It establishes a benchmark for asset valuation by deriving the value of "comparable" assets, standardized using a common variable such as revenues, earnings, and cash flows. The analysis includes a detailed multi-year financial comparison of each company's income statement, balance sheet, and cash flow statement. In addition, each company's performance, profitability, margins, leverage, and business trends are also examined. Based on these analyses, a number of financial multiples and ratios are calculated to gauge each company's relative performance and valuation.

A key factor to this approach is the selection of companies with relatively similar business and operational characteristics to the target company. Criteria for selecting comparable companies include, among other relevant characteristics, similar lines of businesses, business risks, growth prospects, market presence, size, and scale of operations. The selection of truly comparable companies is often difficult and subject to interpretation. The underlying concept, however, is to develop a premise for relative value, which, when coupled with other approaches, presents a foundation for determining firm value. In performing the Comparable Public Company Analysis, Moelis evaluated publicly traded companies in the building products sector similar to the Debtors in some or all of the factors described above. Moelis analyzed the current trading value for the comparable companies as a multiple of operating metrics.

**(c) Precedent Transactions Analysis.** Precedent transactions analysis estimates value by examining publicly announced merger and acquisition transactions. An analysis of the disclosed purchase price as a multiple of various operating statistics reveals industry acquisition multiples for companies with similar business and operational characteristics to the Debtors. These transaction multiples are calculated based on the purchase price (including any debt assumed) paid to acquire companies. In evaluating the comparability of transactions, Moelis considered changes in the macroeconomic operating environment and the capital markets since those transactions were announced.

The valuation in this methodology includes a "control" premium, representing the purchase of a majority or controlling position in a company's assets. Thus, this methodology generally produces higher valuations than the comparable public company analysis. Other aspects of value that manifest themselves in a precedent transaction analysis include the following:

- Circumstances surrounding a sale transaction may introduce "diffusive quantitative results" into the analysis (e.g., an additional premium may be extracted from a buyer in the case of a competitive bidding contest).

- The market environment is not identical for transactions occurring at different periods of time.

- Circumstances pertaining to the financial position of a company may have an impact on the resulting purchase price (e.g., a company in financial distress may receive a lower price due to perceived weakness in its bargaining leverage).

42

As with the comparable company analysis, because no acquisition used in any analysis is identical to a target transaction, valuation conclusions cannot be based solely on quantitative results. The reasons for and circumstances surrounding each acquisition transaction are specific to such transaction, and there are inherent differences between the businesses, operations and prospects of each. Therefore, qualitative judgments must be made concerning the differences between the characteristics of these transactions and other factors and issues that could affect the price an acquirer is willing to pay in an acquisition. The number of completed transactions for which public data is available also limits this analysis.

THE ESTIMATES OF THE REORGANIZATION VALUE AND EQUITY VALUE DETERMINED BY MOELIS REPRESENT ESTIMATED REORGANIZATION VALUES AND DO NOT REFLECT VALUES THAT COULD BE ATTAINABLE IN PUBLIC OR PRIVATE MARKETS. THE IMPUTED ESTIMATE OF THE RANGE OF THE REORGANIZATION EQUITY VALUE OF NEW OPCO, REORGANIZED VIKING AND REORGANIZED COVERSTAR, IN THE AGGREGATE, ASCRIBED IN THE ANALYSIS DOES NOT PURPORT TO BE AN ESTIMATE OF THE POSTREORGANIZATION MARKET VALUE. ANY SUCH VALUE MAY BE MATERIALLY DIFFERENT FROM THE IMPUTED ESTIMATE OF THE REORGANIZATION EQUITY VALUE RANGE FOR NEW OPCO, REORGANIZED VIKING AND REORGANIZED COVERSTAR, IN THE AGGREGATE, ASSOCIATED WITH MOELIS' VALUATION ANALYSIS.

## ARTICLE XVI.

### CONFIRMATION PROCEDURES

**A.    The Confirmation Hearing**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold the Confirmation Hearing. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan. On or about the Petition Date, the Company will promptly seek an order of the Bankruptcy Court scheduling a hearing to consider the approval of the prepetition procedures for the Solicitation, including this Disclosure Statement and confirmation of the Plan. Notice of the Confirmation Hearing will be provided in the manner prescribed by the Bankruptcy Court. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

**B.    Statutory Requirements for Confirmation of the Plan**

At the Confirmation Hearing, the Bankruptcy Court shall determine whether the requirements of section 1129 of the Bankruptcy Code have been satisfied. If so, the Bankruptcy Court shall enter the Confirmation Order. The Company believes that the Plan satisfies or will satisfy the applicable requirements, as follows:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Company, as Plan proponents, will have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Cases, or in connection with the Plan and incident to the case, has been disclosed to the Bankruptcy Court, and any such payment: (1) made before the Confirmation of the Plan is reasonable; or (2) subject to the approval of the Bankruptcy Court as reasonable if it is to be fixed after the Confirmation of the Plan.

43

- Either each Holder of an Impaired Claim or Interest has accepted the Plan, or will receive or retain under the Plan on account of that Claim or Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount that the Holder would receive or retain if the Debtors were liquidated on that date under Chapter 7 of the Bankruptcy Code.

- Each Class of Claims and Interests that is entitled to vote on the Plan has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of each voting Class pursuant to section 1129(b) of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Administrative Claims will be paid in full in cash on the Effective Date.

- At least one Class of Impaired Claims will accept the Plan, determined without including any acceptance of the Plan by any insider holding a Claim of that Class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan unless such a liquidation or reorganization is proposed in the Plan.

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the United States Trustee, will be paid as of the Effective Date

The Company believes that: (1) the Plan satisfies or will satisfy all of the statutory requirements of Chapter 11 of the Bankruptcy Code; (2) it has complied or will have complied with all of the requirements of Chapter 11; and (3) the Plan has been proposed in good faith.

### 1. Best Interests of Creditors Test/Liquidation Analysis

Under the Bankruptcy Code, confirmation of a plan also requires a finding that the plan is in the "best interests" of creditors. Under the "best interests" test, the Bankruptcy Court must find (subject to certain exceptions) that the Plan provides, with respect to each Impaired Class, that each Holder of an Allowed Claim or Interest in such Impaired Class has accepted the Plan, or will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code.

The analysis under the "best interests" test requires that the Bankruptcy Court determine what Holders of Allowed Claims and Interests in each Impaired Class would receive if the Chapter 11 Cases were converted to liquidation cases under Chapter 7 of the Bankruptcy Code, and the Bankruptcy Court appointed a Chapter 7 trustee to liquidate all of the assets into Cash. The Company's "liquidation value" would consist primarily of unencumbered and unrestricted Cash held by the Company at the time of the conversion to Chapter 7 cases, and the proceeds resulting from the Chapter 7 trustee's sale of the Company's remaining unencumbered assets. The gross Cash available for distribution would be reduced by the costs and expenses incurred in effectuating the Chapter 7 liquidation and any additional Administrative Claims incurred during the Chapter 7 cases.

The Bankruptcy Court then must compare the value of the distributions from the proceeds of the hypothetical Chapter 7 liquidation of the Company (after subtracting the Chapter 7-specific claims and administrative costs) with the value to be distributed to the Holders of Allowed Claims and Interests under the Plan. It is possible that in a Chapter 7 liquidation, Claims and Interests may not be classified in the same manner as set forth in the Plan. In a hypothetical Chapter 7 liquidation of the Company's assets, the rule of absolute priority of distribution would apply, i.e., no junior creditor would receive any distribution until payment in full of all senior creditors, and no Holder of an Interest would receive any distribution until all creditors have been paid in full. Further, in Chapter 7 cases, unsecured creditors and interest holders of a debtor are paid from available assets generally in the following order: (a) holders of

secured claims (to the extent of the value of their collateral); (b) holders of priority claims; (c) holders of unsecured claims; (d) holders of claims expressly subordinated by its terms or bankruptcy court order; and (e) holders of equity interests.

Of the foregoing groups of Claims, Priority Non-Tax Claims, Other Secured Claims, Priority Tax Claims, General Unsecured Claims, Administrative Claims, and Reorganized Debtor Intercompany Claims are either unclassified or "Unimpaired" under the Plan, meaning that the Plan generally leaves their legal, equitable, and contractual rights unaltered. As a result, Holders of such Claims and Interests are deemed to accept the Plan. Prepetition Financing Claims are "Impaired" under the Plan and are entitled to vote on the Plan. Subordinated Note Claims and Seller Note Claims are to receive no distribution under the Plan and, therefore, are deemed to reject the Plan. Because the Bankruptcy Code requires that impaired creditors either accept the Plan or receive at least as much under the Plan as they would in a hypothetical Chapter 7 liquidation, the operative "best interests" inquiry in the context of the Plan is whether in a Chapter 7 liquidation, after accounting for recoveries by Secured, Administrative, and Priority creditors, the impaired creditors and interest holders will receive more or less than under the Plan. If the probable distribution to impaired creditors and interest holders under a hypothetical Chapter 7 liquidation is greater than the distributions to be received by such Holders under the Plan, then the Plan is not in the best interests of impaired creditors and interest holders.

As described in more detail in the liquidation analysis set forth in **Exhibit C** hereto (the "Liquidation Analysis"), the Company believes that the value of any distributions in a Chapter 7 case would be less than the value of distributions under the Plan. In particular, proceeds received in a Chapter 7 liquidation are likely to be significantly discounted due to the distressed nature of the sale, and the fees and expenses of a Chapter 7 trustee would likely further reduce Cash available for distribution.

2.     **Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires the Bankruptcy Court to find, as a condition to confirmation, that confirmation is not likely to be followed by the debtor's liquidation or the need for further financial reorganization, unless that liquidation or reorganization is contemplated by the Plan. The Plan contemplates that virtually all creditors (other than Holders of the Subordinated Note Claims and Seller Note Claims) will be paid in full, and the Company's balance sheet will become materially deleveraged. In addition, the Plan also contemplates a $25,000,000 ABL Facility, and, therefore, sufficient funds will exist to make all payments required by the Plan. The Company's overall enterprise value will accrue directly to the Holders of the Prepetition Financing Claims, who will receive the New Equity, pro rata, in exchange for their respective Prepetition Financing Claims. The Company believes that the Plan satisfies the financial feasibility requirements of section 1129(a)(11).

3.     **Acceptance by Impaired Classes**

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each Class of Claims and Interests that is impaired under the Plan accept the Plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such Class is not required. A class is "impaired" unless the plan: (a) leaves unaltered the legal, equitable, and contractual rights to which the claim or equity interest entitles the holder of that claim or equity interest; (b) cures any default and reinstates the original terms of the obligation; or (c) provides that, on the consummation date, the holder of the claim or equity interest receives cash equal to the allowed amount of that claim or, with respect to any interest, any fixed liquidation preference to which the equity interest holder is entitled or any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two thirds in dollar amount and more than one half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance. Under section 1126(d) of the Bankruptcy Code, a class of equity interests has accepted the plan if holders of such equity interests holding at least two thirds in amount actually voting have voted to accept the plan.

45

The Claims and Interests in Classes 1, 2, 6 and 8 are not Impaired under the Plan, and as a result the Holders of such Claims and Interests are deemed to have accepted the Plan.

Prepetition Financing Claims in Class 3 are Impaired under the Plan. The voting class will have accepted the Plan if the Plan is accepted by at least two thirds in amount and a majority in number of the Claims of such Class (other than any Claims of Creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

The members of Classes 4, 5,7 and 9 will not receive a distribution under the Plan and are deemed to reject the Plan and are not entitled to vote on the Plan.

### 4. Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a Bankruptcy Court to confirm a plan, even if all Impaired Classes entitled to vote on the plan have not accepted it, provided that the plan has been accepted by at least one Impaired Class.

Section 1129(b) of the Bankruptcy Code states that, notwithstanding an Impaired Class's failure to accept a plan, the plan shall be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each Class of Claims and Interests that is Impaired under, and has not accepted, the plan.

In general, a plan does not discriminate unfairly if it treats a class substantially equivalent to the treatment of other classes of equal rank. Courts will take into account a number of factors in determining whether a plan discriminates unfairly, including whether the discrimination has a reasonable basis, whether the debtor can carry out a plan without such discrimination, whether such discrimination is proposed in good faith, and the treatment of the class discriminated against. Courts have also held that it is appropriate to classify unsecured creditors separately if the differences in classification are in the best interest of the creditors, foster reorganization efforts, do not violate the absolute priority rule, and do not needlessly increase the number of classes.

The condition that a plan be "fair and equitable" to a non-accepting Class of Secured Claims includes the requirements that: (a) the Holders of such Secured Claims retain the liens securing such Claims to the extent of the Allowed amount of the Claims, whether the property subject to the liens is retained by the debtors or transferred to another entity under the plan; and (b) each Holder of a Secured Claim in the Class receives deferred Cash payments totaling at least the Allowed amount of such Claim with a present value, as of the Effective Date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

The condition that a plan be "fair and equitable" with respect to a non-accepting Class of unsecured Claims includes the requirement that either: (a) the plan provides that each Holder of a Claim of such Class receive or retain on account of such Claim property of a value, as of the Effective Date of the plan, equal to the allowed amount of such Claim; or (b) the Holder of any Claim or Interest that is junior to the Claims of such Class will not receive or retain under the plan on account of such junior Claim or Interest any property.

The condition that a plan be "fair and equitable" to a non accepting Class of Interests includes the requirements that either: (a) the plan provides that each Holder of an Interest in that Class receives or retains under the plan, on account of that Interest, property of a value, as of the Effective Date of the plan, equal to the greater of (i) the allowed amount of any fixed liquidation preference to which such Holder is entitled, (ii) any fixed redemption price to which such Holder is entitled, or (iii) the value of such interest; or (b) if the Class does not receive such an amount as required under (a), no Class of Interests junior to the non-accepting Class may receive a distribution under the plan.

The Plan provides that if any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cram down" provisions of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Company will request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of

the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan or any exhibit or schedule to the Plan, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary .

The Company submits that if the Company "crams down" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured such that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.

Prior to deciding whether and how to vote on the Plan, each Holder of a Class 3 Prepetition Financing Claim should consider carefully all of the information in this Disclosure Statement, and should particularly consider the Risk Factors described in Article XVII, entitled "Plan Related Risk Factors."

## C.    IDENTITY OF PERSONS TO CONTACT FOR MORE INFORMATION

Any interested part desiring further information about the Plan should contact: Counsel for the Debtors: Laura Davis Jones, Esq., Pachulski Stang Ziehl & Jones LLP, 919 N. Market Street, 17th Floor, Wilmington, DE 19801, via e-mail at ljones@pszjlaw.com or by phone at (302) 652-4100.

## D.    DISCLAIMER

In formulating the Plan, the Company has relied on financial data derived from books and records. The Company, therefore, represents that everything stated in this Disclosure Statement is true to the best of their knowledge. The Company nonetheless cannot, and does not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Moreover, the Bankruptcy Court has not yet determined whether the Plan is confirmable and, therefore, does not recommend whether you should accept or reject the Plan.

The discussion in this Disclosure Statement regarding the Company may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate," or "continue" or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The liquidation analyses, distribution projections, and other information are estimates only, and the timing and amount of actual distributions to creditors may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates or recovery projections mayor may not turn out to be accurate.

**Nothing contained in this Disclosure Statement is, or shall be deemed to be, an admission or statement against interest by the Company for purposes of any pending or future litigation matter or proceeding.**

**Although the attorneys, accountants, advisors, and other professionals employed by the Company have assisted in preparing this Disclosure Statement based upon factual information and assumptions respecting financial, business, and accounting data found in the books and records of the Company, they have not independently verified such information and make no representations as to the accuracy thereof. The attorneys, accountants, advisors, and other professionals employed by the Company shall have no liability for the information in this Disclosure Statement.**

**Prior to voting to accept or reject the Plan, all Holders of Claims in Class 3 should read and carefully consider the factors set forth below, as well as all other information set forth or otherwise referenced in this Disclosure Statement.**

47

# ARTICLE XVII.

## PLAN RELATED RISK FACTORS

### A.  GENERAL

The following provides a summary of various important considerations and risk factors associated with the Plan. However, it is not exhaustive. In considering whether to vote for or against the Plan, Holders of Claims entitled to vote should read and carefully consider the factors set forth below, as well as all other information set forth or otherwise referenced or incorporated by reference in this Disclosure Statement.

### B.  CERTAIN BANKRUPTCY LAW CONSIDERATIONS

#### 1.  Parties in Interest May Object to Company's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims and interests in such class. The Company believes that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Company created seven Classes of Claims and Interests, each encompassing Claims or Interests that are substantially similar to the other Claims or Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

#### 2.  Failure to Satisfy Vote Requirement

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Company intends to seek, as promptly as practicable thereafter, Confirmation of the Plan. If the Plan does not receive the required support from the one voting Class, the Company may elect not to File the Cases or to amend the Plan.

#### 3.  The Company May Not Be Able to Obtain Confirmation or Consummation of the Plan

The Company cannot ensure that they will receive the requisite acceptances to confirm the Plan. Even if the Company receives the requisite acceptances, the Company cannot ensure that the Bankruptcy Court will confirm the Plan. A non-accepting creditor or Interest Holder might challenge the adequacy of this Disclosure Statement or the Solicitation Procedures and results as not being in compliance with the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that this Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met. As discussed in further detail above in Article VII herein, section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a plan of reorganization and requires, among other things: a finding by a bankruptcy court that the plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; confirmation is not likely to be followed by a liquidation or a need for further financial reorganization; and the value of distributions to non-accepting holders of claims and interests within a particular class under the plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under Chapter 7 of the Bankruptcy Code. While the Company believes that the Plan complies with section 1129 of the Bankruptcy Code, there can be no assurance that these requirements will be met.

The Confirmation of the Plan is also subject to certain conditions as described in Article XV of the Plan. If the Plan is not confirmed, it is unclear what distributions Holders of Claims and Interests ultimately would receive with respect to their Claims and Interests.

The Company, subject to the terms and conditions of the Plan, reserves the right to modify the terms of the Plan as necessary for Confirmation. Any such modification could result in a less favorable treatment of any nonaccepting Class or Classes, as well as of any Classes junior to such non-accepting

48

Classes, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

### 4. The Company May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan and any final order authorizing the use of Cash Collateral, the Company reserves the right to object to the amount or classification of some Claims or Interest deemed Allowed under the Plan. The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim where such Claim is subject to an objection except to the extent provided in any Final Cash Collateral Order or other Order that may be entered by the Bankruptcy Court.

### 5. Risk of Non-Occurrence of the Effective Date

Although the Company believes that the Effective Date will occur very quickly after the Confirmation Date, there can be no assurance as to such timing.

### 6. Substantive Consolidation Risks

The Plan is premised upon substantively consolidating certain of the Debtors as set forth in Article XII of the Plan for purposes associated with confirming and consummating the Plan, including but not limited to voting, Confirmation, distribution, and streamlining the Company's corporate structure to more properly reflect their operations. The Company can provide no assurance, however, that: (a) the Bankruptcy Court will enter an order granting the Company's motion for substantive consolidation to the extent contemplated by the Plan; or (b) the Bankruptcy Court will overrule any objection that a party in interest might have to such substantive consolidation.

### 7. Contingencies Not to Affect Votes of Impaired Classes to Accept the Plan

The distributions available to Holders of Allowed Claims and Interests under the Plan can be affected by a variety of contingencies, including, without limitation, whether or not the Debtors are consolidated and whether the Bankruptcy Court orders certain Claims to be subordinated to other Claims. The occurrence of any and all such contingencies which could affect distributions available to Holders of Allowed Claims and Interests under the Plan, however, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

## C. FINANCIAL INFORMATION; DISCLAIMER

Although the Company has used its reasonable best efforts to ensure the accuracy of the financial information provided in this Disclosure Statement, some of the financial information contained in this Disclosure Statement has not been audited and is based upon an analysis of data available at the time of the preparation of the Plan and this Disclosure Statement. While the Company believes that such financial information fairly reflects the financial condition of the Company, the Company is unable to warrant or represent that the information contained herein and attached hereto is without inaccuracies.

## D. CERTAIN TAX MATTERS

For a summary of certain federal income tax consequences of the Plan to certain Holders of Claims and to the Debtors, see Article XIX below, entitled "Certain U.S. Federal Income Tax Consequences."

## E. RISK THAT THE INFORMATION IN THIS DISCLOSURE STATEMENT MAY BE INACCURATE

The statements contained in this Disclosure Statement are made by the Company as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change since that date in the information set forth herein. The

Company may subsequently update the information in this Disclosure Statement, but it has no duty to update this Disclosure Statement unless ordered to do so by the Court. Further, the performance and prospective financial information contained herein, unless otherwise expressly indicated, is unaudited. Finally, neither the SEC nor any other governmental authority has passed upon the accuracy or adequacy of this Disclosure Statement, the Plan, or any Exhibits thereto.

## F.    LIQUIDATION UNDER CHAPTER 7

If no plan can be confirmed, the Company's Chapter 11 Cases may be converted to cases under Chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a Chapter 7 liquidation would have on the recoveries of Holders of Claims and Interests and the Debtors' liquidation analysis is set forth in Article XVI above and **Exhibit C.**

## G.    SECURITIES RISK

As discussed in Article XVIII of this Disclosure Statement, the Plan provides for the Company to issue Plan Securities (as defined below in Article XVIII herein) to Holders of Prepetition Financing Claims. The Company believes that the Plan Securities constitute "securities," as defined in Section 2(a)(1) of the Securities Act, Section 101 of the Bankruptcy Code, and applicable Blue Sky Law. The Company further believes that the offer and sale of the Plan Securities pursuant to the Plan are, and subsequent transfers of the Plan Securities by the Holders thereof that are not "underwriters," as defined in Section 2(a)(11) of the Securities Act and in the Bankruptcy Code, will be exempt from federal and state securities registration requirements under various provisions of the Securities Act, the Bankruptcy Code, and state securities laws. However, there is no guaranty that the Plan Securities will be recognized as exempt from federal and state securities registration requirements as discussed in Article XVIII of this Disclosure Statement.

**These risk factors contain certain statements that are "forward looking statements" within the meaning of Section 21E of the Securities Exchange Act and are made pursuant the safe harbor provisions thereof. These statements are subject to a number of assumptions, risks, and uncertainties, many of which are beyond the control of the Company, including the implementation of the Plan, the continuing availability of sufficient borrowing capacity, or other financing to fund operations, currency exchange rate fluctuations, terrorist actions or acts of war, operating efficiencies, labor relations, actions of governmental bodies, and other market and competitive conditions. Holders of Claims and Interests are cautioned that the forward looking statements speak as of the date made and are not guarantees of future performance. Actual results or developments may differ materially from the expectations expressed or implied in the forward looking statements and the Debtors undertake no obligation to update any such statements.**

## ARTICLE XVIII.

## SECURITIES LAW MATTERS

## A.    PLAN SECURITIES

The Plan provides for the Company to issue to Holders of Prepetition Financing Claims in Class 3 the New Equity (the "Plan Securities"). The Company believes that the Plan Securities constitute "securities," as defined in Section 2(a)(1) of the Securities Act, Section 101 of the Bankruptcy Code, and applicable Blue Sky Law. The Company further believes that the offer and sale of the Plan Securities pursuant to the Plan are, and subsequent transfers of the Plan Securities by the Holders thereof that are not "underwriters," as defined in Section 2(a)(11) of the Securities Act and in the Bankruptcy Code, will be exempt from federal and state securities registration requirements under various provisions of the Securities Act, the Bankruptcy Code, and state securities laws.

50

## B.  ISSUANCE AND RESALE OF PLAN SECURITIES UNDER THE PLAN

### 1.  Exemption from Registration

Section 4(2) of the Securities Act provides that the registration requirements of section 5 of the Securities Act shall not apply to the offer and sale of a security in connection with transactions not involving any public offering.  By virtue of section 18 of the Securities Act, section 4(2) also provides that any state Blue Sky Law requirements shall not apply to such offer or sale.

Section 1145 of the Bankruptcy Code provides that the registration requirements of section 5 of the Securities Act (and any state Blue Sky Law requirements) shall not apply to the offer or sale of stock, options, warrants, or other securities by a debtor if (a) the offer or sale occurs under a plan of reorganization; (b) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor; and (c) the securities are issued in exchange for a claim against or interest in a debtor or are issued principally in such exchange and partly for cash and property.

In reliance upon these exemptions, the offer and sale of the Plan Securities will not be registered under the Securities Act or any state Blue Sky Law.

To the extent that the issuance of the Plan Securities are covered by section 1145 of the Bankruptcy Code, the Plan Securities may be resold without registration under the Securities Act or other federal securities laws, unless the holder is an "underwriter" (as discussed below) with respect to such securities, as that term is defined in section 2(a)(11) of the Securities Act and in the Bankruptcy Code.  In addition, the Plan Securities generally may be able to be resold without registration under state securities laws pursuant to various exemptions provided by the respective Blue Sky Law of those states; however, the availability of such exemptions cannot be known unless individual state Blue Sky Laws are examined.  Therefore, recipients of the Plan Securities are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state Blue Sky Law in any given instance and as to any applicable requirements or conditions to such availability.

If the Plan Securities are not covered by section 1145 of the Bankruptcy Code, the Plan Securities will be considered "restricted securities" as defined by Rule 144 promulgated under the Securities Act and may not be resold under the Securities Act and applicable state Blue Sky Law absent an effective registration statement under the Securities Act or pursuant to an applicable exemption from registration, including Rule 144 promulgated under the Securities Act.  Recipients of the Plan Securities are advised to consult with their own legal advisors as to the applicability of section 1145 to the Plan Securities and the availability of any exemption from registration under the Securities Act and state Blue Sky Law in the event that section 1145 is not applicable to the Plan Securities.

### 2.  Resales of Plan Securities; Definition of Underwriter

Section 1 145(b)(l) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer," (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; or (b) offers to sell securities offered or sold under a plan for the holders of such securities; or (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act.  In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a person is an underwriter under Section 11 45(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities.  The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11), is intended to cover

51

"controlling persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "controlling Person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. Moreover, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of a class of securities of a reorganized debtor may be presumed to be a "controlling Person" and, therefore, an underwriter.

Resales of the Plan Securities by persons deemed to be "underwriters" (which definition includes "controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Under certain circumstances, holders of Plan Securities who are deemed to be "underwriters" may be entitled to resell their Plan Securities pursuant to the limited safe harbor resale provisions of Rule 144. Generally, Rule 144 would permit the public sale of securities received by such person if current information regarding the issuer is publicly available and if volume limitations, manner of sale requirements and certain other conditions are met. However, the Company does not presently intend to make publicly available the requisite current information regarding the Company, and as a result, Rule 144 will not be available for resales of Plan Securities by persons deemed to be underwriters. Whether any particular Person would be deemed to be an "underwriter" (including whether such person is a "controlling Person") with respect to the Plan Securities would depend upon various facts and circumstances applicable to that person. Accordingly, the Debtors express no view as to whether any person would be deemed an "underwriter" with respect to the Plan Securities. In view of the complex nature of the question of whether a particular person may be an "underwriter," the Debtors make no representations concerning the right of any person to freely resell Plan Securities. Accordingly, the Company recommends that potential recipients of Plan Securities consult their own counsel concerning their ability to freely trade such securities without compliance with the federal and state securities laws.

## ARTICLE XIX.

## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors, New Latham Group, and certain holders of Claims. The following summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder (the "Regulations"), judicial decisions and published administrative rules and pronouncements of the Internal Revenue Service as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the federal income tax consequences described below.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtors have not requested and will not request a ruling from the Internal Revenue Service or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the Internal Revenue Service will adopt. In addition, this summary does not address foreign, state or local tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as Persons who are related to the Debtors within the meaning of the Tax Code, foreign taxpayers, broker dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, investors in pass through entities and holders of Claims who are themselves in bankruptcy). Furthermore, this discussion assumes that holders of Claims hold only Claims in a single Class. Holders of Claims should consult their own tax advisors as to the effect such ownership may have on the federal income tax consequences described below.

This discussion assumes that the various debt and other arrangements to which the Debtors are a party will be respected for federal income tax purposes in accordance with their form.

52

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE UNITED STATE INTERNAL REVENUE SERVICE, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX RELATED PENALTIES UNDER THE TAX CODE. TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN TO SUPPORT THE PROMOTION AND MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THE DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

A.   CERTAIN UNITED STATES FEDERAL
     INCOME TAX CONSEQUENCES TO THE DEBTORS

The Debtors expect to report consolidated net operating loss ("NOL") carryforwards for U.S. federal income tax purposes of approximately $7.4 million as of the Petition Date. As discussed below, the amount of the Debtors' NOL carryforwards may be significantly reduced or eliminated upon implementation of the Plan. In addition, the Reorganized Debtors' subsequent utilization of any losses and NOL carryforwards remaining and possibly certain other tax attributes may be restricted as a result of and upon the implementation of the Plan.

     1.   Transfer of Business Assets

The Plan provides for the purchase and sale of the assets of Latham International, Inc., Latham Manufacturing Corp. and Kafko (U.S.) Corp. to New Opco. The Debtors believe that such transaction under the Plan constitutes a taxable sale of substantially all of the Debtors' assets. Therefore, New Opco should obtain a tax basis in the assets purchased from the Debtors equal to their cost, which generally should equal the fair market value of the New Equity and New Note transferred to the Debtors plus the amount of any liabilities assumed by New Opco.

Provided the transaction undertaken pursuant to the Plan constitutes a taxable transfer, the Debtors would recognize gain or loss upon the sale of the assets to New Opco in an amount equal to the difference between the fair market value of the assets and its tax basis in such assets. The Debtors believe that no significant federal, state, or local tax liability, if any, should be incurred upon the transfer.

There is no assurance, however, that the purchase and sale will be treated by the IRS as a taxable sale of assets by the Debtors to New Opco. Instead, the IRS may take the position that the exchange constitutes a tax-free reorganization. If the IRS were to succeed in its position, the Debtors would not recognize any gain or loss on the exchange. Instead, the New Latham Group would succeed to certain tax attributes of the Debtors, including the Debtors' tax basis in the assets transferred to New Opco, but only after taking into account the reduction in such tax attributes and tax basis on account of the discharge of indebtedness pursuant to the Plan. Thus, the New Latham Group would generally have no NOL carryforwards (as described below) and would have a significantly diminished tax basis in the assets purchased from the Debtors, and as a result, future tax depreciation and amortization with respect to New Opco's real and personal property would be substantially reduced.

53

2. **Reduction of NOLs**

The Tax Code provides that a debtor in a bankruptcy case must reduce certain of its tax attributes, such as NOL carryforwards, current year NOLs, tax credits and tax basis in assets, by the amount of any cancellation of indebtedness ("COD") realized upon consummation of the Plan. COD is the amount by which the indebtedness discharged (reduced by any unamortized discount) exceeds any consideration given in exchange therefor, subject to certain statutory or judicial exceptions that can apply to limit the amount of COD (such as where the payment of the canceled debt would have given rise to a tax deduction). Assuming that the transaction is treated as a taxable purchase by New Opco of the Debtors' assets, the COD and attribute reduction should not result in any tax liability for the Debtors or New Opco.

3. **Limitation on NOL Carryforwards And Other Tax Attributes**

Under section 382 of the Tax Code, if a corporation undergoes an "ownership change," the amount of any remaining NOL and tax credit carryforwards and, possibly, certain other tax attributes of the Debtors allocable to periods prior to the Effective Date (collectively, "Pre Change Losses") that may be utilized to offset future taxable income generally is subject to an annual limitation. Because (i) substantially all of the Debtors' Pre-Change Losses will likely be eliminated or substantially reduced and (ii) Debtors believe the transaction contemplated by the Plan constitutes a taxable sale of substantially all of the Debtors' assets to New Opco, New Opco should not succeed to any of the Debtors' Pre-Change Losses and therefore, the Section 382 Limitation will not apply to the Debtors or New Opco.

B. **CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES TO THE HOLDERS OF CLASS 1, CLASS 3, AND CLASS 6 CLAIMS**

As described above, the Debtors believe that the transaction undertaken pursuant to the Plan constitutes a taxable sale of substantially all of the Debtors' assets to New Opco. As a consequence, Holders of certain Claims will be considered to be exchanging such Claims for New Equity, the New Note, and Cash, if any, in a taxable exchange. Pursuant to the Plan, holders of Class 1 Priority Non-Tax Claims and Holders of Class 6 General Unsecured Claims will receive Cash in full satisfaction of their Claims. A holder who receives Cash in exchange for its Claim pursuant to the Plan generally will recognize income, gain or loss for federal income tax purposes in an amount equal to the difference between (1) the amount of Cash received in exchange for its Claim and (2) the holder's adjusted tax basis in its Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, the nature of the Claim in such holder's hands, whether the Claim constitutes a capital asset in the hands of the holder, whether the Claim was purchased at a discount and whether and to what extent the holder has previously claimed a bad debt deduction with respect to its Claim.

Pursuant to the Plan, in full satisfaction and discharge of their Claims, holders of Class 3 Prepetition Financing Claims will receive their pro rata share of the New Note and their pro rata share of the New Equity. A holder that receives a share of the New Note and New Equity should be treated as exchanging its Claims for such note and equity in a fully taxable exchange. In that case, the holder should recognize gain or loss equal to the difference between (1) the fair market value as of the Effective Date of the portions of the New Note and New Equity received that is not allocable to accrued interest and (2) the holder's tax basis in the Claims surrendered by the holder. Such gain or loss should be capital in nature (subject to the "market discount" rules described below) and should be long term capital gain or loss if the Claims were held for more than one year by the holder. To the extent that a portion of the New Note or New Equity received in the exchange is allocable to accrued interest, the holder may recognize ordinary income. A holder's tax basis in the New Note or New Equity should equal their fair market value as of the Effective Date. A holder's holding period for the New Note or New Equity should begin on the day following the Effective Date.

The IRS may take the position that the exchange constitutes a tax-free reorganization. If the IRS were to succeed in its position, the tax consequences to Holders of Claims that receive the New Note or New Equity may differ from the consequences described above.

54

## C.    ACCRUED INTEREST

To the extent that any amount received by a Holder of a Claim is attributable to accrued interest, such amount should be taxable to the holder as interest income. Conversely, a holder of a Claim may be able to recognize a deductible loss (or, possibly, a write off against a reserve for worthless debts) to the extent that any accrued interest on the Claims was previously included in the holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

The extent to which the consideration received by the holder of a Claim will be attributable to accrued interest is unclear. Nevertheless, the Regulations generally treat a payment under a debt instrument first as a payment of accrued and untaxed interest and then as a payment of principal.

## D.    MARKET DISCOUNT

Under the "market discount" provisions of sections 1276 through 1278 of the Tax Code, some or all of the gain realized by a holder of a Claim who exchanges the Claim for the New Note, New Equity, or Cash on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the Claim. In general, a debt instrument is considered to have been acquired with "market discount" if its holder's adjusted tax basis in the debt instrument is less than (1) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (2) in the case of a debt instrument issued with original issue discount, its adjusted issue price, by at least a *de minimis* amount (equal to 0.25% of the sum of all remaining payments to be made on the Claim, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a holder on the taxable disposition of Claims that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such Claims were considered to be held by the holder (unless the holder elected to include market discount in income as it accrued).

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTION CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR FOREIGN TAX LAWS AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## ARTICLE XX.

## ALTERNATIVES TO CONFIRMATION OF THE PLAN

The Debtors believe that the Plan affords Holders of Claims the potential for the greatest realization on the Debtors' assets and, therefore, is in the best interests of such Holders. If the Plan is not confirmed, the only viable alternatives are dismissal of the Cases or conversion to Chapter 7 of the Bankruptcy Code. Neither of these alternatives is preferable to confirmation of the Plan.

If the Cases were dismissed, Creditors would revert to a "race to the courthouse," the result being that Creditors would not receive a fair and equitable distribution of the Debtors' Assets. As set forth in the Debtors' liquidation analysis above, the Debtors believe that the Plan provides a greater recovery to Creditors than would be achieved in a Chapter 7 since, at the very least, conversion to Chapter 7 necessarily imposes an additional layer of expenses on the Debtors' estates, reduces the funds available for unsecured Creditors and may result in a substantial delay in payment to Creditors. Therefore, a Chapter 7 case is not an attractive or superior alternative to the Plan.

55

# ARTICLE XXI.

## RECOMMENDATION

In the opinion of the Company, the Plan is preferable to the alternatives described above because it will provide the greatest recoveries to the Company's creditors. Other alternatives would involve significant delay, uncertainty and substantial additional administrative costs. The Debtors recommend that parties entitled to vote on the Plan support Confirmation of the Plan and vote to accept the Plan.

51407-001\DOCS_LA:211361.8

Dated: December 18, 2009

LATHAM INTERNATIONAL, INC.

By: _____
Its: President and Chief Executive Officer

Dated: December 18, 2009

LATHAM MANUFACTURING CORP.

By: _____
Its: President and Chief Executive Officer

Dated: December 18, 2009

VIKING POOLS, LLC

By: _____
Its: Chief Executive Officer

Dated: December 18, 2009

COVERSTAR, LLC

By: _____
Its: Chief Executive Officer

Dated: December 18, 2009

KAFKO (USA) CORP.

By: _____
Its: Chief Executive Officer

PACHULSKI STANG ZIEHL & JONES LLP

/s/ _____
Laura Davis Jones (Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Joshua M. Fried (CA Bar No. 181541)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705
(Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: ljones@pszjlaw.com
       dbertenthal@pszjlaw.com
       jfried@pszjlaw.com

Counsel to Latham International, Inc.,
Latham Manufacturing Corp., Viking Pools, LLC,
Coverstar, LLC, and Kafko (USA) Corp.