# EXHIBIT 1

**LATHAM CORPORATION,**

**COVERSTAR, LLC,** and

**VIKING POOLS, LLC,**

as US Borrowers;

**LATHAM SPLASH CANADA, INC.,** as Canadian Borrower;

The Guarantors Party Hereto;

---

## LOAN AND SECURITY AGREEMENT

Dated as of January __, 2010

$30,000,000

---

## BANK OF AMERICA, N.A.,

as Lender

# TABLE OF CONTENTS

SECTION 1.       DEFINITIONS; RULES OF CONSTRUCTION ................................................... - 1 -
   1.1    Definitions ................................................................................................... - 1 -
   1.2    Accounting Terms ......................................................................................... - 28 -
   1.3    Uniform Commercial Code and PPSA ................................................................ - 29 -
   1.4    Certain Matters of Construction ....................................................................... - 29 -
SECTION 2.       CREDIT FACILITIES ............................................................................... - 29 -
   2.1    US Revolver Loans ....................................................................................... - 29 -
   2.2    Canadian Revolver Loans ............................................................................... - 30 -
   2.3    Letter of Credit Facility ................................................................................. - 31 -
   2.4    Last-Out Term Loan ...................................................................................... - 32 -
SECTION 3.       INTEREST, FEES AND CHARGES ............................................................... - 33 -
   3.1    Interest ...................................................................................................... - 33 -
   3.2    Fees .......................................................................................................... - 35 -
   3.3    Computation of Interest, Fees, Yield Protection ................................................... - 36 -
   3.4    Reimbursement Obligations ............................................................................ - 37 -
   3.5    Illegality .................................................................................................... - 37 -
   3.6    Inability to Determine Rates ............................................................................ - 37 -
   3.7    Increased Costs; Capital Adequacy ................................................................... - 37 -
   3.8    Mitigation ................................................................................................... - 38 -
   3.9    Funding Losses ............................................................................................ - 39 -
   3.10   Maximum Interest ........................................................................................ - 39 -
SECTION 4.       LOAN ADMINISTRATION ......................................................................... - 39 -
   4.1    Manner of Borrowing and Funding Revolver Loans ............................................... - 39 -
   4.2    Number and Amount of LIBOR and BA Equivalent Loans; Determination of
       Rate ......................................................................................................... - 41 -
   4.3    Borrower Agent ........................................................................................... - 41 -
   4.4    One Obligation ............................................................................................ - 42 -
   4.5    Effect of Termination .................................................................................... - 42 -
SECTION 5.       PAYMENTS ........................................................................................... - 42 -
   5.1    General Payment Provisions ............................................................................ - 42 -
   5.2    Repayment of Revolver Loans ......................................................................... - 42 -
   5.3    Payment of Other Obligations ......................................................................... - 43 -
   5.4    Marshaling; Payments Set Aside ...................................................................... - 43 -

**TABLE OF CONTENTS**
(continued)

Page

| | | |
|---|---|---|
| 5.5 | Application of Payments | - 43 - |
| 5.6 | Loan Accounts; Account Stated | - 44 - |
| 5.7 | Taxes | - 44 - |
| 5.8 | Nature and Extent of Each Borrower's Liability | - 45 - |
| SECTION 6. | CONDITIONS PRECEDENT | - 47 - |
| 6.1 | Conditions Precedent to Initial Loans | - 47 - |
| 6.2 | Conditions Precedent to All Credit Extensions | - 48 - |
| SECTION 7. | COLLATERAL | - 49 - |
| 7.1 | Grant of Security Interests | - 49 - |
| 7.2 | Lien on Deposit Accounts; Cash Collateral | - 51 - |
| 7.3 | Real Estate Collateral | - 51 - |
| 7.4 | Other Collateral | - 52 - |
| 7.5 | No Assumption of Liability | - 52 - |
| 7.6 | Further Assurances; Extent of Liens | - 52 - |
| 7.7 | Foreign Subsidiary Stock | - 52 - |
| SECTION 8. | COLLATERAL ADMINISTRATION | - 52 - |
| 8.1 | Borrowing Base Certificates | - 52 - |
| 8.2 | Administration of Accounts | - 53 - |
| 8.3 | Administration of Inventory | - 53 - |
| 8.4 | Administration of Equipment | - 54 - |
| 8.5 | Administration of Deposit Accounts | - 54 - |
| 8.6 | General Provisions | - 55 - |
| 8.7 | Power of Attorney | - 56 - |
| SECTION 9. | REPRESENTATIONS AND WARRANTIES | - 56 - |
| 9.1 | General Representations and Warranties | - 56 - |
| 9.2 | Complete Disclosure | - 62 - |
| SECTION 10. | COVENANTS AND CONTINUING AGREEMENTS | - 62 - |
| 10.1 | Affirmative Covenants | - 62 - |
| 10.2 | Negative Covenants | - 66 - |
| 10.3 | Financial Covenants | - 71 - |
| SECTION 11. | EVENTS OF DEFAULT; REMEDIES ON DEFAULT | - 71 - |
| 11.1 | Events of Default | - 71 - |

11.2     Remedies upon Default ........................................................................................ - 73 -

11.3     License ................................................................................................................ - 74 -

11.4     Setoff ................................................................................................................... - 74 -

11.5     Remedies Cumulative; No Waiver ...................................................................... - 74 -

SECTION 12.          GUARANTEE .......................................................................................... - 74 -

12.1     The Guarantee ..................................................................................................... - 75 -

12.2     Obligations Unconditional .................................................................................. - 75 -

12.3     Reinstatement ...................................................................................................... - 75 -

12.4     Subrogation ......................................................................................................... - 76 -

12.5     Remedies .............................................................................................................. - 76 -

12.6     Direct Obligation of Each Guarantor .................................................................. - 76 -

12.7     Continuing Guarantee ......................................................................................... - 76 -

12.8     General Limitation on Amount of Obligations Guaranteed ................................ - 76 -

12.9     Subordination ...................................................................................................... - 77 -

SECTION 13.          MISCELLANEOUS ................................................................................ - 77 -

13.1     Consents, Amendments and Waivers .................................................................. - 77 -

13.2     Indemnity ............................................................................................................ - 77 -

13.3     Notices and Communications .............................................................................. - 77 -

13.4     Performance of Borrowers' Obligations .............................................................. - 78 -

13.5     Credit Inquiries ................................................................................................... - 78 -

13.6     Severability ......................................................................................................... - 78 -

13.7     Cumulative Effect; Conflict of Terms ................................................................ - 78 -

13.8     Counterparts ........................................................................................................ - 78 -

13.9     Entire Agreement ................................................................................................ - 78 -

13.10    No Control; No Advisory or Fiduciary Responsibility ....................................... - 79 -

13.11    Confidentiality .................................................................................................... - 79 -

13.12    GOVERNING LAW ............................................................................................ - 79 -

13.13    Consent to Forum ................................................................................................ - 79 -

13.14    Waivers by Obligors ........................................................................................... - 80 -

13.15    Patriot Act Notice ............................................................................................... - 80 -

13.16    Canadian Anti-Money Laundering Legislation .................................................. - 80 -

## LIST OF SCHEDULES

| | |
|---|---|
| Schedule 1.1 | Extended Term Account Debtors |
| Schedule 8.5 | Deposit Accounts |
| Schedule 8.6.1 | Business Locations |
| Schedule 9.1.4 | Names and Capital Structure |
| Schedule 9.1.11 | Patents, Trademarks, Copyrights and Licenses |
| Schedule 9.1.14 | Environmental Matters |
| Schedule 9.1.15 | Restrictive Agreements |
| Schedule 9.1.16 | Litigation |
| Schedule 9.1.17 | Material Contracts |
| Schedule 9.1.18 | Pension Plans |
| Schedule 9.1.20 | Labor Agreements |
| Schedule 9.1.24 | Closing Date Liabilities |
| Schedule 10.2.2 | Existing Liens |
| Schedule 10.2.17 | Existing Affiliate Transactions |

**LOAN AND SECURITY AGREEMENT**

**THIS LOAN AND SECURITY AGREEMENT** (this "Agreement") is dated as of January ___, 2010, among **LATHAM CORPORATION**, a Delaware corporation ("Latham"), **COVERSTAR, LLC**, a Delaware limited liability company ("Coverstar"), **VIKING POOLS, LLC**, a West Virginia limited liability company ("Viking", and together with Latham and Coverstar, "US Borrowers"), **LATHAM SPLASH CANADA, INC.**, a corporation organized under the laws of Ontario, Canada ("Canadian Borrower", and collectively with the US Borrowers, "Borrowers"), **THE GUARANTORS** (as herein defined) **FROM TIME TO TIME PARTY HERETO**, and **BANK OF AMERICA, N.A.**, a national banking association as lender.

**R E C I T A L S :**

WHEREAS, on December 22, 2009 (the "Petition Date") the Pre-Petition Entities (hereinafter defined) filed voluntary petitions for relief commencing cases (collectively, the "Bankruptcy Cases") under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), In re Latham International, Inc., et al., Chapter 11 No. 09-14490(css) (Jointly Administered); and

WHEREAS, on the Petition Date, the Pre-Petition Entities filed the Plan of Reorganization (hereinafter defined); and

WHEREAS, the Plan of Reorganization provides for, among other things, the transfer of substantially all of the assets of the Pre-Petition Entities to Latham including the Equity Interests in each of the Canadian Borrower, Coverstar and Viking; and

WHEREAS, on January ___, 2010, the Bankruptcy Court confirmed the Plan of Reorganization pursuant to the Confirmation Order; and

WHEREAS, in order to effectuate the Plan of Reorganization as provided therein and in the Confirmation Order, Borrowers have requested that Lender provide a credit facility to Borrowers to finance their mutual and collective business enterprise; and

WHEREAS, Lender is willing to provide the credit facility on the terms and conditions set forth in this Agreement.

**NOW, THEREFORE**, for valuable consideration hereby acknowledged, the parties agree as follows:

**SECTION 1.   DEFINITIONS; RULES OF CONSTRUCTION**

    **1.1**    **Definitions**. As used herein, the following terms have the meanings set forth below:

Account: as defined in the UCC (or with respect to any account receivable of the Canadian Borrower as to which the PPSA is applicable, as defined in the PPSA), including all rights to payment for goods sold or leased, or for services rendered.

Account Debtor: a Person who is obligated under an Account, Chattel Paper or General Intangible.

Accounts Formula Amount: at any date of determination, 85% of the Value of Eligible Accounts on such date.

Affiliate: with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified. "Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have correlative meanings.

Aggregate Availability: at any date of determination (a) the lesser of (i) the Revolver Commitment or (ii) the Aggregate Borrowing Base, minus (b) in each case, the Aggregate Revolver Exposure.

Aggregate Borrowing Base: at any date of determination, the sum of (a) the US Borrowing Base at such time and (b) the lesser of (i) the Canadian Borrowing Base at such time and (ii) the Canadian Sublimit at such time.

Aggregate Revolver Exposure: at any date of determination, the Dollar Equivalent of the sum of (a) the US Revolver Exposure and (b) the Canadian Revolver Exposure.

Allocable Amount: as defined in **Section 5.8.3**.

Anti-Terrorism Laws: any laws relating to terrorism or money laundering, including the Patriot Act and the Proceeds of Crime Act.

Applicable Law: all laws, rules, regulations and governmental guidelines applicable to the Person, conduct, transaction, agreement or matter in question, including all applicable statutory law, common law and equitable principles, and all provisions of constitutions, treaties, statutes, rules, regulations, orders and decrees of Governmental Authorities.

Applicable Margin: with respect to any Type of Loan:

(a) during the period from the Closing Date through May 31, 2010 (i) 2.50% for Base Rate Loans, (ii) 3.50% for LIBOR Loans, (iii) 2.50% for Canadian Prime Rate Loans, and (iv) 3.50% for BA Equivalent Loans;

(b) during the period from June 1, 2010 through February 28, 2011, the margin set forth below based upon the applicable Level set forth below, which applicable Level will be based upon EBITDA as provided below for the fiscal periods set forth below:

| Level | Applicable Margin for Base Rate Loans | Applicable Margin for LIBOR Loans | Applicable Margin for Canadian Prime Rate Loans | Applicable Margin for BA Equivalent Loans |
|-------|------|------|------|------|
| I | 2.00% | 3.00% | 2.00% | 3.00% |
| II | 2.25% | 3.25% | 2.25% | 3.25% |
| III | 2.50% | 3.50% | 2.50% | 3.50% |
| IV | 2.75% | 3.75% | 2.75% | 3.75% |

- 2 -

The applicable Levels during the period from June 1, 2010 through February 28, 2011, shall be determined as follows:

(i) For the period from June 1, 2010 through August 31, 2010, Tier I shall be deemed to apply if the actual EBITDA for the fiscal period from February 1, 2010 through April 30, 2010, reflects a loss that is not greater than ($743,000), Tier II shall be deemed to apply if the actual EBITDA for the fiscal period from February 1, 2010 through April 30, 2010, reflects a loss that is greater than ($743,000) but is less than or equal to ($1,115,000), Tier III shall be deemed to apply if actual EBITDA for the fiscal period from February 1, 2010 through April 30, 2010, reflects a loss that is greater than ($1,115,000) but is less than or equal to ($1,487,000), and Tier IV shall be deemed to apply if actual EBITDA for the fiscal period from February 1, 2010 through April 30, 2010, reflects a loss that is greater than ($1,487,000); and

(ii) For the period from September 1, 2010 through November 30, 2010, Tier I shall be deemed to apply if the actual EBITDA for the fiscal period from February 1, 2010 through July 31, 2010, is greater than $11,588,000, Tier II shall be deemed to apply if the actual EBITDA for the fiscal period from February 1, 2010 through July 31, 2010, is less than $11,588,000 but greater than or equal to $9,105,000, Tier III shall be deemed to apply if actual EBITDA for the fiscal period from February 1, 2010 through July 31, 2010, is less than $9,105,000 but is greater than or equal to $6,622,000, and Tier IV shall be deemed to apply if actual EBITDA for the fiscal period from February 1, 2010 through July 31, 2010, is less than $6,622,000; and

(iii) For the period from December 1, 2010 through February 28, 2011, Tier I shall be deemed to apply if the actual EBITDA for the fiscal period from February 1, 2010 through October 31, 2010, is greater than $12,352,000, Tier II shall be deemed to apply if the actual EBITDA for the fiscal period from February 1, 2010 through October 31, 2010, is less than $12,352,000 but is greater than or equal to $9,705,000, Tier III shall be deemed to apply if actual EBITDA for the fiscal period from February 1, 2010 through October 31, 2010, is less than $9,705,000 but is greater than or equal to $7,058,000, and Tier IV shall be deemed to apply if actual EBITDA for the fiscal period from February 1, 2010 through October 31, 2010, is less than $7,058,000;

provided, that: the margins shall be subject to increase or decrease upon receipt by Lender pursuant to **Section 10.1.2** of the Compliance Certificate for the months ending on each of April 30, 2010, July 31, 2010 and October 31, 2010, which change shall be effective on the first day of the calendar month following receipt of each such Compliance Certificate. If, by the first day of any month, any Compliance Certificate or related financial information due for the preceding month shall not have been received, then, at the option of Lender, the margins shall be determined as if Level IV were applicable, from such day until the first day of the calendar month following actual receipt; and

(c) during all periods from and after March 1, 2011, the margin set forth below based upon the Fixed Charge Coverage Ratio for the period of four Fiscal Quarters most recently ended for which Lender has received financial statements and a Compliance Certificate:

| Level | Fixed Charge Coverage Ratio | Applicable Margin for Base Rate Loans | Applicable Margin for LIBOR Loans | Applicable Margin for Canadian Prime Rate Loans | Applicable Margin for BA Equivalent Loans |
|---|---|---|---|---|---|
| I | ≥ 1.50 to 1.00 | 2.00% | 3.00% | 2.00% | 3.00% |
| II | ≥ 1.25 to 1.00 but < 1.50 to 1.00 | 2.25% | 3.25% | 2.25% | 3.25% |

- 3 -

| III | $\geq$ 1.10 to 1.00 but | 2.50% | 3.50% | 2.50% | 3.50% |
| | < 1.25 to 1.00 | | | | |
| IV | < 1.10 to 1.00 | 2.75% | 3.75% | 2.75% | 3.75% |

provided that, the margins shall be subject to increase or decrease upon receipt by Lender pursuant to **Section 10.1.2** of the financial statements and corresponding Compliance Certificate for the last month of each Fiscal Quarter, which change shall be effective on the first day of the calendar month following receipt. If, by the first day of a month, any financial statements and Compliance Certificate due in the preceding month have not been received, then, at the option of Lender, the margins shall be determined as if Level IV were applicable, from such day until the first day of the calendar month following actual receipt.

Applicable Seasonal NOLV Percentage: at any date of determination, the NOLV Percentage set forth in the appraisal most recently performed prior to such date for the Season in which such date occurs. For purposes of this definition, the term "Season" shall mean, with respect to any calendar year, (i) the low season of the Borrowers commencing on June 1 and ending on December 31 of such year and (ii) the high season of the Borrowers commencing on January 1 and ending on May 31 of such year, as the case may be.

Asset Disposition: a sale, lease, license, consignment, transfer or other disposition of Property of an Obligor, including a disposition of Property in connection with a sale-leaseback transaction or synthetic lease.

Availability: US Availability, Canadian Availability or Aggregate Availability, as the context requires.

Availability Reserve: the sum (without duplication) of (a) the Inventory Reserve; (b) the Rent and Charges Reserve; (c) the Canadian Priority Payables Reserve, (d) the LC Reserve; (e) the Bank Product Reserve; (f) the aggregate amount of liabilities secured by Liens upon Collateral that are senior to Lender's Liens (but imposition of any such reserve shall not waive an Event of Default arising therefrom); and (g) such additional reserves, in such amounts and with respect to such matters, as Lender in its Credit Judgment may elect to impose from time to time.

BA Equivalent Interest Period: with respect to each BA Equivalent Loan, the interest period applicable thereto, as determined pursuant to **Section 3.1.4**.

BA Equivalent Loan: a Canadian Revolver Loan that bears interest based on the BA Rate.

BA Rate: for the BA Equivalent Interest Period of each BA Equivalent Loan, the rate of interest per annum equal to the CDOR Rate, plus five (5) basis points.

Bank of America: Bank of America, N.A., a national banking association, and its successors and assigns.

Bank Product: any of the following products, services or facilities extended to any Obligor or any Subsidiary of an Obligor by Lender or any of its Affiliates: (a) Cash Management Services; (b) products under Hedging Agreements; (c) commercial credit card and merchant card services; and (d) leases and other banking products or services as may be requested by any Obligor or any Subsidiary of an Obligor, other than Letters of Credit.

Bank Product Debt: Debt and other obligations of an Obligor relating to Bank Products.

- 4 -

Bank Product Reserve: the aggregate amount of reserves established by Lender from time to time in its discretion in respect of Bank Product Debt.

Bankruptcy Code: Title 11 of the United States Code.

Base Rate: for any day, a per annum rate equal to the greater of (a) the Prime Rate for such day; (b) the Federal Funds Rate for such day, plus 0.50%; or (c) LIBOR for a 30 day interest period as determined on such day, plus 1.00%.

Base Rate Loan: collectively, (a) any US Revolver Loan that bears interest based on the Base Rate and (b) at any time that the Last-Out Term Loan is outstanding, the Last-Out Term Loan.

BIA: the Bankruptcy and Insolvency Act (Canada) and the regulations promulgated thereunder.

Board of Governors: the Board of Governors of the Federal Reserve System.

Borrowed Money: with respect to any Obligor, without duplication, its (a) Debt that (i) arises from the lending of money by any Person to such Obligor, (ii) is evidenced by notes, drafts, bonds, debentures, credit documents or similar instruments, (iii) accrues interest or is a type upon which interest charges are customarily paid (excluding trade payables owing in the Ordinary Course of Business), or (iv) was issued or assumed as full or partial payment for Property; (b) Capital Leases; (c) reimbursement obligations with respect to letters of credit; and (d) guaranties of any Debt of the foregoing types owing by another Person.

Borrower: as defined in the introductory paragraph to this Agreement.

Borrower Agent: as defined in **Section 4.3**.

Borrowing: a group of Loans of one Type that are made on the same day or are converted into Loans of one Type on the same day.

Borrowing Base: the US Borrowing Base or the Canadian Borrowing Base, as the context requires.

Borrowing Base Certificate: a certificate from a Senior Officer of the Borrowers' Agent, in a form acceptable to Lender, setting forth the calculations of the US Borrowing Base, the Canadian Borrowing Base and the Aggregate Borrowing Base, including a calculation of each component thereof, all in such detail as shall be reasonably satisfactory to Lender. All calculations of the US Borrowing Base, the Canadian Borrowing Base and the Aggregate Borrowing Base in connection with the preparation of any Borrowing Base Certificate shall originally be made by the Borrower Agent and certified to Lender; provided, that Lender shall have the right to review and adjust any such calculation to the extent that such calculation is not in accordance with this Agreement.

Business Day: any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the laws of, or are in fact closed in, North Carolina and New York, and if such day relates to a LIBOR Loan, any such day on which dealings in Dollar deposits are conducted between banks in the London interbank Eurodollar market; provided, however, when used in connection with a Canadian Revolver Loan, such day shall be a day on which banks are open in Toronto, Ontario, Canada and New York, New York, but excluding Saturday, Sunday and any other day which is a legal holiday in Toronto, Ontario, Canada or New York, New York.

- 5 -

Canada Pension Plan: the pension benefit plan maintained by the Government of Canada.

Canadian Availability: at any date of determination (a) the lesser of (i) the Canadian Sublimit and (ii) the sum of (x) the Canadian Borrowing Base and (y) US Availability, minus (b) the Canadian Revolver Exposure.

Canadian Benefit Plan: any plan, fund, program, policy or agreement, whether oral or written, formal or informal, funded or unfunded, insured or uninsured, governed by the Applicable Laws of Canada and providing employee benefits, including medical, hospital care, dental, sickness, accident, disability or life insurance, maintained by any Obligor or any Subsidiary of any Obligor or under which any Obligor or any Subsidiary of any Obligor has any actual or potential liability with respect to any employee or former employee, but shall not include any Canadian Pension Plans or statutory plans with which any Obligor or its Subsidiaries is required to comply, including the Canada Pension Plan, the Quebec Pension Plan, or plans administered pursuant to applicable provincial health tax, workers' compensation, workers' safety and insurance and unemployment insurance legislation.

Canadian Borrower: as defined in the introductory paragraph to this Agreement.

Canadian Borrowing Base: at any date of determination, with respect to the Canadian Borrower, an amount equal to:

(a)     the Accounts Formula Amount for the Canadian Borrower; plus

(b)     the Inventory Formula Amount for the Canadian Borrower; minus

(c)     the Availability Reserve established by the Lender with respect to the Canadian Borrower.

If any amount in this definition is stated in a currency other than Dollars on any date, then such amount on such date shall be equal to the Dollar Equivalent of such amount in such other currency.

Canadian Collateral: all Property of the Canadian Borrower described in **Section 7.1.2**, all other Property of the Canadian Borrower described in any Security Documents as security for the Canadian Obligations, and all other Property that now or hereafter secures (or is intended to secure) the Canadian Obligations; provided that the term "Canadian Collateral" shall not include US Collateral.

Canadian Dollars and C$: the lawful currency of Canada.

Canadian Dominion Account: a special account established by the Canadian Borrower at Lender or a bank acceptable to Lender, over which Lender has exclusive control for withdrawal purposes.

Canadian Obligations: at any date of determination, all loans, advances, liabilities, obligations, covenants, duties, and debts owing by the Canadian Borrower to any Secured Party or any indemnified Person, arising under or pursuant to this Agreement or any of the other Loan Documents, whether or not evidenced by any note, or other instrument or document, whether arising from an extension of credit, opening of a letter of credit, acceptance, loan, guaranty, indemnification or otherwise, whether direct or indirect, absolute or contingent, due or to become due, primary or secondary, as principal or guarantor, and including all principal, interest, charges, expenses, fees, attorneys' fees, attorney costs, filing fees and any other sums chargeable to any Canadian Borrower or any other Canadian Obligor hereunder or under any of the other Loan Documents. "Canadian Obligations" includes, without limitation, all Bank Product Debt owed by the Canadian Borrower. Notwithstanding anything herein to the contrary, the term

- 6 -

Canadian Obligations shall not include the US Revolver Exposure, the Last-Out Term Loan (if applicable), any Obligation of the Obligors relating to the US Revolver Exposure or the Last-Out Term Loan, or any other Obligation of the Obligors (other than the Canadian Borrower) relating to Extraordinary Expenses, Bank Product Debt or other Obligations not related to the Canadian Loans.

Canadian Pension Plan: any pension plan, supplemental pension, retirement savings, deferred profit sharing or other retirement income plan or arrangement of any kind, registered or unregistered, governed by the Applicable Laws of Canada and established, maintained or contributed to by an Obligor or any Subsidiary of an Obligor for its employees or former employees, but does not include the Canada Pension Plan or the Quebec Pension Plan.

Canadian Priority Payables Reserve: on any date of determination for the Canadian Borrower, reserves established by Lender for amounts payable by the Canadian Borrower and secured by any Liens, choate or inchoate, which rank or which would reasonably be expected to rank in priority to or pari passu with Lender's Liens and/or for amounts which represent costs in connection with the preservation, protection, collection or realization of the Canadian Collateral, including, without limitation, any such amounts due and not paid for wages, vacation pay, severance pay, amounts due and not paid under any legislation relating to workers' compensation or to employment insurance, all amounts deducted or withheld and not paid and remitted when due under the Income Tax Act (Canada), sales tax, goods and services tax, value added tax, harmonized tax, excise tax, tax payable pursuant to Part IX of the Excise Tax Act (Canada) or similar applicable provincial legislation, government royalties, amounts currently or past due and not paid for realty, municipal or similar taxes and all amounts currently or past due and not contributed, remitted or paid to any Canadian Pension Plan or Canadian Benefit Plan under the Canada Pension Plan, the PBA, or any similar statutory or other claims that would have or would reasonably be expected to have priority over or pari passu with any Liens granted to Lender in the future.

Canadian Prime Rate: means, on any day, the rate per annum determined by the Lender to be the greater of (a) the nominal annual rate of interest announced from time to time by Lender as its reference rate of interest for loans made in Canadian Dollars to Canadian customers and designated as its "prime rate"(the "prime rate" being a rate set by Lender based upon various factors including Lender's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above or below such announced rate) and (b) the sum of (i) the CDOR Rate for a one month term in effect from time to time plus (ii) one percent (1.00%) per annum. Any change in the prime rate announced by Lender shall take effect at the opening of business on the day specified in the public announcement of such change. Each Interest Rate based upon the Canadian Prime Rate shall be adjusted simultaneously with any change in the Canadian Prime Rate. In the event that Lender (including any successor or assign) does not at any time publicly announce a prime rate, the "prime rate" means the "prime rate" publicly announced by a Schedule 1 chartered bank in Canada selected by Lender.

Canadian Prime Rate Loan: means any Canadian Revolving Loan which bears interest by reference to the Canadian Prime Rate.

Canadian Revolver Exposure: at any date of determination and without duplication, the Dollar Equivalent of the unpaid principal amount of Canadian Revolver Loans outstanding at such time.

Canadian Revolver Exposure Funded on US Borrowing Base: at any date of determination and without duplication, the positive amount, if any, of (a) the Canadian Revolver Exposure minus (b) the lesser of (i) the Canadian Sublimit and (ii) the Canadian Borrowing Base.

- 7 -

Canadian Revolver Loans: the Loans made to the Canadian Borrower from time to time pursuant to **Section 2.2**.

Canadian Security Agreements: collectively, (a) that certain Canadian General Security Agreement dated as of the date hereof between the Canadian Borrower and the Lender, (b) that certain Movable Hypothec dated as of the date hereof executed by the Canadian Borrower in favor of the Lender, and (c) any other pledge or security agreement executed by the Canadian Borrower in favor of the Lender, in each case, as the same may be amended, restated, supplemented or otherwise modified from time to time.

Canadian Sublimit: an amount equal to $15,000,000.

Capital Expenditures: all liabilities incurred or expenditures made by any Obligor or any Subsidiary of an Obligor for the acquisition of fixed assets, or any improvements, replacements, substitutions or additions thereto with a useful life of more than one year.

Capital Lease: any lease that is required to be capitalized for financial reporting purposes in accordance with GAAP.

Cash Collateral: cash, and any interest or other income earned thereon, that is delivered to Lender to Cash Collateralize any Obligations.

Cash Collateral Account: a demand deposit, money market or other account maintained with Lender and subject to Lender's Liens.

Cash Collateralize: the delivery of cash to Lender, as security for the payment of Obligations, in an amount equal to (a) with respect to LC Obligations, 105% of the aggregate LC Obligations, and (b) with respect to any inchoate, contingent or other Obligations (including Obligations arising under Bank Products), Lender's good faith estimate of the amount due or to become due, including all fees and other amounts relating to such Obligations. "Cash Collateralization" has a correlative meaning.

Cash Equivalents: (a) marketable obligations issued or unconditionally guaranteed by, and backed by the full faith and credit of, the United States or Canadian government, maturing within 12 months of the date of acquisition; (b) certificates of deposit, time deposits and bankers' acceptances maturing within 12 months of the date of acquisition, and overnight bank deposits, in each case which are issued by a commercial bank organized under the laws of the United States, Canada or any state or district of the United States or province of Canada, rated A-1 (or better) by S&P or P-1 (or better) by Moody's at the time of acquisition, and (unless issued by Lender) not subject to offset rights; (c) repurchase obligations with a term of not more than 30 days for underlying investments of the types described in clauses (a) and (b) entered into with any bank meeting the qualifications specified in clause (b); (d) commercial paper rated A-1 (or better) by S&P or P-1 (or better) by Moody's, and maturing within nine months of the date of acquisition; and (e) shares of any money market fund that has substantially all of its assets invested continuously in the types of investments referred to above, has net assets of at least $500,000,000 and has the highest rating obtainable from either Moody's or S&P.

Cash Management Services: any services provided from time to time by Lender or any of its Affiliates to any Obligor or any Subsidiary of an Obligor in connection with operating, collections, payroll, trust, or other depository or disbursement accounts, including automated clearinghouse, e-payable, electronic funds transfer, wire transfer, controlled disbursement, overdraft, depository, information reporting, lockbox and stop payment services.

CCAA: means the Companies' Creditors Arrangement Act (Canada) and the regulations promulgated thereunder.

CDOR Rate: on any day the annual rate of interest which is the rate determined as being the arithmetic average (rounded to the nearest one hundred-thousandth of one percent (with 0.000005 being rounded up)) of the quotations of all institutions listed in respect of the rate for Canadian Dollar denominated bankers' acceptances for the relevant period displayed and identified as such on the "Reuters Screen CDOR Page" (as defined in the International Swap Dealer Association, Inc. definitions, as modified and amended from time to time) as of 10:00 A.M. New York, New York local time on such day and, if such day is not a Business Day, then on the immediately preceding Business Day. If such rates are not available on the Reuters Screen CDOR Page on any particular day, then the CDOR Rate on that day shall be calculated as the arithmetic mean (rounded to the nearest one hundred-thousandth of one percent (with 0.000005 being rounded up)) of the rates applicable to Canadian Dollar denominated bankers' acceptances for the relevant period publicly quoted for customers in Canada by the banks listed in Schedule I of the Bank Act (Canada) as of 10:00 A.M. New York, New York local time on such day; or if such day is not a Business Day, then on the immediately preceding Business Day.

CERCLA: the Comprehensive Environmental Response Compensation and Liability Act (42 U.S.C. § 9601 et seq.).

Change in Law: the occurrence, after the date hereof, of (a) the adoption or taking effect of any law, rule, regulation or treaty; (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority; or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority.

Change of Control: (a) Holdco ceases to own and control, beneficially and of record, directly or indirectly, all Equity Interests in all Obligors free and clear of all Liens (other than Liens in favor of the Lender and Liens on the Equity Interests in Midco in favor of the holders of the Holdco Note); (b) the Littlejohn Entities shall cease to own and control, beneficially and of record, at least 40% of the Equity Interests of Holdco; (c) a change in the majority of directors of Holdco, unless approved by the then majority of directors; or (d) all or substantially all of an Obligor's assets are sold or transferred, other than sale or transfer to a Borrower.

Claims: all liabilities, obligations, losses, damages, penalties, judgments, proceedings, interest, costs and expenses of any kind (including remedial response costs, reasonable attorneys' fees and Extraordinary Expenses) at any time (including after Full Payment of the Obligations) incurred by or asserted against any Indemnitee in any way relating to (a) any Loans, Letters of Credit, Loan Documents, or the use thereof or action taken or omitted to be taken by any Indemnitee in connection with any Loan Documents, (b) any action taken or omitted to be taken by any Indemnitee in connection with any Loan Documents, (c) the existence or perfection of any Liens, or realization upon any Collateral, (d) exercise of any rights or remedies under any Loan Documents or Applicable Law, or (e) failure by any Obligor to perform or observe any terms of any Loan Document, in each case including all costs and expenses relating to any investigation, litigation, arbitration or other proceeding (including an Insolvency Proceeding or appellate proceedings), whether or not the applicable Indemnitee is a party thereto.

Closing Date: as defined in **Section 6.1**.

Closing Date Mortgaged Properties: collectively, the Real Estate owned by the Obligors and located at (a) 162 Enterprise Drive, Rockingham, NC, and (b) 5393 Truman Drive, Decatur, GA.

<u>Code</u>: the Internal Revenue Code of 1986.

<u>Collateral</u>: the US Collateral and the Canadian Collateral.

<u>Commitment Termination Date</u>: the earliest to occur of (a) the Revolver Termination Date; (b) the date on which Borrowers terminate the Revolver Commitment pursuant to **Section 2.1.3**; or (c) the date on which the Revolver Commitment is terminated pursuant to **Section 11.2**.

<u>Compliance Certificate</u>: a certificate, in form and substance satisfactory to Lender, by which Borrowers certify compliance with **Sections 10.2.3 and 10.3**, calculate the applicable Level for the Applicable Margin and provide reasonably detailed calculations of EBITDA and the Fixed Charge Coverage Ratio for the relevant fiscal period (regardless of whether a Financial Covenant Period is in effect).

<u>Confirmation Order</u>: an order of the Bankruptcy Court confirming the Plan of Reorganization, in form and substance acceptable to Lender, not subject to any pending appeal or motion for reversal, stay, review, revocation or reconsideration.

<u>Contingent Obligation</u>: any obligation of a Person arising from a guaranty, indemnity or other assurance of payment or performance of any Debt, lease, dividend or other obligation ("<u>primary obligations</u>") of another obligor ("<u>primary obligor</u>") in any manner, whether directly or indirectly, including any obligation of such Person under any (a) guaranty, endorsement, co-making or sale with recourse of an obligation of a primary obligor; (b) obligation to make take-or-pay or similar payments regardless of nonperformance by any other party to an agreement; and (c) arrangement (i) to purchase any primary obligation or security therefor, (ii) to supply funds for the purchase or payment of any primary obligation, (iii) to maintain or assure working capital, equity capital, net worth or solvency of the primary obligor, (iv) to purchase Property or services for the purpose of assuring the ability of the primary obligor to perform a primary obligation, or (v) otherwise to assure or hold harmless the holder of any primary obligation against loss in respect thereof. The amount of any Contingent Obligation shall be deemed to be the stated or determinable amount of the primary obligation (or, if less, the maximum amount for which such Person may be liable under the instrument evidencing the Contingent Obligation) or, if not stated or determinable, the maximum reasonably anticipated liability with respect thereto.

<u>Coverstar</u>: as defined in the introductory paragraph to this Agreement.

<u>Credit Judgment</u>: Lender's judgment exercised in good faith, based upon its consideration of any factor that it believes (a) could adversely affect the quantity, quality, mix or value of Collateral (including any Applicable Law that may inhibit collection of an Account), the enforceability or priority of Lender's Liens, or the amount that Lender could receive in liquidation of any Collateral; (b) suggests that any collateral report or financial information delivered by any Obligor is incomplete, inaccurate or misleading in any material respect; (c) materially increases the likelihood of any Insolvency Proceeding involving an Obligor; or (d) creates or could result in a Default or Event of Default. In exercising such judgment, Lender may consider any factors that could increase the credit risk of lending to Borrowers on the security of the Collateral.

<u>Creditor Representative</u>: under any Applicable Law, a receiver, interim receiver, national receiver, receiver and manager, trustee (including any trustee in bankruptcy), custodian, conservator, administrator, examiner, sheriff, monitor, assignee, liquidator, provisional liquidator, sequestrator or similar officer or fiduciary.

<u>CWA</u>: the Clean Water Act (33 U.S.C. §§ 1251 <u>et seq</u>.).

Debt: as applied to any Person, without duplication, (a) all items that would be included as liabilities on a balance sheet in accordance with GAAP, including Capital Leases, but excluding current liabilities (other than the current portion of long term debt and accrued interest) incurred and being paid in the Ordinary Course of Business; (b) all Contingent Obligations; (c) all reimbursement obligations in connection with letters of credit issued for the account of such Person; and (d) in the case of any Obligor, the Obligations. The Debt of a Person shall include any recourse Debt of any partnership in which such Person is a general partner or joint venturer.

Default: an event or condition that, with the lapse of time or giving of notice, would constitute an Event of Default.

Default Rate: for any Obligation (including, to the extent permitted by law, interest not paid when due), two percent (2.00%) plus the interest rate otherwise applicable thereto.

Deposit Account Control Agreements: the Deposit Account control agreements in form and substance satisfactory to the Lender to be executed by each institution maintaining a Deposit Account for any Obligor, in favor of Lender, as security for the Obligations.

Distribution: any declaration or payment of a distribution, interest or dividend on any Equity Interest (other than payment-in-kind); any distribution, advance or repayment of Debt to a holder of Equity Interests; or any purchase, redemption, or other acquisition or retirement for value of any Equity Interest.

Dollar and $: lawful money of the United States.

Dollar Equivalent: on any date, with respect to any amount denominated in Dollars, such amount in Dollars, and with respect to any stated amount in a currency other than Dollars, the amount of Dollars that Lender determines (which determination shall be conclusive and binding absent manifest error) would be necessary to be sold on such date at the applicable Exchange Rate to obtain the stated amount of the other currency.

EBITDA: for any period, determined on a consolidated basis for Holdco and its Subsidiaries, net income for such period, calculated before (a) interest expense, (b) provision for income taxes, (c) depreciation and amortization expense, (d) gains or losses arising from the sale of capital assets, (e) non-cash gains arising from the write-up of assets, (f) non-cash losses arising from the write-down of assets, (g) any extraordinary gains or extraordinary losses, and (i) fees, costs and expenses (including fees and expenses of legal counsel and professional advisors) in an aggregate amount not to exceed $1,000,000 relating to the Bankruptcy Cases, the consummation of the Plan of Reorganization and the transactions contemplated thereby, and the transactions contemplated by this Agreement (in the case of each of items (a) – (i) above, to the extent included in determining net income).

Eligible Account: an Account owing to any Borrower that arises in the Ordinary Course of Business from the sale of goods, is payable in Dollars or Canadian Dollars and is deemed by Lender, in its Credit Judgment, to be an Eligible Account. Without limiting the foregoing, no Account shall be an Eligible Account if:

(a)      such Account is unpaid for more than 60 days after the original due date, or more than 90 days after the original invoice date; provided, that Accounts owing from those certain Account Debtors listed on **Schedule 1.1** (which Schedule may be updated from time to time (i) to add additional Account Debtors reasonably acceptable to the Lender or, (ii) upon notice to the Borrower Agent, to exclude Account Debtors based upon any determination by the Lender in its Credit Judgment that any such

- 11 -

Account Debtor's credit profile has deteriorated or is otherwise unacceptable) that are unpaid more than 90 but not more than 210 days after the original invoice date having an aggregate value not in excess of (x) $1,000,000 during the period commencing on the Closing Date and ending on December 31, 2010 and (y) the lesser of (1) $2,500,000 and (2) 20% of the aggregate amount of Eligible Accounts during any Fiscal Year thereafter (including Eligible Accounts owing from the Account Debtors listed on **Schedule 1.1**), shall not be excluded for purposes of this clause (a).

(b) 50% or more of the Accounts owing by the Account Debtor are not Eligible Accounts;

(c) when aggregated with other Accounts owing by the Account Debtor, Accounts owing from such Account Debtor would exceed 15% of the aggregate Eligible Accounts (including Eligible Accounts owing from Pool Corp as described in this clause (c)) of all Borrowers (or such higher percentage as Lender may establish in its Credit Judgment for the Account Debtor from time to time); provided that Accounts owing from Pool Corp that exceed 15% of the aggregate Eligible Accounts of all Borrowers (including Eligible Accounts owing from Pool Corp as described in this clause (c)) but do not exceed 30% of the aggregate Eligible Accounts of all Borrowers (including Eligible Accounts owing from Pool Corp as described in this clause (c)) shall not be excluded pursuant to this clause (c), subject to the Lender's continued satisfaction, in its Credit Judgment, with the credit profile of Pool Corp;

(d) such Account does not conform with a covenant or representation herein;

(e) such Account is owing by a creditor or supplier, or is otherwise subject to a potential offset, counterclaim, dispute, deduction, discount, recoupment, reserve, defense, chargeback, credit or allowance (but ineligibility shall be limited to the amount thereof);

(f) an Insolvency Proceeding has been commenced by or against the Account Debtor; or the Account Debtor has failed, has suspended or ceased doing business, is liquidating, dissolving or winding up its affairs, or is not Solvent; or the Borrower is not able to bring suit or enforce remedies against the Account Debtor through judicial process;

(g) the Account Debtor is organized or has its principal offices (or domicile, for purposes of the Quebec Civil Code) or assets outside the United States or Canada;

(h) such Account is owing by a Government Authority, unless the Account Debtor is the United States or Canada or any department, agency or instrumentality thereof and the Account has been assigned to Lender in compliance with the Assignment of Claims Act, the Financial Administration Act (Canada) or other Applicable Law;

(i) such Account is not subject to a duly perfected, first priority Lien in favor of Lender, or is subject to any other Lien;

(j) the goods giving rise to such Account have not been delivered to and accepted by the Account Debtor, the services giving rise to such Account have not been accepted by the Account Debtor, or such Account otherwise does not represent a final sale;

(k) such Account is evidenced by Chattel Paper or an Instrument of any kind, or has been reduced to judgment;

(l) the Account Debtor has made a partial payment (other than as part of an arrangement for extended payment terms permitted pursuant to clause (a) of this definition), or such Account arises from a sale on a cash-on-delivery basis;

- 12 -

(m)    such Account arises from a sale to an Affiliate, from a sale on a bill-and-hold, guaranteed sale, sale-or-return, sale-on-approval, consignment, or other repurchase or return basis, or from a sale to a Person for personal, family or household purposes;

(n)    such Account represents a progress billing or retainage, or relates to services for which a performance, surety or completion bond or similar assurance has been issued;

(o)    such Account includes a billing for interest, fees or late charges, but ineligibility shall be limited to the extent thereof; or

(p)    the Lender determines in its Credit Judgment that such Account is otherwise unacceptable for any reason whatsoever.

In calculating delinquent portions of Accounts under clauses (a) and (b), credit balances more than 90 days old will be excluded.

Lender shall, in exercising its Credit Judgment to exclude or reduce the applicable percentage of Pool Corp. Accounts from Eligible Accounts, take action only upon five (5) Business Days prior written notice to Borrower Agent specifying the nature of any change in the credit profile of Pool Corp., including written verification of the change as evidenced by a report from S&P, Moody's or a similar service, which change demonstrates that Pool Corp. poses a substantially greater credit risk; provided, that the Lender shall have no obligation to provide any such notice if an Event of Default shall have occurred and be continuing or if Pool Corp. is the subject of an Insolvency Proceeding.

Eligible Inventory: Inventory owned by a Borrower that Lender, in its Credit Judgment, deems to be Eligible Inventory. Without limiting the foregoing, no Inventory shall be Eligible Inventory unless such Inventory:

(a)    is finished goods or raw materials, and not work-in-process, packaging or shipping materials, labels, samples, display items, bags, replacement parts or manufacturing supplies;

(b)    is not held on consignment, nor subject to any deposit or downpayment;

(c)    is in new and saleable condition or has been returned (other than customized or special order items) and is in saleable condition and is not damaged, defective, shopworn or otherwise unfit for sale;

(d)    is not slow-moving, obsolete or unmerchantable, and does not constitute returned or repossessed goods that are not fit for resale (it being understood that returns consisting of customized or special order items shall be excluded from Eligible Inventory);

(e)    meets all standards imposed by any Governmental Authority, and does not constitute hazardous materials under any Environmental Law;

(f)    conforms with the covenants and representations herein;

(g)    is subject to Lender's duly perfected, first priority Lien, and no other Lien;

(h)    is within the continental United States or the Canadian provinces of Ontario or Quebec, is not in transit except between locations of Borrowers, and is not consigned to any Person;

- 13 -

(i)     is not subject to any warehouse receipt or negotiable Document;

(j)     is not subject to any License or other arrangement that restricts such Borrower's or Lender's right to dispose of such Inventory, unless Lender has received an appropriate Lien Waiver;

(k)     is not located on leased premises or in the possession of a warehouseman, processor, repairman, mechanic, shipper, freight forwarder, customs broker or other Person, unless the lessor or such Person has delivered a Lien Waiver or an appropriate Rent and Charges Reserve has been established; and

(l)     is reflected in the details of a current perpetual inventory report;

provided, that, without in any way limiting or modifying the eligibility requirements set forth above, Lender may, in its Credit Judgment, exclude (i) items of Inventory from Eligible Inventory based upon a determination by Lender that such items of Inventory are unacceptable for any reason and (ii) the following types of Inventory classified as ineligible Inventory in the Hilco Appraisal Services, LLC Inventory Evaluation and Appraisal of Latham International, Inc. dated December 1, 2009: Advertising Material, Spare Parts Inventory, Maintenance Equipment, Miscellaneous Accessories, Excess & Slow-Moving Inventory, Inventory Equalization, Tech Profit Inventory and Eliminations.

Enforcement Action: any action to enforce any Obligations or Loan Documents or to realize upon any Collateral (whether by judicial action, self-help, notification of Account Debtors, exercise of setoff or recoupment, or otherwise).

Environmental Agreement: that certain Hazardous Materials Indemnity Agreement dated as of the Closing Date among the Obligors and Lender, in from and substance satisfactory to Lender, as the same may be amended, restated, supplemented or otherwise modified from time to time.

Environmental Laws: all Applicable Laws (including all programs, permits and guidance promulgated by regulatory agencies), relating to public health (but excluding occupational safety and health, to the extent regulated by OSHA) or the protection or pollution of the environment, including CERCLA, RCRA and CWA.

Environmental Notice: a notice (whether written or oral) from any Governmental Authority or other Person of any possible noncompliance with, investigation of a possible violation of, litigation relating to, or potential fine or liability under any Environmental Law, or with respect to any Environmental Release, environmental pollution or hazardous materials, including any complaint, summons, citation, order, claim, demand or request for correction, remediation or otherwise.

Environmental Release: a release as defined in CERCLA or under any other Environmental Law.

Equity Interest: the interest of any (a) shareholder in a corporation; (b) partner in a partnership (whether general, limited, limited liability or joint venture); (c) member in a limited liability company; or (d) other Person having any other form of equity security or ownership interest.

ERISA: the Employee Retirement Income Security Act of 1974.

ERISA Affiliate: any trade or business (whether or not incorporated) under common control with an Obligor within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

ERISA Event: (a) a Reportable Event with respect to a Pension Plan or a Pension Event with respect to a Canadian Pension Plan; (b) a withdrawal by any Obligor or ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by any Obligor or ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization; (d) the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under Section 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (e) any Obligor or ERISA Affiliate fails to meet any funding obligations with respect to any Pension Plan or Multiemployer Plan, or requests a minimum funding waiver; (f) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; or (g) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon any Obligor or ERISA Affiliate.

Event of Default: as defined in **Section 11**.

Exchange Rate: on any date, (a) with respect to Canadian Dollars in relation to Dollars, the spot rate as quoted by Bank of America as its noon spot rate at which Dollars are offered on such date for Canadian Dollars, and (b) with respect to Dollars in relation to Canadian Dollars, the spot rate as quoted by Bank of America as its noon spot rate at which Canadian Dollars are offered on such date for Dollars.

Excluded Account: as defined in **Section 8.5**.

Excluded Tax: with respect to Lender or any other recipient of a payment to be made by or on account of any Obligation, (a) taxes imposed on or measured by its overall net income (however denominated), and franchise taxes imposed on it (in lieu of net income taxes), by the jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized or in which its principal office is located or, in the case of Lender, in which its applicable lending office is located; and (b) any branch profits taxes imposed by the United States or any similar tax imposed by any other jurisdiction in which Borrower Agent is located.

Extraordinary Expenses: all costs, expenses or advances that Lender may incur during a Default or Event of Default, or during the pendency of an Insolvency Proceeding of an Obligor, including those relating to (a) any audit, inspection, repossession, storage, repair, appraisal, insurance, manufacture, preparation or advertising for sale, sale, collection, or other preservation of or realization upon any Collateral; (b) any action, arbitration or other proceeding (whether instituted by or against Lender, any Obligor, any representative of creditors of an Obligor or any other Person) in any way relating to any Collateral (including the validity, perfection, priority or avoidability of Lender's Liens with respect to any Collateral), Loan Documents, Letters of Credit or Obligations, including any lender liability or other Claims; (c) the exercise, protection or enforcement of any rights or remedies of Lender in, or the monitoring of, any Insolvency Proceeding; (d) settlement or satisfaction of any taxes, charges or Liens with respect to any Collateral; (e) any Enforcement Action; and (f) negotiation and documentation of any modification, waiver, workout, restructuring or forbearance with respect to any Loan Documents or Obligations. Such costs, expenses and advances include transfer fees, Other Taxes, storage fees, insurance costs, permit fees, utility reservation and standby fees, legal fees, appraisal fees, brokers' fees and commissions, auctioneers' fees and commissions, accountants' fees, environmental study fees, wages and salaries paid to employees of any Obligor or independent contractors in liquidating any Collateral, and travel expenses.

- 15 -

Federal Funds Rate: (a) the weighted average of interest rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers on the applicable Business Day (or on the preceding Business Day, if the applicable day is not a Business Day), as published by the Federal Reserve Bank of New York on the next Business Day; or (b) if no such rate is published on the next Business Day, the average rate (rounded up, if necessary, to the nearest 1/8 of 1%) charged to Lender on the applicable day on such transactions, as determined by Lender.

Financial Covenant Trigger Amount: (a) at any time during the months of February and March of any year, 18% of the sum of (i) the Revolving Commitment at such time plus (ii) the outstanding principal amount of the Last-Out Term Loan (if applicable) at such time, or (b) at any time during any other month of any year, 20% of the sum of (i) the Revolving Commitment at such time plus (ii) the outstanding principal amount of the Last-Out Term Loan (if applicable) at such time.

Financial Covenant Period: any of the following periods: (a) each period commencing on the date that an Event of Default shall occur and continuing until the 90th day after the date when such Event of Default shall have been cured or waived; (b) each period commencing on the date that Aggregate Availability falls below the Financial Covenant Trigger Amount and continuing until Aggregate Availability shall have exceeded the Financial Covenant Trigger Amount at all times during a period of 90 consecutive days; and (c) each period commencing on the date that US Availability falls below $2,500,000 and continuing until US Availability shall have exceeded the Financial Covenant Trigger Amount at all times during a period of 90 consecutive days.

Fiscal Quarter: each period of approximately three months ending on the last day of Holdco's fiscal quarters ending in March, June and September and on December 31 of each year.

Fiscal Year: the fiscal year of Holdco and its Subsidiaries for accounting and tax purposes, ending on December 31 of each year.

Fixed Charge Coverage Ratio: the ratio, determined on a consolidated basis for Holdco and its Subsidiaries for any period, of (a) EBITDA minus Capital Expenditures (except those financed with Borrowed Money other than Revolver Loans) and cash taxes paid, to (b) Fixed Charges.

Fixed Charges: the sum of interest expense (other than payment-in-kind), principal payments made on Borrowed Money, management fees paid in cash and Distributions made.

FLSA: the Fair Labor Standards Act of 1938.

Foreign Plan: any employee benefit plan or arrangement (a) maintained or contributed to by any Obligor or Subsidiary of an Obligor that is not subject to the laws of the United States or Canada; or (b) mandated by a government other than the United States or Canada for employees of any Obligor or any Subsidiary of an Obligor.

Foreign Subsidiary: a Subsidiary of an Obligor that is a "controlled foreign corporation" under Section 957 of the Code, such that a guaranty by such Subsidiary of the Obligations or a Lien on the assets of such Subsidiary to secure the Obligations would result in material tax liability to Borrowers.

Full Payment: with respect to any Obligations, (a) the full and indefeasible cash payment thereof, including any interest, fees and other charges accruing during an Insolvency Proceeding (whether or not allowed in the proceeding); (b) if such Obligations are LC Obligations or inchoate or contingent in nature, Cash Collateralization thereof (or delivery of a standby letter of credit acceptable to Lender in its discretion, in the amount of required Cash Collateral); and (c) a release of any Claims of Obligors against

- 16 -

Lender arising on or before the payment date. The Revolver Loans shall not be deemed to have been paid in full until the Revolver Commitment has expired or been terminated.

GAAP: generally accepted accounting principles in effect in the United States from time to time.

Governmental Approvals: all authorizations, consents, approvals, licenses and exemptions of, registrations and filings with, and required reports to, all Governmental Authorities.

Governmental Authority: any federal, state, provincial, territorial, municipal, foreign or other governmental department, agency, commission, board, bureau, court, tribunal, instrumentality, political subdivision, or other entity or officer exercising executive, legislative, judicial, regulatory or administrative functions for or pertaining to any government or court, in each case whether associated with the United States, a state, district or territory thereof, Canada, a province or territory thereof, or any other foreign entity or government.

Guarantor Payment: as defined in **Section 5.8.3**.

Guarantors: Midco and each other Person who guarantees payment or performance of any Obligations.

Guaranty: each guaranty agreement executed by a Guarantor in favor of Lender, including Section 12 of this Agreement.

Hedging Agreement: an agreement relating to any swap, cap, floor, collar, option, forward, cross right or obligation, or combination thereof or similar transaction, with respect to interest rate, foreign exchange, currency, commodity, credit or equity risk.

Holdco: LMH I, Inc., a Delaware corporation.

Holdco Note: that certain [Promissory Note] dated as of the Closing Date issued by Holdco pursuant to the Plan of Reorganization in the original principal amount of $20,000,000, bearing interest at the rate of either (i) if all cash pay, LIBOR (with a 3.00% floor) plus 4.00%, and (ii) if paid-in-kind or a combination of paid-in-kind and cash pay, 10% per annum, originally issued in favor of Midco and assigned by Midco to Latham and by Latham to certain holders of pre-petition debt claims against the Pre-Petition Entities.

Holdco Note Documents: that certain Master Note Agreement dated as of the Closing Date among Holdco, Midco (as the original holder of the Holdco Note), the other holders from time to time party thereto and [_____] as holder representative, together with the Holdco Note and all other documents, instruments and agreements executed in connection therewith, each as amended, modified, waived or supplemented from time to time.

Indemnified Taxes: Taxes other than Excluded Taxes.

Indemnitees: Lender and its officers, directors, employees, Affiliates, agents and attorneys.

Insolvency Proceeding: any case, proceeding, plan of arrangement, proposal or assignment into bankruptcy commenced by or against a Person under any state, federal or foreign law for, or any agreement of such Person to, (a) the entry of an order for relief under the Bankruptcy Code, or any other insolvency, debtor relief bankruptcy, receivership, debt adjustment or similar law (whether state, provincial, territorial, federal or foreign), including without limitation, the BIA and the CCAA; (b) the

appointment of a Creditor Representative or other custodian for such Person or any part of its Property; or (c) an assignment or trust mortgage for the benefit of creditors.

Intellectual Property: all intellectual and similar Property of a Person, including inventions, designs, patents, copyrights, trademarks, service marks, trade names, trade secrets, confidential or proprietary information, customer lists, know-how, software and databases; all embodiments or fixations thereof and all related documentation, applications, registrations and franchises; all licenses or other rights to use any of the foregoing; and all books and records relating to the foregoing.

Intellectual Property Claim: any claim or assertion (whether in writing, by suit or otherwise) that an Obligor's or a Subsidiary's ownership, use, marketing, sale or distribution of any Inventory, Equipment, Intellectual Property or other Property violates another Person's Intellectual Property.

Intellectual Property Security Agreement: (a) each trademark security agreement pursuant to which an Obligor grants a Lien to Lender on such Obligor's interests in trademarks, (b) each patent security agreement pursuant to which an Obligor grants a Lien to Lender on such Obligor's interests in patents and (c) each copyright security agreement pursuant to which an Obligor grants a Lien to Lender on such Obligor's interests in copyrights, in each case, as security for the Obligations, in each case, whether under United States law, Canadian law, or the laws of another foreign jurisdiction.

Interest Period: as defined in **Section 3.1.3**.

Inventory: as defined in the UCC (or, with respect to any inventory of the Canadian Borrower to which the PPSA is applicable, as defined in the PPSA), including all goods intended for sale, lease, display or demonstration; all work in process; and all raw materials, and other materials and supplies of any kind that are or could be used in connection with the manufacture, printing, packing, shipping, advertising, sale or furnishing of such goods, or otherwise used or consumed in an Obligor's business (but excluding Equipment).

Inventory Formula Amount: the lesser of (a) 60% of the Value of Eligible Inventory or (ii) 85% of the Applicable Seasonal NOLV Percentage of the Value of Eligible Inventory.

Inventory Reserve: reserves established by Lender to reflect factors that may negatively impact the Value of Inventory, including change in salability, obsolescence, seasonality, theft, shrinkage, imbalance, change in composition or mix, markdowns and vendor chargebacks.

Investment: any acquisition of all or substantially all assets of a Person; any acquisition of record or beneficial ownership of any Equity Interests of a Person; or any advance or capital contribution to or other investment in a Person.

IRS: the United States Internal Revenue Service.

Last-Out Term Loan: as defined in **Section 2.4.1**.

LC Application: an application by Borrower Agent to Lender for issuance of a Letter of Credit, in form and substance satisfactory to Lender.

LC Conditions: the following conditions necessary for issuance of a Letter of Credit: (a) each of the conditions set forth in Section 6; (b) after giving effect to such issuance, (i) total LC Obligations do not exceed the Letter of Credit Subline, (ii) no Overadvance exists, (iii) Aggregate Availability is greater than zero, and (iv) US Availability is greater than zero; (c) the expiration date of such Letter of Credit is

- 18 -

(i) no more than 365 days from issuance, in the case of standby Letters of Credit, (ii) no more than 120 days from issuance, in the case of documentary Letters of Credit, and (iii) at least 20 Business Days prior to the Revolver Termination Date; (d) the Letter of Credit and payments thereunder are denominated in Dollars; and (e) the purpose and form of the proposed Letter of Credit is satisfactory to Lender in its discretion.

LC Documents: all documents, instruments and agreements (including LC Requests and LC Applications) delivered by Borrowers or any other Person to Lender in connection with issuance, amendment or renewal of, or payment under, any Letter of Credit.

LC Obligations: the sum (without duplication) of (a) all amounts owing by Borrowers for any drawings under Letters of Credit; (b) the stated amount of all outstanding Letters of Credit; and (c) all fees and other amounts owing with respect to Letters of Credit.

LC Request: a request for issuance of a Letter of Credit, to be provided by Borrower Agent, in form satisfactory to Lender.

LC Reserve: the aggregate of all LC Obligations, other than (a) those that have been Cash Collateralized, and (b) if no Default or Event of Default exists, those constituting charges owing to Lender.

Lender: Bank of America; provided, that for purposes of the funding of Canadian Revolver Loans and for administrative matters in connection therewith, the term "Lender" shall include Bank of America, N.A. (acting through its Canadian Branch) and its successors and assigns.

Letter of Credit: any standby or documentary letter of credit issued by Lender for the account of a Borrower, or any indemnity, guarantee, exposure transmittal memorandum or similar form of credit support issued by Lender for the benefit of a Borrower.

Letter of Credit Subline: $5,000,000.

LIBOR: for any Interest Period with respect to a LIBOR Loan, the per annum rate of interest (rounded up, if necessary, to the nearest 1/8th of 1%), determined by Lender at approximately 11:00 a.m. (London time) two Business Days prior to commencement of such Interest Period, for a term comparable to such Interest Period, equal to (a) the British Bankers Association LIBOR Rate ("BBA LIBOR"), as published by Reuters (or other commercially available source designated by Lender); or (b) if BBA LIBOR is not available for any reason, the interest rate at which Dollar deposits in the approximate amount of the LIBOR Loan would be offered by Lender's London branch to major banks in the London interbank Eurodollar market. If the Board of Governors imposes a Reserve Percentage with respect to LIBOR deposits, then LIBOR shall be the foregoing rate, divided by 1 minus the Reserve Percentage.

LIBOR Loan: each set of LIBOR Revolver Loans having a common length and commencement of Interest Period.

LIBOR Revolver Loan: a US Revolver Loan that bears interest based on LIBOR.

License: any license or agreement under which an Obligor is authorized to use Intellectual Property in connection with any manufacture, marketing, distribution or disposition of Collateral, any use of Property or any other conduct of its business.

Licensor: any Person from whom an Obligor obtains the right to use any Intellectual Property.

- 19 -

Lien: any Person's interest in Property securing an obligation owed to, or a claim by, such Person, whether such interest is based on common law, statute or contract, including liens, security interests, pledges, hypothecations, statutory trusts, reservations, exceptions, encroachments, easements, rights-of-way, covenants, conditions, restrictions, leases, and other title exceptions and encumbrances affecting Property.

Lien Waiver: an agreement, in form and substance satisfactory to Lender, by which (a) for any material Collateral located on leased premises, the lessor waives or subordinates any Lien it may have on the Collateral, and agrees to permit Lender to enter upon the premises and remove the Collateral or to use the premises to store or dispose of the Collateral; (b) for any Collateral held by a warehouseman, processor, shipper, customs broker or freight forwarder, such Person waives or subordinates any Lien it may have on the Collateral, agrees to hold any Documents in its possession relating to the Collateral as agent for Lender, and agrees to deliver the Collateral to Lender upon request; (c) for any Collateral held by a repairman, mechanic or bailee, such Person acknowledges Lender's Lien, waives or subordinates any Lien it may have on the Collateral, and agrees to deliver the Collateral to Lender upon request; and (d) for any Collateral subject to a Licensor's Intellectual Property rights, the Licensor grants to Lender the right, vis-à-vis such Licensor, to enforce Lender's Liens with respect to the Collateral, including the right to dispose of it with the benefit of the Intellectual Property, whether or not a default exists under any applicable License.

Liquidity: at any date of determination, the sum of (a) Aggregate Availability as of such date plus (b) the aggregate amount of cash of the Obligors on deposit as of such date in Deposit Accounts in the United States.

Littlejohn Entities: Littlejohn & Co., LLC, together with all funds, accounts and other entities managed, advised, controlled or affiliated with Littlejohn & Co., LLC.

Loan: collectively, (a) a Revolver Loan and (b) at any time that the Last-Out Term Loan is outstanding, the Last-Out Term Loan.

Loan Accounts: the loan accounts established by Lender on its books pursuant to **Section 5.6**.

Loan Documents: this Agreement, Other Agreements and Security Documents.

Loan Year: each 12 month period commencing on the Closing Date and on each anniversary of the Closing Date.

Management Agreement: that certain Management Services Agreement dated as of the Closing Date by and between Littlejohn and Co., L.L.C. and Holdco.

Margin Stock: as defined in Regulation U of the Board of Governors.

Material Adverse Effect: the effect of any event or circumstance that, taken alone or in conjunction with other events or circumstances, (a) has or could be reasonably expected to have a material adverse effect on the business, operations, Properties, prospects or condition (financial or otherwise) of the Obligors, taken as a whole, on the value of any material Collateral, on the enforceability of any Loan Documents, or on the validity or priority of Lender's Liens on any Collateral; (b) materially impairs the ability of any Obligor to perform any obligations under the Loan Documents, including repayment of any Obligations; or (c) otherwise impairs the ability of Lender to enforce or collect any Obligations or to realize upon any material portion of the Collateral.

- 20 -

**Material Contract:** any agreement or arrangement to which an Obligor or a Subsidiary of an Obligor is party (other than the Loan Documents) (a) that is deemed to be a material contract under any securities law applicable to such Obligor, including the Securities Act of 1933; (b) for which breach, termination, nonperformance or failure to renew could reasonably be expected to have a Material Adverse Effect; (c) that relates to Subordinated Debt; or (d) that relates to any Debt in an aggregate amount of $250,000 or more.

**Midco:** LMH II, Inc., a Delaware corporation.

**Moody's:** Moody's Investors Service, Inc., and its successors.

**Mortgage:** each mortgage, deed of trust or deed to secure debt pursuant to which an Obligor grants a Lien to Lender on the Real Estate owned by such Obligor, as security for the Obligations.

**Multiemployer Plan:** any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which any Obligor or ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

**Net Proceeds:** with respect to an Asset Disposition, proceeds (including, when received, any deferred or escrowed payments) received by a Borrower or Subsidiary in cash from such disposition, net of (a) reasonable and customary costs and expenses actually incurred in connection therewith, including legal fees and sales commissions; (b) amounts applied to repayment of Debt secured by a Permitted Lien senior to Lender's Liens on Collateral sold; (c) transfer or similar taxes; and (d) reserves for indemnities, until such reserves are no longer needed.

**NOLV Percentage:** the net orderly liquidation value of Inventory, expressed as a percentage, expected to be realized at an orderly, negotiated sale held within a reasonable period of time, net of all liquidation expenses, as determined from the most recent appraisal of Borrowers' Inventory performed by an appraiser and on terms satisfactory to Lender.

**Non-Canadian Obligations:** all Obligations, other than Canadian Obligations.

**Notice of Borrowing:** a Notice of Borrowing to be provided (as the context requires) (a) by Borrower Agent to request a Borrowing of US Revolver Loans or (b) by the Canadian Borrower to request a Borrowing of Canadian Revolver Loans, in each case, in form satisfactory to Lender.

**Notice of Conversion/Continuation:** a Notice of Conversion/Continuation to be provided (as the context requires) (a) by Borrower Agent to request a conversion or continuation of any US Revolver Loans as LIBOR Loans or (b) by Canadian Borrower to request a conversion or continuation of any Canadian Revolver Loans as BA Equivalent Loans, in each case, in form satisfactory to Lender.

**NY Mortgage:** as defined in **Section 2.4.2**.

**NY Owned Real Property:** the Real Estate owned by [Latham] and located at 787 Watervliet Shaker Road, Latham, New York.

**Obligations:** all (a) principal of and premium, if any, on the Loans, (b) LC Obligations and other obligations of Obligors with respect to Letters of Credit, (c) interest, expenses, fees and other sums payable by Obligors under Loan Documents, (d) obligations of Obligors under any indemnity for Claims, (e) Extraordinary Expenses, (f) Bank Product Debt, and (g) other Debts, obligations and liabilities of any kind owing by any Obligor to Lender, whether now existing or hereafter arising, whether evidenced by a

note or other writing, whether allowed in any Insolvency Proceeding, whether arising from an extension of credit, issuance of a letter of credit, acceptance, loan, guaranty, indemnification or otherwise, and whether direct or indirect, absolute or contingent, due or to become due, primary or secondary, or joint or several.

Obligor: each Borrower, Guarantor, or other Person that is liable for payment of any Obligations or that has granted a Lien in favor of Lender on its assets to secure any Obligations.

Ordinary Course of Business: the ordinary course of business of the Obligors and their respective Subsidiaries, consistent with past practices and undertaken in good faith.

Organic Documents: with respect to any Person, its charter, certificate or articles of incorporation, bylaws, articles of organization, limited liability agreement, operating agreement, members agreement, shareholders agreement, partnership agreement, certificate of partnership, certificate of formation, voting trust agreement, or similar agreement or instrument governing the formation or operation of such Person.

OSHA: the Occupational Safety and Hazard Act of 1970.

Other Agreement: each LC Document; Lien Waiver; Related Real Estate Document; Borrowing Base Certificate, Compliance Certificate, financial statement or report delivered hereunder; or other document, instrument or agreement (other than this Agreement or a Security Document) now or hereafter delivered by an Obligor or other Person to Lender in connection with any transactions relating hereto.

Other Taxes: all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made under any Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, any Loan Document.

Overadvance: as defined in **Section 2.1.4.**

Patriot Act: the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. No. 107-56, 115 Stat. 272 (2001).

Payment Item: each check, draft or other item of payment payable to a Borrower, including those constituting proceeds of any Collateral.

PBA: the Pensions Benefits Act (Ontario) or any other Canadian federal, territorial or provincial statute in relation to the Canadian Pension Plans.

PBGC: the Pension Benefit Guaranty Corporation.

Pension Event: solely with respect to Canadian Pension Plans (a) the whole or partial withdrawal of the Canadian Borrower or any Subsidiary of the Canadian Borrower from a Canadian Pension Plan during a plan year; or (b) the filing of a notice of proposal to terminate in whole or in part a Canadian Pension Plan or the treatment of a Canadian Pension Plan amendment as a termination or partial termination; or (c) the issuance of a notice of proposal by any Governmental Authority to terminate in whole or in part or have an administrator or like body appointed to administer a Canadian Pension Plan; or (d) any other event or condition which might constitute grounds for the termination of, winding up or partial termination or winding up or the appointment of trustee to administer, any Canadian Pension Plan.

Pension Plan: any employee pension benefit plan (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or

- 22 -

maintained by any Obligor or ERISA Affiliate or to which the Obligor or ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the preceding five plan years.

Permitted Asset Disposition: (a) an Asset Disposition that is a sale of Inventory in the Ordinary Course of Business and (b) as long as no Default or Event of Default exists and all Net Proceeds are remitted to Lender, an Asset Disposition that is (i) a disposition of Equipment that, in the aggregate during any 12 month period, has a fair market or book value (whichever is more) of $1,000,000 or less; (ii) a disposition of Inventory that is obsolete, unmerchantable or otherwise unsalable in the Ordinary Course of Business; (iii) termination of a lease of real or personal Property that is not necessary for the Ordinary Course of Business, could not reasonably be expected to have a Material Adverse Effect and does not result from an Obligor's default; or (iv) approved in writing by Lender.

Permitted Contingent Obligations: Contingent Obligations (a) arising from endorsements of Payment Items for collection or deposit in the Ordinary Course of Business; (b) arising from Hedging Agreements permitted hereunder; (c) existing on the Closing Date, and any extension or renewal thereof that does not increase the amount of such Contingent Obligation when extended or renewed; (d) incurred in the Ordinary Course of Business with respect to surety, appeal or performance bonds, or other similar obligations; (e) arising from customary indemnification obligations in favor of purchasers in connection with dispositions of Equipment permitted hereunder; (f) arising under the Loan Documents; or (g) in an aggregate amount of $250,000 or less at any time.

Permitted Encumbrances: any Permitted Lien described in **Sections 10.2.2(c), (d), (e), (f), (g), (h) and (i)**; provided that the term "Permitted Encumbrances" shall not include any Lien securing Debt.

Permitted Lien: as defined in **Section 10.2.2**.

Permitted Purchase Money Debt: Purchase Money Debt of Obligors and their Subsidiaries that is unsecured or secured only by a Purchase Money Lien, as long as the aggregate amount does not exceed $2,500,000 at any time and its incurrence does not violate **Section 10.2.3**.

Person: any individual, corporation, limited liability company, partnership, joint venture, joint stock company, land trust, business trust, unincorporated organization, Governmental Authority or other entity.

Plan: any employee benefit plan (as such term is defined in Section 3(3) of ERISA) established by an Obligor or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, an ERISA Affiliate.

Plan of Reorganization: that certain Prepackaged Joint Plan of Reorganization of Latham International, Inc., et al, under Chapter 11 of the Bankruptcy Code filed with the United States Bankruptcy Court for the District of Delaware on December 22, 2009 in the Bankruptcy Cases (together with the disclosure statement with respect thereto) as confirmed pursuant to the Confirmation Order.

Pledge Agreement: that certain Pledge Agreement dated as of the Closing Date between Obligors and Lender, as the same may be amended, restated, supplemented or otherwise modified from time to time.

Pool Corp.: Pool Corporation, a Delaware corporation.

- 23 -

PPSA: the Personal Property Security Act (Ontario) and the regulations thereunder; provided, that, if validity, perfection and effect of perfection and non-perfection of Lender's security interest in any Collateral of the Canadian Borrower are governed by the personal property security laws of any jurisdiction other than Ontario, PPSA shall mean those personal property security laws (including the Civil Code of Québec) in such other jurisdiction for the purposes of the provisions hereof relating to such validity, perfection, and effect of perfection and non-perfection and for the definitions related to such provisions, as from time to time in effect.

Pre-Petition Credit Agreement: that certain Credit Agreement dated as of December 30, 2004, by and among the Pre-Petition Entities, the Canadian Borrower, Wachovia Bank, National Association, as administrative agent, and Wachovia Capital Finance of Canada (formerly named Congress Financial Corporation (Canada)), as Canadian administrative agent, as amended.

Pre-Petition Entities: collectively, (a) Latham International, Inc., a Delaware corporation, (b) Latham Manufacturing Corp., a Delaware corporation, (c) Viking Pools, LLC, a West Virginia limited liability company, (d) Coverstar, LLC, a Delaware limited liability company, and (e) Kafko (U.S.) Corp., a Delaware corporation, in each case, as existing on the date of filing of the Plan of Reorganization.

Prime Rate: the rate of interest announced by Lender from time to time as its prime rate. Such rate is set by Lender on the basis of various factors, including its costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above or below such rate. Any change in such rate announced by Lender shall take effect at the opening of business on the day specified in the public announcement of such change.

Proceeds of Crime Act: the Proceeds of Crime (Money Laundering) and Terrorist Financing Act (Canada) (or any successor statute), as amended from time to time, and includes all regulations thereunder.

Properly Contested: with respect to any obligation of an Obligor, (a) the obligation is subject to a bona fide dispute regarding amount or the Obligor's liability to pay; (b) the obligation is being properly contested in good faith by appropriate proceedings promptly instituted and diligently pursued; (c) appropriate reserves have been established in accordance with GAAP; (d) non-payment could not have a Material Adverse Effect, nor result in forfeiture or sale of any assets of the Obligor; (e) no Lien is imposed on assets of the Obligor, unless bonded and stayed to the satisfaction of Lender; and (f) if the obligation results from entry of a judgment or other order, such judgment or order is stayed pending appeal or other judicial review.

Property: any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible.

Purchase Money Debt: (a) Debt (other than the Obligations) for payment of any of the purchase price of machinery, equipment or other fixed or long term assets; (b) Debt (other than the Obligations) incurred within 10 days before or after acquisition of any machinery, equipment or other fixed or long term assets, for the purpose of financing any of the purchase price thereof; and (c) any renewals, extensions or refinancings (but not increases) thereof.

Purchase Money Lien: a Lien that secures Purchase Money Debt, encumbering only the machinery, equipment or other fixed or long term assets acquired with such Debt and constituting a Capital Lease or a purchase money security interest under the UCC or, with respect to any Purchase Money Debt of the Canadian Borrower, the PPSA.

<u>Quebec Pension Plan</u>: the pension benefit plan maintained by the Province of Quebec.

<u>RCRA</u>: the Resource Conservation and Recovery Act (42 U.S.C. §§ 6991-6991i).

<u>Real Estate</u>: all right, title and interest (whether as owner, lessor or lessee) in any real Property or any buildings, structures, parking areas or other improvements thereon.

<u>Refinancing Conditions</u>: the following conditions for Refinancing Debt: (a) it is in an aggregate principal amount that does not exceed the principal amount of the Debt being extended, renewed or refinanced; (b) it has a final maturity no sooner than, a weighted average life no less than, and an interest rate no greater than (unless such increase in interest is paid-in-kind), the Debt being extended, renewed or refinanced; (c) it is subordinated to the Obligations at least to the same extent as the Debt being extended, renewed or refinanced; (d) the representations, covenants and defaults applicable to it are no less favorable to Borrowers than those applicable to the Debt being extended, renewed or refinanced; (e) no additional Lien is granted to secure it; (f) no additional Person is obligated on such Debt; and (g) upon giving effect to it, no Default or Event of Default exists.

<u>Refinancing Debt</u>: Borrowed Money that is the result of an extension, renewal or refinancing of Debt permitted under **Section 10.2.1(b), (d) or (f)**.

<u>Reimbursement Date</u>: as defined in **Section 2.3.2**.

<u>Related Real Estate Documents</u>: with respect to any Real Estate subject to a Mortgage, the following, in form and substance satisfactory to Lender: (a) a mortgagee title policy (or binder therefor) covering Lender's interest under the Mortgage, in a form and amount and by an insurer acceptable to Lender, which must be fully paid on the date such Mortgage is required to be recorded; (b) such assignments of leases, estoppel letters, attornment agreements, consents, waivers and releases as Lender may require with respect to other Persons having an interest in the Real Estate; (c) a current, as-built survey of the Real Estate, containing a metes-and-bounds property description and flood plain certification, and certified by a licensed surveyor acceptable to Lender; (d) flood insurance in an amount, with endorsements and by an insurer acceptable to Lender, if the Real Estate is within a flood plain; (e) a current appraisal of the Real Estate, prepared by an appraiser, and in form and substance satisfactory to Lender; (f) an environmental assessment, prepared by environmental engineers acceptable to Lender, and accompanied by such reports, certificates, studies or data as Lender may reasonably require, which shall all be in form and substance satisfactory to Lender; (g) an Environmental Agreement and such other documents, instruments or agreements as Lender may reasonably require with respect to any environmental risks regarding the Real Estate; and (h) an opinion of counsel in the state in which such Real Estate is located, in form and substance (and from counsel) reasonably satisfactory to the Lender.

<u>Rent and Charges Reserve</u>: the aggregate of (a) all past due rent and other amounts owing by an Obligor to any landlord, warehouseman, processor, repairman, mechanic, shipper, freight forwarder, broker or other Person who possesses any Collateral or could assert a Lien on any Collateral; and (b) a reserve at least equal to three months rent and other charges that could be payable to any such Person, unless it has executed a Lien Waiver.

<u>Reorganization Transaction Documents</u>: collectively, (a) the Plan of Reorganization, (b) that certain Subscription Agreement dated as of Closing Date between Holdco and Midco, (c) that certain Contribution Agreement dated as of the Closing Date between Midco and Latham, (d) that certain Asset Purchase Agreement dated as of the Closing Date between the Pre-Petition Entities as sellers, and Latham as purchaser, together with all schedules and exhibits thereto, (e) that certain Exchange Agreement dated as of the date hereof among the Pre-Petition Entities, Wachovia Bank, National Association, as

- 25 -

administrative agent under the Pre-Petition Credit Agreement, and [Wachovia Capital Finance of Canada], as Canadian administrative agent under the Pre-Petition Credit Agreement, (e) that certain Release among the Pre-Petition Entities, the Canadian Borrower, Wachovia Bank, National Association, as administrative agent under the Pre-Petition Credit Agreement, and [Wachovia Capital Finance of Canada], as Canadian administrative agent under the Pre-Petition Credit Agreement, and (f) all other documents required to be executed or delivered in connection with, or contemplated by, the Plan of Reorganization, in each case, in form and substance reasonably satisfactory to the Lender.

Reportable Event: any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30 day notice period has been waived.

Reporting Frequency Increase Period: any period (a) commencing on the date that Aggregate Availability falls below $7,500,000 and (b) ending on the date thereafter on which Aggregate Availability shall have exceeded $7,500,000 for a period of 90 consecutive days.

Reserve Percentage: the reserve percentage (expressed as a decimal, rounded up to the nearest 1/8th of 1%) applicable to member banks under regulations issued from time to time by the Board of Governors for determining the maximum reserve requirement (including any emergency, supplemental or other marginal reserve requirement) with respect to Eurocurrency funding (currently referred to as "Eurocurrency liabilities").

Restricted Investment: any Investment by an Obligor or a Subsidiary thereof, other than (a) Investments in Subsidiaries to the extent existing on the Closing Date; (b) Cash Equivalents that are subject to Lender's Lien and control, pursuant to documentation in form and substance satisfactory to Lender; and (c) loans and advances permitted under **Section 10.2.7**.

Restrictive Agreement: an agreement (other than a Loan Document) that conditions or restricts the right of any Borrower, Subsidiary or other Obligor to incur or repay Borrowed Money, to grant Liens on any assets, to declare or make Distributions, to modify, extend or renew any agreement evidencing Borrowed Money, or to repay any intercompany Debt.

Revolver Commitment: Lender's obligation to make Revolver Loans and to issue Letters of Credit in an amount up to $30,000,000 in the aggregate.

Revolver Loan: US Revolver Loan or a Canadian Revolver Loan, as the context requires. The term "Revolver Loans" shall mean US Revolver Loans and Canadian Revolver Loans collectively.

Revolver Termination Date: the earlier of (a) January ___, 2013 or (b) the date that is 90 days prior to the maturity of the Holdco Note.

Royalties: all royalties, fees, expense reimbursement and other amounts payable by Obligor under a License.

S&P: Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and its successors.

Secured Parties: Lender and providers of Bank Products.

Security Documents: the Pledge Agreement, the Canadian Security Agreements, Mortgages, Intellectual Property Security Agreements, Deposit Account Control Agreements, and all other

documents, instruments and agreements now or hereafter securing (or given with the intent to secure) any Obligations.

Senior Officer: the chairman of the board, president, chief executive officer or chief financial officer of a Borrower or, if the context requires, an Obligor.

Solvent: as to any Person, such Person (a) owns Property whose fair salable value (as defined below) is greater than the amount required to pay all of its debts (including contingent, subordinated, unmatured and unliquidated liabilities); (b) owns Property whose present fair salable value is greater than the probable total liabilities (including contingent, subordinated, unmatured and unliquidated liabilities) of such Person as they become absolute and matured; (c) is able to pay all of its debts as they mature; (d) has capital that is not unreasonably small for its business and is sufficient to carry on its business and transactions and all business and transactions in which it is about to engage; (e) is not "insolvent" within the meaning of Section 101(32) of the Bankruptcy Code; (f) is not an "insolvent person" within the meaning of the BIA; (g) is not "insolvent" with the meaning of the CCAA; and (h) has not incurred (by way of assumption or otherwise) any obligations or liabilities (contingent or otherwise) under any Loan Documents, or made any conveyance in connection therewith, with actual intent to hinder, delay or defraud either present or future creditors of such Person or any of its Affiliates. "Fair salable value" means the amount that could be obtained for assets within a reasonable time, either through collection or through sale under ordinary selling conditions by a capable and diligent seller to an interested buyer who is willing (but under no compulsion) to purchase.

Stand-Alone Real Estate Debt: Debt incurred by any US Borrower that is secured solely by Real Estate owned by such US Borrower and improvements thereon; provided that, such Debt is on terms no less favorable to such Borrower than the prevailing market terms for similar Debt as of the date such Debt is incurred.

Subordinated Debt: Debt incurred by an Obligor that is expressly subordinate and junior in right of payment to Full Payment of all Obligations, and is on terms (including maturity, interest, fees, repayment, covenants and subordination) satisfactory to Lender.

Subsidiary: any entity at least 50% of whose voting securities or Equity Interests is owned by an Obligor or any combination of Obligors (including indirect ownership by an Obligor through other entities in which an Obligor directly or indirectly owns 50% of the voting securities or Equity Interests).

Taxes: all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

Type: any type of a Loan (i.e., Base Rate Loan, Canadian Prime Rate Loan, LIBOR Loan or BA Equivalent Loan) that has the same interest option and, in the case of LIBOR Loans, the same Interest Period.

UCC: the Uniform Commercial Code as in effect in the State of New York or, when the laws of any other jurisdiction govern the perfection or enforcement of any Lien, the Uniform Commercial Code of such jurisdiction.

Unfunded Pension Liability: the excess of a Pension Plan's benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of that Pension Plan's assets, determined in accordance with the assumptions used for funding the Pension Plan pursuant to Section 412 of the Code for the

- 27 -

applicable plan year, and includes, with respect to any Canadian Pension Plan, any unfunded liability or solvency deficiency as determined for purposes of the PBA.

Upstream Payment: a Distribution by a Subsidiary of a Borrower to such Borrower. For the avoidance of doubt, any Distribution, loan, payment or other transfer of assets from any Borrower or any Subsidiary of any Borrower to Midco or to Holdco shall not be deemed to constitute an "Upstream Payment" for purposes of this Agreement.

US Availability: at any date of determination (a) the lesser of (i) the Revolver Commitment and (ii) the US Borrowing Base, minus (b) the sum of (i) the US Revolver Exposure and (ii) the Canadian Revolver Exposure Funded on US Borrowing Base.

US Borrowers: as defined in the introductory paragraph to this Agreement.

US Borrowing Base: on any date of determination, with respect to the US Borrowers, an amount equal to:

> (a)     the Accounts Formula Amount for the US Borrowers; plus
>
> (b)     the Inventory Formula Amount for the US Borrowers; minus
>
> (c)     the Availability Reserve established by the Lender with respect to the US Borrowers.

If any amount in this definition is stated in a currency other than Dollars on any date, then such amount on such date shall be equal to the Dollar Equivalent of such amount in such other currency.

US Collateral:    all Property of Midco, the US Borrowers and their domestic Subsidiaries described in **Section 7.1.1**, all other Property of Midco, the US Borrower and their domestic Subsidiaries described in any Security Documents as security for the Obligations, and all other Property that now or hereafter secures (or is intended to secure) the Obligations; provided, however, that at no time shall the term "US Collateral" include any Canadian Collateral or any asset of a controlled foreign corporation as defined in Section 957 of the Code.

US Dominion Account:  a special account established by US Borrowers at Lender or a bank acceptable to Lender, over which Lender has exclusive control for withdrawal purposes.

US Revolver Exposure:  at any date of determination, the sum of (a) the unpaid principal amount of US Revolver Loans outstanding at such time, (b) the LC Reserve at such time, and (c) if applicable, the unpaid principal amount of the Last-Out Term Loan at such time.

US Revolver Loan: means Loans made to the US Borrowers pursuant to **Section 2.1**.

Value: (a) for Inventory, its value determined on the basis of the lower of cost or market, calculated on a first-in, first-out basis, and excluding any portion of cost attributable to intercompany profit among Borrowers and their Affiliates; and (b) for an Account, its face amount, net of any returns, rebates, discounts (calculated on the shortest terms), credits, allowances or Taxes (including sales, excise or other taxes) that have been or could be claimed by the Account Debtor or any other Person.

**1.2     Accounting Terms**.  Under the Loan Documents (except as otherwise specified herein), all accounting terms shall be interpreted, all accounting determinations shall be made, and all financial

- 28 -

statements shall be prepared, in accordance with GAAP applied on a basis consistent with the most recent audited financial statements of Borrowers delivered to Lender before the Closing Date and using the same inventory valuation method as used in such financial statements, except for any change required or permitted by GAAP if Borrowers' certified public accountants concur in such change, the change is disclosed to Lender, and **Section 10.3** is amended in a manner satisfactory to Lender to take into account the effects of the change.

      **1.3**    <u>**Uniform Commercial Code and PPSA**</u>. As used herein, the following terms are defined in accordance with the UCC in effect in the State of New York from time to time (or, with respect to any such property of the Canadian Borrower to which the PPSA is applicable, in accordance with the PPSA): "Chattel Paper," "Commercial Tort Claim," "Deposit Account," "Document,", "Documents of Title", "Equipment," "General Intangibles," "Goods," "Instrument," "Intangibles", "Investment Property," "Letter-of-Credit Right", "Money", "Proceeds" and "Supporting Obligation."

      **1.4**    <u>**Certain Matters of Construction**</u>. The terms "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular section, paragraph or subdivision. Any pronoun used shall be deemed to cover all genders, and the singular shall be deemed to include the plural, and vice versa, as the context may require. In the computation of periods of time from a specified date to a later specified date, "from" means "from and including," and "to" and "until" each mean "to but excluding." The terms "including" and "include" shall mean "including, without limitation" and, for purposes of each Loan Document, the parties agree that the rule of ejusdem generis shall not be applicable to limit any provision. Section titles appear as a matter of convenience only and shall not affect the interpretation of any Loan Document. All references to (a) laws or statutes include all related rules, regulations, interpretations, amendments and successor provisions; (b) any document, instrument or agreement include any amendments, waivers and other modifications, extensions or renewals (to the extent permitted by the Loan Documents); (c) any section means, unless the context otherwise requires, a section of this Agreement; (d) any exhibits or schedules mean, unless the context otherwise requires, exhibits and schedules attached hereto, which are hereby incorporated by reference; (e) any Person include successors and assigns; (f) time of day mean time of day at Lender's notice address under **Section 13.3.1**; or (g) discretion of Lender mean its sole and absolute discretion, except as expressly qualified herein. All calculations of Value, fundings of Loans, issuances of Letters of Credit and payments of Obligations shall be in Dollars and, unless the context otherwise requires, all determinations (including calculations of Borrowing Base and financial covenants) made from time to time under the Loan Documents shall be made in light of the circumstances existing at such time. Borrowing Base calculations shall be consistent with historical methods of valuation and calculation, and otherwise satisfactory to Lender (and not necessarily calculated in accordance with GAAP). Borrowers shall have the burden of establishing any alleged negligence, misconduct or lack of good faith by Lender under any Loan Documents. No provision of any Loan Documents shall be construed against any party by reason of such party having, or being deemed to have, drafted the provision. Whenever the phrase "to the best of Borrowers' knowledge" or words of similar import are used in any Loan Documents, it means actual knowledge of a Senior Officer, or knowledge that a Senior Officer would have obtained if he or she had engaged in good faith and diligent performance of his or her duties, including reasonably specific inquiries of employees or agents and a good faith attempt to ascertain the matter to which such phrase relates.

## SECTION 2.   CREDIT FACILITIES

      **2.1**    <u>**US Revolver Loans.**</u>

      2.1.1   <u>Commitment to Fund US Revolver Loans</u>. Subject to the terms and conditions of this Agreement, Lender agrees to make US Revolver Loans to the US Borrowers from time to time

through the Commitment Termination Date in an aggregate principal amount not to cause the US Revolver Exposure to exceed the US Availability at such time. In no event shall Lender have any obligation to honor a request for a US Revolver Loan if the unpaid balance of US Revolver Loans outstanding at such time (including the requested US Revolver Loan) would cause either (a) the US Revolver Exposure to exceed the US Availability at such time or (b) the Aggregate Revolver Exposure to exceed the Aggregate Availability at such time.

2.1.2 <u>Use of Proceeds</u>. The proceeds of US Revolver Loans shall be used by the US Borrowers solely (a) to satisfy existing Debt; (b) to pay fees and transaction expenses associated with the closing of this credit facility; (c) to pay Obligations in accordance with this Agreement; (d) for working capital and other lawful corporate purposes of the Borrowers; and (e) all fees and expenses incurred in connection with or related to the preparation, filing or implementation of the Plan of Reorganization.

2.1.3 <u>Voluntary Reduction or Termination of Revolver Commitment</u>.

(a) The Revolver Commitment shall terminate on the Revolver Termination Date, unless sooner terminated in accordance with this Agreement. Upon at least 90 days prior written notice to Lender at any time, Borrowers may, at their option, terminate the Revolver Commitment and this credit facility. Any notice of termination given by Borrowers shall be irrevocable. On the termination date, Borrowers shall make Full Payment of all Obligations.

(b) Borrowers may permanently reduce the Revolver Commitment upon at least 90 days prior written notice to Lender delivered at any time after the First Loan Year, which notice shall specify the amount of the reduction and shall be irrevocable once given. Each reduction shall be in a minimum amount of $5,000,000, or an increment of $1,000,000 in excess thereof.

2.1.4 <u>Overadvances</u>. If (a) the US Revolver Exposure exceeds the US Availability or (b) the Aggregate Exposure exceeds the Aggregate Availability (each, an "<u>Overadvance</u>"), at any time, the excess amount shall be payable by the US Borrowers **on demand** by Lender, but such excess shall nevertheless constitute Obligations secured by the US Collateral and entitled to all benefits of the Loan Documents. Any funding or sufferance of an Overadvance shall not constitute a waiver of the Event of Default caused thereby. Each Overadvance shall be a Base Rate Loan and shall bear interest at the Default Rate.

**2.2    Canadian Revolver Loans**.

2.2.1 <u>Commitment to Fund Canadian Revolver Loans</u>. Subject to the terms and conditions of this Agreement, Lender agrees to make Canadian Revolver Loans to the Canadian Borrower from time to time through the Commitment Termination Date in an aggregate principal amount not to cause the Canadian Revolver Exposure to exceed the Canadian Availability at such time. In no event shall Lender have any obligation to honor a request for a Canadian Revolver Loan if the unpaid balance of Canadian Revolver Loans outstanding at such time (including the requested Canadian Revolver Loan) would cause either (a) the Canadian Revolver Exposure to exceed the Canadian Availability at such time or (b) the Aggregate Revolver Exposure to exceed the Aggregate Availability at such time.

2.2.2 <u>Use of Proceeds</u>. The proceeds of Canadian Revolver Loans shall be used by the Canadian Borrower solely (a) to satisfy existing Debt; (b) to pay fees and transaction expenses associated with the closing of this credit facility; (c) to pay Canadian Obligations in accordance with this Agreement; and (d) for working capital and other lawful corporate purposes of the Canadian Borrower.

2.2.3 <u>Voluntary Reduction or Termination of Canadian Subfacility</u>.

- 30 -

(a)     The obligation of Lender to fund Canadian Revolver Loans shall terminate on the Revolver Termination Date, unless sooner terminated in accordance with this Agreement. Upon at least 90 days prior written notice to Lender at any time, Canadian Borrower may, at its option, terminate Lender's obligation to fund Canadian Revolver Loans. Any notice of termination of Lender's obligation to fund Canadian Revolver Loans given by the Canadian Borrower shall be irrevocable. On the date Lender's obligation to fund Canadian Revolver Loans is terminated, the Canadian Borrower shall make Full Payment of all Canadian Obligations.

(b)     The Canadian Borrower may permanently reduce the Canadian Sublimit upon at least 30 days prior written notice to Lender delivered at any time, which notice shall specify the amount of the reduction and shall be irrevocable once given. Each reduction shall be in a minimum amount of $1,000,000, or an increment of $500,000 in excess thereof.

2.2.4    Canadian Overadvances.    If the Canadian Revolver Exposure exceeds the Canadian Availability (a "Canadian Overadvance") at any time, the excess amount shall be payable by the Canadian Borrower **on demand** by Lender, but such excess shall nevertheless constitute part of the Canadian Obligations secured by the Collateral and entitled to all benefits of the Loan Documents. Any funding or sufferance of a Canadian Overadvance shall not constitute a waiver of the Event of Default caused thereby. Each Canadian Overadvance shall be a Canadian Prime Rate Loan and shall bear interest at the Default Rate.

**2.3     Letter of Credit Facility.**

2.3.1    Issuance of Letters of Credit.    Lender agrees to issue Letters of Credit for the accounts of the US Borrowers from time to time until 30 days prior to the Revolver Termination Date (or until the Commitment Termination Date, if earlier), on the terms set forth herein, including the following:

(a)     Each US Borrower acknowledges that Lender's willingness to issue any Letter of Credit is conditioned upon its receipt of a LC Application with respect to the requested Letter of Credit, as well as such other instruments and agreements as Lender may customarily require for issuance of a letter of credit of similar type and amount. Lender shall have no obligation to issue any Letter of Credit unless (i) it receives a LC Request and LC Application at least three Business Days prior to the requested date of issuance; and (ii) each LC Condition is satisfied.

(b)     Letters of Credit may be requested by a US Borrower only (i) to support obligations of such US Borrower or its Subsidiaries incurred in the Ordinary Course of Business; or (ii) for other purposes as Lender may approve from time to time in writing. The renewal or extension of any Letter of Credit shall be treated as the issuance of a new Letter of Credit, except that delivery of a new LC Application shall be required at the discretion of Lender. Borrower Agent may request that a Letter of Credit be issued to secure an obligation of the Canadian Borrower but such Letter of Credit shall nonetheless be a Non-Canadian Obligation and not an obligation of the Canadian Borrower.

(c)     US Borrowers assume all risks of the acts, omissions or misuses of any Letter of Credit by the beneficiary. In connection with issuance of any Letter of Credit, Lender shall not be responsible for the existence, character, quality, quantity, condition, packing, value or delivery of any goods purported to be represented by any Documents; any differences or variation in the character, quality, quantity, condition, packing, value or delivery of any goods from that expressed in any Documents; the form, validity, sufficiency, accuracy, genuineness or legal effect of any Documents or of any endorsements thereon; the time, place, manner or order in which shipment of goods is made; partial or incomplete shipment of, or failure to ship, any goods referred to in a Letter of Credit or Documents; any deviation from instructions, delay, default or fraud by any shipper or other Person in connection with

- 31 -

any goods, shipment or delivery; any breach of contract between a shipper or vendor and a Borrower; errors, omissions, interruptions or delays in transmission or delivery of any messages, by mail, cable, telegraph, telex, telecopy, e-mail, telephone or otherwise; errors in interpretation of technical terms; the misapplication by a beneficiary of any Letter of Credit or the proceeds thereof; or any consequences arising from causes beyond the control of Lender, including any act or omission of a Governmental Authority. Lender shall be fully subrogated to the rights and remedies of each beneficiary whose claims against Borrowers are discharged with proceeds of any Letter of Credit.

(d) In connection with its administration of and enforcement of rights or remedies under any Letters of Credit or LC Documents, Lender shall be entitled to act, and shall be fully protected in acting, upon any certification, documentation or communication in whatever form believed by Lender, in good faith, to be genuine and correct and to have been signed, sent or made by a proper Person. Lender may consult with and employ legal counsel, accountants and other experts to advise it concerning its obligations, rights and remedies, and shall be entitled to act upon, and shall be fully protected in any action taken in good faith reliance upon, any advice given by such experts. Lender may employ agents and attorneys-in-fact in connection with any matter relating to Letters of Credit or LC Documents, and shall not be liable for the negligence or misconduct of agents and attorneys-in-fact selected with reasonable care.

2.3.2 <u>Reimbursement</u>. If Lender honors any request for payment under a Letter of Credit, US Borrowers shall pay to Lender, on the same day ("<u>Reimbursement Date</u>"), the amount paid under such Letter of Credit, together with interest at the interest rate for Base Rate Revolver Loans from the Reimbursement Date until payment by the US Borrowers. The obligation of the US Borrowers to reimburse Lender for any payment made under a Letter of Credit shall be absolute, unconditional, irrevocable, and joint and several, and shall be paid without regard to any lack of validity or enforceability of any Letter of Credit or the existence of any claim, setoff, defense or other right that Borrowers may have at any time against the beneficiary. Whether or not Borrower Agent submits a Notice of Borrowing, US Borrowers shall be deemed to have requested a Borrowing of Base Rate Revolver Loans in an amount necessary to pay all amounts due on any Reimbursement Date.

2.3.3 <u>Cash Collateral</u>. If any LC Obligations, whether or not then due or payable, shall for any reason be outstanding at any time (a) that an Event of Default exists, (b) that Aggregate Availability is less than zero, (c) that US Availability is less than zero, (d) after the Commitment Termination Date, or (e) within 20 Business Days prior to the Revolver Termination Date, then US Borrowers shall, at Lender's request, Cash Collateralize the stated amount of all outstanding Letters of Credit and pay to Lender the amount of all other LC Obligations. If US Borrowers fail to provide Cash Collateral as required herein, Lender may advance, as US Revolver Loans, the amount of the Cash Collateral required.

## 2.4 <u>Last-Out Term Loan</u>.

2.4.1 At any time following the occurrence and during the continuance of an Event of Default, Lender shall have the right, at its discretion, by delivering written notice to Borrower Agent (a "<u>Term Loan Conversion Notice</u>") to immediately and permanently convert a portion of the principal amount of US Revolver Loans then outstanding not in excess of $3,500,000 into a term loan (the "<u>Last-Out Term Loan</u>"). If Lender exercises its right under this Section 2.4, the principal amount of US Revolver Loans specified in such Term Loan Conversion Notice (which principal amount shall not exceed $3,500,000), shall be automatically and permanently converted into the Last-Out Term Loan. The Last-Out Term Loan shall bear interest at the Base Rate plus the Applicable Margin for Base Rate Loans (or, at Lender's election, at any time that a Default or Event of Default shall have occurred and be continuing, at the Default Rate as provided in Section 3.1.1(b)), which interest shall be due and payable in

- 32 -

cash, monthly in arrears, as provided in Section 3.1.1(c). The entire principal balance of the Last-Out Term Loan shall be due and payable in full on the Commitment Termination Date. Unless otherwise agreed by Lender in writing, no voluntary payments of the principal amount of the Last-Out Term Loan shall be permitted prior to the repayment in full of the US Revolver Loans and the Cash Collateralization of all outstanding Letters of Credit. The Last-Out Term Loan shall constitute part of the Obligations and shall be secured by all US Collateral. Notwithstanding anything to the contrary set forth herein, the proceeds of any US Collateral (other than the NY Owned Real Property) shall be applied, first, to repay the US Revolver Loans in full, second to Cash Collateralize outstanding Letters of Credit, and third, to repay the Last-Out Term Loan.

2.4.2 The US Borrowers' Obligations in respect of the Last-Out Term Loan shall also be secured by a Mortgage on the NY Owned Real Property (the "NY Mortgage"). Within 45 days after the Closing Date, Borrowers shall execute and deliver to Lender the NY Mortgage to be held by Lender in escrow. If Lender shall at any time exercise its right under this Section 2.4 to convert a portion of the US Revolver Loans into the Last-Out Term Loan, at any time following the delivery of the Term Loan Conversion Notice, Lender shall have the right to release the NY Mortgage from escrow and to record the NY Mortgage with the applicable Real Estate recording office. In connection with the delivery of the Term Loan Conversion Notice, US Borrowers: (x) shall cause to be delivered to Lender, within 45 days of the date that the Term Loan Conversion Notice is delivered, all Related Real Estate Documents with respect to the NY Owned Real Property (other than the environmental assessment described in clause (f) of the definition of "Related Real Estate Documents" with respect to the NY Owned Real Property, which environmental assessment shall be required to be delivered to lender within 90 days of the date that the Term Loan Conversion Notice is delivered); and (y) shall pay, or shall reimburse Lender for the payment of, all fees, costs and expenses related to the recording of the NY Mortgage (including payment of the applicable New York mortgage recording tax), and the delivery of all Related Real Estate Documents with respect to the NY Owned Real Property.

**SECTION 3. INTEREST, FEES AND CHARGES**

**3.1 Interest.**

3.1.1 Rates and Payment of Interest.

(a) All US Revolving Loans shall bear interest on the unpaid principal amount thereof (i) if a Base Rate Loan, at the Base Rate in effect from time to time, plus the Applicable Margin and (ii) if a LIBOR Loan, at LIBOR for the applicable Interest Period, plus the Applicable Margin. All other Non-Canadian Obligations (including, to the extent permitted by law, interest not paid when due),shall bear interest at the Base Rate in effect from time to time, plus the Applicable Margin for Base Rate Loans. All Canadian Revolving Loans shall bear interest on the unpaid principal amount thereof (including, to the extent permitted by law, on interest thereon not paid when due) (i) if a Canadian Prime Rate Loan, at the Canadian Prime Rate in effect from time to time, plus the Applicable Margin and (ii) if a BA Equivalent Loan, at the BA Rate for the BA Equivalent Interest Period, plus the Applicable Margin. All other Canadian Obligations (including, to the extent permitted by law, interest not paid when due), shall bear interest at the Canadian Prime Rate in effect from time to time, plus the Applicable Margin for Canadian Prime Rate Loans. Interest shall accrue from the date each Loan is advanced or each Obligation is incurred or payable, until paid by Borrowers. If a Loan is repaid on the same day made, one day's interest shall accrue.

(b) During an Insolvency Proceeding with respect to any Borrower, or during any other Event of Default if Lender in its discretion so elects, to the fullest extent permitted by Applicable Law, all Obligations shall bear interest at the Default Rate (whether before or after any judgment). Each

- 33 -

Borrower acknowledges that the cost and expense to Lender due to an Event of Default are difficult to ascertain and that the Default Rate is a fair and reasonable estimate to compensate Lender for this.

(c)     Interest accrued on the Loans shall be due and payable in arrears, (i) on the first day of each month; (ii) on any date of prepayment, with respect to the principal amount of Loans being prepaid; and (iii) on the Commitment Termination Date. Interest accrued on any other Obligations shall be due and payable as provided in the Loan Documents and, if no payment date is specified, shall be due and payable **on demand**. Notwithstanding the foregoing, interest accrued at the Default Rate shall be due and payable **on demand.**

(d)     In the event that any financial statement or certificate delivered pursuant to **Section 10.1.2** is shown to be inaccurate and such inaccuracy, if corrected, would have led to the application of a higher Applicable Margin for a Fiscal Quarter (an "<u>Applicable Period</u>") than the Applicable Margin applied for such Applicable Period, then (i) the Borrowers shall immediately deliver to the Agent a correct certificate for such Applicable Period, (ii) the Applicable Margin shall be determined based on the corrected financial statements for such Applicable Period, and (iii) the Borrowers shall immediately pay to the Lender the accrued additional interest or fees owing as a result of such increased Applicable Margin for such Applicable Period. This provision shall not limit the rights of the Lender with respect to any other remedy hereunder. This provision shall survive payment of all other Obligations and termination of this Agreement.

3.1.2     <u>Application of LIBOR to Outstanding Loans.</u>

(a)     US Borrowers may on any Business Day, subject to delivery of a Notice of Conversion/Continuation, elect to convert any portion of the Base Rate Loans to, or to continue any LIBOR Loan at the end of its Interest Period as, a LIBOR Loan. The Canadian Borrower may on any Business Day, subject to delivery of a Notice of Conversion/Continuation, elect to covert any portion of Canadian Prime Rate Loans to, or to continue any BA Equivalent Loan at the end of its BA Equivalent Interest Period, as a BA Equivalent Loan. During any Default or Event of Default, Lender may declare that no Loan may be made, converted or continued as a LIBOR Loan or as a BA Equivalent Loan.

(b)     Whenever US Borrowers desire to convert or continue Loans as LIBOR Loans, Borrower Agent shall give Lender a Notice of Conversion/Continuation, no later than 11:00 a.m. at least three Business Days before the requested conversion or continuation date. Whenever the Canadian Borrower desires to convert or continue Loans as BA Equivalent Loans, the Canadian Borrower shall give Lender a Notice of Conversion/Continuation, no later than 11:00 a.m. at least three Business Days before the requested conversion or continuation date. Each Notice of Conversion/Continuation shall be irrevocable, and shall specify the amount of Loans to be converted or continued, the conversion or continuation date (which shall be a Business Day), and the duration of the Interest Period or BA Equivalent Interest Period, as applicable (which, in each case, shall be deemed to be 30 days if not specified). If, upon the expiration of any Interest Period in respect of any LIBOR Loans, US Borrowers shall have failed to deliver a Notice of Conversion/Continuation, they shall be deemed to have elected to convert such Loans into Base Rate Loans. If, upon the expiration of any BA Equivalent Interest Period in respect of any BA Equivalent Loans, the Canadian Borrowers shall have failed to deliver a Notice of Conversion/Continuation, the Canadian Borrower shall be deemed to have elected to convert such Loans into Canadian Prime Rate Loans.

3.1.3     <u>Interest Periods for LIBOR Loans</u>. In connection with the making, conversion or continuation of any LIBOR Loans, Borrowers shall select an interest period ("<u>Interest Period</u>") to apply, which interest period shall be 30, 60, 90 or 180 days; <u>provided</u>, <u>however</u>, that:

(a)     the Interest Period shall commence on the date the Loan is made or continued as, or converted into, a LIBOR Loan, and shall expire on the numerically corresponding day in the calendar month at its end;

(b)     if any Interest Period commences on a day for which there is no corresponding day in the calendar month at its end or if such corresponding day falls after the last Business Day of such month, then the Interest Period shall expire on the last Business Day of such month; and if any Interest Period would expire on a day that is not a Business Day, the period shall expire on the next Business Day; and

(c)     no Interest Period shall extend beyond the Revolver Termination Date.

3.1.4     BA Equivalent Interest Periods for BA Equivalent Loans.  In connection with the making, conversion or continuation of any BA Equivalent Loan, the Canadian Borrower shall select an interest period (a "BA Equivalent Interest Period") to apply, which BA Equivalent Interest Period shall be 30, 60, 90 or 180 days; provided, however, that:

(a)     the BA Equivalent Interest Period shall commence on the date the Loan is made or continued as, or converted into, a BA Equivalent Loan, and shall expire on the numerically corresponding day in the calendar month at its end;

(b)     if any BA Equivalent Interest Period commences on a day for which there is no corresponding day in the calendar month at its end or if such corresponding day falls after the last Business Day of such month, then the BA Equivalent Interest Period shall expire on the last Business Day of such month; and if any BA Equivalent Interest Period would expire on a day that is not a Business Day, the period shall expire on the next Business Day; and

(c)     no BA Equivalent Interest Period shall extend beyond the Revolver Termination Date.

**3.2     Fees.**

3.2.1     Unused Line Fee.  US Borrowers shall pay to Lender a fee equal to one half of one percent (0.50%) per annum times the amount by which the Revolver Commitment exceeds the average daily balance of the Aggregate Revolver Exposure during any month.  Such fee shall be payable in arrears, on the first day of each month and on the Commitment Termination Date.

3.2.2     LC Facility Fees.  US Borrowers shall pay to Lender (a) a fee equal to the Applicable Margin in effect for LIBOR Revolver Loans multiplied by the average daily stated amount of Letters of Credit, which fee shall be payable monthly in arrears, on the first day of each month; (b) a fronting fee equal to one-eighth of one percent (0.125%) per annum on the stated amount of each Letter of Credit, which fee shall be payable monthly in arrears, on the first day of each month; and (c) all customary charges associated with the issuance, amending, negotiating, payment, processing, transfer and administration of Letters of Credit, which charges shall be paid as and when incurred.  During an Event of Default, the fee payable under clause (a) shall be increased by two percent (2.0%) per annum.

3.2.3     Closing Fee.  US Borrowers shall pay to Lender a closing fee in an amount equal to 0.75% of the Revolver Commitment in effect as of the Closing Date, which fee shall be paid in full on the Closing Date.

3.2.4 <u>Annual Administration Fee</u>. US Borrowers shall pay to Lender an annual administrative fee of $40,000, payable annually in advance (a) on the Closing Date and (b) on each anniversary of the Closing Date.

**3.3** **Computation of Interest, Fees, Yield Protection**.

3.3.1 All interest, as well as fees and other charges calculated on a per annum basis, shall be computed for the actual days elapsed, based on a year of 360 days, except that interest computed by reference to the Canadian Prime Rate and the BA Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day). Each determination by Lender of any interest, fees or interest rate hereunder shall be final, conclusive and binding for all purposes, absent manifest error. All fees shall be fully earned when due and shall not be subject to rebate, refund or proration. All fees payable under **Section 3.2** are compensation for services and are not, and shall not be deemed to be, interest or any other charge for the use, forbearance or detention of money. A certificate as to amounts payable by Borrowers under **Sections 3.4, 3.5, 3.7, 3.9 or 5.8**, submitted to Borrower Agent by Lender shall be final, conclusive and binding for all purposes, absent manifest error, and Borrowers shall pay such amounts to the appropriate party within 10 days following receipt of the certificate.

3.3.2 For purposes of disclosure pursuant to the Interest Act (Canada), the annual rates of interest or fees to which the rates of interest or fees provided in this Agreement and the other Loan Documents (and stated herein or therein, as applicable, to be computed on the basis of 360 days or any other period of time less than a calendar year) are equivalent are the rates so determined multiplied by the actual number of days in the applicable calendar year and divided by 360 or such other period of time, respectively.

3.3.3 If any provision of this Agreement or of any of the other Loan Documents would obligate any Obligor to make any payment of interest or other amount payable to the Lender in an amount or calculated at a rate which would be prohibited by law or would result in a receipt by the Lender of interest at a criminal rate (as such terms are construed under the Criminal Code (Canada)) then, notwithstanding such provisions, such amount or rate shall be deemed to have been adjusted with retroactive effect to the maximum amount or rate of interest, as the case may be, as would not be so prohibited by law or so result in a receipt by the Lender of interest at a criminal rate, such adjustment to be effected, to the extent necessary, as follows: (1) firstly, by reducing the amount or rate of interest required to be paid to the Lender hereunder, and (2) thereafter, by reducing any fees, commissions, premiums and other amounts required to be paid to the Lender which would constitute "interest" for purposes of Section 347 of the *Criminal Code* (Canada). Notwithstanding the foregoing, and after giving effect to all adjustments contemplated thereby, if the Lender shall have received an amount in excess of the maximum permitted by that section of the *Criminal Code* (Canada), the Obligors shall be entitled, by notice in writing to the Lender, to obtain reimbursement from the Lender in an amount equal to such excess and, pending such reimbursement, such amount shall be deemed to be an amount payable by the Lender to the Borrowers. Any amount or rate of interest referred to herein shall be determined in accordance with GAAP as an effective annual rate of interest over the term that the applicable Loan remains outstanding on the assumption that any charges, fees or expenses that fall within the meaning of "interest" (as defined in the *Criminal Code* (Canada)) shall, if they relate to a specific period of time, be pro-rated over that period of time and otherwise be pro-rated over the period from the date of this Agreement to the Commitment Termination Date and, in the event of a dispute, a certificate of a Fellow of the Canadian Institute of Actuaries appointed by the Lender shall be conclusive for the purposes of such determination.

- 36 -

**3.4** **Reimbursement Obligations**. US Borrowers shall reimburse Lender for all Extraordinary Expenses. US Borrowers shall also reimburse Lender for all legal, accounting, appraisal, consulting, and other fees, costs and expenses incurred by Lender in connection with (a) negotiation and preparation of any Loan Documents, including any amendment or other modification thereof; (b) administration of and actions relating to any Collateral, Loan Documents and transactions contemplated thereby, including any actions taken to perfect or maintain priority of Lender's Liens on any Collateral, to maintain any insurance required hereunder or to verify Collateral; and (c) subject to the limits of **Section 10.1.1(b)**, each inspection, audit or appraisal with respect to any Obligor or Collateral, whether prepared by Lender's personnel or a third party. All legal, accounting and consulting fees shall be charged to Borrowers by Lender's professionals at their full hourly rates, regardless of any reduced or alternative fee billing arrangements that Lender or any of its Affiliates may have with such professionals with respect to this or any other transaction. All amounts payable by US Borrowers under this Section shall be due **on demand**.

**3.5** **Illegality**. If Lender determines that any Applicable Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for Lender to make, maintain or fund LIBOR Loans or BA Equivalent Loans, or to determine or charge interest rates based upon LIBOR or the BA Rate, or any Governmental Authority has imposed material restrictions on the authority of Lender to purchase or sell, or to take deposits of, Dollars in the London interbank market or to purchase or sell Bankers' Acceptances, then, on notice thereof by Lender to Borrower Agent, any obligation of Lender (a) to make or continue LIBOR Loans or to convert Base Rate Loans to LIBOR Loans or (b) to make or continue BA Equivalent Loans or to convert Canadian Prime Rate Loans to BA Equivalent Loans shall be suspended until Lender notifies Borrower Agent that the circumstances giving rise to such determination no longer exist. Upon delivery of such notice, Borrowers shall prepay or, if applicable, convert all LIBOR Loans to Base Rate Loans, and all BA Equivalent Loans to Canadian Prime Rate Loans either on the last day of the Interest Period or BA Equivalent Interest Period, as applicable, therefor, if Lender may lawfully continue to maintain LIBOR Loans or BA Equivalent Loans, as applicable, on such day, or immediately, if Lender may not lawfully continue to maintain LIBOR Loan or BA Equivalent Loans, as applicable. Upon any such prepayment or conversion, Borrowers shall also pay accrued interest on the amount so prepaid or converted.

**3.6** **Inability to Determine Rates**. If Lender notifies Borrower Agent for any reason in connection with a request for a Borrowing of, conversion to or continuation of, a LIBOR Loan or a BA Equivalent Loan that (a) Dollar deposits are not being offered to banks in the London interbank Eurodollar market for the applicable amount and Interest Period of such Loan, (b) adequate and reasonable means do not exist for determining LIBOR for the requested Interest Period or for determining the BA Rate for the requested BA Equivalent Interest Period, or (c) LIBOR for the requested Interest Period or the BA Rate for the requested BA Equivalent Interest Period does not adequately and fairly reflect the cost to Lender of funding such Loan, then the obligation of Lender to make or maintain LIBOR Loans or BA Equivalent Loans, as applicable, shall be suspended until Lender revokes the notice. Upon receipt of the notice, Borrower Agent may revoke any pending request for a Borrowing of, conversion to or continuation of a LIBOR Loan or a BA Equivalent Loan, or, failing that, will be deemed to have submitted a request for a Base Rate Loan (or, in the case of Canadian Revolver Loans, a Canadian Prime Rate Loan).

**3.7** **Increased Costs; Capital Adequacy.**

3.7.1    Change in Law. If any Change in Law shall:

(a)      impose modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit

- 37 -

extended or participated in by, Lender (except any reserve requirement reflected in LIBOR or the BA Rate, as applicable);

(b)     subject Lender to any Tax with respect to any Loan, Loan Document or Letter of Credit, or change the basis of taxation of payments to Lender in respect thereof (except for Indemnified Taxes or Other Taxes covered by **Section 5.7** and the imposition of, or any change in the rate of, any Excluded Tax payable by Lender); or

(c)     impose on Lender or the London interbank market or the market for Bankers' Acceptances any other condition, cost or expense affecting any Loan, Loan Document or Letter of Credit;

and the result thereof shall be to increase the cost to Lender of making or maintaining any LIBOR Loan or BA Equivalent Loan (or of maintaining its obligation to make any such Loan), or to increase the cost to Lender of issuing or maintaining any Letter of Credit (or of maintaining its obligation to issue any Letter of Credit), or to reduce the amount of any sum received or receivable by Lender hereunder (whether of principal, interest or any other amount) then, upon request by Lender, Borrowers will pay to Lender such additional amount or amounts as will compensate Lender for such additional costs incurred or reduction suffered.

3.7.2     Capital Adequacy.  If Lender determines that any Change in Law affecting Lender or its holding company regarding capital requirements has or would have the effect of reducing the rate of return on Lender's or such holding company's capital as a consequence of this Agreement, the Revolver Commitment, Loans or Letters of Credit to a level below that which Lender or such holding company could have achieved but for such Change in Law (taking into consideration Lender's and such holding company's policies with respect to capital adequacy), then from time to time Borrowers will pay to Lender such additional amount or amounts as will compensate it or its holding company for any such reduction suffered.

3.7.3     Compensation.  Failure or delay on the part of Lender to demand compensation pursuant to this Section shall not constitute a waiver of its right to demand such compensation, but Borrowers shall not be required to compensate Lender for any increased costs incurred or reductions suffered more than nine months prior to the date that Lender notifies Borrower Agent of the Change in Law giving rise to such increased costs or reductions and of Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).  As promptly as practical after the Lender obtains knowledge of the facts that entitle Lender to compensation under this Section 3.7, Lender shall provide Borrower with a certificate which identifies the factual basis for Lender's claim, the amount or amounts that Lender has reasonably determined will compensate Lender for such claim, and the manner in which such amount or amounts have been calculated.

**3.8     Mitigation**.  If Lender gives a notice under **Section 3.5** or requests compensation under **Section 3.7**, or if Borrowers are required to pay additional amounts under **Section 5.8**, then Lender shall use reasonable efforts to designate a different lending office or to assign its rights and obligations hereunder to another of its offices, branches or Affiliates, if, in the judgment of Lender, such designation or assignment (a) would eliminate the need for such notice or reduce amounts payable or to be withheld in the future, as applicable; and (b) would not subject Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to it.  Borrowers shall pay all reasonable costs and expenses incurred by Lender in connection with any such designation or assignment.

- 38 -

**3.9     Funding Losses**.  If for any reason (a) any Borrowing of, or conversion to or continuation of, a LIBOR Loan or BA Equivalent Loan does not occur on the date specified therefor in a Notice of Borrowing or Notice of Conversion/Continuation (whether or not withdrawn), (b) any repayment or conversion of a LIBOR Loan or BA Equivalent Loan occurs on a day other than the end of its Interest Period or BA Equivalent Interest Period, as applicable, or (c) US Borrowers fail to repay a LIBOR Loan or the Canadian Borrower fails to repay a BA Equivalent Loan when required hereunder, then US Borrowers or the Canadian Borrower, as applicable, shall pay to Lender all losses and expenses that it sustains as a consequence thereof, including loss of anticipated profits and any loss or expense arising from liquidation or redeployment of funds or from fees payable to terminate deposits of matching funds.  Lender shall not be required to purchase Dollar deposits in the London interbank market or any other offshore Dollar market to fund any LIBOR Loan or to purchase any Bankers' Acceptances to fund any BA Equivalent Loan, but the provisions hereof shall be deemed to apply as if Lender had purchased such deposits to fund its LIBOR Loans or purchased such Bankers' Acceptances to fund its BA Equivalent Loans.

**3.10     Maximum Interest**.  Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by Applicable Law ("<u>maximum rate</u>").  If Lender shall receive interest in an amount that exceeds the maximum rate, the excess interest shall be applied to the principal of the Obligations or, if it exceeds such unpaid principal, refunded to Borrowers.  In determining whether the interest contracted for, charged or received by Lender exceeds the maximum rate, Lender may, to the extent permitted by Applicable Law, (a) characterize any payment that is not principal as an expense, fee or premium rather than interest; (b) exclude voluntary prepayments and the effects thereof; and (c) amortize, prorate, allocate and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

## SECTION 4.    LOAN ADMINISTRATION

**4.1     Manner of Borrowing and Funding Revolver Loans**.

4.1.1    <u>Notice of US Borrowing</u>.

(a)     Whenever US Borrowers desire funding of a Borrowing of US Revolver Loans, Borrower Agent shall give Lender a Notice of Borrowing.  Such notice must be received by Lender no later than 11:00 a.m. (i) on the Business Day of the requested funding date, in the case of Base Rate Loans, and (ii) at least three Business Days prior to the requested funding date, in the case of LIBOR Loans.  Notices received after 11:00 a.m. shall be deemed received on the next Business Day.  Each Notice of Borrowing shall be irrevocable and shall specify (A) the amount of the Borrowing, (B) the requested funding date (which must be a Business Day), (C) whether the Borrowing is to be made as a Base Rate Loan or a LIBOR Loan, and (D) in the case of LIBOR Loans, the duration of the applicable Interest Period (which shall be deemed to be 30 days if not specified).

(b)     Unless payment is otherwise timely made by US Borrowers, the becoming due of any Non-Canadian Obligations (whether principal, interest, fees or other charges, including Extraordinary Expenses, LC Obligations, Cash Collateral and Bank Product Debt) shall be deemed to be a request for Base Rate Revolver Loans on the due date, in the amount of such Non-Canadian Obligations.  The proceeds of such Base Rate Revolver Loans shall be disbursed as direct payment of the relevant Non-Canadian Obligation.  In addition, Lender may, at its option, charge such Obligations against any operating, investment or other account of a US Borrower maintained with Lender or any of its Affiliates.

- 39 -

(c)     If US Borrowers establish a controlled disbursement account with Lender or any of its Affiliates, then the presentation for payment of any check or other item of payment drawn on such account at a time when there are insufficient funds to cover it shall be deemed to be a request for Base Rate Revolver Loans on the date of such presentation, in the amount of the check and items presented for payment. The proceeds of such Base Rate Revolver Loans may be disbursed directly to the controlled disbursement account or other appropriate account.

4.1.2     <u>Funding of US Revolver Loans</u>.  Lender shall fund each Borrowing of US Revolver Loans on the applicable funding date and, subject to the terms of this Agreement, shall disburse the proceeds as directed by Borrower Agent.

4.1.3     <u>Notices Regarding US Revolver Loans</u>.  Each US Borrower authorizes Lender to extend, convert or continue US Revolver Loans, effect selections of interest rates, and transfer funds to or on behalf of US Borrowers based on telephonic or e-mailed instructions. US Borrowers shall confirm each such request by prompt delivery to Lender of a Notice of Borrowing or Notice of Conversion/Continuation, if applicable, but if it differs in any material respect from the action taken by Lender, the records of Lender shall govern. Lender shall not have any liability for any loss suffered by a US Borrower as a result of Lender acting upon its understanding of telephonic or e-mailed instructions from a person believed in good faith to be a person authorized to give such instructions on a US Borrower's behalf.

4.1.4     <u>Notice of Canadian Borrowing</u>.

(a)     Whenever the Canadian Borrower desires funding of a Borrowing of Canadian Revolver Loans, the Canadian Borrower shall give Lender a Notice of Borrowing. Such notice must be received by Lender no later than 11:00 a.m. (i) on the Business Day of the requested funding date, in the case of Canadian Prime Rate Loans, and (ii) at least three Business Days prior to the requested funding date, in the case of BA Equivalent Loans. Notices received after 11:00 a.m. shall be deemed received on the next Business Day. Each Notice of Borrowing shall be irrevocable and shall specify (A) the amount of the Borrowing, (B) the requested funding date (which must be a Business Day), (C) whether the Borrowing is to be made as a Canadian Prime Rate Loan or a BA Equivalent Loan, and (D) in the case of BA Equivalent Loans, the duration of the applicable BA Equivalent Interest Period (which shall be deemed to be 30 days if not specified).

(b)     Unless payment is otherwise timely made by the Canadian Borrower, the becoming due of any Canadian Obligations (whether principal, interest, fees or other charges, including Cash Collateral and Bank Product Debt) shall be deemed to be a request for Canadian Prime Rate Revolver Loans on the due date, in the amount of such Canadian Obligations. The proceeds of such Canadian Prime Rate Revolver Loans shall be disbursed as direct payment of the relevant Canadian Obligation. In addition, Lender may, at its option, charge such Canadian Obligation against any operating, investment or other account of the Canadian Borrower maintained with Lender or any of its Affiliates.

(c)     If the Canadian Borrower establishes a controlled disbursement account with Lender or any of its Affiliates, then the presentation for payment of any check or other item of payment drawn on such account at a time when there are insufficient funds to cover it shall be deemed to be a request for Canadian Revolver Loans on the date of such presentation, in the amount of the check and items presented for payment. The proceeds of such Canadian Revolver Loans may be disbursed directly to the controlled disbursement account or other appropriate account.

- 40 -

4.1.5   Funding of Canadian Revolver Loans. Lender shall fund each Borrowing of Canadian Revolver Loans on the applicable funding date and, subject to the terms of this Agreement, shall disburse the proceeds as directed by the Canadian Borrower.

4.1.6   Notices Regarding Canadian Revolver Loans. The Canadian Borrower authorizes Lender to extend, convert or continue Canadian Revolver Loans, effect selections of interest rates, and transfer funds to or on behalf of the Canadian Borrower based on telephonic or e-mailed instructions. The Canadian Borrower shall confirm each such request by prompt delivery to Lender of a Notice of Borrowing or Notice of Conversion/Continuation, if applicable, but if it differs in any material respect from the action taken by Lender, the records of Lender shall govern. Lender shall not have any liability for any loss suffered by the Canadian Borrower as a result of Lender acting upon its understanding of telephonic or e-mailed instructions from a person believed in good faith to be a person authorized to give such instructions on the Canadian Borrower's behalf. The Lender shall not be obligated to advance a BA Equivalent Loan or convert a Canadian Prime Rate Loan to a BA Equivalent Loan during the continuance of any Default or Event of Default or if such Loan: (A) matures on a day which is not a Business Day; or (B) is less than $1,000,000, or an integral multiple of $1,000,000 in excess thereof.

**4.2   Number and Amount of LIBOR and BA Equivalent Loans; Determination of Rate.**

4.2.1   LIBOR Loans. Each Borrowing of LIBOR Loans when made shall be in a minimum amount of $1,000,000, plus any increment of $1,000,000 in excess thereof. No more than five (5) Borrowings of LIBOR Loans may be outstanding at any time, and all LIBOR Loans having the same length and beginning date of their Interest Periods shall be aggregated together and considered one Borrowing for this purpose. Upon determining LIBOR for any Interest Period requested by US Borrowers, Lender shall promptly notify US Borrowers thereof by telephone or electronically and, if requested by US Borrowers, shall confirm any telephonic notice in writing.

4.2.2   BA Equivalent Loans. Each Borrowing of BA Equivalent Loans when made shall be in a minimum amount of $1,000,000, plus any increment of $1,000,000 in excess thereof. No more than five (5) Borrowings of BA Equivalent Loans may be outstanding at any time, and all BA Equivalent Loans having the same length and beginning date of their BA Equivalent Interest Periods shall be aggregated together and considered one Borrowing for this purpose. Upon determining the BA Rate for any BA Equivalent Interest Period requested by the Canadian Borrower, Lender shall promptly notify the Canadian Borrower thereof by telephone or electronically and, if requested by the Canadian Borrower, shall confirm any telephonic notice in writing

**4.3   Borrower Agent.** Each Borrower hereby designates Latham ("Borrower Agent") as its representative and agent for all purposes under the Loan Documents, including requests for Loans and Letters of Credit, designation of interest rates, delivery or receipt of communications, preparation and delivery of Borrowing Base and financial reports, receipt and payment of Obligations, requests for waivers, amendments or other accommodations, actions under the Loan Documents (including in respect of compliance with covenants), and all other dealings with Lender; provided that requests for Canadian Revolver Loans, designation of interest rates for Canadian Loans, delivery or receipt of communications regarding Canadian Revolver Loans, and communications regarding the receipt and payment of Canadian Obligations shall be made by the Canadian Borrower. Borrower Agent hereby accepts such appointment. Lender shall be entitled to rely upon, and shall be fully protected in relying upon, any notice or communication (including any notice of borrowing) delivered by Borrower Agent on behalf of any Borrower. Lender may give any notice or communication with a Borrower hereunder to Borrower Agent on behalf of such Borrower. Except as provided herein, Lender shall have the right, in its discretion, to deal exclusively with Borrower Agent for any or all purposes under the Loan Documents and each

- 41 -

Borrower agrees that any notice, election, communication, representation, agreement or undertaking made on its behalf by Borrower Agent shall be binding upon and enforceable against it.

**4.4** **One Obligation**. The Loans, LC Obligations and other Obligations shall constitute one general obligation of Borrowers and (unless otherwise expressly provided in any Loan Document) shall be secured by Lender's Lien upon all Collateral; provided, however, that Lender shall be deemed to be a creditor of, and the holder of a separate claim against, each Borrower to the extent of any Obligations jointly or severally owed by such Borrower; and provided further that notwithstanding anything to the contrary set forth herein, the Canadian Borrower shall not be liable for any Obligations other than the Canadian Obligations and the Canadian Collateral shall only secure the Canadian Obligations. For avoidance of doubt, each US Borrower shall be a guarantor of, and shall be jointly and severally liable for, all Obligations, including the Canadian Obligations, and the US Collateral shall secure all Obligations, including the Canadian Obligations.

**4.5** **Effect of Termination**. On the effective date of any termination of the Revolver Commitment, all Obligations shall be immediately due and payable, and each Secured Party may terminate its Bank Products. All undertakings of Borrowers contained in the Loan Documents shall survive any termination, and Lender shall retain its Liens in the Collateral and all of its rights and remedies under the Loan Documents until Full Payment of the Obligations. Notwithstanding Full Payment of the Obligations, Lender shall not be required to terminate its Liens in any Collateral unless, with respect to any damages Lender may incur as a result of the dishonor or return of Payment Items applied to Obligations, Lender receives (a) a written agreement, executed by Borrowers and any Person whose advances are used in whole or in part to satisfy the Obligations, indemnifying Lender from any such damages; or (b) such Cash Collateral as Lender, in its discretion, deems necessary to protect against any such damages. The provisions of **Sections 2.3, 3.4, 3.5, 3.7, 3.9, 5.5, 5.8, 13.2** and this Section, and the obligation of each Obligor with respect to each indemnity given by it in any Loan Document, shall survive Full Payment of the Obligations and any release relating to this credit facility.

## SECTION 5. PAYMENTS

**5.1** **General Payment Provisions**. All payments of Obligations shall be made in Dollars, without offset, counterclaim or defense of any kind, free of (and without deduction for) any Taxes, and in immediately available funds, not later than 12:00 noon on the due date; provided that, at Lender's option, payment of Canadian Obligations may be made in Canadian Dollars. Any payment after 12:00 noon on the due date therefor shall be deemed made on the next Business Day. Any payment of a LIBOR Loan prior to the end of its Interest Period and any payment of a BA Equivalent Loan prior to the end of its BA Equivalent Interest Period, shall be accompanied by all amounts due under **Section 3.9**. Any prepayment of US Revolver Loans shall be applied first to Base Rate Loans and then to LIBOR Loans. Any prepayment of Canadian Revolver Loans shall be applied first to Canadian Prime Rate Loans and then to BA Equivalent Loans. No prepayment shall be applied to repay the Last-Out Term Loan prior to (a) the repayment of the Revolver Loans in full and (b) the Cash Collateralization of all outstanding Letters of Credit.

**5.2** **Repayment of Revolver Loans**.

5.2.1 Revolver Loans shall be due and payable in full on the Revolver Termination Date, unless payment is sooner required hereunder. Subject to **Section 3.9**, Revolver Loans may be prepaid from time to time, without penalty or premium.

5.2.2 If any Asset Disposition includes the disposition of Accounts, Inventory or Equipment of the US Borrowers, then 100% of the Net Proceeds of such Asset Disposition shall be

- 42 -

applied first to repay the US Revolver Loans, second, if applicable, to repay the Canadian Revolver Loans, third, if an Event of Default shall have occurred and be continuing, to Cash Collateralize Letters of Credit, and fourth, if and Event of Default shall have occurred and be continuing, to repay the Last-Out Term Loan, if applicable.

5.2.3    If any Asset Disposition includes the disposition of Accounts, Inventory or Equipment of the Canadian Borrower, then 100% of the Net Proceeds of such Asset Disposition, shall be applied to the Canadian Revolver Loans.

5.2.4    Notwithstanding anything herein to the contrary, Borrowers shall not be obligated to apply the Proceeds of any Asset Disposition to repay any LIBOR Loan or BA Equivalent Loan prior to the last day of the applicable Interest Period or BA Equivalent Interest Period for such Loan, unless (a) an Overadvance shall exist, (b) an Event of Default shall have occurred and be continuing, or (c) Lender, in its Credit Judgment, elects (by written notice to Borrower Agent) to waive the requirement that Borrowers pay to Lender any amounts due under Section 3.9(b) as a result of the repayment of such LIBOR Loan or BA Equivalent Loan prior to the end of the applicable Interest Period or BA Equivalent Interest Period.

5.2.5    Notwithstanding anything to the contrary: (i) if an Overadvance exists, US Borrowers shall, on the sooner of Lender's demand or the first Business Day after any US Borrower has knowledge thereof, repay the outstanding US Revolver Loans in an amount sufficient to cause the US Availability or the Aggregate Availability, as applicable, to be greater than zero; and (ii) if a Canadian Overadvance exists, the Canadian Borrower shall, on the sooner of Lender's demand or the first Business Day after the Canadian Borrower has knowledge thereof, repay the outstanding Canadian Revolver Loans in an amount sufficient to cause the Canadian Availability to be greater than zero.

5.2.6    For the avoidance of doubt, other than in the case of a Permitted Asset Disposition, no Obligor shall (a) sell, transfer or otherwise dispose of Accounts, Inventory or Equipment outside of the Ordinary Course of Business or (b) discount any Inventory other than in the Ordinary Course of Business, consistent with past practices.

**5.3    Payment of Other Obligations**. Obligations other than Loans, including LC Obligations and Extraordinary Expenses, shall be paid by Borrowers as provided in the Loan Documents or, if no payment date is specified, on demand.

**5.4    Marshaling; Payments Set Aside**. Lender shall have no obligation to marshal any assets in favor of any Obligor or against any Obligations. If any payment by or on behalf of Borrowers is made to Lender, or Lender exercises a right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by Lender in its discretion) to be repaid to a trustee, receiver or any other Person, then to the extent of such recovery, the Obligation originally intended to be satisfied, and all Liens, rights and remedies relating thereto, shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred.

**5.5    Application of Payments**. The ledger balance in the US Dominion Account as of the end of a Business Day shall be applied to the Non-Canadian Obligations at the beginning of the next Business Day; provided that, the ledger balance in the US Dominion Account shall not be applied to repay any LIBOR Loan prior to the last day of the applicable Interest Period for such LIBOR Loan unless (a) an Overadvance shall exist, (b) an Event of Default shall have occurred and be continuing, or (c) Lender, in its Credit Judgment, elects (by written notice to Borrower Agent) to waive the requirement that Borrowers pay to Lender any amounts due under Section 3.9(b) as a result of the repayment of such

- 43 -

LIBOR Loan prior to the end of the applicable Interest Period. The ledger balance in the Canadian Dominion Account as of the end of a Business Day shall be applied to the Canadian Obligations at the beginning of the next Business Day; provided that, the ledger balance in the Canadian Dominion Account shall not be applied to repay any BA Equivalent Loan prior to the last day of the applicable BA Equivalent Interest Period for such BA Equivalent Loan unless (a) an Overadvance shall exist, (b) an Event of Default shall have occurred and be continuing, or (c) Lender, in its Credit Judgment, elects (by written notice to Borrower Agent) to waive the requirement that Borrowers pay to Lender any amounts due under Section 3.9(b) as a result of the repayment of such BA Equivalent Loan prior to the end of the applicable BA Equivalent Interest Period. If, as a result of the application of ledger balances in the US Dominion Account or Canadian Dominion Account against the Obligations (other than LIBOR Loans and BA Equivalent Loans as provided in the foregoing sentences), a credit balance exists, the balance shall not accrue interest in favor of US Borrowers or the Canadian Borrower, but shall be made available to the US Borrowers or the Canadian Borrower, as applicable, as long as no Default or Event of Default exists. Subject to the foregoing and provisions of **Sections 5.2.3** and **5.2.4**, each Borrower irrevocably waives the right to direct the application of any payments or Collateral proceeds, and agrees that Lender shall have the continuing, exclusive right to apply and reapply same against the Obligations, in such manner as Lender deems advisable; provided that proceeds of Canadian Collateral shall only be applied against Canadian Obligations.

**5.6** **Loan Accounts; Account Stated.**

5.6.1 Loan Accounts. Lender shall maintain in accordance with its usual and customary practices an account or accounts ("US Loan Account") evidencing the Debt of US Borrowers resulting from each US Revolving Loan or issuance of a Letter of Credit from time to time. Lender shall maintain in accordance with its usual and customary practices an account or accounts ("Canadian Loan Account" and together with the US Loan Account, the "Loan Accounts") evidencing the Debt of the Canadian Borrower resulting from each Canadian Revolving Loan from time to time. Any failure of Lender to record anything in the applicable Loan Account, or any error in doing so, shall not limit or otherwise affect the obligation of Borrowers to pay any amount owing hereunder. Lender may maintain a single US Loan Account in the name of Borrower Agent, and each US Borrower confirms that such arrangement shall have no effect on the joint and several character of the liability of the US Borrowers for the Obligations.

5.6.2 Entries Binding. Entries made in the Loan Accounts shall constitute presumptive evidence of the information contained therein. If any information contained in the Loan Accounts is provided to or inspected by any Person, then such information shall be conclusive and binding on such Person for all purposes absent manifest error, except to the extent such Person notifies Lender in writing within 30 days after receipt or inspection that specific information is subject to dispute.

**5.7** **Taxes.**

5.7.1 Payments Free of Taxes. All payments by Obligors of Obligations shall be free and clear of and without reduction for any Taxes. If Applicable Law requires any Obligor or Lender to withhold or deduct any Tax (including backup withholding or withholding Tax), Lender shall pay the amount withheld or deducted to the relevant Governmental Authority. If the withholding or deduction is made on account of Indemnified Taxes or Other Taxes, the sum payable by Borrowers shall be increased so that Lender receives an amount equal to the sum it would have received if no such withholding or deduction (including deductions applicable to additional sums payable under this Section) had been made. Without limiting the foregoing, Borrowers shall timely pay all Other Taxes to the relevant Governmental Authorities.

- 44 -