# EXHIBIT 8

$20,000,000

## MASTER NOTE AGREEMENT

among

**LMH I, INC.,**
as Issuer,

and

**LMH II, INC.,**
and the other Holders, if any, which are or may become parties hereto,

and

**WELLS FARGO BANK, N.A.,**
as Holders' Representative,

Dated as of January [___], 2010

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS AND CURRENCY PROVISIONS .................................................................. 1

Section 1.1     Defined Terms.................................................................................................... 1

Section 1.2     Other Definitional Provisions. ........................................................................ 7

Section 1.3     Accounting Terms. ........................................................................................... 8

ARTICLE II THE ISSUANCE OF THE INITIAL NOTE; AMOUNT AND TERMS OF THE NOTES............................................................................................................................... 8

Section 2.1     The Initial Note. .............................................................................................. 8

Section 2.2     Fee. .................................................................................................................. 9

Section 2.3     Optional Prepayments. .................................................................................. 10

Section 2.4     Default Rate. .................................................................................................. 10

Section 2.5     Computation of Interest and Fees. ................................................................ 10

Section 2.6     Computations, Pro Rata Treatment and Payments........................................ 10

Section 2.7     Non-Receipt of Funds by the Holders' Representative.................................. 11

Section 2.8     Taxes. ............................................................................................................ 12

ARTICLE III REPRESENTATIONS AND WARRANTIES ................................................................ 13

Section 3.1     Corporate Existence; Compliance with Law.................................................. 13

Section 3.2     Corporate Power; Authorization; Enforceable Obligations. ........................ 13

Section 3.3     No Legal Bar; No Default. ............................................................................. 14

Section 3.4     No Material Litigation.................................................................................... 14

Section 3.5     Investment Company Act. .............................................................................. 14

Section 3.6     Margin Regulations........................................................................................ 14

Section 3.7     Labor Matters. ............................................................................................... 14

Section 3.8     Ownership. ..................................................................................................... 15

Section 3.9     Indebtedness................................................................................................... 15

Section 3.10   Taxes. ............................................................................................................ 15

Section 3.11   No Burdensome Restrictions.......................................................................... 15

Section 3.12   Security Agreement........................................................................................ 15

Section 3.13   Accuracy and Completeness of Information................................................... 15

Section 3.14   Consummation of Plan of Reorganization; Representations and Warranties from Plan of Reorganization. ............................................................................................................. 15

Section 3.15   ABL................................................................................................................ 16

ARTICLE IV CONDITIONS PRECEDENT ...................................................................................... 16

Section 4.1     Conditions to Closing Date ........................................................................... 16

ARTICLE V AFFIRMATIVE COVENANTS ...................................................................18

    Section 5.1    ABL Covenants. ...........................................................................18

    Section 5.2    Additional Affirmative Covenants. ..............................................18

ARTICLE VI NEGATIVE COVENANTS ........................................................................19

    Section 6.1    ABL Covenants. ...........................................................................19

    Section 6.2    Additional Negative Covenants: ..................................................20

    Section 6.3    Labor Matters. .............................................................................20

    Section 6.4    Amendment of ABL. ....................................................................21

ARTICLE VII EVENTS OF DEFAULT. ..........................................................................21

    Section 7.1    Events of Default. ........................................................................21

    Section 7.2    Acceleration; Remedies. ..............................................................22

ARTICLE VIII THE HOLDERS' REPRESENTATIVE ....................................................23

    Section 8.1    Appointment and Authority. ........................................................23

    Section 8.2    Rights as a Holder. ......................................................................23

    Section 8.3    Exculpatory Provisions. ..............................................................23

    Section 8.4    Delegation of Duties. ..................................................................25

    Section 8.5    Reliance by Holders' Representative. ...........................................25

    Section 8.6    Notice of Default. ........................................................................25

    Section 8.7    Non-Reliance on Holders' Representative and Other Holders. ....26

    Section 8.8    Successor Representative. .............................................................26

    Section 8.9    Collateral. ....................................................................................26

    Section 8.10  Holders' Representative May File Proofs of Claim. ....................27

ARTICLE IX MISCELLANEOUS ...................................................................................27

    Section 9.1    Amendments, Waivers and Release of Collateral. .......................27

    Section 9.2    Notices. .......................................................................................28

    Section 9.3    No Waiver; Cumulative Remedies. ..............................................29

    Section 9.4    Survival of Representations and Warranties. ...............................29

    Section 9.5    Payment of Expenses and Taxes. .................................................29

    Section 9.6    Successors and Assigns; Purchasing Holders. .............................30

    Section 9.7    Adjustments; Set-off. ...................................................................32

    Section 9.8    Table of Contents and Section Headings. ....................................33

    Section 9.9    Counterparts. ...............................................................................33

    Section 9.10  Effectiveness. ..............................................................................33

    Section 9.11  Severability. ................................................................................33

    Section 9.12  Integration. ..................................................................................33

Section 9.13  Governing Law. ............................................................................................33

Section 9.14  Consent to Jurisdiction and Service of Process............................................33

Section 9.15  Confidentiality. ...........................................................................................34

Section 9.16  No Advisory or Fiduciary Relationship. .....................................................34

Section 9.17  Waivers of Jury Trial. .................................................................................35

Section 9.18  Judgment Currency. ....................................................................................35

Section 9.19  Patriot Act Notice.......................................................................................35

Schedules

| Schedule 1.1(a) | Holders' Representative |
| Schedule 3.8 | Subsidiaries |

Exhibits

| Exhibit A | Form of Note |
| Exhibit B | Form of Security Agreement |
| Exhibit C | Form of Assignment Instrument |

This **MASTER NOTE AGREEMENT** dated as of January [__], 2010, among LMH I, Inc., a corporation organized and existing under the laws of the State of Delaware (the "*Issuer*"), LMH II, Inc., a corporation organized and existing under the laws of the State of Delaware (the "*Initial Holder*"), each Purchasing Holder that becomes a party hereto in accordance with Section 9.6, and Wells Fargo Bank, N.A., as representative for the Holders (as defined below) hereunder (the "*Holder's Representative*").

## WITNESSETH:

WHEREAS, on December 22, 2009, the Pre-Petition Entities (hereinafter defined) filed voluntary petitions for relief commencing cases (collectively, the "*Bankruptcy Cases*") under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "*Bankruptcy Court*"), In re Latham International, Inc., et al., Chapter 11 No. 09-14490(css) (Jointly Administered);

WHEREAS, on December 22, 2009, the Pre-Petition Entities filed the Plan of Reorganization (hereinafter defined);

WHEREAS, on January [____], 2010, the Bankruptcy Court confirmed the Plan of Reorganization pursuant to the Confirmation Order (the "*Plan of Reorganization*");

WHEREAS, pursuant to the Plan of Reorganization, the following transactions, among other things, are contemplated to occur on the Plan of Reorganization Effective Date: (a) the parties will enter into this Agreement, (b) the Issuer will issue its Equity and the Note to Initial Holder, in exchange for all of the outstanding Stock (hereinafter defined) of Initial Holder, (c) Initial Holder will then contribute the Equity and the Note to Latham Corporation, a corporation organized and existing under the laws of the State of Delaware ("*Latham*"), in exchange for all of the outstanding Stock of Latham, (d) Latham will then contribute the Equity and the Note to purchase substantially all of the assets (subject to certain exclusions) of the Prepetition Entities, and (e) the Prepetition Entities shall transfer the Equity and the Note to the lenders of the Prepetition Financing (the "*Prepetition Lenders*") as satisfaction for the Indebtedness under the Prepetition Financing;

WHEREAS, to evidence the terms, conditions and agreements with respect to the Note, the parties hereto wish to enter into this Agreement;

NOW, THEREFORE, in consideration of the premises and the mutual covenants contained herein, the parties hereto hereby agree as follows:

## ARTICLE I
## DEFINITIONS AND CURRENCY PROVISIONS

**Section 1.1**    **Defined Terms.**

As used in this Agreement, terms defined in the preamble to this Agreement have the meanings therein indicated, and the following terms have the following meanings:

"*ABL*" shall mean that certain financing in the principal amount of $30,000,000 made available to the ABL Borrowers pursuant to the ABL Agreement.

"*ABL Agreement*" shall mean that certain Credit Agreement, dated as of [_____], by the ABL Borrowers, Initial Holder, as the guarantor, and the ABL Lender.

"**ABL Borrowers**" shall mean, collectively, (a) Latham, (b) Coverstar, LLC, a limited liability company organized and existing under the laws of the State of Delaware, (c) Viking Pools, LLC, a limited liability company organized under the laws of the State of West Virginia, and (d) Latham Splash.

"**ABL Cushion**" shall have the meaning set forth in Section 6.1(a).

"**ABL Default**" shall have the meaning set forth in Section 7.1(d).

"**ABL Documents**" shall mean the ABL Agreement and all other documents and instruments executed by the ABL Borrowers, Initial Holder or any of them in connection therewith.

"**ABL Lender**" shall mean Bank of America, N.A, together with its applicable branches.

"**Affiliate**" shall mean as to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified. "**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "**Controlling**" and "**Controlled**" have correlative meanings.

"**Agreement**" shall mean this Agreement.

"**Applicable Interest Period**" shall have the meaning set forth in Section 2.1(c)(iii)(A).

"**Assignment Effective Date**" shall have the meaning set forth in each Assignment Instrument.

"**Assignment Instrument**" shall mean an Assignment Instrument, substantially in the form of Exhibit C.

"**Bankruptcy Cases**" shall have the meaning set forth in the first recital of this Agreement.

"**Bankruptcy Code**" shall mean the Bankruptcy Code in Title 11 of the United States Code.

"**Bankruptcy Court**" shall have the meaning set forth in the first recital of this Agreement.

"**Base Rate**" shall mean LIBOR; *provided, however,* if LIBOR is for whatever reason unavailable, Base Rate shall mean the Federal Funds Rate.

"**Business Day**" shall mean a day other than a Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by law to close.

"**Change of Control**" shall mean the occurrence of any of the following events: (a) Issuer ceases to own and control, beneficially and of record, directly or indirectly, all the Stock in all of its Subsidiaries free and clear of all Liens (other than Liens granted under the Note Documents and Liens granted under the ABL Documents); (b) a change in the majority of directors of Issuer, unless approved by the then majority of directors; or (c) all or substantially all of the assets of a Subsidiary of Issuer are sold or transferred, other than sale or transfer to an ABL Borrower.

"**Closing Date**" shall mean January [__], 2010.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"***Collateral***" shall mean a collective reference to the collateral which is identified in, and at any time will be covered by, the Security Agreement.

"***Confirmation Order***" shall mean an order of the Bankruptcy Court confirming the Plan of Reorganization, in form and substance acceptable to Holders' Representative, not subject to any pending appeal or motion for reversal, stay, review, revocation or reconsideration

"***Default***" shall mean any of the events specified in Section 7.1, whether or not any requirement for the giving of notice or the lapse of time, or both, or any other condition, has been satisfied.

"***Distribution***" shall mean any declaration or payment of a distribution, interest or dividend on any Stock (other than payment-in-kind), or any purchase, redemption, or other acquisition or retirement for value of any Stock.

"***Dollars***" and "***$***" shall mean dollars in lawful currency of the United States of America.

"***Elected Interest Rate***" shall have the meaning set forth in Section 2.1(c)(iii)(A).

"***Equity***" shall mean 100% of the common stock of the Issuer.

"***Event of Default***" shall mean any of the events specified in Section 7.1.

"***Excluded Taxes***" shall mean, with respect to a Holder or any other recipient of a payment to be made by or on account of any Obligation, (a) taxes imposed on or measured by its overall net income (however denominated), and franchise taxes imposed on it (in lieu of net income taxes), by the jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized or in which its principal office is located or, in the case of a Holder, in which its applicable lending office is located; and (b) any branch profits taxes imposed by the United States or any similar tax imposed by any other jurisdiction in which the Issuer is located.

"***Federal Funds Rate***" shall mean, for any day, the rate per annum equal to (a) the weighted average of interest rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers on the applicable Business Day (or on the preceding Business Day, if the applicable day is not a Business Day), as published by the Federal Reserve Bank of New York on the next Business Day; or (b) if no such rate is published on the next Business Day, the average rate (rounded up, if necessary, to the nearest 1/8 of 1%) charged to the Holders' Representative on the applicable day on such transactions, as determined by the Holders' Representative.

"***Fiscal Year***" shall mean the fiscal year of the Issuer for accounting and tax purposes, ending on December 31 of each year.

"***Foreign Holder***" shall mean any Holder that is organized under the laws of a jurisdiction other than that in which the Issuer is resident for tax purposes. For purposes of this definition, the United States of America, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"***Fundamental Change***" shall mean any Subsidiary of Issuer shall merge, amalgamate, combine or consolidate with any other Person, or liquidate, wind up its affairs or dissolve itself, in each case whether in a single transaction or in a series of related transactions, except for mergers, amalgamations or consolidations of a wholly-owned Subsidiary of Issuer with another wholly-owned Subsidiary of Issuer.

"**GAAP**" shall mean generally accepted accounting principles in effect in the United States of America applied on a consistent basis.

"**Governmental Authority**" shall mean any federal, state, territorial, municipal, foreign or other governmental department, agency, commission, board, bureau, court, tribunal, instrumentality, political subdivision, or other entity or officer exercising executive, legislative, judicial, regulatory or administrative functions for or pertaining to any government or court, in each case associated with the United States, a state, district or territory thereof, or any other foreign entity or government.

"**Holders**" shall mean, collectively, the Initial Holder and each Purchasing Holder.

"**Holders' Representative**" shall have the meaning set forth in the preamble of this Agreement and any successors in such capacity.

"**Holders' Representative's Office**" shall mean the Holders' Representative's address and, as appropriate, account as set forth on Schedule 1.1(a), or such other address or account as the Holders' Representative may from time to time notify to the Issuer and the Holders.

"**Indebtedness**" shall mean, with respect to any Person, without duplication, (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, or upon which interest payments are customarily made, (c) all obligations of such Person under conditional sale or other title retention agreements relating to property purchased by such Person (other than customary reservations or retentions of title under agreements with suppliers entered into in the ordinary course of business), (d) all obligations (including, without limitation, earnout obligations) of such Person issued or assumed as the deferred purchase price of property or services purchased by such Person (other than trade debt incurred in the ordinary course of business and due within six months of the incurrence thereof) which would appear as liabilities on a balance sheet of such Person in accordance with GAAP, (e) all obligations of such Person under take-or-pay or similar arrangements or under commodities agreements, (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on, or payable out of the proceeds of production from, property owned or acquired by such Person, whether or not the obligations secured thereby have been assumed, (g) all guaranty obligations of such Person with respect to Indebtedness of another Person, (h) the principal portion of all obligations of such Person under capital leases, (i) all obligations of such Person under hedging agreements, (j) the maximum amount of all letters of credit issued or bankers' acceptances facilities created for the account of such Person and, without duplication, all drafts drawn thereunder (to the extent unreimbursed), (k) all preferred capital stock issued by such Person and which by the terms thereof could be (at the request of the holders thereof or otherwise) subject to mandatory sinking fund payments, redemption or other acceleration, (l) the principal balance outstanding under any synthetic lease, tax retention operating lease, off-balance sheet loan or similar off-balance sheet financing product, and (m) the Indebtedness of any partnership or unincorporated joint venture in which such Person is a general partner or a joint venturer.

"**Indemnified Taxes**" shall mean Taxes other than Excluded Taxes.

"**Information Statements**" shall have the meaning set forth in Section 5.1(a).

"**Initial Holder**" shall have the meaning set forth in the preamble of this Agreement.

"**Initial Note**" shall mean the Note issued to the Initial Holder under Section 2.1 on the date hereof in the principal outstanding amount of $20,000,000 (as such amount may be increased pursuant to Section 2.1(c)(ii)(B)).

"*Interest Option Notice*" shall have the meaning set forth in Section 2.1(c)(iii)(A).

"*Interest Payment Date*" shall have the meaning set forth in Section 2.1(c)(i).

"*Issuer*" shall have the meaning set forth in the first paragraph of this Agreement.

"*Latham*" shall have the meaning set forth in the fourth recital of this Agreement.

"*LIBOR*" shall mean, for any day, the rate for deposits in Dollars for a period of three (3) months as appearing on British Bankers Association LIBOR Rate ("*BBA LIBOR*"), as published by Reuters (or other commercially available source providing quotations of BBA LIBOR as designated by Holders' Representative from time to time), each change in LIBOR to become effective, without notice to the Issuer, on the effective date of each change in LIBOR.

"*License*" shall mean any license or agreement under which the Issuer is authorized to use intellectual property in connection with any manufacture, marketing, distribution or disposition of Collateral, any use of property or any other conduct of its business.

"*Lien*" shall mean any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge or other security interest or any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including, without limitation, any conditional sale or other title retention agreement and any capital lease having substantially the same economic effect as any of the foregoing).

"*Material Adverse Effect*" shall mean the effect of any event or circumstance that, taken alone or in conjunction with other events or circumstances, (a) has or could be reasonably expected to have a material adverse effect on the business, operations, properties, prospects or condition (financial or otherwise) of the Issuer or its Subsidiaries, on the value of any material Collateral, on the enforceability of any Note Documents, or on the validity or priority of the Holders' Liens on any Collateral; (b) impairs the ability of the Issuer to perform any obligations under the Note Documents, including repayment of any Obligations; or (c) otherwise impairs the ability of the Holders' Representative or the Holders to enforce or collect any Obligations or to realize upon any Collateral.

"*Maturity Date*" shall mean January [____], 2015.

"*Moody's*" shall mean Moody's Investor Services, Inc.

"*Note Cushion*" shall have the meaning set forth in Section 6.1(a).

"*Note Documents*" shall mean this Agreement, each of the Notes, the Security Agreement, and all other agreements, documents, certificates and instruments delivered to the Holders' Representative or any Holder by the Issuer in connection therewith.

"*Notes*" shall mean the (a) Initial Note, and (b) any such other promissory notes issued to the Purchasing Holders to evidence the Obligations assigned in the applicable Permitted Transfers.

"*Obligations*" shall mean, without duplication, all of the obligations, indebtedness and liabilities of the Issuer to the Holders and the Holders' Representative, whenever arising, under this Agreement, the Notes or any of the other Note Documents including principal, interest, fees, reimbursements and indemnification obligations and other amounts (including, but not limited to, any interest accruing after

the occurrence of a filing of a petition of bankruptcy under the Bankruptcy Code with respect to the Issuer, regardless of whether such interest is an allowed claim under the Bankruptcy Code).

"*Other Taxes*" shall mean all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or under any other Note Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Note Document.

"*Participant*" shall have the meaning set forth in Section 9.6(b).

"*Permitted Liens*" shall mean:

     (a)    Liens created by or otherwise existing, under or in connection with this Agreement or the other Note Documents in favor of the Holders; and

     (b)    Liens for taxes, assessments, charges or other governmental levies not yet due or as to which the period of grace (not to exceed 60 days), if any, related thereto has not expired or which are being contested in good faith by appropriate proceedings; *provided*, that adequate reserves with respect thereto are maintained on the books of the Issuer, as the case may be, in conformity with GAAP.

"*Permitted Transfers*" shall mean the assignment of the Obligations to occur on or around the Closing Date, in the following order, from (a) Initial Holder to Latham, (b) Latham to the Pre-Petition Entities, (c) the Pre-Petition Entities to the Prepetition Lenders, and (d) from a Prepetition Lender to another Prepetition Lender, in each case, in accordance with and subject to the Plan of Reorganization.

"*Person*" shall mean an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

"*Plan of Reorganization*" shall mean that certain Prepackaged Joint Plan of Reorganization of Latham International, Inc., et al, under Chapter 11 of the Bankruptcy Code filed with the Bankruptcy Court on December 22, 2009 in the Bankruptcy Cases (together with the disclosure statement with respect thereto) as confirmed pursuant to the Confirmation Order.

"*Pre-Petition Entities*" shall mean, collectively, (a) Latham International, Inc., a Delaware corporation, (b) Latham Manufacturing Corp., a Delaware corporation, (c) Viking Pools, LLC, a West Virginia limited liability company, (d) Coverstar, LLC, a Delaware limited liability company, and (e) Kafko (U.S.) Corp., a Delaware limited liability company, in each case, as existing on the date of filing of the Plan of Reorganization

"*Prepetition Financing*" shall mean that certain financing in the principal amount of $200,000,000 made available to the Pre-Petition Entities pursuant to that certain Credit Agreement, dated as of December 30, 2004, by Prepetition Lenders.

"*Prepetition Lenders*" shall have the meaning set forth in the fourth recital of this Agreement.

"*Properly Contested*" shall mean, with respect to any obligation of the Issuer, (a) obligation is subject to a bona fide dispute regarding amount or the Issuer's liability to pay; (b) the obligation is being properly contested in good faith by appropriate proceedings promptly instituted and diligently pursued; (c) appropriate reserves have been established in accordance with GAAP; (d) non-payment could not have

a Material Adverse Effect, nor result in forfeiture or sale of any assets of the Issuer; (e) no Lien is imposed on assets of the Issuer, unless bonded and stayed to the satisfaction of the Holders' Representative; and (f) if the obligation results from entry of a judgment or other order, such judgment or order is stayed pending appeal or other judicial review.

"*Purchasing Holders*" shall have the meaning set forth in Section 9.6(c).

"*Register*" shall have the meaning set forth in Section 9.6(d).

"*Required Holders*" shall mean Holders holding in the aggregate greater than or equal to fifty-one percent (51%) of the aggregate outstanding principal amount of the Notes.

"*Requirement of Law*" shall mean, as to any Person, the certificate of incorporation and bylaws or other organizational or governing documents of such Person, and each law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"*Plan of Reorganization*" shall have the meaning set forth in the third recital of this Agreement.

"*Plan of Reorganization Effective Date*" shall mean [_____].

"*S&P*" shall mean Standard & Poor's Ratings Group, a division of The McGraw Hill Companies, Inc.

"*Security Agreement*" shall mean the Security Agreement dated as of the Closing Date given by the Issuer to the Holders' Representative, for the benefit of the Holders.

"*Stock*" shall mean (a) in the case of a corporation, capital stock, (b) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of capital stock, (c) in the case of a partnership, partnership interests (whether general or limited), (d) in the case of a limited liability company, membership interests, and (e) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person.

"*Subsidiary*" shall mean, as to any Person, any entity at least 50% of whose voting securities or equity interests is owned by the Issuer or any combination of the Issuer and its Affiliates (including indirect ownership by the Issuer through other entities in which the Issuer directly or indirectly owns 50% of the voting securities or equity interests).

"*Taxes*" shall mean all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax and penalties applicable thereto.

### Section 1.2    Other Definitional Provisions.

(a)     Unless otherwise specified therein, all terms defined in this Agreement shall have the defined meanings when used in the Notes or other Note Documents or any certificate or other document made or delivered pursuant hereto.

(b)     The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular

provision of this Agreement, and Section, subsection, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(c)     Any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein).  Any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time

(d)     The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

### Section 1.3     Accounting Terms.

(a)     Unless otherwise specified herein, all accounting terms used herein shall be interpreted, all accounting determinations hereunder shall be made, and all financial statements required to be delivered hereunder shall be prepared in accordance with GAAP.

(b)     The Issuer shall deliver to the Holders' Representative and each Holder at the same time as the delivery of any annual or quarterly financial statements given in accordance with the provisions of Section 5.2(b) (i) a description in reasonable detail of any material change in the application of accounting principles employed in the preparation of such financial statements from those applied in the most recently preceding quarterly or annual financial statements as to which no objection shall have been made in accordance with the provisions above and (ii) a reasonable estimate of the effect on the financial statements on account of such changes in application.

**ARTICLE II**
**THE ISSUANCE OF THE INITIAL NOTE;**
**AMOUNT AND TERMS OF THE NOTES**

### Section 2.1     The Initial Note.

(a)     Issuance.  Subject to the terms and conditions hereof, as consideration for the issuance of 100% of the Stock of Initial Holder to the Issuer, the Issuer agrees to issue to Initial Holder, the Initial Note substantially in the form of Exhibit A.

(b)     Repayment of Principal Amounts.  The principal amount of each Note shall be repaid in its entirety on the Maturity Date.

(c)     Interest Rate; Interest Payments.

(i)     Interest Payment Dates.  Interest on each Note, calculated as provided for in clause (ii) below, shall be due and payable quarterly as it accrues, commencing on [_____], 2010, and thereafter on the [__] day of each succeeding [___], [___], and [___], during the term of the Notes and at the Maturity Date (each such date, an "*Interest Payment Date*").

(ii)    Interest Rates.  Subject to the provisions of Section 2.5, the Notes shall bear interest, at the Issuer's option as elected by the Issuer pursuant to Section 2.1(c)(iii), as follows:

(A)    at a per annum rate equal to the sum of (A) the greater of (x) the actual Base Rate, and (y) the Base Rate set at, and equal to, 3% per annum, plus (B) 4% per annum, to be paid in cash and in arrears on each Interest Payment Date; or

(B)    at a per annum rate equal to ten percent (10%) per annum, to be paid-in-kind by the Issuer, pursuant to which, on each Interest Payment Date, as applicable, the interest payments under this clause (ii)(b) shall be capitalized and shall increase the outstanding principal balance of the Notes by such capitalized amount; *provided, however*, that the Issuer may elect to pay up to 4% of the interest due under this clause (ii)(B) in cash and in arrears on any such Interest Payment Date.  Such capitalized amounts shall be evidenced by one or more accounts or records maintained by the Holders' Representative in the ordinary course of business and such increased principal amount shall be annotated on a schedule attached to each Note (or on a continuation of such schedule and made a part of each such Note).

(iii)    Election of Interest Rate Option.

(A)    So long as no Event of Default exists, Issuer may elect to have the interest rate accrue under Section 2.1(c)(ii)(A) or (B), which option shall be exercised by the Issuer by providing an irrevocable notice (an "***Interest Option Notice***") to the Holders' Representative no later than three (3) Business Days prior to each Interest Payment Date setting forth Issuer's election to have either Section 2.1(c)(ii)(a) or (b) apply (the "***Elected Interest Rate***") for the interest period ending immediately prior to Interest Payment Date (the "***Applicable Interest Period***").

(B)    Upon Holder's Representative receipt of an Interest Option Notice, the interest rate for the Applicable Interest Period shall be set at the Elected Interest Rate and may not be subsequently changed by Issuer without the consent of the Required Holders.  If a complete Interest Option Notice is not provided to the Holders' Representative within the time period set forth in clause (iii)(A) above or if an Event of Default exits, then the interest on the Notes shall be due and payable as provided in clause (ii)(A) above together with the additional interest, if any, under Section 2.4.

(C)    If an Event of Default occurs and continues after the delivery of an Interest Option Notice, then the Interest Option Notice shall only be effective for the Applicable Interest Period that is the subject of such Interest Option Notice to the extent that such Applicable Interest Period is the interest period in effect at the time of initial occurrence of such Event of Default.

## Section 2.2    Fee.

The Issuer agrees to pay to the Holders' Representative the annual fee equal to $[_____], payable on each anniversary of the Closing Date.

**Section 2.3    Optional Prepayments.**

The Issuer shall have the right to prepay the Notes in whole or in part from time to time; *provided*, *however*, that each partial prepayment shall be in a minimum principal amount of $100,000 and integral multiples of $100,000 in excess thereof. The Issuer shall give three Business Days' irrevocable notice to the Holders' Representative (which shall notify the Holders thereof as soon as practicable) of its intent to prepay the Notes. All prepayments under this Section 2.3 shall be subject to Section 2.5, but otherwise without premium or penalty. Interest on the principal amount prepaid shall be payable on any date that a prepayment is made hereunder through the date of prepayment. Amounts prepaid on the Notes may not be reborrowed.

**Section 2.4    Default Rate.**

Upon the occurrence, and during the continuance, of an Event of Default, at the discretion of the Required Holders, the principal of and, to the extent permitted by law, interest on the Notes and any other amounts owing hereunder or under the other Note Documents shall bear interest, payable on demand, at a per annum rate 2% greater than the rate which would otherwise be applicable.

**Section 2.5    Computation of Interest and Fees.**

(a)    Interest payable hereunder shall be calculated on the basis of a year of 365 days (or 366 days, as applicable) for the actual days elapsed. All other fees, interest and all other amounts payable hereunder shall be calculated on the basis of a 360 day year for the actual days elapsed.

(b)    Each determination of an interest rate by the Holders' Representative pursuant to any provision of this Agreement shall be presumptively correct and binding on the Issuer and the Holders in the absence of manifest error. The Holders' Representative shall, at the request of the Issuer, deliver to the Issuer a statement showing the computations used by the Holders' Representative in determining any interest rate.

**Section 2.6    Computations, Pro Rata Treatment and Payments.**

(a)    Each payment on account of an amount due from the Issuer hereunder or under any other Note Document shall be made by the Issuer to the Holders' Representative for the *pro rata* account of the Holders entitled to receive such payment as provided herein. Each payment pursuant to Section 2.2(a) shall be made *pro rata* in accordance with the respective amounts due and owing.

(b)    Unless otherwise specified in this Agreement, each payment under this Agreement or any Notes shall be applied, first, to any fees then due and owing by the Issuer pursuant to Section 2.2, second, to interest then due and owing in respect of the Notes and, third, to principal then due and owing hereunder and under the Notes. Each payment on account of any fees pursuant to Section 2.2 shall be made *pro rata* in accordance with the respective amounts due and owing. Each payment (other than prepayments) by the Issuer on account of principal of and interest on the Notes shall be made *pro rata* according to the respective amounts due and owing in accordance with Section 2.5 hereof. All payments (including prepayments) to be made by the Issuer on account of principal, interest and fees shall be made without defense, set-off or counterclaim, shall be made to the Holders' Representative for the account of the Holders in immediately available funds at the Holders' Representative's Office and shall be made in Dollars not later than 12:00 Noon on the date when due. Any payment received after the foregoing

deadlines shall be deemed received on the next Business Day. The Holders' Representative shall distribute such payments to the Holders entitled thereto promptly upon receipt in like funds as received. If any payment hereunder becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day, and, with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension.

(c)     Allocation of Payments After Exercise of Remedies.  Notwithstanding any other provisions of this Agreement to the contrary, after the exercise of remedies by the Holders' Representative or the Holders pursuant to Section 7.2 (and the Notes (with accrued interest thereon) and all other amounts under the Note Documents shall automatically become due and payable in accordance with the terms of such Section), all amounts collected or received by the Holders' Representative or any Holder on account of the Obligations or any other amounts outstanding under any of the Note Documents or in respect of the Collateral shall be paid over or delivered as follows:

FIRST, to the payment of all reasonable out-of-pocket costs and expenses (including without limitation reasonable attorneys' fees) of the Holders' Representative in connection with enforcing the rights of the Holders under the Note Documents;

SECOND, to the payment of all of the Obligations consisting of accrued fees and interest;

THIRD, to the payment of the outstanding principal amount of the Obligations;

FOURTH, to all other Obligations and other obligations which shall have become due and payable under the Note Documents or otherwise and not repaid pursuant to clauses "FIRST" through "THIRD" above; and

FIFTH, to the payment of the surplus, if any, to whoever may be lawfully entitled to receive such surplus.

In carrying out the foregoing, (i) amounts received shall be applied in the numerical order provided until exhausted prior to application to the next succeeding category; and (ii) each of the Holders shall receive an amount equal to its *pro rata* share (based on the proportion that the then outstanding amount of the Notes held by such Holder bears to the aggregate then outstanding amount of all the Notes) of amounts available to be paid to the Holders under this clause (c).

**Section 2.7    Non-Receipt of Funds by the Holders' Representative.**

(a)     Unless the Holders' Representative shall have been notified in writing by the Issuer, prior to the date on which any payment is due from it hereunder (which notice shall be effective upon receipt) that the Issuer does not intend to make such payment, the Holders' Representative may assume that the Issuer has made such payment when due, and the Holders' Representative may in reliance upon such assumption (but shall not be required to) make available to each Holder on such payment date an amount equal to the portion of such assumed payment to which such Holder is entitled hereunder, and if the Issuer has not in fact made such payment to the Holders' Representative, such Holder shall, on demand, repay to the Holders' Representative the amount made available to such Holder. If such amount is repaid to the Holders' Representative on a date after the date such amount was made available to such Holder,

such Holder shall pay to the Holders' Representative on demand interest on such amount in respect of each day from the date such amount was made available by the Holders' Representative to such Holder to the date such amount is recovered by the Holders' Representative at a per annum rate equal to the Federal Funds Rate.

(b)     A certificate of the Holders' Representative submitted to the Issuer or any Holder with respect to any amount owing under this Section 2.7 shall be presumptively correct in the absence of manifest error.

## Section 2.8     Taxes.

(a)     Payments Free of Taxes.  Any and all payments by or on account of any obligation of the Issuer hereunder or under any other Note Document shall be made free and clear of and without deduction or withholding for any Indemnified Taxes or Other Taxes; *provided that* if the Issuer shall be required by applicable law to deduct any Indemnified Taxes (including any Other Taxes) from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions or withholdings (including deductions or withholdings applicable to additional sums payable under this Section) the Holders' Representative or the Holders receive an amount equal to the sum it would have received had no such deductions or withholdings been made, (ii) the Issuer shall make such deductions, and (iii) the Issuer shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(b)     Payment of Other Taxes by Issuer. Without limiting the provisions of paragraph (a) above, the Issuer shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)     Indemnification by the Issuer.   The Issuer shall indemnify the Holders Representative and each Holder for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section 2.8) paid by the Holders' Representative or such Holder for the account of the Issuer, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  The Issuer shall make any such payment under this Section 2.8(c) within 10 days after demand therefor.  A certificate as to the amount of such payment or liability delivered to the Issuer by a Holder (with a copy to the Holders' Representative), or by the Holders' Representative on its own behalf or on behalf of a Holder, shall be conclusive absent manifest error.

(d)     Evidence of Payments. As soon as practicable after any payment of Indemnified Taxes or Other Taxes by the Issuer to a Governmental Authority, the Issuer shall deliver to the Holders' Representative the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Holders' Representative.

(e)     Status of Holders. Any Foreign Holder that is entitled to an exemption from or reduction of withholding tax under the law of the jurisdiction in which the Issuer is resident for tax purposes, or any treaty to which such jurisdiction is a party, with respect to payments hereunder or under any other Note Document shall deliver to the Issuer (with a copy to Holders' Representative), at the time or times it becomes a Holder and at such other times as are reasonably requested by the Issuer or the Holders' Representative, such properly completed and

executed documentation prescribed by applicable law as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Holder, if requested by the Issuer or the Holders' Representative, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Issuer or the Holders' Representative as will enable the Issuer or the Holders' Representative to determine whether or not such Holder is subject to backup withholding or information reporting requirements.

(f)     Treatment of Certain Refunds.  If a Holder determines, in its sole discretion, that it has actually received a refund of any Taxes or Other Taxes as to which it has been indemnified by the Issuer or with respect to which the Issuer has paid additional amounts pursuant to this Section 2.8, it shall promptly pay to the Issuer an amount equal to such refund plus any interest paid thereon by the relevant Governmental Authority (but only to the extent of the aggregate indemnity payments made, or additional amounts paid, by the Issuer under this Section 2.8 on account of the Taxes or Other Taxes giving rise to such refund), reduced by all out-of-pocket expenses of the Holders' Representative or such Holder, as the case may be, and by the amount of any Taxes payable by such Holder in connection with its receipt of such refund and interest; *provided*, that the Issuer, upon the request of the Holders' Representative or such Holder, agrees to repay the amount paid over to the Issuer (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Holders' Representative or such Holder in the event the Holders' Representative or such Holder is required to repay such refund to such Governmental Authority.  This paragraph shall not be construed to require the Holders' Representative or any Holder to make available its tax returns (or any other information relating to its taxes that it deems confidential) to the Issuer or any other Person.

(g)     Survival.  The agreements in this Section 2.8 shall survive the termination of this Agreement and the payment of the Obligations.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES

As of the date hereof, the Issuer hereby represents and warrants to the Holders' Representative and to the Initial Holder that:

### Section 3.1     Corporate Existence; Compliance with Law.

The Issuer (a) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, (b) has the requisite power and authority and the legal right to own and operate all its material property, to lease the material property it operates as lessee and to conduct the business in which it is currently engaged, (c) is duly qualified to conduct business and in good standing under the laws of each jurisdiction where its ownership, lease or operation of property or the conduct of its business requires such qualification except to the extent that the failure to so qualify or be in good standing could not, in the aggregate, reasonably be expected to have a Material Adverse Effect and (d) is in compliance with all Requirements of Law except to the extent that the failure to comply therewith could not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

### Section 3.2     Corporate Power; Authorization; Enforceable Obligations.

The Issuer has full power and authority and the legal right to make, deliver and perform the Note Documents and has taken all necessary corporate action to authorize the execution, delivery and performance by it of the Note Documents. No consent or authorization of, filing with, notice to or other act by or in respect of, any Governmental Authority or any other Person is required in connection with the

issuance of the Note hereunder or with the execution, delivery or material performance of any Note Document by the Issuer (other than those which have been obtained) or with the validity or enforceability of any Note Document against the Issuer (except such filings as are necessary in connection with the perfection of the Liens created by such Note Documents). Each Note Document has been duly executed and delivered on behalf of the Issuer. Each Note Document constitutes a legal, valid and binding obligation of the Issuer, enforceable against the Issuer in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law).

### Section 3.3    No Legal Bar; No Default.

The execution, delivery and performance of the Note Documents, the issuance of the Initial Note and the use of the proceeds of the Notes will not violate the Plan of Reorganization, any Requirement of Law or any contractual obligation of the Issuer (except those as to which waivers or consents have been obtained), and will not result in, or require, the creation or imposition of any Lien on any of its properties or revenues pursuant to any Requirement of Law or contractual obligation other than the Liens arising under or contemplated in connection with the Note Documents and Permitted Liens. The Issuer is not in default under or with respect to any of its contractual obligations in any respect which could reasonably be expected to have a Material Adverse Effect. No Default or Event of Default has occurred and is continuing.

### Section 3.4    No Material Litigation.

No litigation, investigation or proceeding of or before any arbitrator or Governmental Authority is pending or, to the best knowledge of the Issuer overtly threatened by or against the Issuer or against any of its properties or revenues (a) with respect to the Note Documents or any of the transactions contemplated hereby, or (b) which, if adversely determined, could reasonably be expected to have a Material Adverse Effect.

### Section 3.5    Investment Company Act.

The Issuer is not an "investment company", or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended. The Issuer is not subject to regulation under the Public Utility Holding Company Act of 1935, as amended, the Federal Power Act, the Interstate Commerce Act, or any federal or state statute or regulation limiting its ability to incur the Obligations.

### Section 3.6    Margin Regulations.

No part of the proceeds of the Initial Note hereunder will be used directly or indirectly for the purpose of buying or carrying any margin stock as defined under Regulation U of the Board of Governors of the Federal Reserve System. The Issuer does not own any "margin stock" as defined under Regulation U.

### Section 3.7    Labor Matters.

The Issuer has no employees.

### Section 3.8    Ownership.

The Issuer has good and marketable fee simple title to all of its assets, and none of such assets is subject to any Lien other than Permitted Liens.  Schedule 3.8 hereto shows, for each Subsidiary of the Issuer, its name, its jurisdiction of organization, its authorized and issued Stock, the holders of its Stock, and all agreements binding on such holders with respect to their Stock.

### Section 3.9    Indebtedness.

The Issuer has no Indebtedness, other than the Obligations.

### Section 3.10    Taxes.

The Issuer has filed, or caused to be filed, all tax returns (federal, state, provincial, local and foreign) required to be filed and paid (a) all amounts of taxes shown thereon to be due (including interest and penalties) and (b) all other taxes, fees, assessments and other governmental charges (including mortgage recording taxes, documentary stamp taxes and intangibles taxes) owing by it, except for such taxes (i) which are not yet delinquent or (ii) that are being contested in good faith and by proper proceedings, and against which adequate reserves are being maintained in accordance with GAAP.

### Section 3.11    No Burdensome Restrictions.

The Issuer is not a party to any agreement or instrument or subject to any other obligation or any charter or corporate restriction or any provision of any Requirement of Law which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

### Section 3.12    Security Agreement.

The Security Agreement creates valid security interests in, and Liens on, the Collateral purported to be covered thereby.  Except as set forth in the Security Agreement, such security interests and Liens are currently (or will be, upon the filing of appropriate financing statements in favor of the Holders' Representative, on behalf of the Holders) perfected security interests and Liens, prior to all other Liens other than Permitted Liens.

### Section 3.13    Accuracy and Completeness of Information.

All factual information heretofore, contemporaneously or hereafter furnished by or on behalf of the Issuer to the Holders' Representative or any Holder for purposes of or in connection with this Agreement or any other Note Document, or any transaction contemplated hereby or thereby, is or will be true and accurate in all material respects and not incomplete by omitting to state any material fact necessary to make such information not misleading.  There is no fact now known to the Issuer which has, or could reasonably be expected to have, a Material Adverse Effect which fact has not been set forth herein, in the financial statements of the Issuer furnished to the Holders' Representative or the Holders, or in any certificate, opinion or other written statement made or furnished by the Issuer to the Holders' Representative or the Holders.

### Section 3.14    Consummation of Plan of Reorganization; Representations and Warranties from Plan of Reorganization.

The transactions referred to in the Plan of Reorganization have been consummated substantially in accordance with the terms thereof.  As of the Closing Date, the Plan of Reorganization has not been

materially altered, amended or otherwise modified or supplemented or any condition thereof waived without the prior written consent of the Holders' Representative. Each of the representations and warranties made in the Plan of Reorganization by each of the parties thereto is true and correct, except for any representation or warranty therein the failure of which to be true and correct, does not have or could not reasonably be expected to have a Material Adverse Effect.

### Section 3.15    ABL.

All representations and warranties of the ABL Borrowers contained in any ABL Document are true and correct in all material respects when made. This Agreement and the other Note Documents are the "Master Note Agreement" (or similar term) as defined in the ABL Documents. The incurrence of the Obligations is in full compliance with the ABL Documents. All Obligations are "Indebtedness" as defined in the ABL Documents. There is no event of default or event or condition which could become an event of default with notice or lapse of time or both, under the ABL Documents.

### ARTICLE IV
### CONDITIONS PRECEDENT

**Section 4.1    Conditions to Closing Date**. This Agreement shall become effective upon, and the obligation of the Issuer to issue the Initial Note on the Closing Date is subject to, the satisfaction of the following conditions precedent:

(a)    Execution of Agreement. The Holders' Representative shall have received (i) counterparts of this Agreement, (ii) the Initial Note, (iii) counterparts of the Security Agreement, and (iv) duly executed copies of any other Note Documents, in each case conforming to the requirements of this Agreement and executed by a duly authorized officer of each party thereto.

(b)    Authority Documents. The Holders' Representative shall have received the following:

(i)    Articles of Incorporation. Copies of the articles of incorporation or other charter documents, as applicable, of the Issuer certified to be true and complete as of a recent date by the appropriate Governmental Authority of the state of its incorporation.

(ii)    Resolutions. Copies of resolutions of the board of directors or comparable managing body of the Issuer approving and adopting the Note Documents, the transactions contemplated therein and authorizing execution and delivery thereof, certified by an officer of the Issuer as of the Closing Date to be true and correct and in force and effect as of such date.

(iii)    Bylaws. A copy of the bylaws or comparable operating agreement of the Issuer certified by an officer of the Issuer as of the Closing Date to be true and correct and in force and effect as of such date.

(iv)    Good Standing. Copies of certificates of good standing certified of a recent date by the appropriate Governmental Authorities of the state of incorporation.

(v)    Incumbency. An incumbency certificate of the Issuer certified by a secretary or assistant secretary to be true and correct as of the Closing Date.

(c)     Plan of Reorganization.  Holders' Representative shall have received (i) a copy of the Confirmation Order entered by the Bankruptcy Court confirming the Plan of Reorganization and no pending appeal or motion for reversal, stay, review, revocation or reconsideration of such Confirmation Order shall have been filed or entered in the Bankruptcy Cases and (ii) certificates of the chief financial officer, chief executive officer or other senior financial officer of Issuer in form and substance reasonably satisfactory to Holders' Representative certifying (A) that each of the Reorganization Transaction Documents (as such term is defined in the ABL Agreement) are true, correct and complete and have been executed and delivered by each of the Pre-Petition Entities, Issuer and its Subsidiaries party thereto in accordance with the terms of the Plan of Reorganization, (B) that all conditions precedent to the consummation of the transactions contemplated by the Reorganization Transaction Documents have been satisfied, (C) the Plan of Reorganization has become effective (or shall become effective concurrently with the occurrence of the Closing Date) and (D) all transactions contemplated by the Reorganization Transaction Documents, including the transfer of assets from the Pre-Petition Entities to the Subsidiaries of Issuer have been consummated.

(d)     Collateral.  The Holders' Representative shall have received, in form and substance reasonably satisfactory to the Holders' Representative:

(i)     searches of UCC filings in the jurisdiction of the chief executive office of the Issuer and each jurisdiction where any Collateral is located or where a filing would need to be made in order to perfect the Holders' security interest in the Collateral, copies of the financing statements on file in such jurisdictions and evidence that no Liens exist other than Permitted Liens;

(ii)     UCC financing statements for each appropriate jurisdiction as is necessary, in the Holders' Representative's sole discretion, to perfect the Holders' security interest in the Collateral; and

(iii)     The original stock certificates evidencing 100% of the outstanding Stock of the Initial Holder, with blank stock certificates issued by the Holder.

(e)     Officer's Certificate.  The Holders' Representative shall have received a certificate executed by a responsible officer of the Issuer as of the Closing Date stating that (i) no action, suit, investigation or proceeding is pending or, to the knowledge of the Issuer, threatened in any court or before any arbitrator or governmental instrumentality that purports to affect the Issuer or the Plan of Reorganization or any other transaction contemplated by the Note Documents, if such action, suit, investigation or proceeding could reasonably be expected to have a Material Adverse Effect and (ii) immediately after giving effect to this Agreement, the other Note Documents, the Plan of Reorganization and all the transactions contemplated therein shall be consummated on the Closing Date, (A) no Default or Event of Default exists, and (B) all representations and warranties contained herein and in the other Note Documents are true and correct in all material respects.

(f)     ABL.  The ABL Borrowers and the ABL Lender shall have entered into the ABL Documents with respect to the ABL in form and substance reasonably satisfactory to the Holders' Representative and the Holders and all of the conditions to the initial advance thereunder shall have been satisfied or waived.  The Holders' Representative shall have received a copy, certified by an officer of the Issuer as true and complete, of each ABL Document as originally executed and delivered, together with all exhibits and schedules thereto.

(g)     Representations and Warranties.  The representations and warranties made by the Issuer herein, in the Security Agreement, in any other Note Document shall be true and correct on and as of the Closing Date.

(h)     No Default or Event of Default.  No Default or Event of Default shall have occurred and be continuing on such date or after giving effect to issuance of the Notes to be made on such date unless such Default or Event of Default shall have been waived in accordance with this Agreement.

**ARTICLE V**
**AFFIRMATIVE COVENANTS**

As long as any Obligations are outstanding, Issuer shall:

**Section 5.1     ABL Covenants.**

(a)     During ABL Agreement.  Cause each of its Subsidiaries to deliver all documents and information required to be delivered under Section 10.1.2 (the "*Information Statements*") of the ABL Agreement to the Holders' Representative at the same time as such documents are delivered to the ABL Lender; *provided*, that if the ABL Lender has not received the applicable Information Statement within the time period required under Section 10.1.2 of the ABL Agreement, then an Event of Default shall only occur under this clause (a) to the extent such Information Statements are not delivered to the Holders' Representative on the earlier of (i) 45 days after the due date for such Information Statement and (ii) the date that such Information Statement is delivered to the ABL Lender.

(b)     After ABL Agreement.  Cause each of its Subsidiaries, at anytime after the repayment and termination in full of the ABL Agreement, to comply with all covenants set forth in Section 10.1 of the ABL Loan Agreement (as if such ABL Agreement was still in effect) that are in effect immediately prior to the repayment and termination in full of the ABL Agreement, which shall be automatically incorporated herein by reference at the time of such repayment and termination of the ABL Agreement.

**Section 5.2     Additional Affirmative Covenants.**

(a)     Inspection; Audit.  Permit Holders' Representative from time to time, subject (except when a Default or Event of Default exists) to reasonable notice and normal business hours and at expense of Issuer, to visit and inspect the properties of Issuer or any of its Subsidiaries, inspect, audit and make extracts from Issuer's or any of its Subsidiaries' books and records, and discuss with its officers, employees, agents, advisors and independent accountants Issuer's or such Subsidiary's business, financial condition, assets, prospects and results of operations. Holders' Representative shall not have any duty to Issuer or any of its Subsidiaries to make any inspection, nor to share any results of any inspection, appraisal or report with any such Person.

(b)     Financial and Other Information.  Furnish to Holders' Representative such reports and information (financial or otherwise) as Holders' Representative may reasonably request from time to time in connection with financial condition or business of Issuer or any of its Subsidiaries.

(c)     Notification.  Notify Holders' Representative in writing, promptly after Issuer obtaining knowledge thereof, of any of the following that affects Issuer or any of its Subsidiaries: (a) the threat or commencement of any proceeding or investigation, whether or not covered by insurance, if an adverse determination could have a Material Adverse Effect; (b) any default under or termination of a material contract of Issuer; (c) the existence of any Default or Event of Default; (d) any judgment in an amount exceeding $500,000; and (e) any violation or asserted violation of any applicable law, if an adverse resolution could have a Material Adverse Effect. Furthermore any notices to be delivered by any of Issuer's Subsidiaries under Section 10.1.3 of the ABL Agreement to ABL Lender shall be contemporaneously delivered to Holders' Representative.

(d)     Compliance with Law.  Comply with all applicable laws, and laws regarding collection and payment of Taxes, and maintain all Governmental Approvals (as defined in the ABL Agreement) necessary for the ownership of its properties or conduct of its business, unless failure to comply or maintain could not reasonably be expected to have a Material Adverse Effect.

(e)     Taxes.  Pay and discharge all Taxes prior to the date on which they become delinquent or penalties attach, unless such Taxes are being Properly Contested.

(f)     Licenses.  Keep each License affecting any Collateral or any other material property of Issuer and each Subsidiary in full force and effect; promptly notify Holders' Representative of any proposed modification to any such License, or entry into any new License, in each case at least 30 days prior to its effective date; pay all royalties under such License when due; and notify Lender of any default or breach asserted by any Person to have occurred under any License.

## ARTICLE VI
## NEGATIVE COVENANTS

As long as any Obligations are outstanding, Issuer shall not:

## Section 6.1     **ABL Covenants.**

(a)     During ABL Agreement.  Permit any of its Subsidiaries, at anytime when there are obligations or commitments outstanding under the ABL Agreement, to fail to comply with the covenants set forth in Sections 10.2.1 and 10.2.2 of the ABL Agreement, which are incorporated herein by reference; *provided*, that the references to $500,000 in those sections of the ABL Agreement shall be replaced with $600,000; *provided, further*, that, for the avoidance of doubt, to the extent that ABL Lender amends or modifies the ABL Agreement to change any references to $500,000 (the "*ABL Cushion*") in Section 10.2.1 of the ABL Agreement, then Required Holders shall amend this clause (a) to change the references to "$600,000" under this clause (a) (the "*Note Cushion*") to the extent necessary to cause the Note Cushion to reflect an amount that is 20% more than the ABL Cushion.

(b)     After ABL Agreement.  Permit any of its Subsidiaries, at anytime after the repayment and termination in full of the ABL Agreement, to fail to comply with any of the covenants set forth in Section 10.2 of the ABL Agreement (as if such ABL Agreement was still in effect) that are in effect immediately prior to the repayment and termination in full of the ABL Agreement, which shall be automatically incorporated herein by reference at the time of such repayment and termination of the ABL Agreement.

**Section 6.2       Additional Negative Covenants:**

(a)      Permitted Indebtedness.    Create, incur, guarantee or suffer to exist any Indebtedness, except for the Obligations.

(b)      Permitted Liens.  Create, incur or suffer to exist any Liens on its assets, except for the Permitted Liens.

(c)      Fundamental Changes.  Merge, amalgamate, combine or consolidate with any Person, or liquidate, wind up its affairs or dissolve itself, in each case whether in a single transaction or in a series of related transactions, except for mergers, amalgamations or consolidations of a wholly-owned Subsidiary with another wholly-owned Subsidiary or into the Issuer; change its name or conduct business under any fictitious name; change its tax, charter or other organizational identification number; or change its form or jurisdiction of organization.

(d)      Distributions.  Declare or make any Distributions if a Default or Event of Default exists or would exist after giving effect to the Distribution.

(e)      Investments.  Make any Investment (as defined in the ABL Agreement), other than the Investment contemplated under the Plan of Reorganization.

(f)      Disposition of Assets.  Sell, lease, license, consign, transfer or make any other disposition of any of its property or assets.

(g)      Loans.  Make any loans or other advances of money to any Person.

(h)      Accounting Changes.  Make any material change in accounting treatment or reporting practices, except as required by GAAP and in accordance with Section 1.3; or change its Fiscal Year.

(i)      Restrictive Agreements.  Become a party to any agreement (other than a Note Document) that conditions or restricts the right of the Issuer to incur or repay borrowed money, to grant Liens on any assets, to declare or make Distributions (as defined in the ABL Agreement), to modify, extend or renew any agreement evidencing borrowed money, or to repay any intercompany Indebtedness, other than any such agreements executed in connection with the Plan of Reorganization.

(j)      Conduct of Business.  Engage in any business, other than its business as conducted on the Closing Date and any activities incidental thereto.

(k)      Affiliate Transactions.  Enter into or be party to any transaction with an Affiliate, except (i) transactions contemplated by the Plan of Reorganization, (ii) payment of customary directors' fees and indemnities; and (iii) transactions with Affiliates in the ordinary course of business, upon fair and reasonable terms fully disclosed to the Initial Holder and Holders' Representative and no less favorable than would be obtained in a comparable arm's-length transaction with a non-Affiliate.

**Section 6.3     Labor Matters.**

Hire any employees, without the prior written consent of the Holders' Representative.

**Section 6.4**     **Amendment of ABL.**

Permit any of its Subsidiaries to, after the issuance thereof, amend or modify or waive (or permit the amendment, modification or waiver of) any of the terms of the ABL if the effect of such amendment, modification or waiver would be to increase the principal amount due thereunder which results in the aggregate principal amount under the ABL Agreement to exceed $36,000,000.

**ARTICLE VII**
**EVENTS OF DEFAULT**

**Section 7.1**     **Events of Default.**

An Event of Default shall exist upon the occurrence of any of the following specified events (each an "***Event of Default***"):

(a)     The Issuer shall fail to pay any principal on any Note when due in accordance with the terms thereof or hereof, or the Issuer shall fail to pay any interest on any Note or any fee or other amount payable hereunder when due in accordance with the terms thereof or hereof and such failure shall continue unremedied for five (5) days; or

(b)     Any representation or warranty made or deemed made herein by Issuer, any of its Subsidiaries, or any of the ABL Borrowers, in the Security Agreement, in any of the other Note Documents, in the Plan of Reorganization, or in the ABL Documents or which is contained in any certificate, document or financial or other statement furnished at any time under or in connection with this Agreement shall prove to have been incorrect, false or misleading in any material respect on or as of the date made or deemed made; or

(c)     (i) The Issuer shall fail to perform, comply with or observe any term, covenant or agreement applicable to it contained in Section 5.1 or Article VI hereof; or (ii) the Issuer shall fail to comply with any other covenant, contained in this Agreement or the other Note Documents or any other agreement, document or instrument by the Issuer in favor of the Holders' Representative or the Holders (other than as described in Section 7.1(a) or Section 7.1(c)(i) above), and in the event such breach or failure to comply is capable of cure, is not cured within thirty (30) days of its occurrence; or

(d)     The Issuer, any of its Subsidiaries, or any of the ABL Borrowers shall (i) default in any payment of principal of or interest on the ABL provided in the ABL Documents (after giving effect to any grace periods, such a default is an "***ABL Default***") to the extent such ABL Default results in an acceleration of any of the obligations under the ABL Agreement or is not waived by the ABL Lender within 45 days after the ABL Default, (ii) default in any payment of principal of or interest on any Indebtedness (other than the Notes or the ABL) in a principal amount outstanding of at least $600,000 in the aggregate for the Issuer and any of its Subsidiaries beyond the period of grace (not to exceed 45 days), if any, provided in the instrument or agreement under which such Indebtedness was created; or (iii) default in the observance or performance of any other agreement or condition relating to any Indebtedness in a principal amount outstanding of at least 600,000 in the aggregate for the Issuer and its Subsidiaries or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit the holder or holders of such Indebtedness or beneficiary or beneficiaries of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or

beneficiaries) to cause, with the giving of notice if required, such Indebtedness to become due prior to its stated maturity; or

(e)     (i) The Issuer, any of its Subsidiaries, or any of the ABL Borrowers shall commence any case, proceeding or other action (a) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (b) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets, or such Person shall make a general assignment for the benefit of its creditors; or (ii) there shall be commenced against such Person any case, proceeding or other action of a nature referred to in clause (i) above which (a) results in the entry of an order for relief or any such adjudication or appointment or (b) remains undismissed, undischarged or unbonded for a period of 60 days; or (iii) there shall be commenced against the Issuer any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets which results in the entry of an order for any such relief which shall not have been vacated, discharged, or stayed or bonded pending appeal within 60 days from the entry thereof; or (iv) such Person shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (i), (ii), or (iii) above; or (v) the Issuer shall generally not, or shall be unable to, or shall admit in writing their inability to, pay its debts as they become due; or

(f)     One or more judgments or decrees shall be entered against the Issuer involving in the aggregate a liability (to the extent not covered by insurance) of $600,000 or more and all such judgments or decrees shall not have been paid and satisfied, vacated, discharged, stayed or bonded pending appeal within 10 Business Days from the entry thereof or any injunction, temporary restraining order or similar decree shall be issued against the Issuer that could result in a Material Adverse Effect; or

(g)     There shall occur a Change of Control or a Fundamental Change; or

(h)     Any Note Document (other than immaterial certificates or instruments) shall fail to be in full force and effect in any material respect or to give the Holders' Representative or the Holders the security interests, liens, rights, powers and privileges purported to be created thereby (except as such documents may be terminated or no longer in force and effect in accordance with the terms thereof, other than those indemnities and provisions which by their terms shall survive) or any Lien shall fail to be perfected on a material portion of the Collateral.

**Section 7.2     Acceleration; Remedies.**

(a)     Upon the occurrence and during the continuance of an Event of Default, then, and in any such event, (i) if such event is an Event of Default specified in Section 7.1(e) above, the Notes (with accrued interest thereon), and all other amounts under the Note Documents shall immediately become due and payable, (ii) if such event is any other Event of Default, the Holders' Representative, with the written consent of the Required Holders, by notice to the Issuer shall declare the Notes (with accrued interest thereon) and all other amounts owing under this Agreement and the Notes to be due and payable forthwith, and (iii) the Holders' Representative, solely at the direction of the Required Lenders, may pursue any available rights or remedies under (A) any of the Note Documents, including the Security Agreement, or (B) law or in equity to

collect payment on the Obligations or to enforce the performance of any provision of the Note Documents.

(b)     A delay or omission by the Holders' Representative or the Required Holders in exercising any right or remedy maturing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescense in the Event of Default. No remedy is exclusive of any other remedy. All available remedies are cumulative to the extent permitted by law.

## ARTICLE VIII
## THE HOLDERS' REPRESENTATIVE

### Section 8.1     Appointment and Authority.

(a)     Each of the Holders hereby irrevocably appoints Wells Fargo Bank, N.A., to act on its behalf as Holders' Representative hereunder and under the other Note Documents and authorizes the Holders' Representative to take such actions on its behalf and to exercise such powers as are delegated to the Holders' Representative by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. In performing its functions and duties hereunder, the Holders' Representative shall act solely as an agent of the Holders and does not assume and shall not be deemed to have assumed any obligation towards or relationship of agency or trust with or for the Issuer. The provisions of this Article are solely for the benefit of the Holders' Representative and the Holders, and the Issuer shall not have rights as a third party beneficiary of any of such provisions.

(b)     Except as otherwise specified herein or in any other Note Documents, all actions taken by the Holders' Representative behalf of the Holders pursuant to this Agreement or the other Note Documents, and all amounts realized by the Holders' Representative on behalf of the Holders under or in respect of this Agreement and the other Note Documents, shall be for the ratable benefit of all of Holders.

### Section 8.2     Rights as a Holder.

If the Person serving as the Holders' Representative hereunder also acts as a Holder hereunder, it shall have the same rights and powers in its capacity as a Holder as any other Holder may exercise the same as though it were not a Holders' Representative and the term "Holder" or "Holders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Holders' Representative hereunder in its individual capacity. The Holders' Representative and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Issuer or other Affiliate thereof as if such Person were not the Holders' Representative Agent hereunder and without any duty to account therefor to the Holders.

### Section 8.3     Exculpatory Provisions.

(a)     The Holders' Representative shall not have any duties or obligations except those expressly set forth herein and in the other Note Documents. Without limiting the generality of the foregoing, the Holders' Representative:

(i)     shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred;

(ii)     shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Note Documents that the Holders' Representative is required to exercise; *provided*, that the Holders' Representative shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Holders' Representative to liability or that is contrary to any Note Document or applicable law; or

(iii)     shall not, except as expressly set forth herein and in the other Note Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Issuer or any of its Affiliates that is communicated to or obtained by the Person serving as the Holders' Representative or any of its Affiliates in any capacity.

(b)     Until the Holders' Representative shall have received directions from the Required Holders to take action upon the occurrence of an Event of Default, the Holders' Representative may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to the Event of Default as it shall deem advisable in the best interest of the Holders.

(c)     Neither the Holders' Representative nor any of its Affiliates shall be liable to the Holders for any action taken or omitted by the Holders' Representative under or in connection with any of the Note Documents except to the extent caused by the Holders' Representative's gross negligence or willful misconduct as determined by a court of competent jurisdiction by a final and nonappealable judgment.   The Holders' Representative may at any time request instructions from the Required Holders with respect to any actions or approvals, which by the terms of this Agreement or any of the Note Documents, the Holders' Representative is permitted or required to take or to grant.  The Holders' Representative shall be entitled to refrain from any act or the taking of any action (including the failure to take an action) in connection herewith or any of the other Note Documents or from the exercise of any power, discretion or authority vested in it hereunder or thereunder unless and until the Holders' Representative shall have received instructions in respect thereof from the Required Holders and, upon receipt of such instructions from the Required Holders, the Holders' Representative shall be entitled to act or (where so instructed) refrain from acting, or to exercise such power, discretion or authority, in accordance with such instructions.  Without prejudice to the generality of the foregoing, no Holder shall have any right of action whatsoever against the Holders' Representative as a result of the Holders' Representative acting or (where so instructed) refraining from acting hereunder or any of the other Note Documents in accordance with the instructions of Required Holders.

(d)     The Holders' Representative shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Note Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms, conditions, or provisions set forth herein or in any of the Note Documents, or as to the use of the proceeds of the Notes, or as to the existence or possible existence of any Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Note Document or any other agreement, instrument or document or (v) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Holders' Representative.  The Holders' Representative shall not be required to make any disclosures with respect to the foregoing except as expressly set forth in the Note Documents.

(e)    Except as otherwise specifically set forth in this Agreement, any and all actions (including, without limitation, waivers, consents and/or approvals) that may be or are required to be taken by a Holder under this Agreement or any other Note Document, other than with respect to the purchasing of the Notes, shall be carried out by the Holders' Representative on behalf of such Holder. In no event shall any Holder take any such actions under this Agreement or any other Note Document other than through the Holders' Representative.

### Section 8.4    Delegation of Duties.

The Holders' Representative may perform any and all of its duties and exercise its rights and powers hereunder or under any other Note Document by or through any one or more agents, sub-agents, affiliates or employees appointed by the Holders' Representative. The Holders' Representative and any such agents, sub-agent, affiliates or employees may perform any and all of its duties and exercise its rights and powers by or through their respective Affiliates. The exculpatory provisions of this Article shall apply to any such agents, sub-agents, affiliates or employees and to the Affiliates of the Holders' Representative and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facility provided for herein as well as activities as the Holders' Representative.

### Section 8.5    Reliance by Holders' Representative.

The Holders' Representative shall be entitled to rely, and shall be fully protected in relying, upon any Note, writing, resolution, notice, consent, certificate, affidavit, letter, cablegram, telegram, telecopy, telex or teletype message, statement, order or other document or conversation believed by it in good faith to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including, without limitation, counsel to the Issuer), independent accountants and other experts selected by the Holders' Representative. The Holders' Representative may deem and treat the payee of any Note as the owner thereof for all purposes unless (a) a written notice of assignment, negotiation or transfer thereof shall have been filed with any of the Holders' Representative and (b) the Holders' Representative shall have received the written agreement of such assignee to be bound hereby as fully and to the same extent as if such assignee were an original Holder party hereto, in each case in form satisfactory to the Holders' Representative. The Holders' Representative shall be fully justified in failing or refusing to take any action under this Agreement unless it shall first receive such advice or concurrence of the Required Holders as it deems appropriate or it shall first be indemnified to its satisfaction by the Holders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action. The Holders' Representative shall in all cases be fully protected in acting, or in refraining from acting, under any of the Note Documents in accordance with a request of the Required Holders or all of the Holders, as may be required under this Agreement, and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Holders and all future holders of the Notes.

### Section 8.6    Notice of Default.

The Holders' Representative shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder unless the Holders' Representative has received notice from a Holder or the Issuer referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default". In the event that the Holders' Representative receives such a notice, the Holders' Representative shall give prompt notice thereof to the Holders. The Holders' Representative shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Holders; *provided, however*, that unless and until the Holders' Representative shall have received such directions, the Holders' Representative may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of

Default as it shall deem advisable in the best interests of the Holders except to the extent that this Agreement expressly requires that such action be taken, or not taken, only with the consent or upon the authorization of the Required Holders, or all of the Holders, as the case may be.

### Section 8.7    Non-Reliance on Holders' Representative and Other Holders.

Each Holder expressly acknowledges that neither the Holders' Representative nor any of their officers, directors, employees, agents, attorneys-in-fact or affiliates has made any representation or warranty to it and that no act by the Holders' Representative hereinafter taken, including any review of the affairs of the Issuer, shall be deemed to constitute any representation or warranty by the Holders' Representative to any Holder. Each Holder represents to the Holders' Representative that it has, independently and without reliance upon the Holders' Representative or any other Holder, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of the Issuer and made its own decision to make its Loans hereunder and enter into this Agreement. Each Holder also represents that it will, independently and without reliance upon the Holders' Representative or any other Holder, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Issuer. Except for notices, reports and other documents expressly required to be furnished to the Holders by the Holders' Representative hereunder, the Holders' Representative shall not have any duty or responsibility to provide any Holder with any credit or other information concerning the business, operations, property, condition (financial or otherwise), prospects or creditworthiness of the Issuer which may come into the possession of the Holders' Representative or any of its officers, directors, employees, agents, attorneys-in-fact or affiliates.

### Section 8.8    Successor Representative.

The Holders' Representative may resign as the Holders' Representative upon 30 days' prior notice to the Issuer and the Holders. If the Holders' Representative shall resign as Holders' Representative under this Agreement and the Notes, then the Required Holders shall appoint from among the Holders a successor agent for the Holders, which successor Holders' Representative shall be approved by the Issuer with such approval not to be unreasonably withheld (*provided, however*, if an Event of Default shall exist at such time, no approval of the Issuer shall be required hereunder), whereupon such successor agent shall succeed to the rights, powers and duties of the Holders' Representative, and the term "Holders' Representative", as applicable, shall mean such successor agent effective upon such appointment and approval, and the former Holders' Representative's rights, powers and duties as Holders' Representative shall be terminated, without any other or further act or deed on the part of such former Holders' Representative or any of the parties to this Agreement or any holders of the Notes. After the retiring Holders' Representative's resignation as Holders' Representative, the provisions of this Section 8.8 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Holders' Representative under this Agreement.

### Section 8.9    Collateral.

Each Holder hereby further authorizes the Holders' Representative to enter into the Note Documents as secured party on behalf of and for the benefit of the Holders and agrees to be bound by the terms of the Note Documents. The Holders' Representative is hereby authorized to hold all Collateral pledged pursuant to any Note Document and to act on behalf of the Holders in respect of the Security Agreement; *provided*, that the Holders' Representative shall not agree to the release of any Collateral

except in accordance with the terms of this Agreement and the Note Documents. The Holders acknowledge that the Notes, all interest, fees and expenses and other obligations hereunder constitute one Indebtedness, secured by all of the Collateral.

### Section 8.10    Holders' Representative May File Proofs of Claim.

(a)    In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to the Issuer, the Holders' Representative (irrespective of whether the principal of the Notes shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Holders' Representative shall have made any demand on the Issuer) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(i)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the total amount due under the Notes and all other Obligations that are owing and unpaid to the Holders' Representative or the Holders under the Note Documents and to file such other documents as may be necessary or advisable in order to have the claims of the Holders and the Holders' Representative (including any claim for the reasonable compensation, expenses, disbursements and advances of the Holders and the Holders' Representative and their respective agents and counsel and all other amounts due to the Holders and the Holders' Representative under the Note Documents) allowed in such judicial proceeding; and

(ii)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Holder to make such payments to the Holders' Representative and, in the event that the Holders' Representative shall consent to the making of such payments directly to the Holders, to pay to the Holders' Representative any amount due to the Holders' Representative under the Note Documents.

(b)    Nothing contained herein shall be deemed to authorize the Holders' Representative to authorize or consent to or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting the obligations owed by the Issuer hereunder or the rights of any Holder or to authorize the Holders' Representative to vote in respect of the claim of any Holder in any such proceeding.

### ARTICLE IX
### MISCELLANEOUS

### Section 9.1    Amendments, Waivers and Release of Collateral.

Neither this Agreement nor any of the other Note Documents, nor any terms hereof or thereof may be amended, supplemented, waived or modified except in accordance with the provisions of this Section nor may be released except as specifically provided herein or in the Security Agreement or in accordance with the provisions of this Section 9.1. The Required Holders may, or, with the written consent of the Required Holders, the Holders' Representative may, from time to time, (a) enter into with the Issuer written amendments, supplements or modifications hereto and to the other Note Documents for the purpose of adding any provisions to this Agreement or the other Note Documents or changing in any manner the rights of the Holders or of the Issuer hereunder or thereunder or (b) waive, on such terms and

conditions as the Required Holders may specify in such instrument, any of the requirements of this Agreement or the other Note Documents or any Default or Event of Default and its consequences; *provided, however,* that no such waiver and no such amendment, waiver, supplement, modification or release shall:

> (i)     reduce the amount or extend the scheduled date of maturity of any Note or any installment thereon, or reduce the stated rate of any interest or fee payable hereunder (other than interest at the increased post-default rate) or extend the scheduled date of any payment thereof, in each case without the written consent of each Holder directly affected thereby, or

> (ii)     amend, modify or waive any provision of this Section 9.1 or reduce the percentage specified in the definition of Required Holders, without the written consent of all the Holders, or

> (iii)     amend, modify or waive any provision of Article VIII without the written consent of the then Holders' Representative, or

> (iv)     release all or substantially all of the Collateral, without the written consent of all of the Holders, or

> (v)     amend, modify or waive any provision of the Note Documents affecting the rights or duties of the Holders' Representative under any Note Document without the written consent of the Holders' Representative in addition to the Holders required hereinabove to take such action.

Any such waiver, amendment, supplement or modification and any such release shall apply equally to each of the Holders and shall be binding upon the Issuer, the Holders, the Holders' Representative and all future holders of the Notes. In the case of any waiver, the Issuer, the Holders and the Holders' Representative shall be restored to their former position and rights hereunder and under the outstanding Notes and other Note Documents, and any Default or Event of Default waived shall be deemed to be cured and not continuing; but no such waiver shall extend to any subsequent or other Default or Event of Default, or impair any right consequent thereon.

Notwithstanding any of the foregoing to the contrary, the consent of the Issuer shall not be required for any amendment, modification or waiver of the provisions of Article VIII (other than the provisions of Section 8.8).

Notwithstanding the fact that the consent of all the Holders is required in certain circumstances as set forth above, (x) each Holder is entitled to vote as such Holder sees fit on any bankruptcy reorganization plan that affects the Notes, and each Holder acknowledges that the provisions of Section 1126(c) of the Bankruptcy Code supersedes the unanimous consent provisions set forth herein and (y) the Required Holders may consent to allow the Issuer to use cash collateral in the context of a bankruptcy or insolvency proceeding.

**Section 9.2**    **Notices.**

Except as otherwise provided in Article II, all notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by telecopy), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made (a) when delivered by hand, (b) when transmitted via telecopy (or other facsimile device) to the number set out herein, (c) the

Business Day immediately following the day on which the same has been delivered prepaid to a reputable national overnight air courier service, or (d) the third Business Day following the day on which the same is sent by certified or registered mail, postage prepaid, in each case, addressed as follows in the case of the Issuer and the Holders' Representative or to such other address as may be hereafter notified by the respective parties hereto and any future holders of the Notes:

| The Issuer: | LHM I, Inc. |
| | [_____] |
| | [_____] |

with a copy to:

[_____]
[_____]
[_____]

| To the Holders' Representative: | Wells Fargo Bank, N.A. |
| | [_____] |
| | [_____] |

with a copy to:

[_____]
[_____]
[_____]

### Section 9.3    No Waiver; Cumulative Remedies.

No failure to exercise and no delay in exercising, on the part of the Holders' Representative or any Holder, any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

### Section 9.4    Survival of Representations and Warranties.

All representations and warranties made hereunder and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the Notes; *provided*, that all such representations and warranties shall terminate on the date upon which all amounts owing hereunder and under any Notes have been paid in full.

### Section 9.5    Payment of Expenses and Taxes.

The Issuer agrees (a) to pay or reimburse the Holders' Representative for all its reasonable out-of-pocket costs and expenses incurred in connection with the development, preparation, negotiation, printing and execution of, and any amendment, supplement or modification to, this Agreement and the other Note

Documents and any other documents prepared in connection herewith or therewith, and the consummation and administration of the transactions contemplated hereby and thereby, together with the reasonable fees and disbursements of counsel to the Holders' Representative, (b) to pay or reimburse each Holder and the Holders' Representative for all its costs and expenses incurred in connection with the acceleration of the Notes hereunder and the related enforcement or preservation of any rights under this Agreement and the other Note Documents, including, without limitation, the reasonable fees and disbursements of counsel to the Holders' Representative and to the Holders, and (c) on demand, to pay, indemnify, and hold each Holder and the Holders' Representative harmless from, any and all recording and filing fees and any and all liabilities with respect to, or resulting from any delay in paying, stamp, excise and other similar taxes, if any, which may be payable or determined to be payable in connection with the execution and delivery of, or consummation or administration of any of the transactions contemplated by, or any amendment, supplement or modification of, or any waiver or consent under or in respect of, the Note Documents and any such other documents, and (d) to pay, indemnify, and hold each Holder and the Holders' Representative and their Affiliates harmless from and against, any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever with respect to the execution, delivery, enforcement, performance and administration of the Note Documents and any such other documents and the use, or proposed use, of proceeds of the Notes (all of the foregoing, collectively, the "*indemnified liabilities*"); *provided, however,* that the Issuer shall not have any obligation hereunder to the Holders' Representative or any Holder or any Affiliate thereof with respect to indemnified liabilities to the extent arising from the gross negligence, bad faith or willful misconduct of the Holders' Representative or any such Holder or any such Affiliate, as determined by a court of competent jurisdiction. The agreements in this Section 9.5 shall survive repayment of the Notes and the Obligations.

### Section 9.6    Successors and Assigns; Purchasing Holders.

(a)     This Agreement shall be binding upon and inure to the benefit of the Issuer, the Holders, the Holders' Representative, all future holders of the Notes and their respective successors and assigns, except that the Issuer may not assign or transfer any of its rights or obligations under this Agreement or the other Note Documents without the prior written consent of the Required Holders.

(b)     Any Holder may at any time sell to one or more Persons ("*Participants*") participating interests in any amounts owing to such Holder, any Note held by such Holder, or any other interest of such Holder hereunder.  In the event of any such sale by a Holder of participating interests to a Participant, such Holder's obligations under this Agreement to the other parties to this Agreement shall remain unchanged, such Holder shall remain solely responsible for the performance thereof, such Holder shall remain the holder of any such Note for all purposes under this Agreement, and the Issuer and the Holders' Representative shall continue to deal solely and directly with such Holder in connection with such Holder's rights and obligations under this Agreement; *provided*, that each Participant shall be entitled to the benefits of Section 9.5 with respect to the Notes outstanding from time to time; *provided further*, that no Participant shall be entitled to receive any greater amount pursuant to such Section than the transferor Holder would have been entitled to receive in respect of the amount of the participation transferred by such transferor Holder to such Participant had no such transfer occurred.

(c)     Any Holder may at any time, sell or assign to any Holder or any Affiliate thereof and with the consent of the Holders' Representative and, so long as no Event of Default has occurred and is continuing, the Issuer (in each case, which consent shall not be unreasonably withheld), to one or more Persons ("*Purchasing Holders*"), all or any part of its rights and obligations under this Agreement and the Notes. Each assignment shall be in minimum amounts

of $1,000,000 (or, if less, the entire amount of such Holder's Note), pursuant to an Assignment Instrument, executed by (i) such Purchasing Holder, (ii) such transferor Holder, (iii) in the case of the Purchasing Holder that is not then (A) a Holder, (B) an Affiliate of a Holder, or (C) a Person acquiring its interest under a Permitted Transfer, the Holders' Representative, and (iv) unless an Event of Default has occurred and is continuing or the assignment evidences a Permitted Transfer, the Issuer, and delivered to the Holders' Representative for its acceptance and recording in the Register; *provided, however*, that any Permitted Transfer and any sale or assignment to an existing Holder, or Affiliate thereof, shall not require the consent of the Holders' Representative or the Issuer nor shall any such sale or assignment be subject to the minimum assignment amounts specified herein. Upon such execution, delivery, acceptance and recording, from and after the Assignment Effective Date specified in such Assignment Instrument, (x) the Purchasing Holder thereunder shall be a party hereto and, to the extent provided in such Assignment Instrument, have the rights and obligations of a Holder hereunder with a Note as set forth therein, and (y) the transferor Holder thereunder shall, to the extent provided in such Assignment Instrument, be released from its obligations under this Agreement, except with respect to any accrued obligations not then satisfied (and, in the case of an Assignment Instrument covering all or the remaining portion of a transferor Holder's rights and obligations under this Agreement, such transferor Holder shall cease to be a party hereto). Such Assignment Instrument shall be deemed to amend this Agreement to the extent, and only to the extent, necessary to reflect the addition of such Purchasing Holder. On or prior to the Assignment Effective Date specified in such Assignment Instrument, the Issuer, at its own expense, shall execute and deliver to the Holders' Representative in exchange for the Notes delivered to the Holders' Representative pursuant to, such Assignment Instrument new Notes to the order of such Purchasing Holder in an amount equal to amounts assumed by it pursuant to such Assignment Instrument. Such new Notes [shall be dated the Closing Date] and shall otherwise be in the form of the Notes replaced thereby.

(d)     The Holders' Representative shall maintain at its address referred to in Section 9.2 a copy of each Assignment Instrument delivered to it and a register (the "***Register***") for the recordation of the names and addresses of the Holders, and principal amount of the Notes owing to each Holder from time to time. The entries in the Register shall be presumptively correct, in the absence of manifest error, and the Issuer, the Holders' Representative and the Holders may treat each Person whose name is recorded in the Register as the owner of the Note recorded therein for all purposes of this Agreement. The Register shall be available for inspection by the Issuer or any Holder at any reasonable time and from time to time upon reasonable prior notice.

(e)     Upon its receipt of a duly executed Assignment Instrument, together with payment to the Holders' Representative by the transferor Holder or the Purchasing Holder, as agreed between them, of a registration and processing fee of $3,500 for each Purchasing Holder (other than an Affiliate of such Holder or with respect to a Permitted Transfer) listed in such Assignment Instrument and the Notes subject to such Assignment Instrument, the Holders' Representative shall (i) accept such Assignment Instrument, (ii) record the information contained therein in the Register and (iii) give prompt notice of such acceptance and recordation to the Holders and the Issuer. Notwithstanding the foregoing, this provision shall not be applicable to any assignments contemplated under the Plan of Reorganization.

(f)     The Issuer authorizes each Holder to disclose to any Participant or Purchasing Holder (each, a "***Transferee***") and any prospective Transferee any and all financial information in such Holder's possession concerning the Issuer and its Affiliates which has been delivered to such Holder by or on behalf of the Issuer pursuant to this Agreement or which has been delivered to such Holder by or on behalf of the Issuer in connection with such Holder's credit evaluation of

the Issuer and its Affiliates prior to becoming a party to this Agreement, in each case subject to Section 9.15.

(g)     Nothing herein shall prohibit any Holder from pledging or assigning (except for the Permitted Transfers) any of its rights under this Agreement (including, without limitation, any right to payment of principal and interest under any Note) to any Federal Reserve Bank in accordance with applicable laws, it being acknowledged and agreed that the Note, when assigned by the Pre-Petition Entities to the Prepetition Lenders pursuant to the Plan of Reorganization shall be free and clear of any Liens or encumbrances.

## Section 9.7    Adjustments; Set-off.

(a)     Each Holder agrees that if any Holder (a "***benefited Holder***") shall at any time receive any payment of all or part of its Notes, or interest thereon, or receive any collateral in respect thereof (whether voluntarily or involuntarily, by set-off, pursuant to events or proceedings of the nature referred to in Section 7.1(e), or otherwise) in a greater proportion than any such payment to or collateral received by any other Holder, if any, in respect of such other Holder's Notes, or interest thereon, such benefited Holder shall purchase for cash from the other Holders a participating interest in such portion of each such other Holder's Note, or shall provide such other Holders with the benefits of any such collateral, or the proceeds thereof, as shall be necessary to cause such benefited Holder to share the excess payment or benefits of such collateral or proceeds ratably with each of the Holders; *provided, however*, that if all or any portion of such excess payment or benefits is thereafter recovered from such benefited Holder, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest. The Issuer agrees that each Holder so purchasing a portion of another Holder's Notes may exercise all rights of payment (including, without limitation, rights of set-off) with respect to such portion as fully as if such Holder were the direct holder of such portion.

(b)     In addition to any rights and remedies of the Holders provided by law (including, without limitation, other rights of set-off), each Holder shall have the right, without prior notice to the Issuer, any such notice being expressly waived by the Issuer to the extent permitted by applicable law, during the continuance of any Event of Default, to setoff and appropriate and apply any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Holder or any branch or agency thereof to or for the credit or the account of the Issuer or any part thereof in such amounts as such Holder may elect, against and on account of the obligations and liabilities of the Issuer to such Holder hereunder and claims of every nature and description of such Holder against the Issuer, in any currency, whether arising hereunder, under the Notes or under any documents contemplated by or referred to herein or therein, as such Holder may elect, whether or not such Holder has made any demand for payment and although such obligations, liabilities and claims may be contingent or unmatured. The aforesaid right of set-off may be exercised by such Holder against the Issuer or against any trustee in bankruptcy, debtor in possession, assignee for the benefit of creditors, receiver or execution, judgment or attachment creditor of the Issuer or against anyone else claiming through or against the Issuer or any such trustee in bankruptcy, debtor in possession, assignee for the benefit of creditors, receiver, or execution, judgment or attachment creditor, notwithstanding the fact that such right of set-off shall not have been exercised by such Holder prior to the occurrence of any Event of Default. Each Holder agrees promptly to notify the Issuer and the Holders' Representative after any such set-off and application made by such Holder; *provided, however*, that the failure to give such notice shall not affect the validity of such set-off and application.

### Section 9.8    Table of Contents and Section Headings.

The table of contents and the Section and subsection headings herein are intended for convenience only and shall be ignored in construing this Agreement.

### Section 9.9    Counterparts.

This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. A set of the copies of this Agreement signed by all the parties shall be logged with the Issuer and the Holders' Representative.

### Section 9.10    Effectiveness.

This Agreement shall become effective on the date on which all of the parties have signed a copy hereof (whether the same or different copies) and shall have delivered the same to the Holders' Representative pursuant to Section 9.2 or, in the case of the Holders, shall have given to the Holders' Representative written, telecopied or telex notice (actually received) at such office that the same has been signed and mailed to it.

### Section 9.11    Severability.

Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

### Section 9.12    Integration.

This Agreement and the other Note Documents represent the agreement of the Issuer, the Holders' Representative and the Holders with respect to the subject matter hereof, and there are no promises, undertakings, representations or warranties by the Holders' Representative, the Issuer, or any Holder relative to the subject matter hereof not expressly set forth or referred to herein or therein.

### Section 9.13    Governing Law.

This Agreement and, unless otherwise specified therein, each other Note Document and the rights and obligations of the parties under this Agreement and such other Note Document shall be governed by, and construed and interpreted in accordance with, the law of the State of New York.

### Section 9.14    Consent to Jurisdiction and Service of Process.

All judicial proceedings brought against the Issuer with respect to this Agreement, any Note or any of the other Note Documents may be brought in any state or federal court of competent jurisdiction in the State of New York, and, by execution and delivery of this Agreement, the Issuer accepts, for itself and in connection with its properties, generally and unconditionally, the non-exclusive jurisdiction of the aforesaid courts and irrevocably agrees to be bound by any final judgment rendered thereby in connection with this Agreement from which no appeal has been taken or is available. The Issuer irrevocably agrees that all service of process in any such proceedings in any such court may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to it at its address set forth in Section 9.2 or at such other address of which the Holders' Representative shall

have been notified pursuant thereto, such service being hereby acknowledged by the Issuer to be effective and binding service in every respect. The Issuer, the Holders' Representative and the Holders irrevocably waive any objection, including, without limitation, any objection to the laying of venue or based on the grounds of forum non conveniens which it may now or hereafter have to the bringing of any such action or proceeding in any such jurisdiction. Nothing herein shall affect the right to serve process in any other manner permitted by law or shall limit the right of any Holder to bring proceedings against the Issuer in the court of any other jurisdiction.

### Section 9.15    Confidentiality.

The Holders' Representative and each of the Holders agrees that it will use its best efforts not to disclose without the prior consent of the Issuer (other than to its employees, affiliates, auditors or counsel or to another Holder) any information (the "*Information*") with respect to the Issuer which is furnished pursuant to this Agreement, any other Note Document or any documents referred to as confidential or as to which it is otherwise reasonably clear such information is not public, except that any Holder may disclose any such Information (a) as has become generally available to the public other than by a breach of this Section 9.15, (b) as may be required or appropriate in any report, statement or testimony submitted to any municipal, state, provincial or federal regulatory body having or claiming to have jurisdiction over such Holder or to the Federal Reserve Board or the Federal Deposit Insurance Corporation or the Office of the Comptroller of the Currency or the National Association of Insurance Commissioners or similar organizations (whether in the United States or elsewhere) or their successors, (c) as may be required or appropriate in response to any summons or subpoena or any law, order, regulation or ruling applicable to such Holder, (d) to any prospective Participant or assignee in connection with any contemplated transfer pursuant to Section 9.6, provided that such prospective transferee shall have been made aware of this Section 9.15 and shall have agreed to be bound by its provisions as if it were a party to this Agreement, (e) in connection with any suit, action or proceeding for the purpose of defending itself, reducing its liability, or protecting or exercising any of its claims, rights, remedies or interests under or in connection with the Note Documents, (f) to any direct or indirect contractual counterparty in swap agreements or such contractual counterparty's professional advisor (so long as such contractual counterparty or professional advisor to such contractual counterparty agrees to be bound by the provisions of this Section 9.15) or (g) to the National Association of Insurance Commissioners or any similar organization or any nationally recognized rating agency that requires access to information about a Holder's investment portfolio in connection with ratings issued with respect to such Holder.

### Section 9.16    No Advisory or Fiduciary Relationship.

In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Note Document), the Issuer acknowledges and agrees that: (i)(A) the arranging and other services regarding this Agreement provided by the Holders' Representative are arm's-length commercial transactions between the Issuer and the Holders' Representative, on the other hand, (B) the Issuer has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) the Issuer is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Note Documents; (ii)(A) the Holders' Representative is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Issuer or any of its Affiliates, or any other Person and (B) the Holders' Representative has no any obligation to the Issuer or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Note Documents; and (iii) the Holders' Representative and its Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Issuer and its Affiliates, and the Holders' Representative has no obligations to disclose any of such interests to the Issuer or any of its

Affiliates. To the fullest extent permitted by law, the Issuer hereby waives and releases any claims that it may have against the Holders' Representative with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

### Section 9.17    Waivers of Jury Trial.

THE ISSUER, THE HOLDERS' REPRESENTATIVE, AND THE HOLDERS HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE, TO THE EXTENT PERMITTED BY APPLICABLE LAW, TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER NOTE DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.

### Section 9.18    Judgment Currency.

If, for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder or under any other Note Document in one currency into another currency, the rate of exchange used shall be that at which in accordance with normal banking procedures the Holders' Representative, as applicable, could purchase the first currency with such other currency on the Business Day preceding that on which final judgment is given. The obligation of the Issuer in respect of any such sum due from it to the Holders' Representative or any Holder hereunder or under the other Note Documents shall, notwithstanding any judgment in a currency (the "*Judgment Currency*") other than that in which such sum is denominated in accordance with the applicable provisions of this Agreement (the "*Agreement Currency*"), be discharged only to the extent that on the Business Day following receipt by the Holders' Representative or such Holder of any sum adjudged to be so due in the Judgment Currency, the Holders' Representative or such Holder may in accordance with normal banking procedures purchase the Agreement Currency with the Judgment Currency. If the amount of the Agreement Currency so purchased is less than the sum originally due to the Holders' Representative or such Holder in the Agreement Currency, the Issuer agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Holders' Representative or such Holder or the Person to whom such obligation was owing against such loss. If the amount of the Agreement Currency so purchased is greater than the sum originally due to the Holders' Representative or such Holder in such currency, the Holders' Representative or such Holder agrees to return the amount of any excess to the Issuer (or to any other Person who may be entitled thereto under applicable law).

### Section 9.19    Patriot Act Notice.

Each Holder that is subject to the Patriot Act (as hereinafter defined) and the Holders' Representative (for itself and not on behalf of any Holder) hereby notifies the Issuer that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "*Patriot Act*"), it is required to obtain, verify and record information that identifies the Issuer, which information includes the name and address of the Issuer and other information that will allow such Holder or Holders' Representative, as applicable, to identify the Issuer in accordance with the Patriot Act. The Issuer agrees to promptly provide any Holder or the Holders' Representative with all of the information requested by such Person to the extent such Person deems such information reasonably necessary to identify the Issuer in accordance with the Patriot Act.

*[Remainder of page left blank intentionally.  Signature pages follow.]*

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed and delivered by their respective officers or representatives thereunto duly authorized, as of the date first above written.

**ISSUER:**

LMH I, Inc., as Issuer

By:_____
     Name:
     Title:

**HOLDER:**

LMH II, Inc., as Initial Holder

By:_____
    Name:
    Title:

**HOLDERS' REPRESENTATIVE:**

Wells Fargo Bank, N.A., as Holders' Representative

By:_____
    Name:
    Title:

## SCHEDULE 1.1(A)

## HOLDERS' REPRESENTATIVE

[To be provided.]

**SCHEDULE 3.8**

**SUBSIDIARIES**

**[To be provided.]**

# EXHIBIT A

# FORM OF NOTE

---

## PROMISSORY NOTE

$[_____]

[_____]
[_____], [_____]

FOR VALUE RECEIVED, LMH I, Inc. (the "*Issuer*"), HEREBY PROMISES TO PAY to the order of [_____], a [_____] (the "*Holder*"), at its offices located at [_____], the principal sum of [_____] Dollars ($ [_____]) together with any increases in the principal sum of this Note due to any payments in-kind made by Issuer pursuant to Section 2.1(c)(iii) of the Master Note Agreement (as defined below) in accordance with the terms and conditions set forth in the Master Note Agreement. All capitalized terms not otherwise defined herein are used herein as defined in the Master Note Agreement, dated as of [_____] (as amended, restated, supplanted or otherwise modified from time to time, the "*Master Note Agreement*") among the Issuer, LMH II, Inc., a corporation organized and existing under the laws of the State of Delaware, and Wells Fargo Bank, N.A., as holders' representative.

The Issuer also promises to pay (i) interest on the unpaid principal amount hereof from the date hereof until paid in full at the rates, in the manner, and at the times provided in the Master Note Agreement and (ii) fees at such times and at such rates and amounts as specified in the Master Note Agreement.

Principal, interest and fees are payable in lawful money of the United States of America and in immediately available funds, at the times and in the amounts provided in the Master Note Agreement.

This Note is entitled to the benefits and is subject to the terms and conditions of the Master Note Agreement, and is entitled to the benefits of the security provided under the Security Agreement. As provided in the Master Note Agreement, this Note is subject to voluntary prepayment, in whole or in part. The Issuer agrees to make prepayment of principal on the dates and in the amounts specified in the Master Note Agreement.

The Master Note Agreement, among other things, contains provisions for acceleration of the maturity hereof upon the happening of certain stated events.

The Holder is hereby authorized, at its option, either (i) to endorse on the schedule attached hereto (or on a continuation of such schedule attached to this Note and made a part hereof) an appropriate notation evidencing the date and amount of any capitalized interest and the date and amount of any interest payments, or (ii) to record the amounts of capitalized interest and payments of interest hereunder in its books and records. Such schedule or books and records shall constitute *prima facie* evidence of the accuracy of the information contained therein, but in no event shall any failure by the Holder to endorse or record pursuant this clause be deemed to relieve the Issuer from any of its obligations.

The Issuer hereby waives presentment, demand, protest or notice of any kind in connection with this Note. All amounts payable under this Note are payable without relief from valuation and appraisement laws.

The Issuer agrees to pay all reasonable costs and expenses, including without limitation reasonable attorneys' fees, incurred in connection with the interpretation or enforcement of this Note, in accordance with the Master Note Agreement.

THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

LMH I, Inc.,
a Delaware corporation

By: _____
    Name:
    Title

Schedule to Note

**PREPAYMENTS, CAPITALIZED INTEREST, AND PAYMENTS OF INTEREST**

| Date | Amount of Capitalized Interest | Amount of Interest Paid | Amount of Principal Prepaid | Outstanding Principal Balance | Notation Made By |
|------|-------------------------------|------------------------|----------------------------|-------------------------------|------------------|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

**EXHIBIT B**

**FORM OF SECURITY AGREEMENT**

---

**SECURITY AGREEMENT**

THIS SECURITY AGREEMENT (as amended, modified, extended, renewed, restated or replaced from time to time, the "*Security Agreement*"), is entered into as of [_____], between LMH I, Inc., a corporation organized and existing under the laws of the State of Delaware (the "*Obligor*") and Wells Fargo Bank, N.A., a national banking association, as holders' representative under the Agreement referred to below (in such capacity, the "*Holders' Representative*") acting for the benefit of LMH II, Inc., a corporation organized and existing under the laws of the State of Delaware (the "*Initial Holder*") and all other Holders (as defined in the Agreement).

RECITALS

**WHEREAS**, the Obligor, the Initial Holder and the Holders' Representative are entering into contemporaneously herewith that certain Master Note Agreement dated as of the date hereof (as amended, modified, extended, renewed, restated or replaced from time to time, the "*Agreement*"), pursuant to which the Obligor has agrees to issue to the Initial Holder the Initial Note, upon the terms and subject to the conditions set forth therein; and

**WHEREAS**, it is a condition precedent to the effectiveness of the Agreement that the Obligor shall have executed and delivered this Security Agreement to the Holders' Representative for the ratable benefit of the Holders; and

**NOW, THEREFORE**, in consideration of these premises and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.      Definitions.

      1.01.   Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to such terms in the Agreement.

      1.02.   In addition, the following terms shall have the following meaning:

"*Collateral*" shall mean:

      (a)      all Accounts (as defined in the UCC);

      (b)      all Chattel Paper as defined in the UCC, including electronic chattel paper;

      (c)      all Commercial Tort Claims (as defined in the UCC);

      (d)      all Deposit Accounts (as defined in the UCC);

      (e)      all Documents (as defined in the UCC);

      (f)      all General Intangibles, including Intellectual Property (as defined in the UCC);

(g)     all Goods, including Inventory, Equipment and fixtures (as defined in the UCC);

(h)     all Instruments (as defined in the UCC);

(i)     all Investment Property (as defined in the UCC), including all of the Stock issued by the Initial Holder;

(j)     all Letter-of-Credit Rights (as defined in the UCC);

(k)     all Supporting Obligations (as defined in the UCC);

(l)     all monies, whether or not in the possession or under the control of Holders' Representative;

(m)     all accessions to, substitutions for, and all replacements, products, and cash and non-cash proceeds of the foregoing, including proceeds of and unearned premiums with respect to insurance policies, and claims against any Person for loss, damage or destruction of any Collateral; and

(n)     all books and records (including customer lists, files, correspondence, tapes, computer programs, print-outs and computer records) pertaining to the foregoing.

"**_Control_**" shall have the meaning assigned to such term in the UCC.

"**_Secured Obligations_**" shall mean (a) all of the Obligations howsoever evidenced, created, incurred or acquired, whether primary, secondary, direct, contingent, or joint and several and (b) all expenses and charges, legal and otherwise, incurred by the Holders' Representative or the Holders in collecting or enforcing any of the Obligations or in realizing on or protecting any security therefor as permitted pursuant to the Agreement, including without limitation the security granted hereunder.

"**_UCC_**" shall mean the Uniform Commercial Code as in effect in the State of New York or, when the laws of any other jurisdiction govern the perfection or enforcement of any Lien, the Uniform Commercial Code of such jurisdiction.

2.     Grant of Security Interest in the Collateral .

2.01.     To secure the prompt payment and performance in full when due, whether by lapse of time, acceleration, prepayment or otherwise, of the Secured Obligations, the Obligor hereby grants to the Holders' Representative, for itself and the ratable benefit of the Holders, a continuing security interest in, and a right to set off against, any and all right, title and interest of such Obligor in and to the Collateral.

2.02.     The Obligor and the Holders' Representative, on behalf of the Holders, hereby acknowledge and agree that the security interest created hereby in the Collateral constitutes continuing collateral security for all of the Secured Obligations, whether now existing or hereafter arising.

3.     Representations and Warranties.  The Obligor hereby represents and warrants to the Holders' Representative, for the benefit of the Holders, that so long as any of the Secured Obligations remain outstanding:

3.01. **Chief Executive Office; Books & Records; Leal Name; State of Formation.** As of the Closing Date, the Obligor's chief executive office and chief place of business are located at [_____], and as of the Closing Date the Obligor keeps its books and records at such location. As of the Closing Date, the Obligor's exact legal name is as shown in this Security Agreement and its state of incorporation is the State of Delaware.

3.02. **Location of Tangible Collateral.** As of the Closing Date, the location of all tangible Collateral owned by the Obligor is [_____].

3.03. **Ownership.** The Obligor is the legal and beneficial owner of its Collateral and has the right to pledge, sell, assign or transfer the same.

3.04. **Security Interest/Priority.** This Security Agreement creates a valid security interest in favor of the Holders' Representative, for the benefit of the Holders, in the Collateral of the Obligor and, when properly perfected by filing, the granting of possession or Control to the Holders' Representative or otherwise, shall constitute a valid first priority, perfected security interest in such Collateral, to the extent such security interest can be perfected by filing, the granting of possession or Control or otherwise under the UCC, free and clear of all Liens except for Permitted Liens.

3.05. **Consents.** Except for the filing or recording of UCC financing statements, no consent or authorization of, filing with, or other act by or in respect of, any arbitrator or Governmental Authority and no consent of any other Person (including, without limitation, any stockholder, member or creditor of Obligor), is required (i) for the grant by Obligor of the security interest in the Collateral granted hereby or for the execution, delivery or performance of this Security Agreement by Obligor or (ii) for the perfection of such security interest or the exercise by the Holders' Representative of the rights and remedies provided for in this Security Agreement.

3.06. **Restrictions on Security Interest.** The Obligor is not party to any material agreement that contains legally enforceable restrictions on the granting of a security interest therein.

3.07. **Collateral Consisting of Stock.** If any part of the Collateral consists of Stock, none of such Stock (a) are traded on a securities exchange or in the securities markets, (b) by their terms expressly provide that they are securities governed by Article 8 of the UCC, or (c) are Investment Company Securities (as defined in the UCC); *provided*, that the Holders' Representative has agreed, and Obligor has consented, to treat such Stock as "financial assets," and such Stock will be held or maintained in the form of a Securities Entitlement (as defined under the UCC). The Obligor does not own any "margin stock" as defined in Regulation U issued by the Board of Governors of the Federal Reserve System.

4. **Covenants.** As long as any Secured Obligations are outstanding:

4.01. **Perfection of Security Interest by Filing, Etc.** Obligor hereby authorizes the Holders' Representative to prepare and file such financing statements (including continuation statements) or amendments thereof or supplements thereto or other instruments as the Holders' Representative may from time to time deem necessary or appropriate in order to perfect and maintain the security interests granted hereunder in accordance with the UCC, including, without limitation, any financing statement that describes the Collateral as "all personal property" or "all assets" of Obligor or that describes the Collateral in some other manner as the Holders'

Representative deems necessary or advisable. Obligor shall also execute and deliver to the Holders' Representative or file such agreements, assignments or instruments (including affidavits, notices, reaffirmations and amendments and restatements of existing documents, as the Holders' Representative may reasonably request) and do all such other things as the Holders' Representative may reasonably deem necessary or appropriate (a) to assure to the Holders' Representative its security interests hereunder are perfected, including such financing statements (including continuation statements) or amendments thereof or supplements thereto or other instruments as the Holders' Representative may from time to time reasonably request in order to perfect and maintain the security interests granted hereunder in accordance with the UCC and any other personal property security legislation in the appropriate state(s), (b) to consummate the transactions contemplated hereby and (c) to otherwise protect and assure the Holders' Representative of its rights and interests hereunder. Obligor agrees to mark its books and records to reflect the security interest of the Holders' Representative in the Collateral.

4.02. <u>Perfection of Security Interest by Possession</u>. If any asset part of the Collateral is of a type that requires possession to create and perfect a valid security interest, promptly notify the Holders' Representative of the existence of such assets and deliver such assets to the Holders' Representative, to be held as Collateral pursuant to this Security Agreement.

4.03. <u>Perfection of Security Interest Through Control</u>. If any Collateral shall consist of uncertificated Investment Property (as defined in the UCC) or other assets that require Control to create and perfect a valid security interest, execute and deliver to the Holders' Representative all control agreements, assignments, instruments or other documents as reasonably requested by the Holders' Representative for the purposes of obtaining and maintaining Control of such Collateral.

4.04. <u>Other Liens</u>. To the extent commercially reasonably, defend its interests in the Collateral against the claims and demands of all other parties claiming an interest therein, keep the Collateral free from all Liens, except for Permitted Liens. Neither the Holders' Representative nor any Holder authorizes Obligor to, and Obligor shall not, sell, exchange, transfer, assign, lease or otherwise dispose of the Collateral or any interest therein, except as permitted under the Agreement.

4.05. <u>Preservation of Collateral</u>. Keep the Collateral in good order, condition and repair in all material respects, ordinary wear and tear and casualty excepted; not use the Collateral in violation of the provisions of this Security Agreement or any other agreement relating to the Collateral or any policy insuring the Collateral or any applicable Requirement of Law.

4.06. <u>Changes in Structure or Location</u>. Not, without providing 30 days (or such shorter time period as the Holders' Representative may agree) prior written notice to the Holders' Representative and without filing (or confirming that the Holders' Representative has filed) such financing statements and amendments to any previously filed financing statements as the Holders' Representative may require, (a) alter its legal existence or, in one transaction or a series of transactions, merge into or consolidate with any other entity, or sell all or substantially all of its assets, (b) change its state of incorporation or organization, or (c) change its registered legal name.

4.07. <u>Inspection</u>. Allow the Holders' Representative or its representatives to visit and inspect the Collateral as set forth in the Agreement.

4.08. <u>Status of Collateral as Personal Property</u>. At all times maintain the Collateral as personal property and not affix any of the Collateral to any real property in a manner which

would change its nature from personal property to real property or a Fixture (as defined in the UCC).

4.09. Regulatory Approvals. Promptly, and at its expense, execute and deliver, or cause to be executed and delivered, all applications, certificates, instruments, registration statements, and all other documents and papers the Holders' Representative may reasonably request and as may be required by law in connection with the obtaining of any Governmental Approval or the consent, approval, registration, qualification or authorization of any other Person deemed necessary or appropriate for the effective exercise of any of the rights under this Security Agreement. Upon the occurrence and during the continuance of an Event of Default, Obligor shall further use its reasonable best efforts to assist in obtaining Governmental Approvals, if required, for any action or transaction contemplated by this Security Agreement, including, without limitation, the preparation, execution and filing with the Governmental Authority of Obligor's portion of any necessary or appropriate application for the approval of the transfer or assignment of any portion of the assets (including any Governmental Approval) of Obligor.

4.10. Collateral Consisting of Stock. If any part of the Collateral consists of Stock, before the occurrence of an Event of Default, Obligor is entitled to exercise all voting rights pertaining to such Stock; *provided, however*, that no vote shall be cast or consent, waiver, or ratification given or action taken without the prior written consent of Holders' Representative which would (a) be inconsistent with or violate any provision of this Agreement or any other Note Document, (b) amend, modify, or waive any term, provision or condition of any organizational document that would cause a Default or an Event of Default under the Agreement, or (iii) adversely affect the validity, perfection or priority of the Holders' Representative's Lien. After the occurrence of an Event of Default, if Holders' Representative elects to exercise such right, the right to vote any such Stock shall be vested exclusively in Holders' Representative. To this end, Obligor hereby irrevocably constitutes and appoints Holders' Representative the proxy and attorney-in-fact of Obligor, with full power of substitution, to vote, and to act with respect to, any and all such Stock standing in the name of Obligor or with respect to which Obligor is entitled to vote and act, subject to the understanding that such proxy may not be exercised until after an Event of Default occurs. Upon receipt by Obligor, it shall promptly provide Holders' Representative notice of any solicitation for voting with respect to such Stock. The proxy herein granted is coupled with an interest, is irrevocable, and shall continue until the Secured Obligations have been paid and performed in full.

5. Power of Attorney for Perfection of Liens. Obligor hereby irrevocably makes, constitutes and appoints the Holders' Representative, its nominee or any other person whom the Holders' Representative may designate, as Obligor's attorney-in-fact with full power and for the limited purpose to sign in the name of Obligor notices or any similar documents which in the Holders' Representative's reasonable discretion would be necessary, appropriate or convenient in order to perfect and maintain perfection of the security interests granted hereunder, such power, being coupled with an interest, being and remaining irrevocable so long as any of the Secured Obligations remain outstanding.

6. Events of Default. The occurrence of an event which under the Agreement would constitute an Event of Default shall be an event of default hereunder (an "*Event of Default*").

7. Remedies.

7.01. General Remedies. Upon the occurrence of an Event of Default and during continuation thereof, the Holders' Representative and the Holders shall have, in addition to the rights and remedies provided herein, in the Note Documents or by law (including, but not limited

to, levy of attachment, garnishment and the tights and remedies set forth in the UCC) and the rights and remedies of a secured party under the UCC (regardless of whether the UCC is the law of the jurisdiction where the rights and remedies are asserted and regardless of whether the UCC applies to the affected Collateral). Neither the Holders' Representative's compliance with any applicable state or federal law in the conduct of such sale, nor its disclaimer of any warranties relating to the Collateral, shall be considered to adversely affect the commercial reasonableness of such sale. To the extent the rights of notice cannot be legally waived hereunder, Obligor agrees that any requirement of reasonable notice shall be met if such notice is given to the Obligor in accordance with the notice provisions of Section 9.2 of the Agreement at least 10 days before the time of sale. The Holders' Representative and the Holders shall not be obligated to make any sale or other disposition of the Collateral regardless of notice having been given. To the extent permitted by law, any Holder may be a purchaser at any such sale. To the extent permitted by applicable law, the Obligor hereby waives all of its rights of redemption with respect to any such sale. Subject to the provisions of applicable law, the Holders' Representative and the Holders may postpone or cause the postponement of the sale of all or any portion of the Collateral by announcement at the time and place of such sale, and such sale may, without further notice, to the extent permitted by law, be made at the time and place to which the sale was postponed, or the Holders' Representative and the Holders may further postpone such sale by announcement made at such time and place.

7.02.    Access. In addition to the rights and remedies hereunder, upon the occurrence of an Event of Default and during the continuation thereof, the Holders' Representative shall have the right to enter and remain upon the various premises of the Obligor without cost or charge to the Holders' Representative, and use the same, together with materials, supplies, books and records of the Obligor for the purpose of collecting and liquidating the Collateral, or for preparing for sale and conducting the sale of the Collateral, whether by foreclosure, auction or otherwise. In addition, the Holders' Representative may remove Collateral, or any part thereof, from such premises and/or any records with respect thereto, in order to effectively collect or liquidate such Collateral. If the Holders' Representative exercises its right to take possession of the Collateral, Obligor shall also at its expense perform any and all other steps reasonably requested by the Holders' Representative to preserve and protect the security interest hereby granted in the Collateral, such as placing and maintaining signs indicating the security interest of the Holders' Representative, appointing overseers for the Collateral and maintaining inventory records.

7.03.    Nonexclusive Nature of Remedies. Failure by the Holders' Representative or the Holders to exercise any right, remedy or option under this Security Agreement, any other Note Document, or as provided by law, or any delay by the Holders' Representative or the Holders in exercising the same, shall not operate as a waiver of any such right, remedy or option. No waiver hereunder shall be effective unless it is in writing, signed by the party against whom such waiver is sought to be enforced and then only to the extent specifically stated, which in the case of the Holders' Representative or the Holders shall only be granted as provided herein. To the extent permitted by law, neither the Holders' Representative, the Holders, nor any party acting as attorney for the Holders' Representative or the Holders, shall be liable hereunder for any acts or omissions or for any error of judgment or mistake of fact or law other than their gross negligence or willful misconduct hereunder. The rights and remedies of the Holders' Representative and the Holders under this Security Agreement shall be cumulative and not exclusive of any other right or remedy which the Holders' Representative or the Holders may have.

7.04.    Retention of Collateral. In addition to the rights and remedies hereunder, upon the occurrence of an Event of Default and during the continuation thereof, the Holders' Representative may, after providing the notices required by Sections 9-620 and 9-621 of the UCC

(or any successor sections of the UCC) or otherwise complying with the notice requirements of applicable law of the relevant jurisdiction, accept or retain all or any portion of the Collateral in satisfaction of the Secured Obligations. Unless and until the Holders' Representative shall have provided such notices, however, the Holders' Representative shall not be deemed to have retained any Collateral in satisfaction of any Secured Obligations for any reason.

7.05. <u>Deficiency</u>. In the event that the proceeds of any sale, collection or realization are insufficient to pay all amounts to which the Holders' Representative or the Holders are legally entitled, the Obligor shall be liable for the deficiency, together with interest thereon at the default rate under the Agreement, together with the costs of collection and the reasonable fees of any attorneys employed by the Holders' Representative to collect such deficiency.

8. <u>Rights of the Holders' Representative</u> .

8.01. <u>Power of Attorney</u>. In addition to other powers of attorney contained herein, Obligor hereby designates and appoints the Holders' Representative, on behalf of itself and the Holders, and each of its designees or agents, as attorney-in-fact of Obligor, irrevocably and with power of substitution, with authority to take any or all of the following actions upon the occurrence and during the continuation of an Event of Default:

(a)	to demand, collect, settle, compromise, adjust and give discharges and releases concerning the Collateral of Obligor, all as the Holders' Representative may reasonably determine in respect of such Collateral;

(b)	to commence and prosecute any actions at any court for the purposes of collecting any Collateral and enforcing any other right in respect thereof;

(c)	to defend, settle, adjust or compromise any action, suit or proceeding brought with respect to the Collateral and, in connection therewith, give such discharge or release as the Holders' Representative may deem reasonably appropriate;

(d)	following acceleration of the Notes in accordance with the Agreement, to receive, open and dispose of mail addressed to Obligor and reasonably believed by the Holders' Representative to be related to the Collateral and endorse checks, notes, drafts, acceptances, money orders, bills of lading, warehouse receipts or other instruments or documents evidencing payment, shipment or storage of the goods giving rise to the Collateral of Obligor, or securing or relating to such Collateral, on behalf of and in the name of Obligor;

(e)	to sell, assign, transfer, make any agreement in respect of, or otherwise deal with or exercise rights in respect of, any Collateral or the goods or services which have given rise thereto, as fully and completely as though the Holders' Representative were the absolute owner thereof for all purposes;

(f)	to adjust and settle claims under any insurance policy relating to the Collateral;

(g)	to institute any foreclosure proceedings that the Holders' Representative may deem appropriate; and

(h) to do and perform all such other acts and things as the Holders' Representative may reasonably deem to be necessary, proper or convenient in connection with the Collateral.

This power of attorney is a power coupled with an interest and shall be irrevocable for so long as any of the Secured Obligations remain outstanding. The Holders' Representative shall be under no duty to exercise or withhold the exercise of any of the rights, powers, privileges and options expressly or implicitly granted to the Holders' Representative in this Security Agreement, and shall not be liable for any failure to do so or any delay in doing so. The Holders' Representative shall not be liable for any act or omission or for any error of judgment or any mistake of fact or law in its individual capacity or its capacity as attorney-in-fact except acts or omissions resulting from its gross negligence or willful misconduct. This power of attorney is conferred on the Holders' Representative solely to protect, preserve and realize upon its security interest in the Collateral.

8.02. <u>Assignment by the Holders' Representative</u>. Pursuant to the terms of the Agreement, the Holders' Representative may from time to time assign the Secured Obligations or any portion thereof or the Collateral or any portion thereof to a successor Holders' Representative, and the assignee shall be entitled to all of the rights and remedies of the Holders' Representative under this Security Agreement in relation thereto.

8.03. <u>The Holders' Representative Duty of Care</u>. Other than the exercise of reasonable care to assure the safe custody of the Collateral while being held by the Holders' Representative, the Holders' Representative shall have no duty or liability to preserve rights pertaining thereto, it being understood and agreed that the Obligor shall be responsible for preservation of all rights in the Collateral, and the Holders' Representative shall be relieved of all responsibility for the Collateral upon surrendering it or tendering the surrender of it to the Obligor. The Holders' Representative shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which the Holders' Representative accords its own property, which shall be no less than the treatment employed by a reasonable and prudent agent in the industry, it being understood that the Holders' Representative shall not have responsibility for taking any necessary steps to preserve rights against any parties with respect to any of the Collateral. In the event of a public or private sale of Collateral pursuant to Section 7 hereof, the Holder's Representative shall have no obligation to clean-up, repair or otherwise prepare the Collateral for sale.

9. <u>Application of Proceeds</u>. After the exercise of remedies by the Holders' Representative or the Holders hereunder or pursuant to Section 7.2 of the Agreement (or after the Notes (with accrued interest thereon) and all other amounts under the Note Documents shall automatically become due and payable in accordance with the terms of such Section), any proceeds of the Collateral, when received by the Holders' Representative or any of the Holders in cash or its equivalent, will be applied in reduction of the Secured Obligations in the order set forth in Section 2.6(c) of the Agreement.

10. <u>Costs of Counsel</u>. If at any time hereafter, whether upon the occurrence of an Event of Default or not, the Holders' Representative employs counsel to prepare or consider amendments, waivers or consents with respect to this Security Agreement, or to take action or make a response in or with respect to any legal or arbitral proceeding relating to this Security Agreement or relating to the Collateral, or to protect the Collateral or exercise any rights or remedies under this Security Agreement or with respect to the Collateral, then the Obligor agrees to promptly pay upon demand any and all such reasonable documented costs and expenses of the Holders' Representative, all of which costs and expenses shall constitute Secured Obligations hereunder.

11.    Continuing Agreement.

11.01. This Security Agreement shall be a continuing agreement in every respect and shall remain in full force and effect so long as any of the Secured Obligations remain outstanding. Upon such payment and termination, this Security Agreement shall be automatically terminated and the Holders' Representative and the Holders shall, upon the request and at the expense of the Obligor, forthwith release all of the Liens and security interests granted hereunder. Notwithstanding the foregoing all releases and indemnities provided hereunder shall survive termination of this Security Agreement.

11.02. This Security Agreement shall continue to be effective or be automatically reinstated, as the case may be, if at any time payment, in whole or in part, of any of the Secured Obligations is rescinded or must otherwise be restored or returned by the Holders' Representative or any Holder as a preference, fraudulent conveyance or otherwise under any bankruptcy, insolvency or similar law, all as though such payment had not been made; *provided*, that in the event payment of all or any part of the Secured Obligations is rescinded or must be restored or returned, all reasonable costs and expenses (including without limitation any reasonable legal fees and disbursements) incurred by the Holders' Representative or any Holder in defending and enforcing such reinstatement shall be deemed to be included as a part of the Secured Obligations.

12.    Amendments; Waivers; Modifications.    This Security Agreement and the provisions hereof may not be amended, waived, modified, changed, discharged or terminated except as set forth in Section 9.1 of the Agreement.

13.    Successors in Interest.    This Security Agreement shall create a continuing security interest in the Collateral and shall be binding upon Obligor, its successors and assigns and shall inure, together with the rights and remedies of the Holders' Representative and the Holders hereunder, to the benefit of the Holders' Representative and the Holders and their successors and permitted assigns; *provided, however*, that the Obligor may not assign its rights or delegate its duties hereunder without the prior written consent of each Holder or the Required Holders, as required by the Agreement. To the fullest extent permitted by law, Obligor hereby releases the Holders' Representative and each Holder, each of their respective officers, employees and agents and each of their respective successors and assigns, from any liability for any act or omission relating to this Security Agreement or the Collateral, except for any liability arising from the gross negligence or willful misconduct of the Holders' Representative or such Holder or their respective officers, employees and agents, in each case as determined by a court of competent jurisdiction.

14.    Notices.    All notices required or permitted to be given under this Security Agreement shall be in conformance with Section 9.2 of the Agreement.

15.    Counterparts.    This Security Agreement may be executed in any number of counterparts, each of which where so executed and delivered shall be an original, but all of which shall constitute one and the same instrument. It shall not be necessary in making proof of this Security Agreement to produce or account for more than one such counterpart.

16.    Headings.    The headings of the sections and subsections hereof are provided for convenience only and shall not in any way affect the meaning, construction or interpretation of any provision of this Security Agreement.

17.    Governing Law; Consent to Jurisdiction and Service of Process; Waiver of Jury Trial. **THIS SECURITY AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES**

**HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK (INCLUDING SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK), WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES.** The terms of Sections 9.14 and 9.17 of the Credit Agreement are incorporated herein by reference, *mutatis mutandis*, and the parties hereto agree to such terms.

18.    Severability.  If any provision of this Security Agreement is determined to be illegal, invalid or unenforceable, such provision shall be fully severable and the remaining provisions shall remain in full force and effect and shall be construed without giving effect to the illegal, invalid or unenforceable provisions.

19.    Entirety.  This Security Agreement and the other Note Documents represent the entire agreement of the parties hereto and thereto, and supersede all prior agreements and understandings, oral or written, if any, including any commitment letters or correspondence relating to this Security Agreement, the other Note Documents, or the transactions contemplated herein and therein.

20.    Survival.  All representations and warranties of the Obligor hereunder shall survive the execution and delivery of this Security Agreement, the other Note Documents and the issuance of the Notes under the Agreement.

21.    Rights of Required Holders .  All rights of the Holders' Representative hereunder, if not exercised by the Holders' Representative, may be exercised by the Required Holders.

*[Remainder of page left blank intentionally.  Signature page follows.]*

**IN WITNESS WHEREOF**, the parties hereto have caused this Security Agreement to be duly executed and delivered by their respective officers or representatives thereunto duly authorized, as of the date first above written.

LMH I, Inc.,
as Obligor

By:_____
Name:
Title:


Accepted and agreed to as of the date first above written.

Wells Fargo Bank, N.A.,
as Holders' Representative

By:_____
Name:
Title:

Exhibit C

## FORM OF ASSIGNMENT INSTRUMENT

This Assignment Instrument (the "*Assignment Instrument*") is dated as of the Assignment Effective Date set forth below and is entered into by and between **[Insert name of Assignor]** (the "*Assignor*") and **[Insert name of Assignee]** (the "*Assignee*"). Capitalized terms used but not defined herein shall have the meanings given to them in the Agreement identified below (as amended, supplemented or otherwise modified from time to time, the "*Agreement*"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment Instrument as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Assignment Effective Date inserted by Holders' Representative as contemplated below, (i) all of the Assignor's rights and obligations in its capacity as a Holder under the Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of the Assignor under the Note, and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Holder) against any Person, whether known or unknown, arising under or in connection with the Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby, or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned pursuant to clauses (i) and (ii) above being referred to herein collectively as, the "*Assigned Interest*"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment Instrument, without representation or warranty by the Assignor. The Assignor hereby agrees, with respect to any claim, suit, cause of action and any other right of the Assignor referenced in clause (ii) above that cannot be assigned under applicable law, to enforce such claim, suit, cause of action and/or other right, as the case may be, on behalf of, and at the request and expense of, the Assignee.

1.     Assignor:     [_____]

2.     Assignee:     [_____]

3.     Issuer:     LMH I, Inc., a Delaware corporation.

4.     Holders' Representative:     Wells Fargo Bank, N.A., as Holders' Representative under the Agreement.

5.     Agreement:     The Master Note Agreement dated as of January [__], 2010 among LMH I, Inc. as the Issuer, LMH II, Inc., as the Initial Holder, and Wells Fargo Bank, N.A., as Holders' Representative.

6. Assigned Interest:

| Aggregate Amount of Notes for all Holders | Amount of Notes Assigned[1] | Percentage Assigned of Notes[2] |
|---|---|---|
| $ | $ | % |
| $ | $ | % |
| $ | $ | % |

[7. Trade Date: _____][3]

*[Remainder of page left blank intentionally.]*

---

[1]     Amount to be adjusted by the counterparties to take into account any payments or prepayments made between the Trade Date and the Assignment Effective Date.

[2]     Set forth, to at least 9 decimals, as a percentage of the Notes of all Holders thereunder.

[3]     To be completed if the Assignor and the Assignee intend that the minimum assignment amount is to be determined as of the Trade Date.

Assignment Effective Date: _____ ___, 20___ **[TO BE INSERTED BY HOLDERS'**
**REPRESENTATIVE AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION**
**OF TRANSFER IN THE REGISTER THEREFOR.]**

The terms set forth in this Assignment Instrument are hereby agreed to:

ASSIGNOR
[NAME OF ASSIGNOR]

By:_____
    Name:
    Title

ASSIGNEE
[NAME OF ASSIGNEE]

By:_____
    Name:
    Title:

Consented to and Accepted:

Wells Fargo Bank, N.A., as Holders'
Representative

By:_____
    Name:
    Title

Consented to and Accepted:

LMH I, Inc., as Issuer

By:_____
    Name:
    Title

## STANDARD TERMS AND CONDITIONS FOR
## ASSIGNMENT INSTRUMENT

1.      <u>Representations and Warranties</u>.

1.1      <u>Assignor</u>.  The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any Lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment Instrument and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Agreement or any other Note Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Note Documents or any collateral thereunder, (iii) the financial condition of Issuer or any other Person obligated in respect of any Note Document or (iv) the performance or observance by Issuer or any other Person of any of their respective obligations under any Note Document.

1.2.      <u>Assignee</u>.  The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment Instrument and to consummate the transactions contemplated hereby and to become a Holder under the Agreement, (ii) from and after the Assignment Effective Date, it shall be bound by the provisions of the Agreement as a Holder thereunder and, to the extent of the Assigned Interest, shall have the obligations of a Holder thereunder, (iii) it has received a copy of the Note Documents, together with copies of the most recent financial statements delivered pursuant to the Agreement, and such other reports, documents and information as it has deemed appropriate to perform its own analysis and to make its own decision (credit, legal or otherwise) to enter into this Assignment Instrument and to purchase the Assigned Interest on the basis of which it has made such analysis and decision independently and without reliance on Holders' Representative or any other Holder, and (iv) if it is a Foreign Holder, attached to this Assignment Instrument is any documentation required to be delivered by it pursuant to the terms of the Agreement, duly completed and executed by the Assignee; and (b) agrees that (i) it will, independently and without reliance on Holders' Representative, the Assignor or any other Holder, and based on such documents and information as it shall deem appropriate at the time, continue to perform its own analysis and to make its own decisions (credit, legal or otherwise) in taking or not taking action under the Note Documents, and (ii) it will perform in accordance with their terms all of the obligations that by the terms of the Note Documents are required to be performed by it as a Holder.  Without limiting the foregoing, the Assignee acknowledges that it has conducted to its satisfaction its own independent investigation of the condition, operations and business of Issuer and, in making its determination to proceed with the transactions contemplated by this Assignment Instrument, the Assignee has relied on the results of its own independent investigation.  In connection therewith, the Assignee is not relying on any documents provided to it by Assignor (including any document created or generated by Assignor for its purposes), other than the Note Documents.

Assignee will not, without the prior written consent of Assignor, disclose any confidential information with respect to Assignor furnished to it under this Assignment Instrument or otherwise, except as may be required to comply with any applicable law or the request of any regulatory body (including, but not limited to, any self-regulatory organization) having jurisdiction over Assignee or pursuant to legal process or otherwise as required in connection with litigation (and Assignee agrees that

it will, to the extent reasonably practicable and if permitted by applicable law, give Assignor prior notice of such disclosure reasonably sufficient to permit Assignor to contest such disclosure).

2.    Payments. From and after the Assignment Effective Date, Holders' Representative shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts that have accrued to but excluding the Assignment Effective Date, and to the Assignee for amounts that have accrued from and after the Assignment Effective Date.[4]

3.    General Provisions. This Assignment Instrument shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns. This Assignment Instrument may be executed in any number of counterparts, which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Assignment Instrument by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment Instrument. This Assignment Instrument shall be governed by, and construed in accordance with, the law of the State of New York without giving effect to its conflict of laws provisions other than Section 5-1401 of the New York General Obligations Law.

---

[4]    If Holders' Representative determines that this method does not conform to its systems then the following alternative language shall be used:

"From and after the Assignment Effective Date, Holders' Representative shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignee whether such amounts have accrued prior to, on or after the Assignment Effective Date. The Assignor and the Assignee shall make all appropriate adjustments in payments by the Holders' Representative for periods prior to the Assignment Effective Date or with respect to the making of this assignment directly between themselves."