# EXHIBIT 21

# LMH I, INC.

## STOCKHOLDERS' AGREEMENT

THIS STOCKHOLDERS' AGREEMENT (this "*Agreement*") is made as of January __, 2010, by and among LMH I, Inc., a Delaware corporation (the "*Company*") and **[THE CREDITORS]** (collectively, the "*Stockholders*"). The number of shares of the Company's common stock, par value $0.001 per share (the "*Common Stock*"), held by each Stockholder as of the date of this Agreement is set forth on Schedule A hereto.

## RECITALS

WHEREAS, each of the initial Stockholders are lenders under that certain Credit Agreement, dated as of December 30, 2004, by and among Latham Manufacturing Corp., a Delaware corporation ("*Latham Manufacturing*"), Latham Splash Canada, Inc., an Ontario corporation ("*Latham Canada*" and together with Latham Manufacturing, the "*Borrowers*"), the several banks and other financial institutions parties thereto (the "*Lenders*"), Wachovia Bank, National Association, as administrative agent for the Lenders, Wachovia Capital Finance of Canada, as Canadian administrative agent for the Lenders, Latham International, Inc., a Delaware corporation and guarantor ("*Latham International*"), and each of the subsidiary guarantors referenced therein (the "*Subsidiary Guarantors*" and together with Latham International and the Borrowers, the "*Credit Parties*"), as such agreement has been amended to date (the "*Credit Agreement*");

WHEREAS, in connection with a "pre-packaged" joint plan of reorganization (the "*Plan*") of Latham International, Latham Manufacturing, Viking Pools, LLC, a West Virginia limited liability company ("*Viking*"), Coverstar, LLC, a Delaware limited liability company ("*Coverstar*"), and Kafko (U.S.) Corp., a Delaware corporation ("*Kafko*" and together with Latham International, Latham Manufacturing, Viking and Coverstar, the "*Debtors*"), under Chapter 11 of the Bankruptcy Code, dated December 18, 2009 (Case No. 09-14490 (CSS)), (i) Latham Corporation, a Delaware corporation and indirect wholly owned subsidiary of the Company, acquired all of the assets and certain liabilities of the Debtors and (ii) the Stockholders agreed to terminate and release all obligations of the Credit Parties under the Credit Documents (as defined in the Credit Agreement) in exchange for 1,000,000 shares of Common Stock of the Company (the "*Company Shares*"), which shares constitute all of the issued and outstanding capital stock of the Company, and a senior promissory note in the principal sum of $20,000,000 (the "*Company Note*") issued by the Company (together, the "*Reorganization*");

WHEREAS, it is a condition to the Stockholders consenting to the Reorganization, the other transactions set forth in the Plan and accepting the Company Note and Company Shares as consideration for the termination and release all obligations of the Credit Parties under the Credit Documents that the Company and each of the Stockholders enter into this Agreement; and

WHEREAS, the Board of Directors of the Company has determined that it is in the best interest of the Company and its stockholders to consent to the Reorganization, the other transactions set forth in the Plan and to enter into this Agreement and to effect the transactions contemplated herein and therein.

## AGREEMENT

NOW THEREFORE, in consideration of the mutual promises set forth herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby expressly acknowledged, the parties hereto agree as follows:

1.    Restriction on Transfer; Certain Definitions.

(a)    Restrictions on Transfer.  During the term of this Agreement, all of the Company's capital stock now owned or hereafter acquired by the Stockholders (the "*Shares*") shall be subject to the terms and conditions of this Agreement.  No Transfer (as defined below), whether voluntary or involuntary, of all or any portion of the Shares shall be valid unless it is made pursuant to the terms and conditions of this Agreement.  Notwithstanding the foregoing, (i) each of the Stockholders that is an entity shall have the right to Transfer all or part of its Shares, without compliance with the terms of Sections 2 and 3 of this Agreement, (A) to an Affiliate (as defined below), (B) in the case of a partnership, corporation, or a limited liability company, to its current or retired general or limited partners, stockholders or members, (C) to the Company or (D) to another Stockholder or an Affiliate of another Stockholder, and (ii) each of the Stockholders that is an individual shall have the right to Transfer all or part of its Shares, without compliance with the terms of Sections 2 and 3 of this Agreement, (A) to such Stockholder's spouse, ancestors, descendants, brothers or sisters, or descendants of such Stockholder's brothers or sisters, whether related by consanguinity or affinity (collectively, "*Immediate Family*"), (B) to a custodian, trustee (including a trustee of a voting trust), executor or other fiduciary for the account of such Stockholder or such Stockholder's Immediate Family, (C) a corporation, partnership or any other entity, provided such corporation, partnership or other entity is owned exclusively by such Stockholder and/or such Stockholder's Immediate Family, (D) to the Company or (E) to another Stockholder or an Affiliate of another Stockholder; *provided, however*, that in the case of clauses (i) and (ii) above, the terms and conditions of this Agreement shall be binding upon any such transferee and such transferee shall so acknowledge in writing prior to any such transfer.

(b)·    Certain Definitions.  In this Agreement:

"*Affiliate*" means with respect to any person, a person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such person, and, in the case of an individual, includes any relative or spouse of such person.  The term "*control*" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities by contract or otherwise.  The term "*person*" means an individual, a partnership, a corporation, an association, a joint stock company, a trust, a joint venture, a limited liability company, an unincorporated organization or a governmental entity or any department, agency or political subdivision thereof.

"*Cetus*" means Cetus Capital, LLC, a Delaware limited liability company, or any of its Affiliates.

"*Master Note Agreement*" means that certain Master Note Agreement, dated as of January __, 2010, by and among the Company, the lenders holding notes issued thereunder (the "*Senior Lenders*") and, _____, as the holders' representative.

"*SVP*" means Strategic Value Special Situations Master Fund, L.P. or any of its Affiliates, including without limitation its investment manager.

"*Transfer*," "*Transferring*," "*Transferred*," or words of similar import, mean and include any sale, assignment, encumbrance, hypothecation, pledge, conveyance in trust, gift, transfer by bequest, devise or descent, or other transfer or disposition of any kind, including but not limited to transfers to receivers, levying creditors, trustees or receivers in bankruptcy proceedings or general assignees for the benefit of creditors, whether voluntary or by operation of law, directly or indirectly.

2.    Right of First Refusal

(a)    The Company and Non-Transferring Stockholders' Rights.    Subject to the third sentence of Section 1(a), in the event any Stockholder desires to Transfer (a "*Transferring Stockholder*") any Shares, the Company and each of the other Stockholders (the "*Non-Transferring Stockholders*") shall have the right of first refusal to purchase all or part of the Shares the Transferring Stockholder desires to Transfer (the "*Offered Shares*"). The Transferring Stockholder must give to the Company and the Non-Transferring Stockholders a written notice signed by the Transferring Stockholder ("*Transferring Stockholder's Notice*") stating (a) the Transferring Stockholder's bona fide intention to Transfer such Offered Shares; (b) the number of Offered Shares; (c) the name, address and relationship to the Transferring Stockholder, if any, of each proposed purchaser or other transferee; and (d) the bona fide cash price or, in reasonable detail, other consideration, per share for which the Transferring Stockholder proposes to Transfer such Offered Shares (the "*Offered Price*").

(b)    Exercise of the Company's Right of First Refusal. The Company's Right of First Refusal may be exercised as follows:

(i)    The Company shall have the opportunity to purchase all or any part of the Offered Shares.

(ii)    If the Company desires to purchase all or any part of the Offered Shares, the Company must, within the twenty (20) day period (the "*Company Refusal Period*") commencing on the date the Company receives the Transferring Stockholder's Notice, give written notice to the Transferring Stockholder of the Company's election to purchase all or part of the Offered Shares. In the event that the Company elects not to purchase all of the Offered Shares, the remaining Offered Shares may be purchased by the Non-Transferring Stockholders as set forth below.

(iii)    On or prior to the expiration of the Company Refusal Period, the Company will give written notice (the "*Company's Expiration Notice*") to the Transferring Stockholder and to the Non-Transferring Stockholders specifying either (A) that all or a portion of the Offered Shares was subscribed for by the Company exercising its right of first refusal or (B) that the Company waived its right to purchase any of the Offered Shares. Notwithstanding any failure by the Company to deliver a Company's Expiration Notice, a failure by the Company to exercise its right of first refusal within the Company Refusal Period shall be deemed a waiver of such right.

(c)    Exercise of Non-Transferring Stockholders' Right of First Refusal. The Non-Transferring Stockholders' right of first refusal may be exercised as follows:

(i)    In the event the Company does not purchase all of the Offered Shares, each Non-Transferring Stockholder shall have the opportunity to purchase such Non-Transferring Stockholder's *pro rata* share of the remaining Offered Shares. For purposes of this Section 2, an Non-Transferring Stockholder's *pro rata* share shall be determined by dividing the number of Shares held by a Non-Transferring Stockholder by the total number of Shares held by all Non-Transferring Stockholders.

(ii)    If any Non-Transferring Stockholder desires to purchase its *pro rata* share of the remaining Offered Shares, such Non-Transferring Stockholder must, within the fifteen (15) day period (the "*Non-Transferring Stockholder Refusal Period*") commencing on the earlier of (A) the date the Company's Expiration Notice is received or (B) the 20th day after the date of the Transferring Stockholder's Notice was received by the Company, give written notice ("*Non-Transferring Stockholder Notice*") to the Transferring Stockholder and to the Company of such Non-Transferring Stockholder's election to purchase its *pro rata* share of the remaining Offered Shares. In the event that any Non-

Transferring Stockholder elects not to purchase such Non-Transferring Stockholder's *pro rata* share of the remaining Offered Shares during the Non-Transferring Stockholder Refusal Period, promptly following the expiration of such Non-Transferring Stockholder Refusal Period, the Transferring Stockholder shall advise the Non-Transferring Stockholders who elect to purchase their *pro rata* portion of the Offered Shares in writing of the number of Offered Shares with respect to which any Non-Transferring Stockholders have failed to fully exercise their refusal rights hereunder (such notice being an "***Unexercised Right of First Refusal Notice***"). In such event, each Non-Transferring Stockholder that elected to purchase Offered Shares shall have a right to purchase such Non-Transferring Stockholder's *pro rata* share of such rejected Offered Shares, based on the relative number of Shares owned by the Non-Transferring Stockholders that elected to purchase their *pro rata* share of the remaining Offered Shares with respect to which Non-Transferring Stockholder's Expiration Notices were received. Such Non-Transferring Stockholders wishing to exercise its right to acquire additional remaining Offered Shares shall deliver an additional Non-Transferring Stockholder Notice to the Transferring Stockholder within two (2) business days from the date that the Transferring Stockholder provides the Unexercised Right of First Refusal Notice to the Non-Transferred Stockholders indicating the number of additional remaining Offered Shares such Non-Transferring Stockholder wishes to purchase, subject to the limitations set forth herein.

(d)  <u>Purchase Price</u>. The purchase price for the Offered Shares to be purchased by the Company or the Non-Transferring Stockholders exercising their right of first refusal under this Agreement will be the Offered Price, but will be payable as set forth in <u>Section 2(e)</u> hereof. If the Offered Price includes consideration other than cash, the cash equivalent value of the non-cash consideration will be determined by the Board of Directors of the Company in good faith, which determination will be binding upon the Company, the Non-Transferring Stockholders and the transferring Stockholder.

(e)  <u>Payment</u>. Payment of the purchase price for the Offered Shares purchased by the Company or by a Non-Transferring Stockholder exercising a right of first refusal will be made by the 50th day after the Company receives the Transferring Stockholder's Notice. Unless otherwise agreed to by the Transferring Stockholder, payment of the purchase price will be made by the exercising Company or Non-Transferring Stockholder by check or wire transfer of immediately available funds.

(f)  <u>Rights as a Stockholder</u>. If the Company or the Non-Transferring Stockholder exercise their rights of first refusal to purchase the Offered Shares, then, upon consummation of such purchase, the Transferring Stockholder will have no further rights as a holder of the Offered Shares except the right to receive payment for the Offered Shares from the Company or the Non-Transferring Stockholder in accordance with the terms of this Agreement, and the Transferring Stockholder will forthwith cause all certificate(s) evidencing such Offered Shares to be surrendered to the Company for transfer to the Company or to the Non-Transferring Stockholders.

(g)  <u>Stockholder's Right to Transfer</u>. If the Company or the Non-Transferring Stockholders have not elected to purchase all of the Offered Shares, then, subject to the right of co-sale set forth in <u>Section 3</u> below, the Transferring Stockholder may Transfer the Offered Shares permitted to be Transferred by the Transferring Stockholder to any person named as a purchaser or other transferee in the Transferring Stockholder's Notice, at the Offered Price, provided that such transfer (i) is consummated within the time frame provided in <u>Section 3</u> and (ii) is in accordance with all the terms of this Agreement. Any proposed Transfer not in compliance with this <u>Section 2</u> as well as any subsequent proposed Transfer of any of the Offered Shares by the Transferring Stockholder shall be subject to the right of right of first refusal provided herein.

(h)  <u>Transfers in Violation of Right of First Refusal</u>. Any attempt by a Transferring Stockholder to transfer Shares in violation of this <u>Section 2</u> (other than as permitted in Section 1(a)) shall

be void and the Company agrees it will not effect such a transfer nor will it treat any alleged transferee(s) as a stockholder.

3.    Right of Co-Sale.

(a)    Common Stockholders' Right of Co-Sale.   Subject to the third sentence of Section 1(a) and after compliance with Section 2, if there are any Offered Shares not being acquired pursuant to Section 2, then this Section 3 shall apply.  Each Non-Transferring Stockholder that so notifies the Transferring Stockholder in writing (such notice being a "*Co-Sale Inclusion Notice*") within ten (10) days after the end of the Non-Transferring Stockholder Refusal Period (the "*Co-Sale Notice Period*") shall have the right to participate in such sale of Offered Shares on the same terms and conditions as specified in the Transferring Stockholder's Notice (for purposes of this Section 3, each such participating Stockholder shall be referred to as a "*Selling Stockholder*").  Such Co-Sale Inclusion Notice shall indicate the number of shares of the Company's capital stock that a Selling Stockholder wishes to sell pursuant to this Section 3 (the "*Selling Stockholder Shares*"), subject to any limitations provided for herein. To the extent one or more of the Non-Transferring Stockholders exercise such right of participation in accordance with the terms and conditions set forth below, the number of Shares that the Transferring Stockholder may sell in the Transfer shall be correspondingly reduced.  Each Selling Stockholder may initially sell up to such number of Selling Stockholder Shares equal to the product obtained by multiplying (i) the aggregate number of remaining Offered Shares by (ii) a fraction, the numerator of which shall be the number of shares of Common Stock owned by such Selling Stockholder on the date of the Transferring Stockholder Notice and the denominator of which shall be the total number of shares of Common Stock owned by the Transferring Stockholder and by all of the Non-Transferring Stockholders on the date of the Transferring Stockholder Notice. In the event that any Non-Transferring Stockholder fails to fully exercise its right of participation pursuant to this Section 3 (each, a "*Non-Subscribing Stockholder*"), promptly following the termination of the Co-Sale Notice Period, the Transferring Stockholder shall advise the Selling Stockholders in writing of the number of Offered Shares with respect to which Non-Transferring Stockholders have failed to fully exercise their rights hereunder (such notice being an "*Unexercised Co-Sale Notice*").  In such event, each Selling Stockholder shall have a right of over-allotment (the "*Over-Allotment Right*") to include in its Transfer under this Section 3 such Selling Stockholder's *pro rata* share, based on the relative number of Shares owned by the Transferring Stockholder and the Selling Stockholders that are not or have not become Non-Subscribing Stockholders, of the Offered Shares with respect to which the Non-Subscribing Stockholders have failed to fully exercise their participation rights hereunder. A Selling Stockholder wishing to exercise its Over-Allotment Right shall deliver an additional Co-Sale Inclusion Notice to the Transferring Stockholder within two (2) business days from the date that the Transferring Stockholder provides the Unexercised Co-Sale Notice to the Selling Stockholders indicating the number of additional Shares such Selling Stockholder wishes to sell, subject to the limitations set forth herein. Each Selling Stockholder shall effect its participation in the sale by promptly delivering to the Transferring Stockholder for transfer to the prospective purchaser one or more certificates representing the number of Shares such Selling Stockholder is entitled to sell pursuant to this Section 3, properly endorsed for transfer.  To the extent that any prospective purchaser or purchasers refuses to purchase shares or other securities from a Selling Stockholder exercising its rights of co-sale hereunder, the Transferring Stockholder shall not Transfer to such prospective purchaser or purchasers any Shares unless and until, simultaneously with such sale, the Transferring Stockholder purchases such shares or other securities from such Selling Stockholder for the same consideration and on the same terms and conditions as the proposed transfer described in the Transferring Stockholder Notice.

(b)    Right to Transfer.  To the extent that the Non-Transferring Stockholders have not exercised their rights to participate in the sale of the Offered Shares within the time periods specified in Section 3(a), then the Transferring Stockholder shall be free to sell any such Offered Shares to such

prospective purchaser on the same terms and conditions as outlined in the Transferring Stockholder Notice, and provided that in the event such Offered Shares are not sold within ninety (90) days of the date of the Transferring Stockholder Notice, they shall once again be subject to the right of co-sale provided herein.

(c)     Transfers in Violation of Co-Sale Rights.  Any attempt by a Transferring Stockholder to transfer Shares in violation of this Section 3 shall be void and the Company agrees it will not effect such a transfer nor will it treat any alleged transferee(s) as a stockholder.

4.     Right of First Offer.  Subject to the terms and conditions specified in this Section 4, the Company hereby grants to each Stockholder (for purposes of this Section 4, each, an "*Offeree*"), a right of first offer to subscribe for and purchase such Offeree's Pro Rata Share (as hereinafter defined for the purpose of this Section 4), in whole or in part, of future issuances by the Company of Future Shares (as hereinafter defined). Each Offeree shall be entitled to assign or apportion the right of first offer among its partners and Affiliates in such proportions as it deems appropriate.  For purposes of this Section 4, an Offeree's "*Pro Rata Share*" of Future Shares shall be a fraction, the numerator of which is the number of shares of Common Stock held by such Offeree immediately prior to the issuance of Future Shares and the denominator of which is the total number of shares of the Company's Common Stock outstanding immediately prior to the issuance of Future Shares. Each time the Company proposes to offer any shares of Common Stock or other equity securities of the Company, whether now or hereinafter authorized, any rights, options or warrants to purchase shares of Common Stock and any securities of any kind whatsoever that are, or may become, convertible into or exchangeable for shares of Common Stock or other equity securities of the Company ("*Future Shares*"), the Company shall first make an offering of such Future Shares to each Offeree in accordance with the following provisions:

(a)     The Company shall deliver a notice ("*Notice*") to each Offeree stating (i) the Company's bona fide intention to offer such Future Shares, (ii) the number of such Future Shares to be offered, and (iii) the price and a summary of the terms upon which it proposes to offer such Future Shares.

(b)     Each Offeree may elect to subscribe for and purchase, at the price and on the terms specified in the Notice, (i) up to such Offeree's Pro Rata Share of the Future Shares and (ii) such additional number of the Future Shares as such Offeree indicates it is willing to purchase should the other Offerees subscribe for less than their respective Pro Rata Shares (for each Offeree, the "*Additional Portion*") by notifying the Company in writing within fifteen (15) business days from the date the Notice is given by the Company.

(c)     If the aggregate number of Future Shares subscribed for pursuant to subsection (b) above is less than the aggregate Pro Rata Share for which all Offerees are entitled to subscribe, then each Offeree who has subscribed for an Additional Portion pursuant to subsection (b) above shall be entitled to purchase, in addition to such Offeree's Pro Rata Share, the Additional Portion subscribed for by such Offeree; *provided, however*, that if the Additional Portions subscribed for by all Offerees exceed the difference obtained by subtracting (x) the aggregate Pro Rata Share for which all Offerees are entitled to subscribe from (y) the number of Future Shares subscribed for by all Offerees (the "*Available Additional Portion*"), then each Offeree who has subscribed for an Additional Portion shall be entitled to purchase only that portion of the Available Additional Portion as such Offeree's Pro Rata Share bears to the aggregate Pro Rata Share for all Offerees who subscribed for an Additional Portion, subject to rounding by the Company's Board of Directors to the extent it reasonably deems necessary and equitable. To the extent that Future Shares are not purchased by the Offerees as provided in subsection (b) above and this subsection (c), the Company may, during the ninety (90) calendar days following the expiration of the period provided in subsection (b) above, offer the remaining unsubscribed portion of

such Future Shares to any person or persons at a price not less than and upon terms no more favorable than those specified in the Notice. If the Company does not enter into an agreement for the sale of the Future Shares within such period, or if such agreement is not consummated within thirty (30) calendar days of the execution thereof, the right provided in this <u>Section 4</u> shall be deemed to be revived and such Future Shares shall not be offered unless first reoffered to the Offerees in accordance herewith.

(d)     The right of first offer in this <u>Section 4</u> shall not be applicable to the issuance of (i) securities issued as a dividend or distribution on the Shares; (ii) securities issued in connection with any stock split of or stock dividend on the Common Stock; (iii) securities issued to the Company's employees, officers, directors, consultants, advisors or services providers for compensatory purposes pursuant to a stock option plan, warrant plan or similar plan, agreement or arrangement, *provided,* such issuance is approved by a majority of the Company's Board of Directors; (iv) securities issued to vendors, banks or equipment lessors, *provided,* such issuance is approved by a majority of the Company's Board of Directors; (v) securities issued in a firm commitment underwritten public offering pursuant to an effective registration statement under the Securities Act of 1933, as amended (the "*Securities Act*"); (vi) securities issued in connection with a bona fide business acquisition of or by the Company (whether by merger, consolidation, sale of assets, sale or exchange of stock or otherwise), *provided*, such acquisition is approved by a majority of the Company's Board of Directors, and provided further that any securities issued for cash in order to finance such acquisition shall be subject to such right of first offer; or (vii) any right, option or warrant to acquire any security convertible into or exercisable for the securities listed in clauses (i) through (vi) above.

5.     <u>Election of Board of Directors</u>.

(a)     <u>Voting</u>.  During the term of this Agreement, each Stockholder agrees to vote, or cause to be voted, all Shares owned by such Stockholder, or over which such Stockholder has voting control, in such manner as may be necessary to elect (and maintain in office) as members of the Company's Board of Directors (each a "*Director*") the following individuals:

(i)     The Cetus Directors (as defined below), to the extent applicable;

(ii)     The SVP Director (as defined below), to the extent applicable; and

(iii)     The Company's Chief Executive Officer (the "*CEO*"), who shall initially be Mark P. Laven, provided that if for any reason he shall cease to be the CEO, each of the Stockholders shall promptly vote their respective Shares (i) to remove him from the Board of Directors if he has not resigned as a member of the Board and (ii) to elect the replacement CEO as a Director upon the commencement of his or her employment.

(b)     <u>Designation of Directors</u>.  The designees to the Company's Board of Directors described above (each a "*Designee*") shall be selected as follows:

(i)     Cetus shall be entitled to designate three (3) Directors (each, a "*Cetus Director*"); *provided, however*, that (i) the number of Cetus Directors shall be reduced to two (2) to the extent that Cetus fails to hold at least twenty-five percent (25%) of the outstanding shares of Common Stock, (ii) the number of Cetus Directors shall be reduced to one (1) to the extent that Cetus fails to hold at least ten percent (10%) of the outstanding shares of Common Stock, and (iii) to the extent that Cetus fails to hold at least five percent (5%) of the outstanding shares of Common Stock, Cetus shall lose its right     to     so     designate     any     Directors.     The     Cetus     Directors     shall     initially     be _____.

(ii)     SVP shall be entitled to designate (1) Director (the "***SVP Director***"); provided, however, that to the extent that SVP fails to hold at least five percent (5%) of the outstanding shares of Common Stock, SVP shall lose its right to so designate such Director. The SVP director shall initially be _____.

(iii)     The CEO board member shall initially be Mark P. Laven.

(c)     Changes in Designees.  From time to time during the term of this Agreement, Stockholders who hold sufficient Shares to select a Designee may, in their sole discretion:

(i)     notify the Company in writing of an intention to remove from the Company's Board of Directors any incumbent Designee who occupies a Board seat for which such Stockholders are entitled to designate the Designee; or

(ii)     notify the Company in writing of an intention to select a new Designee for election to a Board seat for which such Stockholders are entitled to designate the Designee (whether to replace a prior Designee or to fill a vacancy in such Board seat).

In the event of such an initiation of a removal or selection of a Designee under this Section 5(c), the Company shall take such reasonable actions as are necessary to facilitate such removals or elections, including, without limitation, soliciting the votes of the appropriate Stockholders, and the Stockholders shall vote their Shares to cause:  (x) the removal from the Company's Board of Directors the Designee or Designees so designated for removal; and (y) the election to the Company's Board of Directors of any new Designee or Designees so designated.

(d)     Removal of Board Members.  Each Stockholder also agrees to vote, or cause to be voted, all Shares owned by such Stockholder, or over which such Stockholder has voting control, from time to time and at all times, in whatever manner as shall be necessary to ensure that:

(i)     no Director elected pursuant to Sections 5(a) or 5(b) of this Agreement may be removed from office unless (A) such removal is approved pursuant to Section 5(c) or (B) the person(s) originally entitled to designate or approve such Director or occupy such Board seat pursuant to Sections 5(a) and 5(b) is no longer so entitled to designate or approve such Director or occupy such Board seat; and

(ii)     any vacancies created by the resignation, removal or death of a Director elected pursuant to Section 5(a) or 5(b) shall be filled pursuant to the provisions of this Section 5.

All Stockholders agree to execute any written consents required to perform the obligations of this Agreement, and the Company agrees at the request of any party entitled to designate Directors to call a special meeting of stockholders for the purpose of electing Directors.

(e)     Size of Board of Directors.  During the term of this Agreement, and so long as Cetus has the right to appoint any Directors under Section 5(b)(i) hereof, each Stockholder agrees to vote all Shares to maintain the authorized number of members of the Board of Directors of the Company at five (5) Directors.

(f)     No Liability for Election of Recommended Directors.  No party, nor any Affiliate of any such party, shall have any liability as a result of designating a person for election as a Director or for any act or omission by such designated person in his or her capacity as a Director of the Company, nor

shall any party have any liability as a result of voting for any such designee in accordance with the provisions of this Agreement.

(g)     Board Meetings and Representation.  Regular meetings of the Board of Directors of the Company shall be held, in person or telephonically, conducted in accordance with the Company's bylaws and applicable law, no less frequently than quarterly.  The Company agrees to use its best efforts to nominate and secure the election to its Board of Directors of designees as set forth in this Section 5. The Designees shall be entitled to serve on the executive, compensation, and audit committees of the Board of Directors if formed by the Board.  All reasonable travel and other out-of-pocket expenses of the members of the Board of Directors in attending Board, Board committee, or stockholder meetings shall be paid by the Company.

(h)     Corporate Opportunities.  The Company and the Stockholders each agree that the Directors shall be under no obligation to bring any corporate opportunity to the attention of the Company or the Board of Directors for their consideration, whether such opportunity is related to the Company's business or otherwise.  The Company and each Stockholder hereby waives any claims against the Directors that may arise in connection with any such opportunity to the fullest extent permitted by law..

6.     Drag-Along Right.

(a)     Definitions.  A "*Sale of the Company*" shall mean (i) a transaction or series of related transactions in which a person, or a group of related persons, each of whom is not an affiliate of the Company, acquires from stockholders of the Company shares representing more than fifty percent (50%) of the outstanding voting power of the Company (a "*Stock Sale*"), (ii) the acquisition of the Company by an unaffiliated person by means of any transaction or series of related transactions (including, without limitation, any merger, consolidation or other form of reorganization in which outstanding shares of the Company are exchanged for securities or other consideration issued, or caused to be issued, by the acquiring entity or its subsidiary), unless the Company's stockholders of record as constituted immediately prior to such transaction or series of related transactions will, immediately after such transaction or series of related transactions, hold at least a majority of the voting power of the surviving or acquiring entity in the same relative proportions, or (iii) a sale of all or substantially all of the assets of the Company to an unaffiliated person.

(b)     Actions to be Taken.  In the event that the Company's Board of Directors and holders of a majority of the outstanding shares of Common Stock (collectively, the "*Approving Stockholders*") approve of the Sale of the Company in writing, specifying that this Section 6 shall apply to such transaction, then each Stockholder hereby agrees:

(i)     if such transaction requires stockholder approval, with respect to all Shares that such Stockholder owns or over which such Stockholder otherwise exercises voting power, to vote (in person, by proxy or by action by written consent, as applicable) all Shares in favor of, and adopt, such Sale of the Company and to vote in opposition to any and all other proposals that could delay or impair the ability of the Company to consummate such Sale of the Company  (unless such proposals are made by the Company's Board of Directors or the Approving Stockholders);

(ii)     if such transaction is a Stock Sale, to sell the same proportion of shares of capital stock of the Company beneficially held by such Stockholder as is being sold by the Approving Stockholders to the person to whom the Approving Stockholders propose to sell their Shares, and, except as permitted in Section 6(c) below, on the same terms and conditions as the Approving Stockholders;

(iii) to execute and deliver all related documentation and take such other action in support of the Sale of the Company as shall reasonably be requested by the Company or the Approving Stockholders in order to carry out the terms and provision of this <u>Section 6</u>, including without limitation executing and delivering instruments of conveyance and transfer, and any purchase agreement, merger agreement, indemnity agreement, escrow agreement, transmittal letter, consent, waiver, governmental filing, share certificates duly endorsed for transfer (free and clear of impermissible liens, claims and encumbrances) and any similar or related documents;

(iv) not to deposit, and to cause their Affiliates not to deposit, except as provided in this Agreement, any Shares owned by such party or Affiliate in a voting trust or subject any Shares to any arrangement or agreement with respect to the voting of such Shares, unless specifically requested to do so by the acquirer in connection with the Sale of the Company; and

(v) to refrain from exercising any dissenters' rights or rights of appraisal under applicable law at any time with respect to such Sale of the Company.

(c) <u>Exceptions</u>. Notwithstanding the forgoing, a Stockholder will not be required to comply with <u>Section 6(b)</u> above in connection with any proposed Sale of the Company (the "***Proposed Sale***") unless:

(i) any representations and warranties to be made by such Stockholder in connection with the Proposed Sale are limited to representations and warranties related to authority, ownership and the ability to convey title to such Shares, including but not limited to representations and warranties that (A) such Stockholder holds all right, title and interest in and to the Shares such Stockholder purports to hold, free and clear of all liens and encumbrances, (B) the obligations of such Stockholder in connection with the transaction have been duly authorized, if applicable, (C) the documents to be entered into by such Stockholder have been duly executed by such Stockholder and delivered to the acquirer and are enforceable against such Stockholder in accordance with their respective terms and (D) neither the execution and delivery of documents to be entered into in connection with the transaction, nor the performance of such Stockholder's obligations thereunder, will cause a breach or violation of the terms of any agreement, law or judgment, order or decree of any court or governmental agency;

(ii) such Stockholder shall not be liable for the inaccuracy of any representation or warranty made by any other person in connection with the Proposed Sale, other than the Company or for which they had actual knowledge;

(iii) the liability for indemnification, if any, of such Stockholder in the Proposed Sale and for the inaccuracy of any representations and warranties made by the Company in connection with such Proposed Sale, is several and not joint with any other person, and is *pro rata* in accordance with such Stockholder's relative ownership of Common Stock;

(iv) such Stockholder's liability shall be limited to the amount of consideration actually paid to such Stockholder in connection with such Proposed Sale, except with respect to (A) representations and warranties of such Stockholder related to its authority to execute and perform the applicable transaction documents, its ownership of the applicable capital stock of the Company and its ability to convey title to such shares, (B) any covenants made by such Stockholder with respect to confidentiality or voting related to the Proposed Sale or (C) any fraud or willful breach by such Stockholder, in any such cases, the liability for which need not be limited;

(v)     upon the consummation of the Proposed Sale, each holder of Common Stock will receive the same amount of consideration per share of Common Stock; and

(vi)     subject to clause (v) above, if any holders of any capital stock of the Company are given an option as to the form and amount of consideration to be received as a result of the Proposed Sale, all holders of such capital stock will be given the same option.

7.     Additional Covenants of the Company.  The Company agrees that:

(a)     Access to Information.  The Company shall give each Stockholder, its counsel, accountants, and other representatives access at reasonable times during normal business hours to all of the properties, books and records, and executive employees of the Company, and shall furnish each Stockholder with such information as it may reasonably request concerning the Company.

(b)     Reporting Requirements.  The Company shall furnish to each Stockholder:

(i)     within 180 days after the end of each fiscal year of the Company, an audited balance sheet of the Company as at the end of that fiscal year and the related audited statements of income, stockholders' equity, and cash flows of the Company for that fiscal year, together with a copy of the related audit report by independent certified public accountants who are of nationally recognized standing or who are otherwise acceptable to the Stockholders; and

(ii)     within 45 days after the end of each fiscal quarter, an unaudited balance sheet of the Company as at the end of that fiscal quarter and the related unaudited statements of income, stockholders' equity, and cash flows of the Company for that fiscal quarter and for the period from the beginning of the then current fiscal year to the end of that fiscal quarter.

The Company's financial statements referred to in this Section 7(b) shall be prepared and presented in accordance with generally accepted accounting principles and on a consolidated basis inclusive of any subsidiaries to the extent required or permitted under generally accepted accounting principles.

(c)     Amendment to Certificate of Incorporation.  The Company shall not, nor shall it permit, the Certificate of Incorporation of the Company to be amended in any manner adverse to SVP without the approval of holders of at least 65% of the outstanding shares of Common Stock.

8.     General Covenants of the Company; Other Remedies.

(a)     Covenants of the Company.  The Company agrees to use its best efforts, within the requirements of applicable law, to ensure that the rights granted under this Agreement are effective and that the parties enjoy the benefits of this Agreement.  Such actions include, without limitation, the use of the Company's best efforts to cause the nomination and election of the Directors as provided in this Agreement.

(b)     Specific Enforcement.  Each Stockholder acknowledges and agrees that each party hereto will be irreparably damaged in the event any of the provisions of this Agreement are not performed by the parties in accordance with their specific terms or are otherwise breached.  Accordingly, it is agreed that the Company and each of the Stockholders shall be entitled to an injunction to prevent breaches of this Agreement, and to specific enforcement of this Agreement and its terms and provisions in any action instituted in any court of the United States or any state having subject matter jurisdiction. Further, each party hereto waives any claim or defense that there is an adequate remedy at law for such

breach or threatened breach. All remedies, either under this Agreement or by law or otherwise afforded to any party, shall be cumulative and not alternative.

(c)     Remedies Cumulative. All remedies, either under this Agreement or by law or otherwise afforded to any party, shall be cumulative and not alternative.

9.     Restrictive Legends and Stop Transfer Instructions.

(a)     Legends. Each Stockholder understands and agrees that the Company will cause the legends set forth below, or a legend substantially equivalent thereto, to be placed upon any certificate(s) evidencing ownership of the Shares held by such Stockholder:

> THE SHARES OF STOCK REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO AND MAY BE TRANSFERRED ONLY IN COMPLIANCE WITH CERTAIN RIGHTS OF FIRST REFUSAL AND CO-SALE AS SET FORTH IN A STOCKHOLDERS' AGREEMENT. A COPY OF SUCH AGREEMENT IS ON FILE AT THE PRINCIPAL OFFICES OF THE COMPANY. SUCH RIGHTS OF FIRST REFUSAL AND CO-SALE ARE BINDING ON THE TRANSFEREES OF THESE SHARES.

> THE SHARES EVIDENCED HEREBY ARE SUBJECT TO A VOTING AGREEMENT AND DRAG-ALONG RIGHTS, AS SET FORTH IN A STOCKHOLDERS' AGREEMENT BETWEEN THE COMPANY AND THE ORIGINAL HOLDER OF THESE SHARES, A COPY OF WHICH MAY BE OBTAINED AT THE COMPANY'S PRINCIPAL OFFICE. SUCH VOTING AGREEMENT AND DRAG-ALONG RIGHTS ARE BINDING ON TRANSFEREES OF THESE SHARES.

(b)     Stop Transfer Instructions. In order to ensure compliance with the restrictions referred to herein, each Stockholder agrees that the Company may issue appropriate *"stop transfer"* instructions on the Shares held by such Stockholder.

(c)     Transfers. The Shares have not been registered under the Securities Act, and each Stockholder hereby confirms that such Stockholder has been informed that the Shares are restricted securities under the Securities Act and may not be resold or Transferred unless the sale or Transfer is first registered under the applicable federal and state securities laws or unless an exemption from such registration is available. Accordingly, each Stockholder hereby acknowledges that such Stockholder is prepared to hold the Shares for an indefinite period and that Stockholder is aware that Rule 144 promulgated pursuant to the Securities Act that exempts certain resales of restricted securities is not presently available to exempt the resale of the Shares from the registration requirements of the Securities Act. The Company may, if reasonable, require a Transferring Stockholder to provide to the Company an opinion of counsel selected by the Transferring Stockholder and reasonably acceptable to the Company, to the effect that such transfer does not require registration to be transferred. The Company shall not be required (i) to transfer on its books any Shares that have been Transferred in violation of any provision of this Agreement or (ii) to treat as the owner of such Shares or to accord the right to vote as such owner or to pay dividends to any transferee to whom such Shares have been so Transferred.

10.     Additional Shares. In the event that subsequent to the date of this Agreement any shares or other securities are issued on, or in exchange for, any of the Shares by reason of any stock dividend, stock split, consolidation of shares, reclassification or consolidation involving the Company, such shares or securities shall be deemed to be Shares for purposes of this Agreement.

11.    Additional Parties and Transfers.

(a)    Additional Parties.  Notwithstanding anything to the contrary contained herein, if the Company issues additional shares of capital stock after the date hereof, as a condition to the issuance of such shares, the Company shall require that all purchasers become a party to this Agreement by executing and delivering (i) the Adoption Agreement attached to this Agreement as Exhibit A, or (ii) a counterpart signature page hereto agreeing to be bound by and subject to the terms of this Agreement as a Stockholder hereunder.  In either event, each such person shall thereafter shall be deemed a Stockholder for all purposes under this Agreement.

(b)    Transfers.  Each transferee or assignee of any Shares subject to this Agreement shall continue to be subject to the terms hereof, and, as a condition precedent to the Company's recognizing such Transfer, each transferee or assignee shall agree in writing to be subject to each of the terms of this Agreement by executing and delivering an Adoption Agreement substantially in the form attached hereto as Exhibit A.  Upon the execution and delivery of an Adoption Agreement by any transferee, such transferee shall be deemed to be a party hereto as if such transferee were the transferor and such transferee's signature appeared on the signature pages of this Agreement and shall be deemed to be a Stockholder.  The Company shall not permit the transfer of the Shares subject to this Agreement on its books or issue a new certificate representing any such Shares unless and until such transferee shall have complied with the terms of this Section 11(b).  Each certificate representing the Shares subject to this Agreement if issued on or after the date of this Agreement shall be endorsed by the Company with the legends set forth in Section 9.

12.    Termination.  This Agreement shall terminate upon the earliest to occur of any one of the following events (and shall not apply to any Transfer in connection with any such event):

(a)    The closing of a liquidation, dissolution or winding up of the business and affairs of the Company;

(b)    The closing of a firm commitment underwritten public offering pursuant to an effective registration statement under the Securities Act (other than a registration statement relating either to the sale of securities to employees of the Company pursuant to its stock option, stock purchase or similar plan or a transaction pursuant to Rule 145 of the Securities Act), covering the offer and sale of Common Stock to the public for the account of the Company in which the aggregate gross proceeds to the Company exceeds $50,000,000, or such time as the Common Stock is listed on a national securities exchange; or

(c)    The closing of the sale or other transfer of all or substantially all of the assets of the Company.

13.    Miscellaneous.

(a)    Rights and Obligations of the Stockholders.  The parties hereto agree and acknowledge that nothing contained herein, and no Stockholder's status as a stockholder of the Company, shall prevent or prohibit such Stockholder from (i) serving any other person or entity in any capacity such Stockholder may deem appropriate, (ii) conducting its business and affairs in any manner it may elect, or (iii) acquiring, pursuing or otherwise engaging in any business that is competitive with the business now or hereafter conducted by the Company (or any of its subsidiaries), and the Company hereby waives any claim against the Stockholders or their affiliates with respect thereto.

(b)     Certain Definitions.  Shares "*held*" by a Stockholder shall mean any Shares directly or indirectly owned (of record or beneficially) by such Stockholder or as to which such Stockholder has voting power.  "*Vote*" shall include any exercise of voting rights whether at an annual or special meeting or by written consent or in any other manner permitted by applicable law.

(c)     Notices.  All notices, requests, demands, consents, instructions or other communications required or permitted hereunder shall be in writing and faxed, e-mailed, mailed, or delivered to each party as follows:  (x) if to a Stockholder, at such Stockholder's address, facsimile number or e-mail address set forth in the Company's records, or at such other address, facsimile number or e-mail address as such Stockholder shall have furnished the Company in writing, or (y) if to the Company, to LMH I, Inc. at the address set forth on the signature pages hereto, or at such other address or facsimile number as the Company shall have furnished to the Stockholders in writing.  All such notices and communications will be deemed effectively given the earlier of (i) when received, (ii) when delivered personally, (iii) one business day after being delivered by facsimile or e-mail (with receipt of appropriate confirmation), (iv) one business day after being deposited with an overnight courier service of recognized standing or (v) five days after being deposited in the U.S. mail, first class with postage prepaid.  With respect to any notice given by the Company under any provision of the Delaware General Corporation Law or the Company's certificate of incorporation or bylaws, each Stockholder agrees that such notice may be given by facsimile or by electronic mail.  In the event of any conflict between the Company's books and records and this Agreement or any notice delivered hereunder, the Company's books and records will control absent fraud or error.

(d)     Successors and Assigns.  The provisions of this Agreement shall inure to the benefit of, and be binding upon, the successors, assigns, heirs, executors and administrators of the parties hereto.  The Company shall not permit the transfer of any Shares on its books or issue a new certificate representing any Shares unless and until the person to whom such security is to be transferred shall have executed a written agreement pursuant to which such person becomes a party to this Agreement and agrees to be bound by all the provisions hereof as if such person was a Stockholder hereunder.

(e)     Governing Law.  This Agreement shall be governed in all respects by the internal laws of the State of Delaware as applied to agreements entered into among Delaware residents to be performed entirely within Delaware, without regard to principles of conflicts of law.

(f)     Titles and Subtitles.  The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.  All references in this Agreement to sections, paragraphs and exhibits shall, unless otherwise provided, refer to sections and paragraphs hereof and exhibits attached hereto.

(g)     Further Assurances.  Each party hereto agrees to execute and deliver, by the proper exercise of its corporate, limited liability company, partnership or other powers, all such other and additional instruments and documents and so all such other acts and things as may be necessary to more fully effectuate this Agreement.

(h)     Entire Agreement.  This Agreement and the exhibits hereto constitute the full and entire understanding and agreement between the parties with regard to the subjects hereof.  No party hereto shall be liable or bound to any other party in any manner with regard to the subjects hereof or thereof by any warranties, representations or covenants except as specifically set forth herein.

(i)     No Grant of Proxy. Nothing in this Agreement grants any proxy and should not be interpreted as doing so.  Nevertheless, should the provisions of this Agreement be construed to

constitute the granting of proxies, such proxies shall be deemed coupled with an interest and are irrevocable for the term of this Agreement.

(j)  Not a Voting Trust.  This Agreement is not a voting trust governed by Section 218 of the Delaware General Corporation Law and should not be interpreted as such.

(k)  Amendment.  Except as expressly provided herein, neither this Agreement nor any term hereof may be amended, waived, discharged or terminated other than by a written instrument referencing this Agreement and signed by (i) the Company, (ii)(a) with regard to all Sections other than Sections 1, 2, 3, 4, 5(b)(ii), 6, 12 and 13, Stockholders holding a majority of the shares of Common Stock then outstanding and (b) with regard to Sections 1, 2, 3, 4, 5(b)(ii), 6, 12 and 13, Stockholders holding 65% of the shares of Common Stock then outstanding and (iii) Cetus so long as Cetus holds at least 5% of the outstanding shares of Common Stock; *provided, however*, that in the event such amendment or waiver adversely affects the rights or obligations of a Stockholder in a different manner than all other Stockholders, such amendment or waiver shall also require the written consent of such adversely affected Stockholder (it being understood and agreed upon by the parties hereto that differences in the amounts paid for securities and differences in the number of shares held by Stockholders shall be ignored in determining whether such amendment or waiver adversely affects a Stockholder in a manner different than other Stockholders).  Any such amendment, waiver, discharge or termination effected in accordance with this paragraph shall be binding upon each Stockholder that has entered into this Agreement.  Each Stockholder acknowledges that by the operation of this paragraph, the Company and the holders of a majority of the shares of Common Stock then outstanding will have the right and power to diminish or eliminate all rights of each Stockholder under this Agreement.

(l)  No Waiver.  The failure or delay by a party to enforce any provision of this Agreement will not in any way be construed as a waiver of any such provision or prevent that party from thereafter enforcing any other provision of this Agreement.  The rights granted both parties hereunder are cumulative and will not constitute a waiver of either party's right to assert any other legal remedy available to it.

(m)  Severability.  If any provision of this Agreement becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable or void, portions of such provision, or such provision in its entirety, to the extent necessary, shall be severed from this Agreement, and such court will replace such illegal, void or unenforceable provision of this Agreement with a valid and enforceable provision that will achieve, to the extent possible, the same economic, business and other purposes of the illegal, void or unenforceable provision.  The balance of this Agreement shall be enforceable in accordance with its terms.

(n)  Counterparts.  This Agreement may be executed in one or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same agreement.  Facsimile copies of signed signature pages will be deemed binding originals.

(o)  Spousal Consent.  If any individual Stockholder is married on the date such Stockholder becomes a party, or subject, to this Agreement, such Stockholder's spouse shall execute and deliver to the Company a consent of spouse in the form of Exhibit B hereto (*"Consent of Spouse"*), effective on the date hereof or thereof.  Notwithstanding the execution and delivery thereof, such consent shall not be deemed to confer or convey to the spouse any rights in such Stockholder's Shares that do not otherwise exist by operation of law or the agreement of the parties.  If any individual Stockholder should marry or remarry subsequent to the date such Stockholder becomes a party, or subject, to this Agreement, such Stockholder shall within thirty (30) days thereafter obtain his/her new spouse's acknowledgement of and consent to the existence and binding effect of all restrictions contained in this Agreement by causing

such spouse to execute and deliver a Consent of Spouse acknowledging the restrictions and obligations contained in this Agreement and agreeing and consenting to the same.

*[Remainder of Page Intentionally Blank]*

IN WITNESS WHEREOF, the parties have executed this Agreement on the day, month and year first set forth above.

**"Company"**

**LMH I, Inc.**

By: _____

     Mark P. Laven, President

Address:

787 Watervliet Shaker Road
Latham, NY 12110
Facsimile: (518) 783-0004

**"Stockholders"**

[_____]

By:
Its:



By: _____

Address:

## Schedule A

### Shares of Common Stock Held by Each Stockholder

| Stockholder | Shares of Common Stock |
|---|---|
| | |

**Total**

## Exhibit A

## Adoption Agreement

This Adoption Agreement ("***Adoption Agreement***") is executed by the undersigned (the "***Transferee***") pursuant to the terms of that certain Stockholders' Agreement dated as of January ___, 2010 (the "***Agreement***") by and among LMH I, Inc., a Delaware corporation (the "***Company***"), and certain of its stockholders. Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Agreement. By the execution of this Adoption Agreement, the Transferee agrees as follows:

(a)     <u>Acknowledgment</u>.  Transferee acknowledges that Transferee is acquiring Shares of the capital stock of the Company, subject to the terms and conditions of the Agreement.

(b)     <u>Agreement</u>.  Transferee (i) agrees that the Shares acquired by Transferee shall be bound by and subject to the terms of the Agreement, and (ii) hereby adopts the Agreement with the same force and effect as if Transferee were originally a party thereto.

(c)     <u>Notice</u>.  Any notice required or permitted by the Agreement shall be given to Transferee at the address listed beside Transferee's signature below.

EXECUTED AND DATED this _____ day of _____, 20___.

**TRANSFEREE:**

_____

(Signature)

_____

(Print Name of Individual Whose Signature Appears Above)

_____

(If Transferee is an Entity, Print Legal Name of Transferee)

_____
(If Transferee is an Entity, Print Title of Signing Party)

**Consent of Spouse**


I, _____, spouse of _____, acknowledge that I have read the Stockholders' Agreement, dated as of January ___, 2010, to which this Consent is attached as <u>Exhibit B</u> (the "*Agreement*") and that I know the contents of the Agreement. I am aware that the Agreement contains certain provisions regarding the voting of shares of capital stock of the Company as well as provisions granting certain rights to certain other holders of capital stock of the Company upon the sale or other disposition of shares of Common Stock of the Company which my spouse may own including any interest I might have therein.

I hereby agree that my interest, if any, in any shares of capital stock of the Company subject to the Agreement shall be irrevocably bound by the Agreement and further understand and agree that any community property interest I may have in such shares of capital stock of the Company shall be similarly bound by the Agreement.

<u>I am aware that the legal, financial and related matters contained in the Agreement are complex and that I am free to seek independent professional guidance or counsel with respect to this Consent. I have either sought such guidance or counsel or determined after reviewing the Agreement carefully that I will waive such right.</u>


Dated as of the _____ day of _____, _____.




_____
(Signature)


_____
Print Name